UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X

CIT BANK, N.A.,

                                                    Plaintiff

                        -against-

WILLIAM COVINO; BOARD OF DIRECTORS OF
EAGLE WOOD VISTAS HOMEOWNERS
ASSOCIATION, INC.,

                                                    Defendants

-----------------------------------------------------------------------X

Civil Action No.

17-cv-09579-NSR

**AFFIDAVIT IN SUPPORT OF
MOTION FOR SUMMARY
JUDGMENT**

**Mortgaged Premises**: 10
Eaglewood Vista Lane
Warwick, NY 10990

STATE OF CALIFORNIA    )
                       ) ss
COUNTY OF ORANGE       )

    Ron McMahan, being duly sworn, deposes and says:

    1.      I am a CEO of American Mortgage Investment Partners Management, LLC

(hereinafter "AMIP"), administrator and attorney-in-fact for Plaintiff's assignee Wilmington

Savings Fund Society, FSB, as Owner Trustee of the Residential Credit Opportunities Trust VI-

A (hereinafter "Wilmington"). In that capacity, I am responsible for the maintenance and review

of internal foreclosure and loan specific documents. As such, I am fully familiar with the facts

and circumstances set forth herein and am authorized to sign this affidavit on Wilmington's

behalf.  A copy a Limited Power of Attorney between AMIP and Wilmington is attached hereto

as **Exhibit 1**.

    2.      AMIP maintains business records for the subject loan on behalf of Wilmington

and I am familiar with AMIP and Wilmington's business and record-keeping practices. As part of

my job responsibilities for AMIP, I am personally familiar with the type of records maintained

by AMIP on Wilmington's behalf. The information contained in this affidavit is taken from AMIP's business records. I have personal knowledge of AMIP's procedures for creating and maintaining these records. These records are made at the time of the act, transaction, occurrence or event, or within a reasonable time thereafter, by a person with knowledge, and are made in the course of business activity conducted regularly by Wilmington. These records include data compilations (including the date certain original documents such as original promissory notes were received), electronic images of documents, and a wide array of supplementary documentation. The business records, such as transaction and payment histories, that were created by prior holders and/or servicers of the loan have been integrated into AMIP's business records and are kept and relied upon as a regular business practice and in the ordinary course of business conducted by AMIP. I have personal knowledge of these procedures for integrating prior servicer records.

3.      I submit this affidavit in support of Wilmington's motion for, *inter alia*, summary judgment (hereinafter "Summary Judgment Motion"), based upon my own personal knowledge of how AMIP's business records are kept in the course of its regularly conducted business activities, and based upon knowledge that I have acquired by reviewing the specific business records as they relate to the mortgage loan of William Covino (hereinafter "Defendant").

4.      According to the aforementioned business records, on May 16, 2007, Defendant executed and delivered a note to IndyMac Bank, F.S.B., for the sum of $752,000.00, with interest to be computed pursuant to the terms thereof (hereinafter "Note"). A true and correct copy of the Note containing the allonges firmly affixed thereto is annexed hereto as **Exhibit 2**.

5.     As security for payment of this debt, on May 16, 2007, Defendant executed a mortgage to IndyMac Bank, F.S.B., which encumbered the premises located at 10 Eaglewood Vista Lane, Warwick, NY 10990 (hereinafter "Mortgaged Premises"). The mortgage was recorded in the Orange County Clerk's Office on June 13, 2007, in Book 12465, Page 1751 (hereinafter "Mortgage"). A true and correct copy of the Mortgage is annexed hereto as **Exhibit 3**.

6.     At origination of the loan and as part of the closing, on May 17, 2007, Defendant executed a "Notice to Customer Required by Law and Federal Reserve Regulation Z". A true and correct copy of the Notice is annexed hereto as **Exhibit 4**.

7.     On March 19, 2009, the FDIC as Receiver of IndyMac sold the Note to OneWest Bank, FSB ("OneWest"). The sale was memorialized with an Assignment of Mortgage from IndyMac to OneWest dated August 21, 2009, recorded in the Orange County Clerk's Office in Book 12465, Page 1751. A copy of the Assignment of Mortgage and Purchase Agreements are annexed hereto as **Exhibit 5**.

8.     On or about November 1, 2010, Defendant modified the terms of the Note and Mortgage by execution of a loan modification agreement with OneWest (the "Modification Agreement"). A true and correct copy of the Modification Agreement is annexed hereto as **Exhibit 6**.

9.     On February 28, 2014, the Office of the Comptroller of the Currency ("OCC") approved an application to change OneWest Bank, FSB's charter from that of a federal savings association to a national association. OneWest Bank, FSB's name was changed to OneWest Bank, N.A. Documentation of the change is annexed hereto as **Exhibit 7**.

10.     On August 3, 2015, OneWest Bank, N.A. merged with CIT Bank, Salt Lake City, UT and became CIT Bank, N.A. *See* **Exhibit 8**.

11.     According to the business records I have reviewed (which records include the payment history of the subject loan obtained from prior servicers, that have been integrated into AMIP's business records and are kept and relied upon as a regular business practice and in the ordinary course of business conducted by AMIP, Defendant defaulted under the terms of the loan documents by failing to make the monthly installment due on November 11, 2016 and has remained in default to the present date.  A true and correct copy of the loan history is annexed hereto as **Exhibit 9**.

12.     Following the commencement of this action, on June 17, 2021, the Note and Mortgage were sold and assigned to Wilmington pursuant to a written assignment.  A true and correct copy of the assignment is annexed hereto as **Exhibit 10**. Accordingly, it is requested that Wilmington Savings Fund Society, FSB, as Owner Trustee of the Residential Credit Opportunities Trust VI-A be substituted in the place and stead of CIT BANK, N.A.

AMIP Management, as administrator and attorney-in-fact for Plaintiff's assignee, Wilmington Savings Fund Society, FSB, as Owner Trustee of the Residential Credit Opportunities Trust VI-A

By: _____

Print Name: Ron McMahan

Title: CEO of American Mortgage Investment Partners Management, LLC

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

Sworn to before me on this
____ day of _____, 2021

_____
Notary Public

VALYA FISHER
Notary Public - California
Orange County
Commission # 2283516
My Comm. Expires Mar 29, 2023

4

ACKNOWLEDGED OUTSIDE THE STATE OF NEW YORK

*A Notary Public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.*

State of California
County of Orange

On ___7 | 9 | 2021___ before me, Valya Fisher,   the undersigned Notary Public, personally appeared Ron McMahan, who proved to me on the basis of satisfactory evidence which was state-issued driver's license, to be the person whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity voluntarily for its stated purpose and that by his signature on the instrument the person or the entity upon behalf of which the person acted, executed the instrument.

I certify under penalty of perjury under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal

Signature_____
              Valya Fisher, Notary Public

VALYA FISHER
Notary Public - California
Orange County
Commission # 2283516
My Comm. Expires Mar 29, 2023

# Exhibit 1

DOCUMENT DRAFTED BY AND
RECORDING REQUESTED BY:
American Mortgage Investment Partners Management, LLC
3020 Old Ranch Parkway,
Suite 180,
Seal Beach,
California 90740

_____

SPACE ABOVE THIS LINE FOR RECORDER'S USE

## LIMITED POWER OF ATTORNEY

Wilmington Savings Fund Society, FSB, a federal savings bank ("Trustee"), not in its individual capacity but solely as Trustee for Home Preservation Partnership Trust, having an office at 500 Delaware Avenue, 11th Floor, Wilmington, Delaware 19801 (the "Trust"), hereby constitutes and appoints **Residential Credit Opportunities Trust VI-A**, c/o Wilmington Savings Fund Society, FSB, d/b/a Christiana Trust, 500 Delaware Avenue, 11th Floor, Wilmington, Delaware 19801 (the "Purchaser") and the Purchaser's designated agent, **American Mortgage Investment Partners Management, LLC**, having an address of 3020 Old Ranch Parkway, Suite 180, Seal Beach, California 90740 (the "Purchasers' Agent"), as its true and lawful Attorney-in-Fact, in Trustee's name, place and stead and for its use and benefit, to execute and acknowledge in writing or by facsimile stamp all documents customarily and reasonably necessary and appropriate for the tasks described in items (1) through (2) below in connection with that certain Assignment and Assumption Agreement, dated October 28, 2020 (the "Assignment Agreement"), by and among the Trust, the Purchaser and Residential Credit Opportunities VI-AB, LLC. This Limited Power of Attorney is being issued solely in connection with those mortgage loans subject to the terms of the Assignment Agreement (the "Mortgage Loans") and the conveyance of title related thereto. The said attorney-in fact is hereby authorized and empowered, as follows:

1.  To endorse the promissory note or equivalent for each Mortgage Loan to the Purchaser (or trustee of the Purchaser) where the Purchaser, bears full responsibility for ensuring such endorsements are in a form that complies with applicable local, state and federal law. The authorization for endorsement is strictly limited to endorsement of such Mortgage Loan promissory notes to the Purchaser (or trustee of the Purchaser). Any endorsement to any other entity other than the Purchaser (or trustee of the Purchaser) shall be void.

2.  To execute an assignment of mortgage, deed of trust, allonges or equivalent for each Mortgage Loan to the Purchaser (or trustee of the Purchaser) where the Purchaser, bears full responsibility for ensuring such assignments are in a form that complies with applicable local, state and federal law. The authorization for assignment is strictly limited to assignment of mortgage of Mortgage Loans to the Purchaser (or trustee of the Purchaser). Any assignment to any other entity other than the Purchaser (or trustee of the Purchaser) shall be void.

This appointment is to be construed and interpreted as a Limited Power of Attorney. The enumeration of specific items, rights, acts or powers herein is not intended to, nor does it give rise to, and it is not to be construed as a general power of attorney.

Third parties without actual notice may rely upon the exercise of the power granted under this Limited Power of Attorney; and may be satisfied that this Limited Power of Attorney shall continue in full force and effect and has not been revoked unless an instrument of revocation has been made in writing by the undersigned.

It is expressly understood and agreed by the Attorneys and any person relying on this Power of Attorney that (a) this Power of Attorney is executed and delivered by Wilmington Savings Fund Society, FSB, not individually or personally, but solely as Trustee (the "Trustee") for the Trust, in the exercise of the powers and authority conferred and vested in it, (b) each of the representations, undertakings and agreements made in this Power of Attorney on the part of the Trust or Trustee is made and intended not as personal representations, undertakings and agreements by Wilmington Savings Fund Society, FSB but is made and intended for the purpose of binding only the Trust, (c) nothing herein contained shall be construed as creating any liability on Wilmington Savings Fund Society, FSB, individually or personally, to perform any covenant either expressed or implied contained herein of the Trustee or the Trust, all such liability, if any, being expressly waived by the Attorneys and any person relying on this power of attorney and by any person claiming by, through or under the Attorneys or such person, (d) Wilmington Savings Fund Society, FSB has made no investigation as to the accuracy or completeness of any representations and warranties made herein and (e) under no circumstances shall Wilmington Savings Fund Society, FSB be personally liable for the payment of any indebtedness or expenses of the Trustee or Trust be liable for the breach or failure of any obligation, representation, warranty or covenant made or undertaken by the Trustee or Trust under this Power of Attorney or any other related documents.

Notwithstanding anything herein to the contrary, this Power of Attorney does not, and is not intended to, and will not be construed to, grant any authority to the Attorneys to (i) expand, increase, incur, or otherwise impose any duties, liabilities or obligations of or on the Trustee, as trustee or in its individual capacity, or (ii) provide any guaranty, indemnity or property of the Trustee, as trustee or in its individual capacity, for any reason whatsoever.

**[Signature Page Follows]**

2

**Witness** my hand and seal this 16th day of November 2020.

**NO CORPORATE SEAL**

Wilmington Savings Fund Society, FSB, not in its individual capacity but solely as Trustee for Home Preservation Partnership Trust

By: _____

_____
Witness: Tara Tresolini

Name: Mary Emily Pagano

Title: Assistant Vice President

_____
Witness: Rob Moses

_____
Attest: Sean Pearce

*Acknowledged outside the state of New York*

**CORPORATE ACKNOWLEDGMENT**

STATE OF Delaware

              : ss.

COUNTY OF New Castle

On the 16th day of November, in the year 2020, before me, the undersigned, a Notary Public in and for said State, personally appeared Mary Emily Pagano a(n) Assistant Vice President of Wilmington Savings Fund Society, FSB personally known to me (or proved to me on the basis of satisfactory evidence) to be the individual whose name is subscribed to the within instrument, and acknowledged to me that he/she executed the same in his/her authorized capacity and that by his/her signature on the instrument, the entity upon behalf of which the individual acted, executed the instrument.

WITNESS my hand and official seal.

Signature: _____

My commission expires: August 13, 2023

ARIANA JUNE MAGUIRE
NOTARY
PUBLIC
My Commission
Expires on
Aug 13, 2023
STATE OF DELAWARE

3

# Exhibit 2

FIXED/ADJUSTABLE   RATE NOTE
(1 Year Libor Index - Rate Caps)

Loan #: 126189255-PERM

**THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE AND MY MONTHLY PAYMENT. THIS NOTE LIMITS THE AMOUNT MY INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE I MUST PAY.**

May 16, 2007                      NEWPORT BEACH                        California
  [Date]                              [City]                              [State]

10 Eagle Wood Vista Lane
Warwick, NY 10990

[Property Address]

**1.   BORROWER'S PROMISE TO PAY**

In return for a loan that I have received, I promise to pay U.S. $752,000.00          (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is
INDYMAC BANK, F. S. B.
a federally chartered savings bank
I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

**2.   INTEREST**

This Note, as amended by the attached Residential Construction Loan Addendum Amending Note (the "Addendum"), represents both a construction/home improvement loan and a permanent mortgage loan. During the Construction Period of the loan, the Note Holder will advance funds in accordance with the Residential Construction Loan Agreement. The "Construction Period" is defined as the period beginning on the date of the Note and ending on the first day of the month preceding the due date of the first monthly payment of principal and interest stated in the Note ("Permanent Loan Commencement Date") if Completion (as defined in the Residential Construction Loan Agreement) has occurred before that date in accordance with the Residential Construction Loan Agreement. If Completion has not occurred by that date, I will be in default under the Addendum and under this Note. If Completion has occurred prior to the Permanent Loan Commencement Date, then the loan evidenced by this Note will automatically become a permanent mortgage loan on the Permanent Loan Commencement Date, and the provisions of the Addendum will cease to be in effect and all terms and conditions of the loan will be as set forth in this Note on the Permanent Loan Commencement Date.

I will pay interest beginning on the Permanent Loan Commencement Date at the Initial Interest Rate. The "Initial Interest Rate" will be calculated by adding (i) the Index described in Section 4(B) of this Note that is most recently available as of the day that is 45 days prior to the Permanent Loan Commencement Date, to (ii) the Margin described in Section 4(C), and (iii)    Three and Three Quarters                          percentage points ( 3.750            %), and rounding the result to the nearest one-eighth percentage point (0.125%), except that the Initial Interest Rate may not be more than the Maximum Rate shown in Section 4(D) of this Note. If Completion (as defined in the Residential Construction Loan Agreement) has occurred on schedule and the Permanent Loan Commencement Date therefore occurs on or before the required Completion Date set forth in the Residential Construction Loan Agreement, and if there has been no default on or before that date under the Note or the Residential Construction Loan Agreement, then I will have a one-time option to choose to have the interest rate set forth in Section 2(A) of the Residential Construction Loan Addendum Amending Note carry over and be the Initial Interest Rate instead of having the Initial Interest Rate determined in accordance with the preceding formula. If I want to exercise this option, I will notify the Note Holder in writing prior to the Permanent Loan Commencement Date.

The interest rate I will pay will change in accordance with Section 4 of this Note.

The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

IndyMac Bank
Construction-to-Perm    Adjustable  Rate  Note
Intermediate · Libor ARMs · Multistate                                    Initials:
8440336  (0205)                                                                                                  HCL 1012
DDS-1FI                              Page 1 of 5                                                                  01405
                           VMP Mortgage Solutions, Inc. (800) 521-7291

3.   **PAYMENTS**

(A) Time and Place of Payments

I will pay Principal and interest by making a payment every month.

I will make my monthly payment on the 1st   day of each month beginning on      July 1, 2008      . I will make these payments every month until I have paid all of the Principal and Interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on     June 1, 2038     , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at   3465 EAST FOOTHILL BLVD

PASADENA, CA 91107

or at a different place if required by the Note Holder.

(B) Amount of My Initial Monthly Payments

Each of my initial monthly payments will be in an amount calculated as follows (the "Initial Payment Amount"). After determining the Initial Interest Rate, the Note Holder will determine the' amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Permanent Loan Commencement Date in full on the Maturity Date at my Initial Interest Rate in substantially equal payments. My Initial Payment Amount will change in accordance with Sections 3(C) and 4(C) of this Note.

(C) Monthly Payment Changes

Changes in my monthly payment will reflect changes in the unpaid principal of my loan and in the interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 of this Note.

4.   **INTEREST RATE AND MONTHLY PAYMENT CHANGES**

(A) Change Dates

The interest rate I will pay may change on the      1st      day of June, 2013                , and on that day every 12th month thereafter. Each date on which my interest rate could change is called a "Change Date."

(B) The Index

Beginning with the first Change Date, my adjustable interest rate will be based on an Index. The "Index" is the average of Interbank offered rates for one-year U.S. dollar-denominated deposits in the London market ("Libor"), as published in *The Wall Street Journal.*

If the Index is no longer available, the Note Holder will choose a new index which is based upon comparable information. The Note Holder will give me notice of this choice.

(C) Calculation of Changes

Before each Change Date, the Note Holder will calculate my new interest rate by adding      Three and Three Quarters percentage point(s) (      3.750 %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

(D) Limits on Interest Rate Changes

The interest rate I am required to pay at the first Change Date will not be greater than      13.375 % or less than     3.750 %.  Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than      Two      percentage points (s) (     2.000 %) from the rate of interest I have been paying for the preceding 12 months.  My interest rate will never be greater than     13.375 %.

Initials: _____ (W)

(E) Effective Date of Changes

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

(F) Notice of Changes

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**5.    BORROWER'S  RIGHT TO PREPAY**

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due dates of my monthly payment unless the Note Holder agrees in writing to those changes. My partial Prepayment may reduce the amount of my monthly payments after the first Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

**6.    LOAN CHARGES**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced  by the amount necessary  to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose  to make this refund by reducing  the Principal I owe under this Note or by making  a direct payment to me. If a refund reduces  Principal, the reduction will be treated as a partial Prepayment.

**7.    BORROWER'S  FAILURE TO PAY AS REQUIRED**

(A) Late Charges  for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of  15       calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be        2.000 % of my overdue payment of Principal and interest.  I will pay this late charge promptly but only once on each late payment.

(B) Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

(C) Notice of Default

If I am in default, the Note Holder may send  me a written notice telling me that if I do not pay the overdue  amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

(D) No Waiver By Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

(E) Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable  attorneys'  fees.

8.   **GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

9.   **OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

10.  **WAIVERS**

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

11.  **UNIFORM SECURED NOTE**

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

(A) Until my initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section 4 above, Uniform Covenant 18 of the Security Instrument shall read as follows:

Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

(B) When my initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section 4 above, Uniform Covenant 18 of the Security Instrument described in Section 11(A) above shall then cease to be in effect, and Uniform Covenant 18 of the Security Instrument shall instead read as follows:

Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)
WILLIAM COVINO                    -Borrower

_____ (Seal)
                                  -Borrower

_____ (Seal)
                                  -Borrower

_____ (Seal)
                                  -Borrower

_____ (Seal)
                                  -Borrower

_____ (Seal)
                                  -Borrower

_____ (Seal)
                                  -Borrower

_____ (Seal)
                                  -Borrower

*[Sign Original Only]*

## ALLONGE TO NOTE

**Loan #        129510289**

For purposes of further endorsement of the following described Note, the allonge is affixed and becomes a permanent part of said Note.

**Loan Amount:        $752,000.00**

**Note Date:        5/16/2007**

**Borrower(s) Name:   WILLIAM COVINO**

**Address:            10  EAGLE WOOD VISTA LANE**

**WARWICK, NY  10990**

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**PAY TO THE ORDER OF: ONEWEST BANK, FSB, WITHOUT RECOURSE**

_Sue North_

**Sue North**
**Attorney In-Fact**
**FEDERAL DEPOSIT INSURANCE CORPORATION as Receiver for Indymac Federal Bank, FSB, successor to Indymac Bank, F.S.B.**

## ALLONGE TO NOTE

**Loan #        129510289**

For purposes of further endorsement of the following described Note, the allonge is
affixed and becomes a permanent part of said Note.

**Loan Amount:**        **$752,000.00**

**Note Date:**        **5/16/2007**

**Borrower(s) Name:**   **WILLIAM COVINO**

**Address:**            **10  EAGLE WOOD VISTA LANE**

                   **WARWICK, NY  10990**

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**PAY TO THE ORDER OF: CIT Bank, N.A., Without Recourse**

**By:** _____

**Name:  Pamela Ota**

**Title:   Assistant Vice President**

           **OneWest Bank, FSB**

**ALLONGE TO NOTE**

**Loan #**     **129510289**

For purposes of further endorsement of the following described Note, the allonge is affixed and becomes a permanent part of said Note.

**Loan Amount:**     $752,000.00

**Note Date:**     5/16/2007

**Borrower(s) Name:**  WILLIAM COVINO

**Address:**        10  EAGLE WOOD VISTA LANE

                    WARWICK, NY  10990

*********************************************************************************************************

**PAY TO THE ORDER OF:**

_____

**Without Recourse**

**By:**  _____

**Name:**  Pamela Ota

**Titile:**    **Assistant Vice President**

            **CIT Bank, N.A.**

# Exhibit 3

# ORANGE COUNTY CLERK'S OFFICE RECORDING PAGE
## THIS PAGE IS PART OF THE INSTRUMENT – DO NOT REMOVE

TYPE IN BLACK INK:
NAME(S) OF PARTY(S) TO DOCUMENT

WILLIAM COUINO

TO

INDYMAC BANK FSB

SECTION __24__ BLOCK __1__ LOT __45.2__

RECORD AND RETURN TO:
(name and address)

INDYMAC BANK
3465 E. FOOTHILL BLVD.
PASADENA, CA 91107

THIS IS PAGE ONE OF THE RECORDING

ATTACH THIS SHEET TO THE FIRST PAGE OF EACH
RECORDED INSTRUMENT ONLY

## DO NOT WRITE BELOW THIS LINE

INSTRUMENT TYPE: DEED____ MORTGAGE ✓ SATISFACTION____ ASSIGNMENT____ OTHER_____

### PROPERTY LOCATION

| | | | |
|---|---|---|---|
| ___2089 BLOOMING GROVE (TN) | ___4289 MONTGOMERY (TN) | NO. PAGES _31_ CROSS REF._____ | |
| ___2001 WASHINGTONVILLE (VLG) | ___4201 MAYBROOK (VLG) | CERT. COPY_____ ADD'L X-REF._____ | |
| ___2003 SO. BLOOMING GROVE (VLG) | ___4203 MONTGOMERY (VLG) | MAPS_____ PGS._____ | |
| ___2289 CHESTER (TN) | ___4205 WALDEN (VLG) | | |
| ___2201 CHESTER (VLG) | ___4489 MOUNT HOPE (TN) | PAYMENT TYPE: CHECK ✓ | |
| ___2489 CORNWALL (TN) | ___4401 OTISVILLE (VLG) | CASH_____ | |
| ___2401 CORNWALL (VLG) | ___4600 NEWBURGH (TN) | CHARGE_____ | |
| ___2600 CRAWFORD (TN) | ___4800 NEW WINDSOR (TN) | NO FEE_____ | |
| ___2800 DEERPARK (TN) | ___5089 TUXEDO (TN) | Taxable | |
| ___3089 GOSHEN (TN) | ___5001 TUXEDO PARK (VLG) | CONSIDERATION $_____ | |
| ___3001 GOSHEN (VLG) | ___5200 WALLKILL (TN) | TAX EXEMPT_____ | |
| ___3003 FLORIDA (VLG) | ✓5489 WARWICK (TN) | Taxable | |
| ___3005 CHESTER (VLG) | ✓5401 FLORIDA (VLG) | MORTGAGE AMT. $ _752,000_ | |
| ___3200 GREENVILLE (TN) | ___5403 GREENWOOD LAKE (VLG) | | |
| ___3489 HAMPTONBURGH (TN) | ___5405 WARWICK (VLG) | | |
| ___3401 MAYBROOK (VLG) | ___5600 WAWAYANDA (TN) | MORTGAGE TAX TYPE: | |
| ___3689 HIGHLANDS (TN) | ___5889 WOODBURY (TN) | ___ (A) COMMERCIAL/FULL 1% | |
| ___3601 HIGHLAND FALLS (VLG) | ___5801 HARRIMAN (VLG) | ✓(B) 1 OR 2 FAMILY | |
| ___3889 MINISINK (TN) | ___5809 WOODBURY (VLG) | ___ (C) UNDER $10,000 | |
| ___3801 UNIONVILLE (VLG) | CITIES | ___ (E) EXEMPT | |
| ___4089 MONROE (TN) | ___0900 MIDDLETOWN | ___ (F) 3 TO 6 UNITS | |
| ___4001 MONROE (VLG) | ___1100 NEWBURGH | ___ (I) NAT.PERSON/CR. UNION | |
| ___4003 HARRIMAN (VLG) | ___1300 PORT JERVIS | ___ (J) NAT.PER-CR.UN/1 OR 2 | |
| ___4005 KIRYAS JOEL (VLG) | | ___ (K) CONDO | |
| | ___9999 HOLD | | |

**DONNA L. BENSON**
ORANGE COUNTY CLERK

Received From ___Forshes___



RECORDED/FILED
06/13/2007/  14:11:21
County Clerk
DONNA L. BENSON
ORANGE COUNTY, NY
FILE # 20070067112
MORT/BK 12465 PG 1751
SER# CY005245 MTAX 7,866.00
BASIC 3,760.00
MTA  2,226.00
SPECIAL 0.00
SPECIAL ASST  1,880.00
RECORDING FEES  118.00
Receipt#749205 juls

Return To:
INDYMAC BANK, F. S. B.
3465 EAST FOOTHILL BLVD
PASADENA, CA 91107

Prepared By:
INDYMAC BANK, F. S. B.
3465 EAST FOOTHILL BLVD
PASADENA, CA 91107

——————————————————— [Space Above This Line For Recording Data] ———————————————————

# MORTGAGE

Loan Number: 126189255-PERM

## WORDS USED OFTEN IN THIS DOCUMENT

(A) "Security Instrument." This document, which is dated        May 16, 2007
together with all Riders to this document, will be called the "Security Instrument."

(B) "Borrower."
WILLIAM COVINO, A SINGLE MAN

whose address is   28 NORTH DRIVE
ROCHELLE PARK, NJ 07662
sometimes will be called "Borrower" and sometimes simply "I" or "me."

(C) "Lender." INDYMAC BANK, F. S. B.,
a federally chartered savings bank
will be called "Lender." Lender is a corporation or association which exists under the laws of
                                 . Lender's address is
3465 EAST FOOTHILL BLVD
PASADENA, CA 91107

| Section: | Block: | Lot: | Unit: |
|---|---|---|---|

NEW YORK - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT                Form 3033 1/01
Wolters Kluwer Financial Services
VMP ® -6(NY) (0508).01
Page 1 of 17          Initials: _____
DDS-NY8

**(D) "Note."** The note signed by Borrower and dated                    May 16, 2007                   , will be called the "Note." The Note shows that I owe Lender

Seven Hundred Fifty-Two Thousand and 00/100                                                                                    **Dollars** (U.S. $ 752,000.00          ) plus interest and other amounts that may be payable. I have promised to pay this debt in Periodic Payments and to pay the debt in full by          June 1, 2038

**(E) "Property."** The property that is described below in the section titled "Description of the Property," will be called the "Property."

**(F) "Loan."** The "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

**(G) "Sums Secured."** The amounts described below in the section titled "Borrower's Transfer to Lender of Rights in the Property" sometimes will be called the "Sums Secured."

**(H) "Riders."** All Riders attached to this Security Instrument that are signed by Borrower will be called "Riders." The following Riders are to be signed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| [X] Adjustable Rate Rider | [ ] Condominium Rider | [ ] Second Home Rider |
| [ ] Balloon Rider | [ ] Planned Unit Development Rider | [ ] 1-4 Family Rider |
| [ ] VA Rider | [ ] Biweekly Payment Rider | [X] Other(s) [specify] Construction Rider |

**(I) "Applicable Law."** All controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable, judicial opinions will be called "Applicable Law."

**(J) "Community Association Dues, Fees, and Assessments."** All dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization will be called "Community Association Dues, Fees, and Assessments."

**(K) "Electronic Funds Transfer."** "Electronic Funds Transfer" means any transfer of money, other than by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Some common examples of an Electronic Funds Transfer are point-of-sale transfers (where a card such as an asset or debit card is used at a merchant), automated teller machine (or ATM) transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

**(L) "Escrow Items."** Those items that are described in Section 3 will be called "Escrow Items."

**(M) "Miscellaneous Proceeds."** "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance Proceeds, as defined in, and paid under the coverage described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) Condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of Condemnation or sale to avoid Condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property. A taking of the Property by any governmental authority by eminent domain is known as "Condemnation."

**(N) "Mortgage Insurance."** "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the Loan.

**(O) "Periodic Payment."** The regularly scheduled amount due for (i) principal and interest under the Note, and (ii) any amounts under Section 3 will be called "Periodic Payment."

**(P) "RESPA."** "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

VMP ® -4(NY) (0500).01                              Page 2 of 17                              Initials:                    Form 3033 1/01
DDS-NY8

## BORROWER'S TRANSFER TO LENDER OF RIGHTS IN THE PROPERTY

I mortgage, grant and convey the Property to Lender subject to the terms of this Security Instrument. This means that, by signing this Security Instrument, I am giving Lender those rights that are stated in this Security Instrument and also those rights that Applicable Law gives to lenders who hold mortgages on real property. I am giving Lender these rights to protect Lender from possible losses that might result if I fail to:

(A) Pay all the amounts that I owe Lender as stated in the Note including, but not limited to, all renewals, extensions and modifications of the Note;

(B) Pay, with interest, any amounts that Lender spends under this Security Instrument to protect the value of the Property and Lender's rights in the Property; and

(C) Keep all of my other promises and agreements under this Security Instrument and the Note .

## DESCRIPTION OF THE PROPERTY

I give Lender rights in the Property described in (A) through (G) below:

(A) The Property which is located at

10 Eagle Wood Vista Lane                                                                                    [Street]

Warwick                                        [City, Town or Village] , New York          10990         [Zip Code].

This Property is in                  Orange                                      County. It has the following legal
description:

LEGAL DESCRIPTION ATTACHED HERETO AND MADE A PART HEREOF

Parcel Number: 24-1-45.2

(B) All buildings and other improvements that are located on the Property described in subsection (A) of this section;

(C) All rights in other property that I have as owner of the Property described in subsection (A) of this section. These rights are known as "easements and appurtenances attached to the Property ;"

(D) All rights that I have in the land which lies in the streets or roads in front of, or next to, the Property described in subsection (A) of this section;

(E) All fixtures that are now or in the future will be on the Property described in subsections (A) and (B) of this section;

(F) All of the rights and property described in subsections (B) through (E) of this section that I acquire in the future; and

(G) All replacements of or additions to the Property described in subsections (B) through (F) of this section and all Insurance Proceeds for loss or damage to, and all Miscellaneous Proceeds of the Property described in subsections (A) through (F) of this section.

VMP @ -4(NY) (0005).01                          Page 3 of 17                                   Form 3033 1/01
DDS-NY8

**BORROWER'S RIGHT TO MORTGAGE THE PROPERTY AND BORROWER'S OBLIGATION TO DEFEND OWNERSHIP OF THE PROPERTY**

I promise that: (A) I lawfully own the Property; (B) I have the right to mortgage, grant and convey the Property to Lender; and (C) there are no outstanding claims or charges against the Property, except for those which are of public record.

I give a general warranty of title to Lender. This means that I will be fully responsible for any losses which Lender suffers because someone other than myself has some of the rights in the Property which I promise that I have. I promise that I will defend my ownership of the Property against any claims of such rights.

**PLAIN LANGUAGE SECURITY INSTRUMENT**

This Security Instrument contains promises and agreements that are used in real property security instruments all over the country. It also contains other promises and agreements that vary in different parts of the country. My promises and agreements are stated in "plain language."

**COVENANTS**

I promise and I agree with Lender as follows:

**1. Borrower's Promise to Pay.** I will pay to Lender on time principal and interest due under the Note and any prepayment, late charges and other amounts due under the Note. I will also pay all amounts for Escrow Items under Section 3 of this Security Instrument.

Payments due under the Note and this Security Instrument shall be made in U.S. currency. If any of my payments by check or other payment instrument is returned to Lender unpaid, Lender may require my payment be made by: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location required in the Note, or at another location designated by Lender under Section 15 of this Security Instrument. Lender may return or accept any payment or partial payment if it is for an amount that is less than the amount that is then due. If Lender accepts a lesser payment, Lender may refuse to accept a lesser payment that I may make in the future and does not waive any of its rights. Lender is not obligated to apply such lesser payments when it accepts such payments. If interest on principal accrues as if all Periodic Payments had been paid when due, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until I make payments to bring the Loan current. If I do not do so within a reasonable period of time, Lender will either apply such funds or return them to me. In the event of foreclosure, any unapplied funds will be applied to the outstanding principal balance immediately prior to foreclosure. No offset or claim which I might have now or in the future against Lender will relieve me from making payments due under the Note and this Security Instrument or keeping all of my other promises and agreements secured by this Security Instrument.

**2. Application of Borrower's Payments and Insurance Proceeds.** Unless Applicable Law or this Section 2 requires otherwise, Lender will apply each of my payments that Lender accepts in the following order:

First, to pay interest due under the Note;

Next, to pay principal due under the Note; and

Next, to pay the amounts due Lender under Section 3 of this Security Instrument.

Such payments will be applied to each Periodic Payment in the order in which it became due.

Any remaining amounts will be applied as follows:

First, to pay any late charges;

Next, to pay any other amounts due under this Security Instrument; and

Next, to reduce the principal balance of the Note.

VMP © 40(NY) (0508)01
DDS-NY8

Page 4 of 17

Form 3033 1/01

If Lender receives a payment from me for a late Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the late Periodic Payment and the late charge. If more than one Periodic Payment is due, Lender may apply any payment received from me: First, to the repayment of the Periodic Payments that are due if, and to the extent that, each payment can be paid in full; Next, to the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due.

Voluntary prepayments will be applied as follows: First, to any prepayment charges; and Next, as described in the Note.

Any application of payments, Insurance Proceeds, or Miscellaneous Proceeds to principal due under the Note will not extend or postpone the due date of the Periodic Payments or change the amount of those payments.

### 3. Monthly Payments For Taxes And Insurance.

(a) Borrower's Obligations.

I will pay to Lender all amounts necessary to pay for taxes, assessments, water charges, sewer rents and other similar charges, ground leasehold payments or rents (if any), hazard or property insurance covering the Property, flood insurance (if any), and any required Mortgage Insurance, or a Loss Reserve as described in Section 10 in the place of Mortgage Insurance. Each Periodic Payment will include an amount to be applied toward payment of the following items which are called "Escrow Items:"

(1) The taxes, assessments, water charges, sewer rents and other similar charges, on the Property which under Applicable Law may be superior to this Security Instrument as a Lien on the Property. Any claim, demand or charge that is made against property because an obligation has not been fulfilled is known as a "Lien;"

(2) The leasehold payments or ground rents on the Property (if any);

(3) The premium for any and all insurance required by Lender under Section 5 of this Security Instrument;

(4) The premium for Mortgage Insurance (if any);

(5) The amount I may be required to pay Lender under Section 10 of this Security Instrument instead of the payment of the premium for Mortgage Insurance (if any); and

(6) If required by Lender, the amount for any Community Association Dues, Fees, and Assessments.

After signing the Note, or at any time during its term, Lender may include these amounts as Escrow Items. The monthly payment I will make for Escrow Items will be based on Lender's estimate of the annual amount required.

I will pay all of these amounts to Lender unless Lender tells me, in writing, that I do not have to do so, or unless Applicable Law requires otherwise. I will make these payments on the same day that my Periodic Payments of principal and interest are due under the Note.

The amounts that I pay to Lender for Escrow Items under this Section 3 will be called "Escrow Funds." I will pay Lender the Escrow Funds for Escrow Items unless Lender waives my obligation to pay the Escrow Funds for any or all Escrow Items. Lender may waive my obligation to pay to Lender Escrow Funds for any or all Escrow Items at any time. Any such waiver must be in writing. In the event of such waiver, I will pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Escrow Funds has been waived by Lender and, if Lender requires, will promptly send to Lender receipts showing such payment within such time period as Lender may require. My obligation to make such payments and to provide receipts will be considered to be a promise and agreement contained in this Security Instrument, as the phrase "promises and agreements" is used in Section 9 of this Security Instrument. If I am obligated to pay Escrow Items directly, pursuant to a waiver, and I fail to pay the amount due for an Escrow Item, Lender may pay that amount and I will then be obligated under Section 9 of this Security Instrument to repay to Lender. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 of this Security Instrument and, upon the revocation, I will pay to Lender all Escrow Funds, and in amounts, that are then required under this Section 3.

I promise to promptly send to Lender any notices that I receive of Escrow Item amounts to be paid. Lender will estimate from time to time the amount of Escrow Funds I will have to pay by using existing assessments and bills and reasonable estimates of the amount I will have to pay for Escrow Items in the future, unless Applicable Law requires Lender to use another method for determining the amount I am to pay.

Lender may, at any time, collect and hold Escrow Funds in an amount sufficient to permit Lender to apply the Escrow Funds at the time specified under RESPA. Applicable Law puts limits on the total amount of Escrow Funds Lender can at any time collect and hold. This total amount cannot be more than the maximum amount a lender could require under RESPA. If there is another Applicable Law that imposes a lower limit on the total amount of Escrow Funds Lender can collect and hold, Lender will be limited to the lower amount.

### (b) Lender's Obligations.

Lender will keep the Escrow Funds in a savings or banking institution which has its deposits insured by a federal agency, instrumentality, or entity, or in any Federal Home Loan Bank. If Lender is such a savings or banking institution, Lender may hold the Escrow Funds. Lender will use the Escrow Funds to pay the Escrow Items no later than the time allowed under RESPA or other Applicable Law. Lender will give to me, without charge, an annual accounting of the Escrow Funds. That accounting will show all additions to and deductions from the Escrow Funds and the reason for each deduction.

Lender may not charge me for holding or keeping the Escrow Funds, for using the Escrow Funds to pay Escrow Items, for making a yearly analysis of my payment of Escrow Funds or for receiving, or for verifying and totaling assessments and bills. However, Lender may charge me for these services if Lender pays me interest on the Escrow Funds and if Applicable Law permits Lender to make such a charge. Lender will not be required to pay me any interest or earnings on the Escrow Funds unless either (1) Lender and I agree in writing that Lender will pay interest on the Escrow Funds, or (2) Applicable Law requires Lender to pay interest on the Escrow Funds.

### (c) Adjustments to the Escrow Funds.

Under Applicable Law, there is a limit on the amount of Escrow Funds Lender may hold. If the amount of Escrow Funds held by Lender exceeds this limit, then there will be an excess amount and RESPA requires Lender to account to me in a special manner for the excess amount of Escrow Funds.

If, at any time, Lender has not received enough Escrow Funds to make the payments of Escrow Items when the payments are due, Lender may tell me in writing that an additional amount is necessary. I will pay to Lender whatever additional amount is necessary to pay the Escrow Items when the payments are due, but the number of payments will not be more than 12.

When I have paid all of the Sums Secured, Lender will promptly refund to me any Escrow Funds that are then being held by Lender.

**4. Borrower's Obligation to Pay Charges, Assessments and Claims.** I will pay all taxes, assessments, water charges, sewer rents and other similar charges, and any other charges and fines that may be imposed on the Property and that may be superior to this Security Instrument. I will also make any ground rents or payments due under my lease if I am a tenant on the Property and Community Association Dues, Fees, and Assessments (if any) due on the Property. If these items are Escrow Items, I will do this by making the payments as described in Section 3 of this Security Instrument. In this Security Instrument, the word "Person" means any individual, organization, governmental authority or other party.

I will promptly pay or satisfy all Liens against the Property that may be superior to this Security Instrument. However, this Security Instrument does not require me to satisfy a superior Lien if: (a) I agree, in writing, to pay the obligation which gave rise to the superior Lien and Lender approves the way in which I agree to pay that obligation, but only so long as I am performing such agreement; (b) in good faith, I argue or defend against the superior Lien in a lawsuit so that in Lender's opinion, during the lawsuit, the superior Lien may not be enforced, but only until the lawsuit ends; or (c) I secure from the holder of that other Lien an agreement, approved in writing by Lender, that the Lien of this Security Instrument is superior to the Lien held by that Person. If Lender determines that any part of the Property is subject to a superior Lien, Lender may give Borrower a notice identifying the superior Lien. Within 10 days of the date on which the notice is given, Borrower shall pay or satisfy the superior Lien or take one or more of the actions mentioned in this Section 4.

Lender also may require me to pay a one-time charge for an independent real estate tax reporting service used by Lender in connection with the Loan, unless Applicable Law does not permit Lender to make such a charge.

5. Borrower's Obligation to Maintain Hazard Insurance or Property Insurance. I will obtain hazard or property insurance to cover all buildings and other improvements that now are, or in the future will be, located on the Property. The insurance will cover loss or damage caused by fire, hazards normally covered by "Extended Coverage" hazard insurance policies, and any other hazards for which Lender requires coverage, including, but not limited to earthquakes and floods. The insurance will be in the amounts (including, but not limited to, deductible levels) and for the periods of time required by Lender. What Lender requires under the last sentence can change during the term of the Loan. I may choose the insurance company, but my choice is subject to Lender's right to disapprove. Lender may not disapprove my choice unless the disapproval is reasonable. Lender may require me to pay either (a) a one-time charge for flood zone determination, certification and tracking services, or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect the flood zone determination or certification. If I disagree with the flood zone determination, I may request the Federal Emergency Management Agency to review the flood zone determination and I promise to pay any fees charged by the Federal Emergency Management Agency for its review.

If I fail to maintain any of the insurance coverages described above, Lender may obtain insurance coverage, at Lender's option and my expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage will cover Lender, but might or might not protect me, my equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. I acknowledge that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that I could have obtained. Any amounts disbursed by Lender under this Section 5 will become my additional debt secured by this Security Instrument. These amounts will bear interest at the interest rate set forth in the Note from the date of disbursement and will be payable with such interest, upon notice from Lender to me requesting payment.

All of the insurance policies and renewals of those policies will include what is known as a "Standard Mortgage Clause" to protect Lender and will name Lender as mortgagee and/or as an additional loss payee. The form of all policies and renewals will be acceptable to Lender. Lender will have the right to hold the policies and renewal certificates. If Lender requires, I will promptly give Lender all receipts of paid premiums and renewal notices that I receive.

If I obtain any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy will include a Standard Mortgage Clause and will name Lender as mortgagee and/or as an additional loss payee.

If there is a loss or damage to the Property, I will promptly notify the insurance company and Lender. If I do not promptly prove to the insurance company that the loss or damage occurred, then Lender may do so.

The amount paid by the insurance company for loss or damage to the Property is called "Insurance Proceeds." Unless Lender and I otherwise agree in writing, any Insurance Proceeds, whether or not the underlying insurance was required by Lender, will be used to repair or to restore the damaged Property unless: (a) it is not economically feasible to make the repairs or restoration; (b) the use of the Insurance Proceeds for that purpose would lessen the protection given to Lender by this Security Instrument; or (c) Lender and I have agreed in writing not to use the Insurance Proceeds for that purpose. During the period that any repairs or restorations are being made, Lender may hold any Insurance Proceeds until it has had an opportunity to inspect the Property to verify that the repair work has been completed to Lender's satisfaction. However, this inspection will be done promptly. Lender may make payments for the repairs and restorations in a single payment or in a series of progress payments as the work is completed. Unless Lender and I agree otherwise in writing or unless Applicable Law requires otherwise, Lender is not required to pay me any interest or earnings on the Insurance Proceeds. I will pay for any public adjusters or other third parties that I hire, and their fees will not be paid out of the Insurance Proceeds. If the repair or restoration is not economically feasible or if it would lessen Lender's protection under this Security Instrument, then the Insurance Proceeds will be used to reduce the amount that I owe to Lender under this Security Instrument. Such Insurance Proceeds will be applied in the order provided for in Section 2. If any of the Insurance Proceeds remain after the amount that I owe to Lender has been paid in full, the remaining Insurance Proceeds will be paid to me.

VMP ® -6(NY) (0506).01
DDS-NY8

Page 7 of 17

Initials

Form 3033 1/01

If I abandon the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If I do not answer, within 30 days, a notice from Lender stating that the insurance company has offered to settle a claim, Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 of this Security Instrument or otherwise, I give Lender my rights to any Insurance Proceeds in an amount not greater than the amounts unpaid under the Note and this Security Instrument. I also give Lender any other of my rights (other than the right to any refund of unearned premiums that I paid) under all insurance policies covering the Property, if the rights are applicable to the coverage of the Property. Lender may use the Insurance Proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Borrower's Obligations to Occupy The Property.** I will occupy the Property and use the Property as my principal residence within 60 days after I sign this Security Instrument. I will continue to occupy the Property and to use the Property as my principal residence for at least one year. The one-year period will begin when I first occupy the Property. However, I will not have to occupy the Property and use the Property as my principal residence within the time frames set forth above if Lender agrees in writing that I do not have to do so. Lender may not refuse to agree unless the refusal is reasonable. I also will not have to occupy the Property and use the Property as my principal residence within the time frames set forth above if extenuating circumstances exist which are beyond my control.

**7. Borrower's Obligations to Maintain And Protect The Property And to Fulfill Any Lease Obligations.**

**(a) Maintenance and Protection of the Property.**

I will not destroy, damage or harm the Property, and I will not allow the Property to deteriorate. Whether or not I am residing in the Property, I will keep the Property in good repair so that it will not deteriorate or decrease in value due to its condition. Unless it is determined under Section 5 of this Security Instrument that repair is not economically feasible, I will promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or Condemnation (as defined in the definition of Miscellaneous Proceeds) proceeds are paid because of loss or damage to, or Condemnation of, the Property, I will repair or restore the Property only if Lender has released those proceeds for such purposes. Lender may pay for the repairs and restoration out of proceeds in a single payment or in a series of progress payments as the work is completed. If the insurance or Condemnation proceeds are not sufficient to repair or restore the Property, I promise to pay for the completion of such repair or restoration.

**(b) Lender's Inspection of Property.**

Lender, and others authorized by Lender, may enter on and inspect the Property. They will do so in a reasonable manner and at reasonable times. If it has a reasonable purpose, Lender may inspect the inside of the home or other improvements on the Property. Before or at the time an inspection is made, Lender will give me notice stating a reasonable purpose for such interior inspection.

**8. Borrower's Loan Application.** If, during the application process for the Loan, I, or any Person or entity acting at my direction or with my knowledge or consent, made false, misleading, or inaccurate statements to Lender about information important to Lender in determining my eligibility for the Loan (or did not provide Lender with such information), Lender will treat my actions as a default under this Security Instrument. False, misleading, or inaccurate statements about information important to Lender would include a misrepresentation of my intention to occupy the Property as a principal residence. This is just one example of a false, misleading, or inaccurate statement of important information.

**9. Lender's Right to Protect Its Rights in The Property.** If: (a) I do not keep my promises and agreements made in this Security Instrument; (b) someone, including me, begins a legal proceeding that may significantly affect Lender's interest in the Property or rights under this Security Instrument (such as a legal proceeding in bankruptcy, in probate, for Condemnation or Forfeiture (as defined in Section 11), proceedings which could give a Person rights which could equal or exceed Lender's interest in the Property or under this Security Instrument, proceedings for enforcement of a Lien which may become superior to this Security Instrument, or to enforce laws or regulations); or (c) I have abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and Lender's rights under this Security Instrument.

Lender's actions may include, but are not limited to: (a) protecting and/or assessing the value of the Property; (b) securing and/or repairing the Property; (c) paying sums to eliminate any Lien against the Property that may be equal or superior to this Security Instrument; (d) appearing in court; and (e) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Lender can also enter the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, have utilities turned on or off, and take any other action to secure the Property. Although Lender may take action under this Section 9, Lender does not have to do so and is under no duty to do so. I agree that Lender will not be liable for not taking any or all actions under this Section 9.

I will pay to Lender any amounts, with interest, which Lender spends under this Section 9. I will pay those amounts to Lender when Lender sends me a notice requesting that I do so. I will pay interest on those amounts at the interest rate set forth in the Note. Interest on each amount will begin on the date that the amount is spent by Lender. This Security Instrument will protect Lender in case I do not keep this promise to pay those amounts with interest.

If I do not own, but am a tenant on the Property, I will fulfill all my obligations under my lease. I also agree that, if I acquire the full title (sometimes called "Fee Title") to the Property, my lease interest and the Fee Title will not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, I will pay the premiums for the Mortgage Insurance. If, for any reason, the Mortgage Insurance coverage ceases to be available from the mortgage insurer that previously provided such insurance and Lender required me to make separate payments toward the premiums for Mortgage Insurance, I will pay the premiums for substantially equivalent Mortgage Insurance coverage from an alternate mortgage insurer. However, the cost of this Mortgage Insurance coverage will be substantially equivalent to the cost to me of the previous Mortgage Insurance coverage, and the alternate mortgage insurer will be selected by Lender.

If substantially equivalent Mortgage Insurance coverage is not available, Lender will establish a non-refundable "Loss Reserve" as a substitute for the Mortgage Insurance coverage. I will continue to pay to Lender each month an amount equal to one-twelfth of the yearly Mortgage Insurance premium (as of the time the coverage lapsed or ceased to be in effect). Lender will retain these payments, and will use these payments to pay for losses that the Mortgage Insurance would have covered. The Loss Reserve is non-refundable even if the Loan is ultimately paid in full and Lender is not required to pay me any interest on the Loss Reserve. Lender can no longer require Loss Reserve payments if: (a) Mortgage Insurance coverage again becomes available through an insurer selected by Lender; (b) such Mortgage Insurance is obtained; (c) Lender requires separately designated payments toward the premiums for Mortgage Insurance; and (d) the Mortgage Insurance coverage is in the amount and for the period of time required by Lender.

If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separate payments toward the premiums for Mortgage Insurance, I will pay the Mortgage Insurance premiums, or the Loss Reserve payments, until the requirement for Mortgage Insurance ends according to any written agreement between Lender and me providing for such termination or until termination of Mortgage Insurance is required by Applicable Law. Lender may require me to pay the premiums, or the Loss Reserve payments, in the manner described in Section 3 of this Security Instrument. Nothing in this Section 10 will affect my obligation to pay interest at the rate provided in the Note.

A Mortgage Insurance policy pays Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance policy.

Mortgage insurers assess their total risk on all Mortgage Insurance from time to time. Mortgage insurers may enter into agreements with other parties to share or change their risk, or to reduce losses. These agreements are based on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include Mortgage Insurance premiums).

As a result of these agreements, Lender, any owner of the Note, another insurer, any reinsurer, or any other entity may receive (directly or indirectly) amounts that come from a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or changing the mortgage insurer's risk, or reducing losses. If these agreements provide that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." It also should be understood that: (a) any of these agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. These agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund; and (b) any of these agreements will not affect the rights Borrower has - if any - regarding the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right (a) to receive certain disclosures, (b) to request and obtain cancellation of the Mortgage Insurance, (c) to have the Mortgage Insurance terminated automatically, and/or (d) to receive a refund of any Mortgage Insurance premiums that were not earned at the time of such cancellation or termination.

**11. Agreements About Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are assigned to and will be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds will be applied to restoration or repair of the Property, if (a) the restoration or repair is economically feasible, and (b) Lender's security given in this Security Instrument is not lessened. During such repair and restoration period, Lender will have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect the Property to verify that the work has been completed to Lender's satisfaction. However, the inspection will be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless Lender and I agree otherwise in writing or unless Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender will not be required to pay Borrower any interest or earnings on the Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security given in this Security Instrument would be lessened, the Miscellaneous Proceeds will be applied to the Sums Secured, whether or not then due. The excess, if any, will be paid to me. Such Miscellaneous Proceeds will be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds will be applied to the Sums Secured, whether or not then due. The excess, if any, will be paid to me.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the Sums Secured immediately before the partial taking, destruction, or loss in value, the Sums Secured will be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the Sums Secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to me.

VMP ® -6(NY) (0509).01
DDS-NYX

Page 10 of 17

Initials

Form 3033 1/01

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the Sums Secured immediately before the partial taking, destruction, or loss in value, the Miscellaneous Proceeds will be applied to the Sums Secured whether or not the sums are then due.

If I abandon the Property, or if, after Lender sends me notice that the Opposing Party (as defined in the next sentence) offered to make an award to settle a claim for damages, I fail to respond to Lender within 30 days after the date Lender gives notice, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the Sums Secured, whether or not then due. "Opposing Party" means the third party that owes me Miscellaneous Proceeds or the party against whom I have a right of action in regard to Miscellaneous Proceeds.

I will be in default under this Security Instrument if any civil or criminal action or proceeding that Lender determines could result in a court ruling (a) that would require Forfeiture of the Property, or (b) that could damage Lender's interest in the Property or rights under this Security Instrument. "Forfeiture" is a court action to require the Property, or any part of the Property, to be given up. I may correct the default by obtaining a court ruling that dismisses the court action, if Lender determines that this court ruling prevents Forfeiture of the Property and also prevents any damage to Lender's interest in the Property or rights under this Security Instrument. If I correct the default, I will have the right to have enforcement of this Security Instrument discontinued, as provided in Section 19 of this Security Instrument, even if Lender has required Immediate Payment in Full (as defined in Section 22). The proceeds of any award or claim for damages that are attributable to the damage or reduction of Lender's interest in the Property are assigned, and will be paid, to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property will be applied in the order provided for in Section 2.

### 12. Continuation of Borrower's Obligations And of Lender's Rights.

#### (a) Borrower's Obligations.

Lender may allow me, or a Person who takes over my rights and obligations, to delay or to change the amount of the Periodic Payments. Even if Lender does this, however, I will still be fully obligated under the Note and under this Security Instrument unless Lender agrees to release me, in writing, from my obligations.

Lender may allow those delays or changes for me or a Person who takes over my rights and obligations, even if Lender is requested not to do so. Even if Lender is requested to do so, Lender will not be required to (1) bring a lawsuit against me or such a Person for not fulfilling obligations under the Note or under this Security Instrument, or (2) refuse to extend time for payment or otherwise modify amortization of the Sums Secured.

#### (b) Lender's Rights.

Even if Lender does not exercise or enforce any right of Lender under this Security Instrument or under Applicable Law, Lender will still have all of those rights and may exercise and enforce them in the future. Even if: (1) Lender obtains insurance, pays taxes, or pays other claims, charges or Liens against the Property; (2) Lender accepts payments from third Persons; or (3) Lender accepts payments in amounts less than the amount then due, Lender will have the right under Section 22 below to demand that I make Immediate Payment in Full of any amounts remaining due and payable to Lender under the Note and under this Security Instrument.

**13. Obligations of Borrower And of Persons Taking Over Borrower's Rights or Obligations.** If more than one Person signs this Security Instrument as Borrower, each of us is fully obligated to keep all of Borrower's promises and obligations contained in this Security Instrument. Lender may enforce Lender's rights under this Security Instrument against each of us individually or against all of us together. This means that any one of us may be required to pay all of the Sums Secured. However, if one of us does not sign the Note: (a) that Person is signing this Security Instrument only to give that Person's rights in the Property to Lender under the terms of this Security Instrument; (b) that Person is not personally obligated to pay the Sums Secured; and (c) that Person agrees that Lender may agree with the other Borrowers to delay enforcing any of Lender's rights, to modify, or make any accommodations with regard to the terms of this Security Instrument or the Note without that Person's consent.



Subject to the provisions of Section 18 of this Security Instrument, any Person who takes over my rights or obligations under this Security Instrument in writing, and is approved by Lender in writing, will have all of my rights and will be obligated to keep all of my promises and agreements made in this Security Instrument. Borrower will not be released from Borrower's obligations and liabilities under this Security Instrument unless Lender agrees to such release in writing. Any Person who takes over Lender's rights or obligations under this Security Instrument will have all of Lender's rights and will be obligated to keep all of Lender's promises and agreements made in this Security Instrument except as provided under Section 20.

14. **Loan Charges.** Lender may charge me fees for services performed in connection with my default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. With regard to other fees, the fact that this Security Instrument does not expressly indicate that Lender may charge a certain fee does not mean that Lender cannot charge that fee. Lender may not charge fees that are prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to Applicable Law which sets maximum loan charges, and that Applicable Law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed permitted limits: (a) any such loan charge will be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (even if a prepayment charge is provided for under the Note). If I accept such a refund that is paid directly to me, I will waive any right to bring a lawsuit against Lender because of the overcharge.

15. **Notices Required under this Security Instrument.** All notices given by me or Lender in connection with this Security Instrument will be in writing. Any notice to me in connection with this Security Instrument is considered given to me when mailed by first class mail or when actually delivered to my notice address if sent by other means. Notice to any one Borrower will be notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address is the address of the Property unless I give notice to Lender of a different address. I will promptly notify Lender of my change of address. If Lender specifies a procedure for reporting my change of address, then I will only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender will be given by delivering it or by mailing it by first class mail to Lender's address stated on the first page of this Security Instrument unless Lender has given me notice of another address. Any notice in connection with this Security Instrument is given to Lender when it is actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

16. **Law That Governs this Security Instrument; Word Usage.** This Security Instrument is governed by federal law and the law of New York State. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might allow the parties to agree by contract or it might be silent, but such silence does not mean that Lender and I cannot agree by contract. If any term of this Security Instrument or of the Note conflicts with Applicable Law, the conflict will not affect other provisions of this Security Instrument or the Note which can operate, or be given effect, without the conflicting provision. This means that the Security Instrument or the Note will remain as if the conflicting provision did not exist.

As used in this Security Instrument: (a) words of the masculine gender mean and include corresponding words of the feminine and neuter genders; (b) words in the singular mean and include the plural, and words in the plural mean and include the singular; and (c) the word "may" gives sole discretion without any obligation to take any action.

17. **Borrower's Copy.** I will be given one copy of the Note and of this Security Instrument.

18. **Agreements about Lender's Rights If the Property Is Sold or Transferred.** Lender may require Immediate Payment in Full of all Sums Secured by this Security Instrument if all or any part of the Property, or if any right in the Property, is sold or transferred without Lender's prior written permission. If Borrower is not a natural Person and a beneficial interest in Borrower is sold or transferred without Lender's prior written permission, Lender also may require Immediate Payment in Full. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender requires Immediate Payment in Full under this Section 18, Lender will give me a notice which states this requirement. The notice will give me at least 30 days to make the required payment. The 30-day period will begin on the date the notice is given to me in the manner required by Section 15 of this Security Instrument. If I do not make the required payment during that period, Lender may act to enforce its rights under this Security Instrument without giving me any further notice or demand for payment.

**19. Borrower's Right to Have Lender's Enforcement of this Security Instrument Discontinued.** Even if Lender has required Immediate Payment in Full, I may have the right to have enforcement of this Security Instrument stopped. I will have this right at any time before the earliest of: (a) five days before sale of the Property under any power of sale granted by this Security Instrument; (b) another period as Applicable Law might specify for the termination of my right to have enforcement of the Loan stopped; or (c) a judgment has been entered enforcing this Security Instrument. In order to have this right, I will meet the following conditions:

(a) I pay to Lender the full amount that then would be due under this Security Instrument and the Note as if Immediate Payment in Full had never been required;

(b) I correct my failure to keep any of my other promises or agreements made in this Security Instrument;

(c) I pay all of Lender's reasonable expenses in enforcing this Security Instrument including, for example, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and

(d) I do whatever Lender reasonably requires to assure that Lender's interest in the Property and rights under this Security Instrument and my obligations under the Note and under this Security Instrument continue unchanged.

Lender may require that I pay the sums and expenses mentioned in (a) through (d) in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer.

If I fulfill all of the conditions in this Section 19, then this Security Instrument will remain in full effect as if Immediate Payment in Full had never been required. However, I will not have the right to have Lender's enforcement of this Security Instrument discontinued if Lender has required Immediate Payment in Full under Section 18 of this Security Instrument.

**20. Note Holder's Right to Sell the Note or an Interest in the Note; Borrower's Right to Notice of Change of Loan Servicer; Lender's and Borrower's Right to Notice of Grievance.** The Note, or an interest in the Note, together with this Security Instrument, may be sold one or more times. I might not receive any prior notice of these sales.

The entity that collects the Periodic Payments and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law is called the "Loan Servicer." There may be a change of the Loan Servicer as a result of the sale of the Note. There also may be one or more changes of the Loan Servicer unrelated to a sale of the Note. Applicable Law requires that I be given written notice of any change of the Loan Servicer. The notice will state the name and address of the new Loan Servicer, and also tell me the address to which I should make my payments. The notice also will contain any other information required by RESPA or Applicable Law. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to me will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither I nor Lender may commence, join or be joined to any court action (as either an individual party or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other has not fulfilled any of its obligations under this Security Instrument, unless the other is notified (in the manner required under Section 15 of this Security Instrument) of the unfulfilled obligation and given a reasonable time period to take corrective action. If Applicable Law provides a time period which will elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to me under Section 22 and the notice of the demand for payment in full given to me under Section 22 will be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20. All rights under this paragraph are subject to Applicable Law.

21. **Continuation of Borrower's Obligations to Maintain and Protect the Property.** The federal laws and the laws of New York State that relate to health, safety or environmental protection are called "Environmental Law." Environmental Law classifies certain substances as toxic or hazardous. There are other substances that are considered hazardous for purposes of this Section 21. These substances are gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials. The substances defined as toxic or hazardous by Environmental Law and the substances considered hazardous for purposes of this Section 21 are called "Hazardous Substances." "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law. An "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

I will not do anything affecting the Property that violates Environmental Law, and I will not allow anyone else to do so. I will not cause or permit Hazardous Substances to be present on the Property. I will not use or store Hazardous Substances on the Property. I also will not dispose of Hazardous Substances on the Property, or release any Hazardous Substance on the Property, and I will not allow anyone else to do so. I also will not do, nor allow anyone else to do, anything affecting the Property that: (a) is in violation of any Environmental Law; (b) creates an Environmental Condition; or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The promises in this paragraph do not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized as appropriate for normal residential use and maintenance of the Property (including, but not limited to, Hazardous Substances in consumer products). I may use or store these small quantities on the Property. In addition, unless Environmental Law requires removal or other action, the buildings, the improvements and the fixtures on the Property are permitted to contain asbestos and asbestos-containing   materials if the asbestos and asbestos-containing materials are undisturbed and "non-friable" (that is, not easily crumbled by hand pressure).

I will promptly give Lender written notice of: (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which I have actual knowledge; (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance; and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If I learn, or any governmental or regulatory authority, or any private party, notifies me that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, I will promptly take all necessary remedial actions in accordance with Environmental Law.

Nothing in this Security Instrument creates an obligation on Lender for an Environmental Cleanup.

## NON-UNIFORM COVENANTS

I also promise and agree with Lender as follows:

22. **Lender's Rights If Borrower Fails to Keep Promises and Agreements. Except as provided in Section 18 of this Security Instrument, if all of the conditions stated in subsections (a), (b) and (c) of this Section 22 are met, Lender may require that I pay immediately the entire amount then remaining unpaid under the Note and under this Security Instrument. Lender may do this without making any further demand for payment. This requirement is called "Immediate Payment in Full."**

If Lender requires Immediate Payment in Full, Lender may bring a lawsuit to take away all of my remaining rights in the Property and have the Property sold. At this sale Lender or another Person may acquire the Property. This is known as "Foreclosure and Sale." In any lawsuit for Foreclosure and Sale, Lender will have the right to collect all costs and disbursements and additional allowances allowed by Applicable Law and will have the right to add all reasonable attorneys' fees to the amount I owe Lender, which fees shall become part of the Sums Secured.

Lender may require Immediate Payment in Full under this Section 22 only if all of the following conditions are met:

(a) I fail to keep any promise or agreement made in this Security Instrument or the Note, including, but not limited to, the promises to pay the Sums Secured when due, or if another default occurs under this Security Instrument;

(b) Lender sends to me, in the manner described in Section 15 of this Security Instrument, a notice that states:

(1) The promise or agreement that I failed to keep or the default that has occurred;

(2) The action that I must take to correct that default;

(3) A date by which I must correct the default. That date will be at least 30 days from the date on which the notice is given;

(4) That if I do not correct the default by the date stated in the notice, Lender may require Immediate Payment in Full, and Lender or another Person may acquire the Property by means of Foreclosure and Sale;

(5) That if I meet the conditions stated in Section 19 of this Security Instrument, I will have the right to have Lender's enforcement of this Security Instrument stopped and to have the Note and this Security Instrument remain fully effective as if Immediate Payment in Full had never been required; and

(6) That I have the right in any lawsuit for Foreclosure and Sale to argue that I did keep my promises and agreements under the Note and under this Security Instrument, and to present any other defenses that I may have; and

(c) I do not correct the default stated in the notice from Lender by the date stated in that notice.

23. Lender's Obligation to Discharge this Security Instrument. When Lender has been paid all amounts due under the Note and under this Security Instrument, Lender will discharge this Security Instrument by delivering a certificate stating that this Security Instrument has been satisfied. I will pay all costs of recording the discharge in the proper official records. I agree to pay a fee for the discharge of this Security Instrument, if Lender so requires. Lender may require that I pay such a fee, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted by Applicable Law.

24. Agreements about New York Lien Law. I will receive all amounts lent to me by Lender subject to the trust fund provisions of Section 13 of the New York Lien Law. This means that I will: (a) hold all amounts which I receive and which I have a right to receive from Lender under the Note as a trust fund; and (b) use those amounts to pay for "Cost of Improvement" (as defined in Section 13 of the New York Lien Law) before I use them for any other purpose. The fact that I am holding those amounts as a trust fund means that for any building or other improvement located on the Property I have a special responsibility under the law to use the amount in the manner described in this Section 24.

25. Borrower's Statement Regarding the Property [check box as applicable].

☑ This Security Instrument covers real property improved, or to be improved, by a one or two family dwelling only.

☐ This Security Instrument covers real property principally improved, or to be improved, by one or more structures containing, in the aggregate, not more than six residential dwelling units with each dwelling unit having its own separate cooking facilities.

☐ This Security Instrument does not cover real property improved as described above.

VMP ® 4(NY) (0601).01
DDS-NY8

Page 15 of 17

Initials

Form 3033 1/01

BY SIGNING BELOW, I accept and agree to the promises and agreements contained in pages 1 through 17 of this Security Instrument and in any Rider signed by me and recorded with it.

Witnesses:

_____

PATRICIA D'ARCO
Notary Public
State of New Jersey
My Commission Expires May 7, 2011

_____ (Seal)
WILLIAM COVINO                 -Borrower

_____ (Seal)
                               -Borrower

_____ (Seal)    _____ (Seal)
                          -Borrower                              -Borrower

_____ (Seal)    _____ (Seal)
                          -Borrower                              -Borrower

_____ (Seal)    _____ (Seal)
                          -Borrower                              -Borrower

VMP ® -6(NY) (0509).01
DDS-NYs

Page 16 of 17

Form 3033 1/01

STATE OF ~~NEW YORK~~ New Jersey, Bergen          County ss:

On the    17th    day of   May   2007          before me, the undersigned, a notary
public in and for said state, personally appeared

William Covin

personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is/are
subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies),
and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s)
acted, executed the instrument.

Notary Public

Tax Map Information:

PATRICIA D'ARCO
Notary Public
State of New Jersey
My Commission Expires May 7, 2011

VMP ® -6(NY) (0506).01
DOS-NY8

Page 17 of 17

Initials

Form 3033 1/01

**FRONTIER ABSTRACT & RESEARCH SERVICES, INC.**
AS AGENT FOR
**TICOR TITLE INSURANCE COMPANY**

SCHEDULE A
PROPERTY DESCRIPTION

ALL THAT CERTAIN PLOT, PIECE OR PARCEL OF LAND, situate, lying and being in the Town of Warwick, County of Orange, and State of New York, being bounded and described as follows:

BEING Lot No. 2 on a certain subdivision map entitled "Final Subdivision Prepared for Eagle Wood Vistas, Town of Warwick, Orange County, New York" and filed in the Orange County Clerk's Office on June 1, 2005 as Map No. 435/05.

Together with rights to use the private road as described in the Declaration of Private Road, Drainage and Infrastructure Maintenance, Agricultural and Ridgeline Protection recorded in Liber 11783, Page 754, Orange County Clerk's Office.

Commitment Number:   505377

## FIXED/ADJUSTABLE    RATE RIDER
### (1 Year Libor Index - Rate Caps)

Loan #: 126189255-PERM

THIS ADJUSTABLE  RATE RIDER is made this  16th  day of        May, 2007               ,
and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust,
or Security  Deed (the "Security  Instrument") of the same  date  given by the undersigned (the
"Borrower") to secure Borrower's Adjustable Rate Note (the "Note") to
INDYMAC BANK, F. S. B.,

a federally chartered savings bank

(the "Lender") of the same  date and covering the property described in the Security Instrument and
located at:

10 Eagle Wood Vista Lane
Warwick, NY 10990

[Property Address]

THE NOTE CONTAINS  PROVISIONS  ALLOWING  FOR CHANGES  IN THE
INTEREST  RATE AND THE MONTHLY  PAYMENT.  THE NOTE LIMITS  THE
AMOUNT  THE BORROWER'S  INTEREST  RATE CAN CHANGE  AT ANY ONE
TIME AND THE MAXIMUM  RATE THE BORROWER  MUST PAY.

ADDITIONAL  COVENANTS.  In addition to the covenants and agreements made in the Security
Instrument, Borrower and Lender further covenant and agree as follows:

### A. INTEREST RATE AND MONTHLY PAYMENT CHANGES

The Note contains the following provisions: This Note, as amended by the attached Residential
Construction  Loan Addendum Amending   Note (the "Addendum"),  represents  both  a
construction/home  improvement loan and a permanent mortgage loan. During the Construction Period
of the loan, the Note Holder will advance funds in accordance with the Residential Construction Loan
Agreement. The "Construction Period" is defined as the period beginning  on the date of the Note and
ending on the first day of the month preceding  the due date of the first monthly payment of principal
and interest stated in the Note ("Permanent Loan Commencement Date") if Completion (as defined in
the Residential Construction Loan Agreement) has occurred before that date in accordance with the
Residential Construction Loan Agreement. If Completion has not occurred on that date, I will be in
default under the Addendum and under this Note. If Completion has occurred prior to the Permanent
Loan Commencement Date, then the loan evidenced by this Note will automatically become a
permanent mortgage loan on the Permanent Loan Commencement Date, and the provisions of the
Addendum will cease to be in effect and all terms and conditions of the loan will be as set forth in this
Note on the Permanent Loan Commencement Date.

IndyMac Bank
Construction-to-Perm  Adjustable  Rate Rider
Intermediate  Libor ARMs - Multistate
8480827  (0506)                          Page 1 of 5                              HCL  1013
                           VMP Mortgage Solutions, Inc. (800)521-7291                06/05
DDS-9FI

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of 8.375 %. The interest rate I will pay will change in accordance with Section 4 of this Note.

The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

## 4. INTEREST RATE AND MONTHLY PAYMENT CHANGES

### (A) Change Dates

The interest rate I will pay may change on the 1st day of June, 2013 and on that day every 12th month thereafter. Each date on which my interest rate could change is called a "Change Date."

### (B) The Index

Beginning with the first Change Date, my adjustable interest rate will be based on an Index. The "Index" is the average of interbank offered rates for one-year U.S. dollar-denominated deposits in the London market ("Libor"), as published in The Wall Street Journal.

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

### (C) Calculation of Changes

Before each Change Date, the Note Holder will calculate my new interest rate by adding Three and Three Quarters percentage points ( 3.750 %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

### (D) Limits on Interest Rate Changes

The interest rate I am required to pay at the first Change Date will not be greater than 13.375 % or less than 3.750 %. Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than Two percentage points ( 2.000 %) from the rate of interest I have been paying for the preceding 12 months. My interest rate will never be greater than 13.375 %.

### (E) Effective Date of Changes

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

8480827  (0506)

Page 2 of 5

HCL 1013
06/05

DDS-9FI

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

## B. TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER

1. Until Borrower's initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section A above, Uniform Covenant 18 of the Security Instrument shall read as follows:

Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

2. When Borrower's initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section A above, Uniform Covenant 18 of the Security Instrument described in Section B1 above shall then cease to be in effect, and the provisions of Uniform Covenant 18 of the Security Instrument shall be amended to read as follows:

Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

8480327  (0506)                    Page 3 of 5                    HCL 1013
DDS-9FI                                                            08/06

If all or any part of the Property or any interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

8480827   (0506)

DDS-9FI

Page 4 of 5

HCL 1013
06/06

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider.

_____ (Seal)  _____ (Seal)
-Borrower                          -Borrower
WILLIAM COVINO

_____ (Seal)  _____ (Seal)
-Borrower                          -Borrower

_____ (Seal)  _____ (Seal)
-Borrower                          -Borrower

_____ (Seal)  _____ (Seal)
-Borrower                          -Borrower

8480827  (0508)                    Page 5 of 5                HCL 1013
DDS-9FI                                                        08/05

TO BE RECORDED WITH THE SECURITY INSTRUMENT

Loan #: 126189255-PERM                               Date: May 16, 2007

## RESIDENTIAL CONSTRUCTION LOAN RIDER WITH SECURITY AGREEMENT AND FINANCING STATEMENT
### (New York)

Words used in this Rider are defined below. Words in the singular mean and include the plural and vice versa.

"Agreement" means the Residential Construction Loan Agreement.
"Borrower" is
WILLIAM COVINO

10 EAGLE WOOD VISTA LN.
WARWICK, NY

"Borrower's Funds Account" means any and all construction loan accounts established pursuant to the Agreement and held by Lender and used to deposit additional funds provided by Borrower.
"Contractor" is

and its successors or assigns.
"Improvements" are the improvements made to a single family residence or new construction of a single family residence.
"Lender" is INDYMAC BANK, F. S. B.,  3465 E. FOOTHILL BLVD.
a federally chartered savings bank  PASADENA CA 91107
and its successors or assigns.
"Loan" means the debt evidenced by the Note and all sums due under the Security Instrument and the Agreement.
"Loan Documents" means the Agreement, the Note, the Security Instrument, all other documents now or hereafter executed by borrower or any other person or party to evidence or securing the loan, and any and all renewals, reinstatements, extensions, amendments thereto or substitutes given therefor.
"Note" means the promissory note of even date signed by Borrower in favor of Lender.
"Property" means the property commonly known as
10 Eagle Wood Vista Lane

IndyMac Bank, F.S.B.
Residential Construction Loan Rider to Security Instrument - New York
Page 1 of 6
VMP Mortgage Solutions (800) 521-7291
8480408 (0311)
DDS-YRK
HCL 911(NY)
12/03

"Security Instrument" means the Deed of Trust/Mortgage/Security Deed/Security Instrument of even date signed by Borrower in favor of Lender.

THIS RESIDENTIAL CONSTRUCTION LOAN RIDER shall be deemed to amend and supplement the Security Instrument of the same date given by the Borrower to secure Borrower's Note to Lender of the same date and covering the Property described in the Security Instrument.

AMENDED AND ADDITIONAL COVENANTS. In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

1. **Residential Construction Loan Agreement.** Borrower agrees to comply with the covenants and conditions of the Agreement between Borrower, Lender and Contractor, which is incorporated herein by this reference and made a part of this Security Instrument. The Agreement provides for the construction of certain Improvements on the Property. All advances made by Lender pursuant to the Agreement shall be an indebtedness of Borrower secured by this Security Instrument as amended, and such advances may be obligatory under the terms of the Agreement. The Security Instrument secures the payment of all sums and the performance of all covenants required by Lender in the Agreement. Upon the failure of Borrower to keep and perform all the covenants, conditions and agreements of the Agreement, the principal sum and all interest and other charges provided for in the loan documents and secured hereby shall, at the option of the Lender, become due and payable.

2. **Security Instrument.** This Security Instrument is a "construction mortgage" securing an obligation incurred for the construction of Improvements on the Property including the acquisition cost of the Property, if any, and any notes issued in extension, renewal, or substitution thereof. Borrower affirms, acknowledges and warrants that prior to the recordation of this Security Instrument, as amended, in the appropriate Real Property Records of the State of New York, no Improvements contemplated by the Loan Agreement have been constructed, no work has been performed, and no materials have been ordered or delivered.

3. **Future Advances.** This Security Instrument shall secure in addition to the sum evidenced by the Note all funds hereafter advanced by Lender to or for the benefit of Borrower, as contained in the Contract and/or the Agreement for the construction of Improvements on the mortgaged property or for any other purpose. All future advances shall be made within the time limit authorized by the laws of this state. To the extent that moneys advanced by Lender are used to pay for the costs of acquiring the Property, this mortgage shall be a purchase money security interest.

4. **Disbursements to Protect Security.** All sums disbursed by Lender prior to completion of the Improvements to protect the security of this Security Instrument, up to the principal amount of the Note and any future advances, shall be treated as disbursements pursuant to the Agreement. All such sums shall bear interest from the date of disbursement at the rate stated in the Note, unless the collection from Borrower of interest at such rate would be contrary to applicable law, in which event such amounts shall bear interest at the highest rate which may be collected from Borrower under applicable law and shall be payable upon notice from Lender to Borrower requesting payment therefore.

5. **Assignment of Rights or Claims.** From time to time as Lender deems necessary to protect Lender's interest, Borrower shall, upon request of Lender, execute, acknowledge before a notary, and deliver to Lender, assignments of any and all rights or claims which relate to the construction on the Property.

8480408 (5311)                    Page 2 of 6                    HCL 911(NY)
DDS-YRK                                                          12/03

6.  **Breach by Borrower.**

a. Upon the occurrence of a breach under any of the Loan Documents, Lender at its option, may (a) declare all sums owing under the Agreement, the Note and the other Loan Documents immediately due and payable; (b) disburse and incur such expenses to preserve the Property and Improvements as security; (c) terminate its commitment to lend and any obligation to make any further disbursements of the Loan; (d) set-off and apply, to the extent thereof and to the maximum extent permitted by law, any and all deposits, funds or assets at any time held and any and all indebtedness at any time owing by Lender to or for the credit or account of Borrower against the Loan; (e) exercise any and all rights and remedies afforded by the Security Instrument, the Agreement, the other Loan Documents, law, equity or otherwise; and (f) in its own name or in the name of Borrower, enter into possession of the Property, perform all work necessary to complete the construction of the Improvements substantially in accordance with the plans and specifications (as modified as deemed necessary by Lender), the Loan Documents, laws, and governmental requirements, and continue to employ any contractor or subcontractor pursuant to applicable contracts or otherwise. The remedies provided in this Paragraph shall be in addition to other remedies provided by law, equity, or the Loan Documents.

b. All costs and expenses paid or incurred by Lender pursuant to the foregoing subparagraph of this paragraph shall be deemed to be advanced to Borrower and shall be a part of the indebtedness evidenced by the Note and secured by the Security Instrument. At the option of Lender, such sums may be deducted from any advance thereafter becoming due.

c. Nothing herein contained shall be deemed to waive any right given to Lender pursuant to the applicable law relating to mechanic's, artisan's and materialman's liens.

7.  **Termination of Agreement upon Amortization.** After the commencement of amortization of the Note, the terms of the Agreement (except to the extent Lender is indemnified therein) shall be null and void, and there shall be no claim or defense arising out of or in connection with the Agreement against the obligations of the Note and this Security Instrument.

8.  **Property.** The property covered by this Security Instrument includes the property described or referred to in this Security Instrument, together with the following, all of which are referred to as the "Property." The portion of the Property described below which constitutes real property is sometimes referred to as the "Real Property." The portion of the Property which constitutes personal property is sometimes referred to as the "Personal Property," listed as follows:

Any and all buildings, improvements (provided in the Agreement or otherwise), and tenements now or hereafter erected on the Property; any and all heretofore and hereafter vacated alleys and streets abutting the Property, easements, rights, appurtenances, rents (subject however to any assignment of rents to Lender), leases, royalties, mineral, oil and gas rights and profits, water, water rights and water stock appurtenant to the Property (to the extent they are included in Borrower's fee simple title); any and all fixtures, machinery, equipment, building materials, appliances, and goods of every nature whatsoever now or hereafter located in, or on, or used, or intended to be used in connection with the Property and all replacements and accessions of them, including, but not limited to those for the purpose of supplying or distributing heating, cooling, electricity, gas, water, air and light; security and access control apparatus; plumbing and plumbing fixtures;

refrigerating, cooking and laundry equipment; carpet, floor coverings and interior and exterior window treatments; furniture and cabinets; interior and exterior sprinkler plant and lawn maintenance equipment; fire prevention and extinguishing apparatus and equipment, water tanks, swimming pool, compressor, vacuum cleaning system, disposal, dishwasher, range, and oven, any shrubbery and landscaping; any and all plans and specifications for development of or construction of Improvements upon the Property; any and all contracts and subcontracts relating to the Property; any and all accounts, contract rights, instruments, documents, general intangibles, and chattel paper arising from or by virtue of any transactions related to the Property; any and all permits, licenses, franchises, certifications, and other rights and privileges obtained in connection with the Property; any and all products and proceeds arising from or by virtue of the sale, lease, or other disposition of any of the Property; any and all proceeds payable or to be payable under each policy of insurance relating to the Property; any and all proceeds arising from the taking of all or part of the Property for any public or quasi-public use under any law, or by right of eminent domain, or by private or other purchase in lieu thereof; all building permits, certificates of occupancy, certificates of compliance, any right to use utilities of any kind including water, sewage, drainage and any other utility rights, however arising whether private or public, present or future, including any reservation, permit, letter, certificate, license, order, contract or otherwise and any other permit, letter, certificate, license, order, contract or other document or approval received from or issued by any governmental entity, quasi-governmental entity common carrier, or public utility in any way relating to any part of the Property or the Improvements, fixtures and equipment thereon; all other interests of every kind and character which Borrower now has or at any time hereafter acquires in and to the Property, including all other items of property and rights described elsewhere in this Security Instrument.

The Personal Property also includes the Borrower's Funds Account, together with any interest accruing thereon and proceeds thereof.

9.  **Security Agreement and Financing Statement.** This Security Instrument shall be a security agreement granting Lender a first and prior security interest in all of Borrower's right, title and interest in, to and under the Personal Property, under and within the meaning of applicable statutes of this state, as well as a Mortgage and/or a Deed of Trust granting a lien upon and against the Real Property. In the event of any foreclosure sale all of the Real and Personal Property may, at the option of Lender, be sold as a whole or in any part. It shall not be necessary to have present at the place of such sale the Personal Property or any part thereof. Lender shall have all the rights, remedies and recourses with respect to the Personal Property afforded to a "Secured Party" by the applicable statutes of this state in addition to and not in limitation of the other rights and recourse afforded Lender under this Security Instrument. Borrower shall, upon demand, pay to Lender the amount of any and all expenses, including the fees and disbursements of Lender's legal counsel and of any experts and agents which Lender may incur in connection with: (i) the making and/or administration of this Security Instrument; (ii) the custody, preservation, use or operation of, or the sale of, collection from, or other realization upon any property, real and/or personal, described in this Security Instrument, (iii) the exercise or enforcement of any of the rights of Lender under this Security Instrument; or (iv) the failure by Borrower to perform or observe any of the provisions or covenants in this Security Instrument; or (v) any actions taken by Lender for any reason whatsoever in any case or proceeding under Chapter 7, 11, or 13 of the Bankruptcy Code or any successor statute thereto, including, but not limited to, action taken with respect to issues particular to federal bankruptcy law.

Lender may, at its election, at any time after the delivery of this Security Instrument, sign one or more copies of this Security Instrument in order that such copies may be used as a financing statement under the statutes of this state. Lender's signature need not be acknowledged, and is not necessary to the effectiveness hereof as a mortgage, a security agreement, or (unless otherwise required by applicable law) a financing statement.

10. **Completion.** Lender shall not be responsible for the completion of the Improvements, and shall not in any way be considered a guarantor or surety of performance by Borrower. In the event the Improvements are not completed according to the plans and specifications approved by Lender, and it is determined for whatever reason the Lender does not have a lien arising by or through Borrower, then Lender shall have a valid lien for its loan amount, less the amount reasonably necessary to complete the Improvements, or in such event Lender, at its option, shall have the right to complete the Improvements, and the lien shall be valid for the loan amount.

11. **Invalid Provisions.** If any provision of this Security Instrument is declared invalid, illegal, or unenforceable by a court of competent jurisdiction, then such invalid, illegal or unenforceable provision shall be severed from this Security Instrument and the remainder enforced as if such invalid, illegal or unenforceable provision is not a part of this Security Instrument.

12. **Address.**

The name and address of the Borrower/Debtor during construction of the Improvements is:
WILLIAM COVINO

28 NORTH DRIVE
ROCHELLE PARK, NJ 07662

The name and address of the Lender/Secured Party is:
INDYMAC BANK, F. S. B.,
a federally chartered savings bank
3465 EAST FOOTHILL BLVD
PASADENA, CA 91107

13. **Trust Fund.** The Agreement, the Security Instrument, and the other Loan Documents are subject to the trust fund provision of Section 13 of the New York Lien Law.

14. **Rights of Lender.** In addition to all rights of Lender set forth in the Loan Documents and otherwise provided to Lender by applicable law, Lender shall have all rights of a lender provided in Section 254 of the New York Real Property Law.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Residential Construction Loan Rider.

_____ (Seal)      _____ (Seal)
                          -Borrower                               -Borrower
WILLIAM COVINO

_____ (Seal)      _____ (Seal)
                          -Borrower                               -Borrower

_____ (Seal)      _____ (Seal)
                          -Borrower                               -Borrower

_____ (Seal)      _____ (Seal)
                          -Borrower                               -Borrower

**ATTENTION OFFICIAL RECORDER OF INSTRUMENTS:** This instrument covers goods that are or are to become fixtures on the described Property herein and is to be filed for record in the District Recorder's records where mortgages on real estate are recorded. Additionally, this instrument should be appropriately indexed, not only as a mortgage but as a financing statement covering goods that are or are to become fixtures on the described Property herein. The mailing address of the Borrower (Debtor) and Lender (Secured Party) are set forth in this instrument.

[Please See Attached Acknowledgment(s)]

8480428  (0311)          Page 8 of 8          HCL 9110(NY)
DDS-YRK                                        12/03

State of _New Jersey_

County of _Bergen_

On ___ 5/17/07 ___ before me, _Patricia D'Arco, Notary Public_,

(here insert name and title of the officer)

personally appeared _William Corino_

personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

Signature _Patricia D'Arco_                    (Seal)

PATRICIA D'ARCO
Notary Public
State of New Jersey
My Commission Expires May 7, 2011

_Residential construction_
_Loan Rider_
_pg 6/6_

(notary.wpd)(01-06)

# Exhibit 4

## NOTICE TO CUSTOMER REQUIRED BY LAW AND FEDERAL RESERVE REGULATION Z

Loan #: ▮▮▮▮▮▮▮▮▮▮   Loan Amt .: $752,000.00   Date:   May 16, 2007

INDYMAC BANK, F. S. B.
3465 EAST FOOTHILL BLVD, PASADENA, CA 91107
Name of Borrower(s):  William Covino

Mailing  Address:   28 NORTH DRIVE, ROCHELLE PARK, NJ 07662
Property  Address:   10 Eagle Wood Vista Lane, Warwick, NY 10990

| ANNUAL PERCENTAGE RATE The cost of your credit as a yearly rate. | FINANCE CHARGE The dollar amount the credit will cost you | AMOUNT FINANCED The amount of credit provided to you or on your behalf. | TOTAL OF PAYMENTS The amount you will have paid after you have made all payments as scheduled. |
|---|---|---|---|
| ℮        8.490% | ℮ ·        $30,651.87 | ℮        $719,985.17 | ℮        $750,637.04 |

| | |
|---|---|
| Payment Schedule: | |
| REPAYMENT: | One payment of principal of $752,000.00   on May 16, 2008. Interest on the amount of credit outstanding is not required to be withdrawn from the interest reserve account monthly. You have the option to make interest payments as they become due. |
| INSURANCE: | You may obtain property insurance from anyone you want that is acceptable to the lender. Credit life and credit disability insurance are not required to obtain credit. |
| LATE CHARGE: | If a payment is more than 15 days late, you will be charged 2.0000%  of the payment. |
| SECURITY: | You are giving a security interest in real property located at: 10 Eagle Wood Vista Lane ,Warwick, NY 10990 |
| PREPAYMENT: | If you pay off early, you will not have to pay a penalty and you will not be entitled to a refund of any part of the finance charge. |
| ASSUMPTION: | Someone buying your house will not be allowed to assume the remainder of the mortgage on the original terms. |

THE ANNUAL PERCENTAGE RATE (APR) IS NOT THE SAME AS THE INTEREST RATE (NOTE RATE) OF THE MORTGAGE FOR WHICH YOU APPLIED.  THE NOTE RATE DESCRIBES ONLY THE INTEREST.  THE APR, WHICH IS USUALLY HIGHER, INCLUDES OTHER ITEMS SUCH AS DISCOUNT POINTS, FEES, FINANCE CHARGES AND CERTAIN OTHER CHARGES WHICH ARE REQUIRED TO BE PAID, TO OBTAIN THE LOAN.

See your contract documents for any additional information about nonpayment, default, any required repayment in full before the scheduled date, prepayment refunds and penalties, security interest and the policy of the lender regarding assumption of the mortgage.

I (WE) HEREBY ACKNOWLEDGE  RECEIVING AND READING A COPY OF THIS DISCLOSURE.

| | |
|---|---|
| _____ 5/17/07 | _____ |
| WILLIAM COVINO      DATE | DATE |
| _____ DATE | _____ DATE |
| _____ DATE | _____ DATE |
| _____ DATE | _____ DATE |

DDS-009

## ITEMIZATION OF AMOUNT FINANCED

INDYMAC BANK, F. S. B.
3465 EAST FOOTHILL BLVD
PASADENA, CA 91107
Date:  May 16, 2007
Sales Price:  $0.00
Applicants:  William Covino

Loan Number: ▉▉▉▉▉▉▉
Base Loan Amount:  $0.00

Interest Rate:  8.375%      Term:  12
Total Loan Amount:     $752,000.00

Property   Address:  10 Eagle Wood Vista Lane, Warwick, NY 10990

| Loan Amount: | $ | 752,000.00 | TOTAL ESTIMATED MONTHLY PAYMENT: | | |
|---|---|---|---|---|---|
| Total Prepaid Finance Charges: | $ | 0.00 | Principal & Interest | $ | N/A |
| Amount  Financed: | $ | 719,985.17 | Total Real Estate Taxes | $ | 0.00 |
| Total Paid To Others: | $ | 0.00 | Flood & Hazard Insurance | $ | 0.00 |
| Estimated  Net Proceeds  For Funding: | $ | 752,000.00 | Mortgage  Insurance | $ | 0.00 |
| Total Paid By Broker/Lender: | $ | 0.00 | Total Other Impounds | $ | 0.00 |
| Total Paid By Lender To Broker: | $ | - 0.00 | TOTAL  MONTHLY  PAYMENT | $ | N/A |

| Ref HUD1 Statement | | * Broker = B  Other = O  Lender = L |
|---|---|---|

| ITEMIZATION  OF  AMOUNT  FINANCED<br>"POC" amounts  will be included in computing  totals. | POC | FINANCED | * |
|---|---|---|---|
| AMOUNT  FINANCED: | | 719,985.17 | |
| TOTAL  PREPAID  FINANCE  CHARGES: | | 0.00 | |

| AMOUNT  PAID  TO OTHERS  ON YOUR  BEHALF<br>"POC" amounts  will not be included in computing  totals. | POC | AMOUNT | * |
|---|---|---|---|
| TOTAL  PAID  TO  OTHERS: | | 0.00 | |

Initials:
DOS-506

## ITEMIZATION OF AMOUNT FINANCED

INDYMAC BANK, F. S. B.
3465 EAST FOOTHILL BLVD
PASADENA, CA 91107
Date:  May 16, 2007
Sales Price:  $0.00

Loan Number:
Base Loan Amount:  . $0.00

Interest Rate:  8.375%      Term:  12
Total Loan Amount:   $752,000.00

Ref HUDI
Statement

* Broker = B  Other = O  Lender = L

| FEES · PAID  BY  BROKER/LENDER "POC" amounts  will  not  be included in computing   totals. | POC | AMOUNT | * |
|---|---|---|---|
| TOTAL  PAID  BY  BROKER/LENDER: | 0.00 | | |

| TOTAL  PAID  BY  LENDER  TO  BROKER "POC" amounts  will  not  be included in computing.  totals. | POC | AMOUNT | * |
|---|---|---|---|
| TOTAL  PAID  BY  LENDER  TO  BROKER: | 0.00 | | |

| PAYOFFS | POC | AMOUNT | * |
|---|---|---|---|
| TOTAL  PAYOFFS: | | 0.00 | |

This form may not cover all items you will be required to pay in cash at settlement,  for example, deposits in escrow for real estate taxes and insurance may be different.   You may wish to inquire as to the amounts of such other items.  You may be required to pay other additional amounts at settlement.

I (WE) HEREBY ACKNOWLEDGE   RECEIVING  AND READING A COPY OF THIS DISCLOSURE.

5/17/07

WILLIAM COVINO                          DATE                                        DATE

_____                DATE                                        DATE

_____                DATE                                        DATE

_____                DATE                                        DATE

DDS-506                                              Page 2 of 2

## NOTICE TO CUSTOMER REQUIRED BY LAW AND FEDERAL RESERVE REGULATION Z

| | | |
|---|---|---|
| Loan #: | Loan Amt.: $752,000.00 | Date:   May 16, 2007 |

**INDYMAC BANK, F. S. B.**
3465 EAST FOOTHILL BLVD, PASADENA, CA 91107
Name of Borrower(s):   William Covino

Mailing Address:   28 NORTH DRIVE, ROCHELLE PARK, NJ 07662
Property Address:   10 Eagle Wood Vista Lane, Warwick, NY 10990

| ANNUAL PERCENTAGE RATE The cost of your credit as a yearly rate. | FINANCE CHARGE The dollar amount the credit will cost you. | AMOUNT FINANCED The amount of credit provided to you or on your behalf. | TOTAL OF PAYMENTS The amount you will have paid after you have made all payments as scheduled. |
|---|---|---|---|
| 8.878% | $1,407,124.40 | $741,733.00 | $2,148,857.40 |

Payment Schedule: All payments shown are MONTHLY   payments  starting  on the date provided in the Beginning Date column.

| PMT(S) | AMOUNT(S) | BEGINNING DATE |
|---|---|---|
| 60 | $ 5,715.74 | 07/01/2008 |
| 300 | $6,019.71 | 07/01/2013 |

**VARIABLE RATE:**   Your loan contains a variable-rate feature.  Disclosures about the variable-rate feature have been provided to you earlier.

**INSURANCE:**   You may obtain property insurance from anyone you want that is acceptable to the lender.  Credit life and credit disability insurance are not required to obtain credit.

**LATE CHARGE:**   If a payment is more than 15 days late, you will be charged 2.0000% of the payment.

**SECURITY:**   You are giving a security interest in real property located at:
10 Eagle Wood Vista Lane
Warwick, NY 10990

**PREPAYMENT:**   If you pay off early, you will not have to pay a penalty and you will not be entitled to a refund of any part of the finance charge.

**ASSUMPTION:**   Someone buying your house may, subject to conditions, be allowed to assume the remainder of the mortgage on the original terms.

THE ANNUAL PERCENTAGE RATE (APR) IS NOT THE SAME AS THE INTEREST RATE (NOTE RATE) OF THE MORTGAGE FOR WHICH YOU APPLIED.  THE NOTE RATE DESCRIBES ONLY THE INTEREST.  THE APR, WHICH IS USUALLY HIGHER, INCLUDES OTHER ITEMS SUCH AS DISCOUNT POINTS, FEES, FINANCE CHARGES AND CERTAIN OTHER CHARGES WHICH ARE REQUIRED TO BE PAID TO OBTAIN THE LOAN.

See your contract documents for any additional information about nonpayment, default, any required repayment in full before the scheduled date, prepayment refunds and penalties, security interest and the policy of the lender regarding assumption of the mortgage.

I (WE) HEREBY ACKNOWLEDGE  RECEIVING AND READING A COPY OF THIS DISCLOSURE.

| | | |
|---|---|---|
| WILLIAM COVINO | 5/17/07 DATE | DATE |
| | DATE | DATE |
| | DATE | DATE |
| | DATE | DATE |

DDS-009

## ITEMIZATION OF AMOUNT FINANCED

INDYMAC BANK, F. S. B.
346S EAST FOOTHILL BLVD
PASADENA, CA 91107
Date:   May 16, 2007
Sales Price:   $0.00
Applicants:   William Covino

Loan Number: ████████
Base Loan Amount:   $0.00

Interest Rate:   8.375%     Term:   360
Total Loan Amount:   $752,000.00

Property   Address:   10 Eagle Wood Vista Lane, Warwick, NY 10990

| Loan Amount: | $ | 752,080.00 | TOTAL ESTIMATED MONTHLY PAYMENT: | | |
|---|---|---|---|---|---|
| Total Prepaid Finance Charges: | $ | 10,267.00 | Principal & Interest | $ | 5,715.74 |
| Amount Financed: | $ | 741,733.00 | Total Real Estate Taxes | $ | 0.00 |
| Total Paid To Others: | $ | 5,758.33 | Flood & Hazard Insurance | $ | 0.00 |
| Estimated Net Proceeds For Funding: | $ | 735,974.67 | Mortgage Insurance | $ | 0.00 |
| Total Paid By Broker/Lender: | $ | 0.00 | Total Other Impounds | $ | 0.00 |
| Total Paid By Lender, To Broker: | $ | 0.00 | TOTAL MONTHLY PAYMENT | $ | 5,715.74 |

Ref HUDI
Statement

* Broker = B   Other = O   Lender = L

| ITEMIZATION OF AMOUNT FINANCED | POC | FINANCED | * |
|---|---|---|---|
| "POC" amounts will be included in computing totals. | | | |

**AMOUNT   FINANCED:**   741,733.00

| | | POC | FINANCED | * |
|---|---|---|---|---|
| 802 | Lender Discount INDYMAC BANK | | 3,760.00 | L |
| 810 | Underwriting Fee Lender INDYMAC BANK | | 300.00 | L |
| 812 | Flood Certificate LSI | | 7.00 | L |
| 813 | Tax Service Fee INDYMAC BANK | | 75.00 | L |
| 815 | FUNDING FEE INDYMAC BANK | | 725.00 | L |
| 1101 | Settlement/Closing Fee FIDELITY NATIONAL TITLE | | 2,500.00 | |
| 1113 | IndyMac Admin Fee INDYMAC BANK | | 2,500.00 | L |
| 1303 | MOBILE NOTARY/SIGNING FIDELITY NATIONAL TITLE | | 175.00 | |
| 1304 | Courier Fee FIDELITY NATIONAL TITLE | | 150.00 | |
| 1307 | WIRE FIDELITY NATIONAL TITLE | | 75.00 | |
| | TOTAL PREPAID FINANCE CHARGES: | | 10,267.00 | |

| AMOUNT PAID TO OTHERS ON YOUR BEHALF | POC | AMOUNT | * |
|---|---|---|---|
| "POC" amounts will not be included in computing totals. | | | |

| | | POC | AMOUNT | * |
|---|---|---|---|---|
| 803 | Appraisal Fee HUDSON VALLEY APPRAISAL | 500.00 | -75.00 | L |
| 804 | Credit Report LANDAMERICA | | 8.33 | L |
| 1108 | Title Insurance FIDELITY NATIONAL TITLE | | 3,000.00 | |
| 1111 | TITLE ENDORSEMENT FIDELITY NATIONAL TITLE | | 500.00 | |
| 1112 | DATE DOWN ENDORSEMENT FIDELITY NATIONAL TITLE | | 200.00 | L |
| 1201 | Recording FIDELITY NATIONAL TITLE | | 125.00 | |
| 1305 | COURSE OF CONSTRUCTION INSURANCE COMPANY | | 2,000.00 | |
| | TOTAL PAID TO OTHERS: | | 5,758.33 | |

Initials:
DDS-506

Page 1 of 2

## ITEMIZATION OF AMOUNT FINANCED

INDYMAC BANK, F. S. B.
3465 EAST FOOTHILL BLVD
PASADENA, CA 91107

| Date:  May 16, 2007 | Loan Number: ▮▮▮▮▮▮ | Interest Rate:  8.375%   Term:  360 |
|---|---|---|
| Sales Price:  $0.00 | Base Loan Amount:  $0.00 | Total Loan Amount:   $752,000.00 |

Ref HUD1
Statement

\* Broker = B  Other  = O  Lender = L

| FEES PAID BY BROKER/LENDER | POC | AMOUNT | \* |
|---|---|---|---|
| "POC" amounts will not be included in computing  totals | | | |
| TOTAL  PAID  BY  BROKER/LENDER: | 0.00 | | |

| TOTAL  PAID  BY LENDER TO BROKER | POC | AMOUNT | \* |
|---|---|---|---|
| "POC" amounts will not be included in computing  totals. | | | |
| TOTAL PAID  BY  LENDER TO BROKER: | 0.00 | | |

| PAYOFFS | POC | AMOUNT | \* |
|---|---|---|---|
| TOTAL  PAYOFFS: | | | 0.00 |

This form may not cover all items you will be required to pay in cash at settlement,  for example,  deposits in escrow for real estate taxes and insurance  may  be different.   You may  wish  to inquire as to the amounts of such other items.   You may  be required to pay other  additional amounts  at settlement.

I (WE)  HEREBY  ACKNOWLEDGE   RECEIVING  AND READING  A COPY  OF THIS  DISCLOSURE.

_____5/17/07_____

| WILLIAM COVINO | DATE | | DATE |
|---|---|---|---|
| | DATE | | DATE |
| | DATE | | DATE |
| | DATE | | DATE |

DDS-506

Page 2 of 2

# Exhibit 5

# ORANGE COUNTY CLERK'S OFFICE RECORDING PAGE
## THIS PAGE IS PART OF THE INSTRUMENT -- DO NOT REMOVE

TYPE IN BLACK INK:
**NAME(S) OF PARTY(S) TO DOCUMENT**

S/B/L: S: 24 B: J L: 45.2

SECTION_____ BLOCK_____ LOT_____

FEDERAL DEPOSIT INSURANCE CORPORATION AS RECEIVER
FOR INDYMAC FEDERAL BANK, FSB, SUCCESSOR TO
INDYMAC BANK, F.S.B.

**TO**

OneWest Bank, FSB, WHOSE ADDRESS IS 888 E. WALNUT
STREET , PASADENA, CA 91101, ITS SUCCESSORS OR ASSIGNS,
(ASSIGNEE)

**RECORD AND RETURN TO:**
(name and address)

OneWest Bank, FSB
C/O NTC 2100 Alt. 19 North
Palm Harbor, FL 34683
Ref: OWBAS 10773406

*THIS IS PAGE ONE OF THE RECORDING*

ATTACH THIS SHEET TO THE FIRST PAGE OF EACH
RECORDED INSTRUMENT ONLY

## DO NOT WRITE BELOW THIS LINE

INSTRUMENT TYPE: DEED____ MORTGAGE____ SATISFACTION____ ASSIGNMENT ✓ OTHER_____

### PROPERTY LOCATION

| | | |
|---|---|---|
| 2089 BLOOMING GROVE (TN) | 4289 MONTGOMERY (TN) | NO PAGES 2 CROSS REF. 1 |
| 2001 WASHINGTONVILLE (VLG) | 4201 MAYBROOK (VLG) | CERT.COPY____ ADD'L X-REF.____ |
| 2289 CHESTER (TN) | 4203 MONTGOMERY (VLG) | MAP#_____ PGS._____ |
| 2201 CHESTER (VLG) | 4205 WALDEN (VLG) | |
| 2489 CORNWALL (TN) | 4489 MOUNT HOPE (TN) | PAYMENT TYPE: CHECK ✓ |
| 2401 CORNWALL (VLG) | 4401 OTISVILLE (VLG) | CASH_____ |
| 2600 CRAWFORD (TN) | 4600 NEWBURGH (TN) | CHARGE_____ |
| 2800 DEERPARK (TN) | 4800 NEW WINDSOR (TN) | NO FEE_____ |
| 3089 GOSHEN (TN) | 5089 TUXEDO (TN) | Taxable |
| 3001 GOSHEN (VLG) | 5001 TUXEDO PARK (VLG) | CONSIDERATION $_____ |
| 3003 FLORIDA (VLG) | 5200 WALLKILL (TN) | TAX EXEMPT_____ |
| 3005 CHESTER (VLG) | 5489 WARWICK (TN) | Taxable |
| 3200 GREENVILLE (TN) | 5401 FLORIDA (VLG) | MORTGAGE AMT. $_____ |
| 3489 HAMPTONBURGH (TN) | 5403 GREENWOOD LAKE (VLG) | |
| 3401 MAYBROOK (VLG) | 5405 WARWICK (VLG) | |
| 3689 HIGHLANDS (TN) | 5600 WAWAYANDA (TN) | **MORTGAGE TAX TYPE:** |
| 3601 HIGHLAND FALLS (VLG) | 5889 WOODBURY (TN) | ___ (A) COMMERCIAL/FULL 1% |
| 3889 MINISINK (TN) | 5801 HARRIMAN (VLG) | ___ (B) 1 OR 2 FAMILY |
| 3801 UNIONVILLE (VLG) | | ___ (C) UNDER $10,000 |
| 4089 MONROE (TN) | **CITIES** | ___ (E) EXEMPT |
| 4001 MONROE (VLG) | 0900 MIDDLETOWN | ___ (F) 3 TO 6 UNITS |
| 4003 HARRIMAN (VLG) | 1100 NEWBURGH | ___ (I) NAT.PERSON/CR. UNION |
| 4005 KIRYAS JOEL (VLG) | 1300 PORT JERVIS | ___ (J) NAT.PER-CR.UN/1 OR 2 |
| | | ___ (K) CONDO |
| | 9999 HOLD | |

*Donna L. Benson*

**DONNA L. BENSON**
ORANGE COUNTY CLERK

RECEIVED FROM: *Nationwide*

Loan #: 129510289

## ASSIGNMENT OF MORTGAGE

FOR GOOD AND VALUABLE CONSIDERATION, the sufficiency of which is hereby acknowledged, the undersigned, FEDERAL DEPOSIT INSURANCE CORPORATION AS RECEIVER FOR INDYMAC FEDERAL BANK, FSB, SUCCESSOR TO INDYMAC BANK, F.S.B., WHOSE ADDRESS IS 6900 BEATRICE DR. , KALAMAZOO, MI 49009, (ASSIGNOR),, by these presents does convey, grant, sell, assign, transfer and set over the described mortgage together with the certain note(s) described therein together with all interest secured thereby, all liens, and any rights due or to become due thereon to OneWest Bank, FSB, WHOSE ADDRESS IS 888 E. WALNUT STREET , PASADENA, CA 91101, ITS SUCCESSORS OR ASSIGNS, (ASSIGNEE).

Mortgage dated 05/16/2007, made by WILLIAM COVINO to INDYMAC BANK, F.S.B. in the principal sum of $752,000.00 and recorded on 06/13/2007 in Liber 12465 page 1751, Doc# 20070067112 in the office of the Registry of ORANGE County, N.Y.

This mortgage(s) has not been assigned of record.
This Assignment is not subject to the requirements of section 275 of the Real Property Law because it is an assignment within the secondary mortgage market.
This assignment is made without recourse, representation or warranty, express or implied, by the FDIC in any capacity.
Dated:this 25th day of January in the year 2010
FEDERAL DEPOSIT INSURANCE CORPORATION AS RECEIVER FOR INDYMAC FEDERAL BANK, FSB, SUCCESSOR TO INDYMAC BANK, F.S.B.

By _____          By _____
BRYAN BLY                               VILMA CASTRO    Witness
ATTORNEY-IN-FACT

STATE OF FLORIDA
COUNTY OF PINELLAS

this 25th day of January in the year 2010, before me, the undersigned, personally appeared BRYAN BLY, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her capacity, that by his/her signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument, and that such individual made such appearance before the undersigned in PINELLAS County, State of FLORIDA

_____
CRYSTAL MOORE    Notary Public
Residing in the county of PINELLAS
My commission expires:09/23/2013

CRYSTAL MOORE
Notary Public, State of Florida
Commission # DD 927242
Expires September 23, 2013
Bonded Through National Notary Assn.

Document Prepared By: Jessica Fretwell/NTC,2100 Alt. 19 North, Palm Harbor, FL 34683 (800)346-9152
Property ID(S/B/L): S: 24 B: 1 L: 45.2
Return by Mail to:  OneWest Bank, FSB
                    C/O NTC 2100 Alt. 19 North
                    Palm Harbor, FL 34683

OWBAS 10773406  CI2412277      $50.50

**AMENDED AND RESTATED
INSURED DEPOSIT
PURCHASE AND ASSUMPTION AGREEMENT**

**AMONG**

**FEDERAL DEPOSIT INSURANCE CORPORATION,
RECEIVER OF INDYMAC BANK, FSB
PASADENA, CALIFORNIA, USA**

**FEDERAL DEPOSIT INSURANCE CORPORATION**

**and**

**FEDERAL DEPOSIT INSURANCE CORPORATION
AS CONSERVATOR FOR INDYMAC FEDERAL BANK, FSB
PASADENA, CALIFORNIA**

**DATED AS OF**

**JULY 11, 2008**

ARTICLE I - DEFINITIONS ............................................................................................. 2
   Accounting Records ................................................................................................... 2
   Acquired Subsidiaries ............................................................................................... 2
   Adversely Classified ................................................................................................. 2
   Affiliate ....................................................................................................................... 2
   Affiliated Funding ...................................................................................................... 2
   Agreement ................................................................................................................... 2
   Assets .......................................................................................................................... 3
   Assumed Deposits ..................................................................................................... 3
   Bank Premises ............................................................................................................ 3
   Book Value .................................................................................................................. 3
   Business Day .............................................................................................................. 3
   Chartering Authority ................................................................................................ 4
   Commitment ............................................................................................................... 4
   Credit Documents ...................................................................................................... 4
   Credit File ................................................................................................................... 4
   Data Processing Lease .............................................................................................. 4
   Deposit ........................................................................................................................ 4
   Failed Bank Advances .............................................................................................. 4
   Fair Market Value ..................................................................................................... 5
   Fixtures ....................................................................................................................... 5
   Furniture and Equipment ......................................................................................... 5
   Indemnitees ................................................................................................................ 5
   Insured Deposit ......................................................................................................... 6
   Initial Payment .......................................................................................................... 6
   Legal Balance ............................................................................................................. 6
   Liabilities Assumed .................................................................................................. 6
   Lien .............................................................................................................................. 6
   Loans ........................................................................................................................... 6
   Obligor ........................................................................................................................ 7
   Other Real Estate ...................................................................................................... 7
   Payment Date ............................................................................................................. 7
   Person ......................................................................................................................... 7
   Primary Indemnitor .................................................................................................. 7
   Put Date ...................................................................................................................... 7
   Put Notice ................................................................................................................... 7
   Qualified Financial Contract ................................................................................... 7
   Record ......................................................................................................................... 7
   Related Liability ........................................................................................................ 7
   Related Liability Amount ......................................................................................... 8
   Repurchase Price ....................................................................................................... 8
   Resolution Date ......................................................................................................... 8
   Safe Deposit Boxes ................................................................................................... 8

Settlement Date ................................................................................................ 8
Settlement Interest Rate .................................................................................. 9
Subsidiary ......................................................................................................... 9

**ARTICLE II - ASSUMPTION OF LIABILITIES** ............................................... 9
2.1   Liabilities Assumed by Assuming Bank ............................................. 9
2.2   Interest on Deposit Liabilities .......................................................... 11
2.3   Unclaimed Deposits ........................................................................... 11
2.4   Employee Benefit Plans ..................................................................... 12

**ARTICLE III - PURCHASE OF ASSETS** ....................................................... 12
3.1   Assets Purchased by Assuming Bank ............................................... 12
3.2   Consideration ..................................................................................... 14
3.3   Manner of Conveyance; Limited Warranty; Nonrecourse; Etc. ....... 15
3.4   Assets Not Acquired by Assuming Bank .......................................... 15
3.5   Loans Essential to Receiver .............................................................. 16
3.6   Puts of Assets and Liabilities Assumed to the Receiver ................. 16
   (a)   Puts Prior to the Settlement Date ............................................. 16
   (b)   Notices to the Receiver .............................................................. 17
   (c)   Purchase by Receiver .................................................................. 17
   (d)   Purchase Price and Payment Date ............................................. 18
   (e)   Servicing ..................................................................................... 18
   (f)   Reversals ..................................................................................... 18

**ARTICLE IV - ASSUMPTION OF CERTAIN DUTIES AND OBLIGATIONS** ............... 18
4.1   Continuation of Banking Business .................................................. 18
4.2   Agreement with Respect to Credit Card Business .......................... 18
4.3   Agreement with Respect to Safe Deposit Business ......................... 19
4.4   Agreement with Respect to Safekeeping Business .......................... 19
4.5   Agreement with Respect to Trust Business. .................................... 19
4.6   Agreement with Respect to Leases. .................................................. 20
   (a)   Option to Assume ........................................................................ 20
   (c)   Facilitation .................................................................................. 20
   (d)   Occupancy .................................................................................... 20
   (e)   Occupancy Costs .......................................................................... 20
   (f)   Certain Requirements as to Furniture, Equipment and Fixtures ......... 21
   (g)   Vacating Premises ....................................................................... 21
   (h)   Furniture and Equipment and Certain Other Equipment ......... 21
4.7   Agreement with Respect to Leased Data Processing Equipment .... 22
4.8   Agreement with Respect to Certain Existing Agreements .............. 22
4.9   Informational Tax Reporting ........................................................... 23
4.10  Insurance. .......................................................................................... 23
4.11  Office Space for Receiver and Corporation .................................... 23
4.12  Reserved ............................................................................................. 23
4.13  Agreement with Respect to Interim Asset Servicing and Interim Management .. 24

4.14    Agreement With Respect to Certain Back Room Functions and Certain Data Processing Services ................................................................................................ 24

ARTICLE V - DUTIES WITH RESPECT TO DEPOSITORS OF THE FAILED BANK 24
5.1    Payment of Checks, Drafts and Orders .................................................... 24
5.2    Certain Agreements Related to Deposits .................................................. 25
5.3    Notice to Depositors ................................................................................. 25

ARTICLE VI - RECORDS ..................................................................................... 25
6.1    Transfer of Records .................................................................................. 25
6.2    Delivery of Assigned Records .................................................................. 26
6.3    Preservation of Records ........................................................................... 26
6.4    Access to Records; Copies ....................................................................... 26

ARTICLE VII - INITIAL PAYMENT; FINAL DISTRIBUTION ....................... 27
7.1.    Initial Payment ......................................................................................... 27
7.2.    Final Distribution ..................................................................................... 27

ARTICLE VIII - ADJUSTMENTS .......................................................................... 27
8.1    Pro Forma Statement ................................................................................ 27
8.2    Correction of Errors and Omissions; Other Liabilities ........................... 28
8.3    Payments ................................................................................................... 28
8.4    Interest ...................................................................................................... 28
8.5    Subsequent Adjustments .......................................................................... 28

ARTICLE IX - CONTINUING COOPERATION ................................................. 29
9.1    General Matters ........................................................................................ 29
9.2    Additional Title Documents ..................................................................... 29
9.3    Claims and Suits ....................................................................................... 29
9.4    Payment of Deposits ................................................................................. 29
9.5    Withheld Payments ................................................................................... 30
9.6    Proceedings with Respect to Certain Assets and Liabilities .................... 30
9.7    Information ................................................................................................ 31

ARTICLE X - CONDITION PRECEDENT .......................................................... 31

ARTICLE XI - REPRESENTATIONS AND WARRANTIES OF THE ASSUMING BANK ...................................................................................................................... 32
11.1    Corporate Existence and Authority .......................................................... 32
11.2    Third Party Consents ................................................................................ 32
11.3    Execution and Enforceability ................................................................... 32
11.4    Compliance with Law ............................................................................... 32
11.5    Representations Remain True .................................................................... 32

iii

**ARTICLE XII - INDEMNIFICATION** ......................................................... 33
  12.1      Indemnification of Indemnitees ...................................................... 33
  12.2      Conditions Precedent to Indemnification ........................................ 36
  12.3      No Additional Warranty ................................................................. 37
  12.4      Indemnification of Receiver and Corporation ............................... 37
  12.5      Obligations Supplemental ............................................................... 37
  12.6      Criminal Claims ............................................................................. 37
  12.7      Limited Guaranty of the Corporation ........................................... 38
  12.8      Subrogation ..................................................................................... 38

**ARTICLE XIII - MISCELLANEOUS** .......................................................... 38
  13.1      Entire Agreement ........................................................................... 38
  13.2      Headings ......................................................................................... 38
  13.3      Counterparts .................................................................................. 38
  13.4      Governing Law ............................................................................... 38
  13.5      Successors ....................................................................................... 39
  13.6      Modification; Assignment .............................................................. 39
  13.7      Notice .............................................................................................. 39
  13.8      Manner of Payment ....................................................................... 40
  13.9      Costs, Fees and Expenses .............................................................. 40
  13.10    Waiver ............................................................................................ 40
  13.11    Severability .................................................................................... 40
  13.12    Term of Agreement ........................................................................ 40
  13.13    Survival of Covenants, Etc ............................................................ 41
  SCHEDULE 2.1 - Certain Liabilities Assumed .............................................. 43
  SCHEDULE 3.1 - Certain Assets Purchased .................................................. 44
    SCHEDULE 3.1(e) - Loans Fully Secured by Assumed Deposits .............. 45
  SCHEDULE 3.1(E) Loans Fully Secured by Assumed Deposits ................... 45
  SCHEDULE 3.1(v) - Other Real Estate Purchased ....................................... 46
  SCHEDULE 3.1(h) - Acquired Subsidiaries ................................................... 47
  SCHEDULE 3.2 - Purchase Price of Assets or assets .................................... 48
  SCHEDULE 3.5(k) - Securities Not Purchased ............................................. 49
  EXHIBIT 3.1(U) -- Valuation of Certain Qualified Financial Contracts ...... 50
  Exhibit 4.13 - Interim Asset Servicing Arrangement ................................... 52
    INTERIM MANAGEMENT ARRANGEMENT ........................................ 54
  EXHIBIT 4.13(a) - Interim Management Arrangement ................................ 54
    DEFINITIONS ........................................................................................... 54

## AMENDED AND RESTATED
## INSURED DEPOSIT PURCHASE AND ASSUMPTION AGREEMENT

**THIS AMENDED AND RESTATED AGREEMENT**, made and entered into as of July 11, 2008, by and among the **FEDERAL DEPOSIT INSURANCE CORPORATION, RECEIVER of INDYMAC BANK, FSB,** Pasadena, California USA (the "Receiver"), **FEDERAL DEPOSIT INSURANCE CORPORATION AS CONSERVATOR FOR INDYMAC FEDERAL BANK, FSB,** organized under the laws of the United States of America, and having its principal place of business in Pasadena, California, USA, (the "Assuming Bank"), and the **FEDERAL DEPOSIT INSURANCE CORPORATION,** organized under the laws of the United States of America and having its principal office in Washington, D.C., acting in its corporate capacity (the "Corporation").

## WITNESSETH:

**WHEREAS**, on Bank Closing, the Chartering Authority closed IndyMac Bank, FSB (the "Failed Bank") pursuant to applicable law and the Corporation was appointed Receiver thereof; and

**WHEREAS**, pursuant to 12 U.S.C. § 1821(d)(2)(F)(i), with respect to savings banks and by application to the OTS, the Receiver may organize a new Federal savings association to take over such assets or liabilities as the Corporation may determine to be appropriate; and

**WHEREAS**, the Assuming Bank is unwilling to assume the Failed Bank's liabilities to certain creditors in consideration for the acquisition by it of certain of the Failed Bank's assets as provided in this Agreement, having concluded that the value of such assets is less than the amount of the liabilities assumed hereunder, and the Assuming Bank has therefore required as a condition to entering into this Agreement that the Corporation (i) agree to undertake the obligations of the Corporation as provided in this Agreement, and (ii) provide indemnification pursuant to Article XII; and

**WHEREAS**, the Assuming Bank desires to acquire certain assets and assume certain deposit and other liabilities of the Failed Bank on the terms and conditions set forth in this Agreement; and

**WHEREAS**, pursuant to 12 U.S.C. Section 1823(c)(2)(A), the Corporation may provide assistance to the Assuming Bank to facilitate the transactions contemplated by this Agreement, which assistance may include indemnification pursuant to Article XII; and

**WHEREAS**, the Board of Directors of the Corporation (the "Board") has determined to provide assistance to the Assuming Bank on the terms and subject to the conditions set forth in this Agreement; and

**WHEREAS**, the Board has determined pursuant to 12 U.S.C. Section 1823(c)(4)(A) that such assistance is necessary to meet the obligation of the Corporation to provide insurance coverage for the insured deposits in the Failed Bank and is the least costly to the deposit insurance fund of all possible methods for meeting such obligation.

**NOW THEREFORE**, in consideration of the mutual promises herein set forth and other valuable consideration, the parties hereto agree as follows:

## ARTICLE I
## DEFINITIONS

Capitalized terms used in this Agreement shall have the meanings set forth in this Article I, or elsewhere in this Agreement. As used herein, words imparting the singular include the plural and vice versa.

**"Accounting Records"** means the general ledger and subsidiary ledgers and supporting schedules which support the general ledger balances.

**"Acquired Subsidiaries"** has the meaning provided in Section 3.1.

**"Adversely Classified"** means, with respect to any Loan or security, a Loan or security which, as of the date of the Information Package, has been designated in the most recent report of examination as "Substandard," "Doubtful" or "Loss" by the Failed Bank's appropriate Federal or State Chartering Authority or regulator.

**"Affiliate"** of any Person means any director, officer, or employee of that Person and any other Person (i) who is directly or indirectly controlling, or controlled by, or under direct or indirect common control with, such Person, or (ii) who is an affiliate of such Person as the term "affiliate" is defined in Section 2 of the Bank Holding Company Act of 1956, as amended, 12 U.S.C. Section 1841.

**"Affiliated Funding"** means any form of secured or unsecured funding made to the Failed Bank by the Failed Bank's holding company or by any Subsidiary or Affiliate of the Failed Bank's holding company as of Bank Closing.

**"Agreement"** means this Amended and Restated Insured Deposit Purchase and Assumption Agreement by and among the Assuming Bank, the Corporation and the Receiver, as amended or otherwise modified from time to time.

2

**"Assets"** means all assets of the Failed Bank purchased pursuant to Section 3.1. Assets owned by Subsidiaries of the Failed Bank are not "Assets" within the meaning of this definition.

**"Assumed Deposits"** means Insured Deposits, excluding, however, brokered deposits, as defined by 12 USC 1831(f); and Deposits of public money (other than such liabilities that are Insured Deposits) in the Failed Bank to the extent such Deposits are properly and fully secured .
In the event that a depositor's aggregate Deposits in the Failed Bank are in excess of its Insured Deposit, the Corporation, in accordance with its standard policies and procedures, shall determine which Deposits are assumed.

A Deposit in the form of a negotiable instrument shall not be assumed by or transferred to the Assuming Bank, and any interest with respect thereto as provided in this Agreement shall not accrue or be paid until the owner thereof shall provide proof satisfactory to the Corporation that such negotiable instrument was negotiated to such owner prior to Bank Closing, as provided in 12 C.F.R. Section 330.4(b)(4).

**"Bank Closing"** means the close of business of the Failed Bank on the date on which the Chartering Authority closed such institution.

**"Bank Premises"** means the banking houses, drive-in banking facilities, and teller facilities (staffed or automated) together with appurtenant parking, storage and service facilities and structures connecting remote facilities to banking houses, and land on which the foregoing are located, that are owned or leased by the Failed Bank and that are occupied by the Failed Bank as of Bank Closing.

**"Book Value"** means, with respect to any Asset and any Liability Assumed, the dollar amount thereof stated on the Accounting Records of the Failed Bank. The Book Value of any item shall be determined as of Bank Closing after adjustments made by the Receiver for differences in accounts, suspense items, unposted debits and credits, and other similar adjustments or corrections. The Book Value of an Acquired Subsidiary shall be determined from the investment in subsidiary and related accounts on the "bank only" (unconsolidated) balance sheet of the Failed Bank based on the equity method of accounting. Without limiting the generality of the foregoing, (i) the Book Value of a Liability Assumed shall include all accrued and unpaid interest thereon as of Bank Closing, and (ii) the Book Value of a Loan shall reflect adjustments for earned interest, or unearned interest (as it relates to the "rule of 78s" or add-on-interest loans, as applicable), if any, as of Bank Closing, adjustments for the portion of earned or unearned loan-related credit life and/or disability insurance premiums, if any, attributable to the Failed Bank as of Bank Closing, and adjustments for Failed Bank Advances, if any, in each case as determined for financial reporting purposes. The Book Value of an Asset shall not include any adjustment for loan premiums, discounts or any related deferred income or fees, or general or specific reserves on the Accounting Records of the Failed Bank.

**"Business Day"** means a day other than a Saturday, Sunday, Federal legal holiday or legal holiday under the laws of the State where the Failed Bank is located, or a day on which the principal office of the Corporation is closed.

3

**"Chartering Authority"** means the Office Thrift Supervision.

**"Commitment"** means the unfunded portion of a line of credit or other commitment reflected on the books and records of the Failed Bank to make an extension of credit (or additional advances with respect to a Loan) that was legally binding on the Failed Bank as of Bank Closing, other than extensions of credit pursuant to the credit card business and overdraft protection plans of the Failed Bank, if any.

**"Credit Documents"** mean the agreements, instruments, certificates or other documents at any time evidencing or otherwise relating to, governing or executed in connection with or as security for, a Loan, including without limitation notes, bonds, loan agreements, letter of credit applications, lease financing contracts, banker's acceptances, drafts, interest protection agreements, currency exchange agreements, repurchase agreements, reverse repurchase agreements, guarantees, deeds of trust, mortgages, assignments, security agreements, pledges, subordination or priority agreements, lien priority agreements, undertakings, security instruments, certificates, documents, legal opinions, participation agreements and intercreditor agreements, and all amendments, modifications, renewals, extensions, rearrangements, and substitutions with respect to any of the foregoing.

**"Credit File"** means all Credit Documents and all other credit, collateral, or insurance documents in the possession or custody of the Assuming Bank, or any of its Subsidiaries or Affiliates, relating to an Asset or a Loan included in a Put Notice, or copies of any thereof.

**"Data Processing Lease"** means any lease or licensing agreement, binding on the Failed Bank as of Bank Closing, the subject of which is data processing equipment or computer hardware or software used in connection with data processing activities. A lease or licensing agreement for computer software used in connection with data processing activities shall constitute a Data Processing Lease regardless of whether such lease or licensing agreement also covers data processing equipment.

**"Deposit"** means a deposit as defined in 12 U.S.C. Section 1813(l), and the regulations promulgated thereunder without limitation, outstanding cashier's checks and other official checks and all uncollected items included in the depositors' balances and credited on the books and records of the Failed Bank; provided, that the term "Deposit" shall not include all or any portion of those deposit balances which, in the discretion of the Receiver or the Corporation, (i) may be required to satisfy it for any liquidated or contingent liability of any depositor arising from an unauthorized or unlawful transaction, or (ii) may be needed to provide payment of any liability of any depositor to the Failed Bank or the Receiver, including the liability of any depositor as a director or officer of the Failed Bank, whether or not the amount of the liability is or can be determined as of Bank Closing.

**"Failed Bank Advances"** means the total sums paid by the Failed Bank to (i) protect its lien position, (ii) pay ad valorem taxes and hazard insurance, and (iii) pay credit life insurance, accident and health insurance, and vendor's single interest insurance.

4

**"Fair Market Value"** means (i)(a) "Market Value" as defined in the regulation prescribing the standards for real estate appraisals used in federally related transactions, 12 C.F.R. § 323.2(g), and accordingly shall mean the most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently and knowledgeably, and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:

(1) Buyer and seller are typically motivated;
(2) Both parties are well informed or well advised, and acting in what they consider their own best interests;
(3) A reasonable time is allowed for exposure in the open market;
(4) Payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and
(5) The price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale;

as determined as of Bank Closing by an appraiser mutually acceptable to the Receiver and the Assuming Bank; any costs and fees associated with such determination shall be shared equally by the Receiver and the Assuming Bank, and (b) which, with respect to Bank Premises (to the extent, if any, that Bank Premises are purchased utilizing this valuation method), shall be determined not later than sixty (60) days after Bank Closing by an appraiser selected by the Receiver and the Assuming Bank within seven (7) days after Bank Closing; or (ii) with respect to property other than Bank Premises purchased utilizing this valuation method, the price therefor as established by the Receiver and agreed to by the Assuming Bank, or in the absence of such agreement, as determined in accordance with clause (i)(a) above.

**"Fixtures"** means those leasehold improvements, additions, alterations and installations constituting all or a part of Bank Premises and which were acquired, added, built, installed or purchased at the expense of the Failed Bank, regardless of the holder of legal title thereto as of Bank Closing.

**"Furniture and Equipment"** means the furniture and equipment (other than Safe Deposit Boxes, artwork, motor vehicles and leased data processing equipment, including hardware and software), leased or owned by the Failed Bank and reflected on the books of the Failed Bank as of Bank Closing, including without limitation automated teller machines, carpeting, furniture, office machinery (including personal computers), shelving, office supplies, telephone, surveillance and security systems, artwork, and motor vehicles (which motor vehicles shall be deemed located at Bank Premises owned by the Failed Bank).

**"Indemnitees"** means, except as provided in paragraph (k) of Section 12.1, (i) the Assuming Bank, (ii) the Subsidiaries and Affiliates of the Assuming Bank other than any Subsidiaries or Affiliates of the Failed Bank that are or become Subsidiaries or Affiliates of the Assuming Bank, and (iii) the directors, officers, employees and agents of the Assuming Bank and its Subsidiaries and Affiliates who are not also present or former directors, officers, employees or agents of the Failed Bank or of any Subsidiary or Affiliate of the Failed Bank.

5

**"Insured Deposits"** means the net amount due to any depositor with respect to its Deposits as determined by the Receiver or the Corporation pursuant to 12 U.S.C. Sections 1813(l) and (m), and the regulations promulgated thereunder.

**"Initial Payment"** shall mean $0.  There will be no Initial Payment.

**"Legal Balance"** means the amount of indebtedness legally owed by an Obligor with respect to a Loan, including principal and accrued and unpaid interest, late fees, attorneys' fees and expenses, taxes, insurance premiums, and similar charges, if any.

**"Liabilities Assumed"** has the meaning provided in Section 2.1.

**"Lien"** means any mortgage, lien, pledge, charge, assignment for security purposes, security interest, or encumbrance of any kind with respect to an Asset, including any conditional sale agreement or capital lease or other title retention agreement relating to such Asset.

**"Loans"** means all of the following owed to or held by the Failed Bank as of Bank Closing:

(i) loans, participation agreements, interests in participations, overdrafts of customers (including but not limited to overdrafts made pursuant to an overdraft protection plan or similar extensions of credit in connection with a deposit account), revolving commercial lines of credit, home equity lines of credit, United States and/or State-guaranteed student loans, and lease financing contracts;

(ii) all Liens, rights (including rights of set-off), remedies, powers, privileges, demands, claims, priorities, equities and benefits owned or held by, or accruing or to accrue to or for the benefit of, the holder of the obligations or instruments referred to in clause (i) above, including but not limited to those arising under or based upon Credit Documents, casualty insurance policies and binders, standby letters of credit, mortgagee title insurance policies and binders, payment bonds and performance bonds at any time and from time to time existing with respect to any of the obligations or instruments referred to in clause (i) above; and

(iii) all amendments, modifications, renewals, extensions, refinancings, and refundings of or for any of the foregoing;

provided, that there shall be excluded from the definition of Loans (a) any portion of the foregoing which the Failed Bank or the Assuming Bank (or any of their respective Subsidiaries) holds not for its own account but solely as agent or fiduciary for, or otherwise as representative of, any other Person, (b) any loans which have been charged off the Accounting Records of the Failed Bank in whole or in part prior to the date of the Information Package, (c) loans recorded on the Accounting Records of the Failed Bank on "in substance foreclosure" status as of Bank Closing, (d) Commitments and (e) amounts owing under Qualified Financial Contracts.

6

"**Obligor**" means each Person liable for the full or partial payment or performance of any Loan, whether such Person is obligated directly, indirectly, primarily, secondarily, jointly, or severally.

"**Other Real Estate**" means all of the following (including any of the following fully or partially charged off the books and records of the Failed Bank or the Assuming Bank) that are owned by the Failed Bank as of Bank Closing and are purchased pursuant to Section 3.1(v):

    (A)    all interests in real estate (other than Bank Premises and Fixtures), including but not limited to mineral rights, leasehold rights, condominium and cooperative interests, air rights and development rights; and

    (B)    all other assets (whether real or personal property) acquired by foreclosure or in full or partial satisfaction of judgments or indebtedness.

"**Payment Date**" means the first Business Day after Bank Closing.

"**Person**" means any individual, corporation, partnership, joint venture, association, joint-stock company, trust, unincorporated organization, or government or any agency or political subdivision thereof, excluding the Corporation.

"**Primary Indemnitor**" means any Person (other than the Assuming Bank or any of its Affiliates) who is obligated to indemnify or insure, or otherwise make payments (including payments on account of claims made against) to or on behalf of any Person in connection with the claims covered under Article XII, including without limitation any insurer issuing any directors and officers liability policy or any Person issuing a financial institution bond or banker's blanket bond.

"**Put Date**" has the meaning provided in Section 3.4.

"**Put Notice**" has the meaning provided in Section 3.4.

"**Qualified Financial Contract**" means a qualified financial contract as defined in 12 U.S.C. Section 1821(e)(8)(D).

"**Record**" means any document, microfiche, microfilm and computer records (including but not limited to magnetic tape, disc storage, card forms and printed copy) of the Failed Bank generated or maintained by the Failed Bank that is owned by or in the possession of the Receiver at Bank Closing.

"**Related Liability**" with respect to any Asset means any liability existing and reflected on the Accounting Records of the Failed Bank as of Bank Closing for (i) indebtedness secured by mortgages, deeds of trust, chattel mortgages, security interests or other liens on or affecting such Asset, (ii) ad valorem taxes applicable to such Asset, and (iii) any other obligation determined by the Receiver to be directly related to such Asset.

"**Related Liability Amount**" with respect to any Related Liability on the books of the Assuming Bank, means the amount of such Related Liability as stated on the Accounting Records of the Assuming Bank (as maintained in accordance with generally accepted accounting principles) as of the date as of which the Related Liability Amount is being determined. With respect to a liability that relates to more than one asset, the amount of such Related Liability shall be allocated among such assets for the purpose of determining the Related Liability Amount with respect to any one of such assets. Such allocation shall be made by specific allocation, where determinable, and otherwise shall be pro rata based upon the dollar amount of such assets stated on the Accounting Records of the entity that owns such asset.

"**Repurchase Price**" means with respect to any Asset or asset, which shall be determined by the Receiver, the <u>lesser</u> of (a) or (b):

(a) the amount paid by the Assuming Bank, decreased by the amount of any money received with respect thereto since Bank Closing and, if the Asset is a Loan or other interest bearing or earning asset, the resulting amount shall then be increased or decreased, as the case may be, by interest or discount (whichever is applicable) accrued from and after Bank Closing at the lower of: (i) the contract rate with respect to such Asset, or (ii) the Settlement Interest Rate; net proceeds received by or due to the Assuming Bank from the sale of collateral, any forgiveness of debt, or otherwise shall be deemed money received by the Assuming Bank; or

(b) the dollar amount thereof stated on the Accounting Records of the Assuming Bank as of the date as of which the Repurchase Price is being determined, as maintained in accordance with generally accepted accounting principles, and, if the asset is a Loan, regardless of the Legal Balance thereof and adjusted in the same manner as the Book Value of a Failed Bank Loan would be adjusted hereunder.

Provided, however, (b), above, shall not be applicable for Loans repurchased pursuant to Section 3.4(a).

If any Asset or asset is purchased as part of a group of Assets or assets for Book Value and/or as a percentage of Book Value, the amount paid by the Assuming Bank, for purposes of (a), above, shall be the Book Value, as of the date of Bank Closing, of the individual Asset or asset being repurchased multiplied, if applicable, by the percentage paid.

"**Resolution Date**" means the date on which the Corporation implements a resolution with respect to the Assuming Bank in accordance with 12 U.S.C. § 1821(n) and/or § 1823(C) or other applicable law, which date shall be determined by the Corporation.

"**Safe Deposit Boxes**" means the safe deposit boxes of the Failed Bank, if any, including the removable safe deposit boxes and safe deposit stacks in the Failed Bank's vault(s), all rights and benefits (other than fees collected prior to Bank Closing) under rental agreements with respect to such safe deposit boxes, and all keys and combinations thereto.

"**Settlement Date**" means the first Business Day immediately prior to the day which is three hundred sixty-five (365) days after Bank Closing, or such other date prior thereto

as may be agreed upon by the Receiver and the Assuming Bank. The Receiver, in its discretion, may extend the Settlement Date.

"**Settlement Interest Rate**" means, for the first calendar quarter or portion thereof during which interest accrues, the rate determined by the Receiver to be equal to the equivalent coupon issue yield on twenty-six (26)-week United States Treasury Bills in effect as of Bank Closing as published in The Wall Street Journal; provided, that if no such equivalent coupon issue yield is available as of Bank Closing, the equivalent coupon issue yield for such Treasury Bills most recently published in The Wall Street Journal prior to Bank Closing shall be used. Thereafter, the rate shall be adjusted to the rate determined by the Receiver to be equal to the equivalent coupon issue yield on such Treasury Bills in effect as of the first day of each succeeding calendar quarter during which interest accrues as published in The Wall Street Journal.

"**Subsidiary**" has the meaning set forth in Section 3(w)(4) of the Federal Deposit Insurance Act, 12 U.S.C. Section 1813(w)(4), as amended.

# ARTICLE II
## ASSUMPTION OF LIABILITIES

2.1    **Liabilities Assumed by Assuming Bank.** The Assuming Bank expressly assumes at Book Value (subject to adjustment pursuant to Article VIII) and agrees to pay, perform, and discharge all of the following liabilities of the Failed Bank as of Bank Closing, except as otherwise provided in this Agreement (such liabilities referred to as "Liabilities Assumed"):

(a)    Assumed Deposits; provided, that as to any Deposits of public money which are Assumed Deposits, the Assuming Bank agrees to properly secure such Deposits with such of the Assets as appropriate which, prior to Bank Closing, were pledged as security therefor by the Failed Bank, or with assets of the Assuming Bank, if such securing Assets, if any, are insufficient to properly secure such Deposits;

(b)    liabilities for indebtedness secured by mortgages, deeds of trust, chattel mortgages, security interests or other liens on or affecting any Assets, if any; provided, that the assumption of any liability pursuant to this paragraph shall be limited to the market value of the Assets securing such liability as determined by the Receiver;

(c)    borrowings from Federal Reserve Banks and Federal Home Loan Banks, if any, provided, that the assumption of any liability pursuant to this paragraph shall be limited to the market value of the assets securing such liability as determined by the Receiver; and overdrafts, debit balances, service charges, reclamations, and adjustments to accounts with the Federal Reserve Banks as reflected on the books and records of any such Federal Reserve Bank within ninety (90) days after Bank Closing, if any;

9

(d)     ad valorem taxes applicable to any Asset, if any; provided, that the assumption of any ad valorem taxes pursuant to this paragraph shall be limited to an amount equal to the market value of the Asset to which such taxes apply as determined by the Receiver;

(e)     liabilities, if any, for federal funds purchased, repurchase agreements and overdrafts in accounts maintained with other depository institutions (including any accrued and unpaid interest thereon computed to and including Bank Closing); provided, that the assumption of any liability pursuant to this paragraph shall be limited to the market value of the Assets securing such liability as determined by the Receiver;

(f)     United States Treasury tax and loan note option accounts, if any;

(g)     liabilities for any acceptance or commercial letter of credit (other than (i) any such obligation to a Subsidiary of the Failed Bank that is not acquired by the Assuming Bank and (ii) "standby letters of credit" as defined in 12 C.F.R. Section 337.2(a)); provided, that the assumption of any liability pursuant to this paragraph shall be limited to the market value of the Assets securing such liability as determined by the Receiver;

(h)     duties and obligations assumed pursuant to this Agreement including without limitation those relating to the Failed Bank's credit card business, overdraft protection plans, safe deposit business, safekeeping business or trust business, if any; and

(i)     liabilities, if any, for amounts owed to any Acquired Subsidiary.

(j)     liabilities, if any, with respect to Qualified Financial Contracts.

(k)     duties and obligations under any contract pursuant to which the Failed Bank provides mortgage servicing for others, or mortgage servicing is provided to the Failed Bank by others.

(l)     duties and obligations under any contract pursuant to which the Failed Bank holds mortgage servicing rights;

(m)     such liabilities to trade creditors of the Failed Bank as may be determined by the Assuming Bank;

(n)     duties and obligations, if any, with respect to Loans in the form of loan participations;

(o)     liabilities, if any, to fund Commitments to consumers and Acquired Subsidiaries; and

(p)     liabilities (including liabilities for administration), if any, which have vested on or before Bank Closing under or with respect to any Failed Bank employees' pension, profit sharing or stock ownership plan, in accordance with the terms of any such plan that is determined by the Receiver to be adequately funded as of Bank Closing; provided, that the Assuming Bank shall not assume any liability hereunder with respect to any such plan until such time as the Receiver shall have given the Assuming Bank written notice of its election and determination pursuant to Section 2.4.

Notwithstanding the foregoing provisions of this Section 2.1, the Assuming Bank expressly does not assume under this Agreement any (w) Affiliated Funding, (x) obligation or liability of the Failed Bank to, or incurred on behalf of, any Subsidiary of the Failed Bank other than an Acquired Subsidiary, (except as provided in Section 2.1(j)), (y) certain liabilities with respect to the trust business of the Failed Bank as specified in Section 4.5(a), and (z) any liability for any assessment by the Corporation against the Failed Bank pursuant to 12 U.S.C. Section 1815(e).

Schedule 2.1 attached hereto and incorporated herein sets forth certain categories of Liabilities Assumed and the aggregate Book Value of the Liabilities Assumed in such categories. Such schedule is based upon the best information available to the Receiver and may be adjusted as provided in Article VIII.

**22.     Interest on Deposit Liabilities.** The Assuming Bank agrees that, from and after Bank Closing, it will accrue and pay interest on Deposit liabilities assumed pursuant to Section 2.1 at a rate(s) it shall determine.  With respect to certificates of deposit, the Assuming Bank agrees to offer to enter into a new deposit agreement with the depositor, on the same terms and conditions and maturing on the same date, with respect to the insured amount of such certificate of deposit that existed between the Failed Bank and such depositor; provided, that if such Deposit has been pledged to secure an obligation of the depositor or other party, any withdrawal thereof shall be subject to the terms of the agreement governing such pledge.  The Assuming Bank shall give notice to such depositors as provided in Section 5.3 of the rate(s) of interest which it has determined to pay.

**2.3     Unclaimed Deposits.** If, within eighteen (18) months after Bank Closing, any depositor of the Failed Bank does not claim or arrange to continue such depositor's Deposit assumed pursuant to Section 2.1 at the Assuming Bank, the Assuming Bank shall, within fifteen (15) Business Days after the end of such eighteen (18)-month period, (i) refund to the Corporation the full amount of each such Deposit (without reduction for service charges), (ii) provide to the Corporation a schedule of all such refunded Deposits in such form as may be prescribed by the Corporation, and (iii) assign, transfer, convey and deliver to the Receiver all right, title and interest of the Assuming Bank in and to Records previously transferred to the Assuming Bank and other records generated or maintained by the Assuming Bank pertaining to such Deposits. During such eighteen (18)-month period, at the request of the Corporation, the Assuming Bank promptly shall provide to the Corporation schedules of unclaimed deposits in such form as may be prescribed by the Corporation.

11

2.4    **Employee Benefit Plans.**

(a)  The Assuming Bank agrees to assume, honor, and perform all duties, responsibilities and obligations of the Failed Bank which have vested on or before Bank Closing under or with respect to any Failed Bank employee pension, profit sharing or stock ownership plan, in the event that (i) the Receiver elects to have the Assuming Bank assume such duties, responsibilities and obligations with respect to such plan, and (ii) the Receiver determines in its discretion that such plan is adequately funded as of Bank Closing.  The Assuming Bank shall have no obligation under this Section 2.4(a) until such time as the Receiver shall have given the Assuming Bank written notice of such election and determination.

(b)  The Assuming Bank agrees to assume, honor and perform all duties and responsibilities of the Failed Bank under any health insurance plan of the Failed Bank with respect to individuals who were employees or former employees of the Failed Bank or any Subsidiary of the Failed Bank eligible for coverage thereunder.

## ARTICLE III
## PURCHASE OF ASSETS

3.1    **Assets Purchased by Assuming Bank**.  Subject to Sections 3.4 and 3.5, and Article VII, the Assuming Bank hereby acquires from the Receiver, and the Receiver hereby, assigns, transfers, conveys, and delivers to the Assuming Bank, all right, title, and interest of the Receiver in and to all of the following (which, except as otherwise specifically may be provided in this Agreement, initially shall be recorded at Book Value) (such assets referred to as "Assets"):

(a)    cash and receivables from depository institutions, including cash items in the process of collection, plus any accrued interest thereon computed to and including Bank Closing;

(b)    securities (other than the capital stock of Subsidiaries of the Failed Bank), plus any accrued interest thereon computed to and including Bank Closing, if any;

(c)    federal funds sold, if any, including any accrued interest thereon computed to and including Bank Closing;

(d)    Loans;

(e)    credit card business and revolving non-commercial credit plans, if any, subject to Section 4.2;

(f)    Safe Deposit Boxes and related business, safekeeping business and trust business, if any, subject to Sections 4.3, 4.4 and 4.5, respectively;

12

(g)      Records and other documents as provided in Section 6.1;

(h)      the capital stock of Subsidiaries of the Failed Bank listed on Schedule 3.1(i), if any (the "Acquired Subsidiaries");

(i)      amounts owed to the Failed Bank by any Acquired Subsidiary;

(j)      all insurance policies and agreements and the rights and benefits thereunder (including any prepaid assessments or prepaid insurance premiums, premium refunds derived from cancellation, or any proceeds payable with respect to any of the foregoing) of the Failed Bank with respect to insurance coverage for public liability, casualty, fire, extended coverage, and similar coverage provided with respect to assets of the Failed Bank acquired under this Agreement by the Assuming Bank (including such policies and agreements with respect to owned and leased Bank Premises, owned and leased Furniture and Equipment, Fixtures and Leasehold Improvements, and leased data processing equipment, which the Assuming Bank acquires or as to which the Assuming Bank accepts an assignment of the respective lease or enters into a sublease or negotiates a new lease in accordance with this Agreement;

(k)      the legal or equitable interest in receivables of the Failed Bank, including but not limited to, claims against any Person relating to or arising in connection with:  (i) the purported transfer prior to Bank Closing of any asset of the Failed Bank for less than adequate consideration, (ii) improper payment of actual or constructive dividends, (iii) overfunding of any pension plan that is assumed by the Assuming Bank pursuant to Section 2.4, (iv) assessments or premiums paid prior to Bank Closing in connection with any financial institution bonds, banker's blanket bonds, or any other similar insurance policy of the Failed Bank, (v) any right of contribution or indemnity in favor of the Failed Bank relating to or arising in connection with the Failed Bank being named as a party with its holding company and/or any Subsidiary or Affiliate of such holding company in any litigation, investigation or other official inquiry, or (vi) severance benefits or similar benefits of any director or officer of the Failed Bank;

(l)      any premium refunds or unearned premiums derived from cancellation of any financial institution bonds, banker's blanket bonds, or any other similar insurance policy of the Failed Bank;

(m)      prepaid regulatory assessments of the Failed Bank, if any;

(n)      amounts reflected on the books of the Failed Bank as of Bank Closing as a general or specific loss reserve or contingency account, if any with respect to an Asset;

(o)      assets securing any acceptance or commercial letter of credit at the Fair Market Value thereof;

13

(p)      assets securing Deposits of public money at the Fair Market Value thereof;

(q)      Commitments to consumers and Acquired Subsidiaries;

(r)      owned Bank Premises and owned Fixtures and owned Furniture and Equipment located on owned Bank Premises.

(s)      rights under all ground leases, if any, relating to land on which owned Bank Premises are located;

(t)      Qualified Financial Contracts, at the market value thereof determined in accordance with Exhibit 3.1(u). Any costs associated with such valuation shall be shared equally by the Receiver and the Assuming Bank;

(u)      mortgage servicing rights and related contracts;

(v)      Other Real Estate;

(w)      Federal Home Loan Bank stock, and any rights with respect to such stock relating to borrowings from Federal Home Loan Banks assumed under Section 2.1.

(x)      all Loans (not otherwise purchased pursuant to Section 3.1(d) above or pursuant to any asset sale agreement with the Assuming Bank or any other party) that have been fully charged-off (including, without limitation, Loans that have been charged-off to only a nominal Book Value amount) by the Failed Bank prior to Bank Closing, including, without limitation, Loans, or the residual rights from any such Loans, that, as of Bank Closing, were reflected on the books and records of the Failed Bank as judgements or deficiencies; (l)overdrafts of customers (including but not limited to overdrafts made pursuant to an overdraft protection plan or similar extensions of credit in connection with a deposit account).

Assets are acquired hereunder by the Assuming Bank subject to all liabilities for indebtedness collateralized by Liens affecting such Assets to the extent provided in Section 2.1.

     **3.2**    **Consideration.** (a)  As consideration for the acquisition of Assets pursuant to this Agreement, the Assuming Bank (i) assumes certain liabilities pursuant to Article II, (ii) assumes certain duties and obligations under this agreement, and (iii) agrees to comply with the provisions of Article XII.

     (b)      The purchase price for securities (other than the capital stock of any Acquired Subsidiary) purchased under Section 3.1 by the Assuming Bank shall be the market value thereof as of Bank Closing, which market value shall be (i) the "Mid/Last", or "Trade" (as applicable), market price for each such security quoted at the close of the trading day effective on Bank Closing as published electronically by Bloomberg, L.P.; (ii) provided, that if such market price is not available for any such security, the Assuming Bank will submit a bid  for each such security within three days of notification/bid request by the Receiver (unless a different time period is

agreed to by the Assuming Bank and the Receiver) and the Receiver, in its sole discretion will accept or reject each such bid; and (iii) <u>further provided</u> in the absence of an acceptable bid from the Assuming Bank, each such security shall not pass to the Assuming Bank and shall be deemed to be an excluded asset hereunder.

     **3.3**   **<u>Manner of Conveyance; Limited Warranty; Nonrecourse; Etc.</u>** THE CONVEYANCE OF ALL ASSETS, INCLUDING REAL AND PERSONAL PROPERTY INTERESTS, PURCHASED BY THE ASSUMING BANK UNDER THIS AGREEMENT SHALL BE MADE, AS NECESSARY, BY RECEIVER'S DEED OR RECEIVER'S BILL OF SALE, "AS IS", "WHERE IS", WITHOUT RECOURSE AND, EXCEPT AS OTHERWISE SPECIFICALLY PROVIDED IN THIS AGREEMENT, WITHOUT ANY WARRANTIES WHATSOEVER WITH RESPECT TO SUCH ASSETS, EXPRESS OR IMPLIED, WITH RESPECT TO TITLE, ENFORCEABILITY, COLLECTIBILITY, DOCUMENTATION OR FREEDOM FROM LIENS OR ENCUMBRANCES (IN WHOLE OR IN PART), OR ANY OTHER MATTERS.

     **3.4**   **<u>Assets Not Acquired by Assuming Bank</u>**. The Assuming Bank does not purchase, or obtain an option to purchase under this Agreement:

(a)    any financial institution bonds, banker's blanket bonds, or any other similar insurance policy of the Failed Bank, or any proceeds with respect to any of the foregoing;

(b)    any interest, right, action, claim, or judgment against (i) any officer, director, employee, accountant, attorney, or any other Person employed or retained by the Failed Bank or any Subsidiary of the Failed Bank on or prior to Bank Closing arising out of any act or omission of such Person in such capacity, (ii) any underwriter of financial institution bonds, banker's blanket bonds or any other similar insurance policy of the Failed Bank, (iii) any shareholder or holding company of the Failed Bank, or (iv) any other Person whose action or inaction may be related to any loss (exclusive of any loss resulting from such Person's failure to pay on a Loan made by the Failed Bank) incurred by the Failed Bank; <u>provided, that</u> for the purposes hereof, the acts, omissions or other events giving rise to any such claim shall have occurred on or before Bank Closing, regardless of when any such claim is discovered and regardless of whether any such claim is made with respect to a financial institution bond, banker's blanket bond, or any other similar insurance policy of the Failed Bank in force as of Bank Closing;

(c)    any agreement or executory contract for the sale of any branch of the Failed Bank including the assets, liabilities and business related thereto;

(d)    any defensive litigation with respect to which the Failed Bank was a defendant or counter-claimant;

(e)    owned Bank Premises which the Receiver, in its discretion, determines may contain environmentally hazardous substances.

**3.5**     **Loans Essential to Receiver**.

(a)  The Receiver may refuse to sell to the Assuming Bank, or the Assuming Bank agrees, at the request of the Receiver set forth in a written notice to the Assuming Bank, to promptly assign, transfer, convey, and deliver to the Receiver, at no cost to the Receiver, all of the Assuming Bank's right, title and interest in and to, any Loan essential to the Receiver as determined by the Receiver in its discretion (together with all Credit Documents evidencing or pertaining thereto), which may include any Loan that the Receiver determines to be:

(i)  made to an officer, director, or other Person engaging in the affairs of the Failed Bank, its Subsidiaries or Affiliates or any related entities of any of the foregoing;

(ii)  the subject of any investigation relating to any claim described in Section 3.4(a) or (b), or the subject of, or potentially the subject of, any legal proceedings;

(iii)  made to a Person who is an Obligor on a loan owned by the Receiver or the Corporation in its corporate capacity or its capacity as receiver of any institution;

(iv)  secured by collateral which also secures any asset owned by the Receiver or any Subsidiary of the Failed Bank that is not an Acquired Subsidiary; or

(v)  related to any asset of the Failed Bank not acquired by the Assuming Bank pursuant to this Agreement.

(b)     The Assuming Bank agrees to service and manage each such Loan in accordance with usual and prudent banking standards and practices until each such Loan is transferred to the Receiver.  All transfers necessitated by the transfer to the Receiver of any Loan under this Section 3.5 shall be made within seven (7) days after the date of the notice by the Receiver with respect thereto.  The Assuming Bank shall transfer all such Loans to the Receiver without recourse, and shall indemnify the Receiver against any and all claims of any Person claiming by, through or under the Assuming Bank with respect to any such Loan, as provided in Section 11.4.

**3.6**     **Puts of Assets and Liabilities Assumed to the Receiver**.

**(a)**     **Puts Prior to the Settlement Date.** During the period from Bank Closing to and including the Business Day immediately preceding the Settlement Date, the Assuming Bank shall be entitled to require the Receiver to purchase any Asset that was transferred to the Assuming Bank pursuant to Section 3.1, and to take back any Liabilities Assumed pursuant to Section 2.1.  Notwithstanding the foregoing, the Assuming Bank shall <u>not</u> have the right to require the Receiver to purchase any Loan if (i) the Obligor with respect to such Loan is an Acquired Subsidiary, or (ii) the Assuming Bank has:

16

<div style="margin-left:2em">

(A)    made any advance in accordance with the terms of a Commitment or otherwise with respect to such Loan;

(B)    taken any action that increased the amount of a Related Liability with respect to such Loan over the amount of such liability immediately prior to the time of such action;

(C)    created or permitted to be created any Lien on such Loan which secures indebtedness for money borrowed or which constitutes a conditional sales agreement, capital lease or other title retention agreement;

(D)    entered into, agreed to make, grant or permit, or made, granted or permitted any modification or amendment to, any waiver or extension with respect to, or any renewal, refinancing or refunding of, such Loan or related Credit Documents; or

(E)    sold, assigned or transferred all or a portion of such Loan to a third party (whether with or without recourse).

</div>

The Assuming Bank shall transfer all such Loans to the Receiver without recourse, and shall indemnify the Receiver against any and all claims of any Person claiming by, through or under the Assuming Bank with respect to any such Loan, as provided in Section 12.4.

    **(b)**    **Notices to the Receiver**. In the event that the Assuming Bank elects to require the Receiver to purchase one or more Assets, or take back any Liabilities Assumed, the Assuming Bank shall deliver to the Receiver a notice (a "Put Notice") which shall include:

    (i) a list of all Assets that the Assuming Bank requires the Receiver to purchase, or Liabilities Assumed that the Assuming Bank required the Receiver to take back;

    (ii) a list of all Related Liabilities with respect to the Assets or Liabilities Assumed identified pursuant to (i) above; and

    (iii) a statement of the estimated Repurchase Price of each Asset identified pursuant to (i) above as of the applicable Put Date.

Such notice shall be in the form prescribed by the Receiver or such other form to which the Receiver shall consent. As provided in Section 9.6, the Assuming Bank shall deliver to the Receiver such documents, Credit Files and such additional information relating to the subject matter of the Put Notice as the Receiver may request and shall provide to the Receiver full access to all other relevant books and records.

    **(c)**    **Purchase by Receiver**. The Receiver shall purchase Loans that are specified in the Put Notice and shall assume Related Liabilities with respect to such Loans, and the transfer of such Loans and Related Liabilities shall be effective as of a date determined by the Receiver,

which date shall not be later than thirty (30) days after receipt by the Receiver of the Credit Files with respect to such Loans (the "Put Date").

      **(d)**    **Purchase Price and Payment Date**. Each Loan purchased by the Receiver pursuant to this Section 3.6 shall be purchased at a price equal to the Repurchase Price of such Loan less the Related Liability Amount applicable to such Loan, in each case determined as of the applicable Put Date. If the difference between such Repurchase Price and such Related Liability Amount is positive, then the Receiver shall pay to the Assuming Bank the amount of such difference; if the difference between such amounts is negative, then the Assuming Bank shall pay to the Receiver the amount of such difference. The Assuming Bank or the Receiver, as the case may be, shall pay the purchase price determined pursuant to this Section 3.6(e) not later than the twentieth (20th) Business Day following the applicable Put Date, together with interest on such amount at the Settlement Interest Rate for the period from and including such Put Date to and including the day preceding the date upon which payment is made.

      **(e)**    **Servicing.** The Assuming Bank shall administer and manage any Asset subject to purchase by the Receiver in accordance with usual and prudent banking standards and business practices until such time as such Asset is purchased by the Receiver.

      **(f)**    **Reversals**. In the event that the Receiver purchases an Asset (and assumes the Related Liability) that it is not required to purchase pursuant to this Section 3.6, the Assuming Bank shall repurchase such Asset (and assume such Related Liability) from the Receiver at a price computed so as to achieve the same economic result as would apply if the Receiver had never purchased such Asset pursuant to this Section 3.6.

## ARTICLE IV
## ASSUMPTION OF CERTAIN DUTIES AND OBLIGATIONS

      The Assuming Bank agrees with the Receiver and the Corporation as follows:

      **4.1**    **Continuation of Banking Business**. The Assuming Bank agrees to provide full service banking in the trade area of the Failed Bank commencing on the first banking business day (including a Saturday) after Bank Closing. At the option of the Assuming Bank, such banking services may be provided at any or all of the Bank Premises, or at other premises within such trade area.

      **4.2**    **Agreement with Respect to Credit Card Business**. The Assuming Bank agrees to honor and perform, from and after Bank Closing, all duties and obligations with respect to the Failed Bank's credit card business, and/or processing related to credit cards, if any, and assumes all outstanding extensions of credit with respect thereto. Fees related to the credit card business collected prior to Bank Closing shall be for the benefit of the Receiver and fees collected after Bank Closing shall be for the benefit of the Assuming Bank.

**4.3** **Agreement with Respect to Safe Deposit Business**. The Assuming Bank assumes and agrees to discharge, from and after Bank Closing, in the usual course of conducting a banking business, the duties and obligations of the Failed Bank with respect to all Safe Deposit Boxes, if any, of the Failed Bank and to maintain all of the necessary facilities for the use of such boxes by the renters thereof during the period for which such boxes have been rented and the rent therefor paid to the Failed Bank, subject to the provisions of the rental agreements between the Failed Bank and the respective renters of such boxes; provided, that the Assuming Bank may relocate the Safe Deposit Boxes of the Failed Bank to any office of the Assuming Bank located in the trade area of the Failed Bank. Fees related to the safe deposit business collected prior to Bank Closing shall be for the benefit of the Receiver and fees collected after Bank Closing shall be for the benefit of the Assuming Bank.

**4.4** **Agreement with Respect to Safekeeping Business**. The Receiver transfers, conveys and delivers to the Assuming Bank and the Assuming Bank accepts all securities and other items, if any, held by the Failed Bank in safekeeping for its customers as of Bank Closing. The Assuming Bank assumes and agrees to honor and discharge, from and after Bank Closing, the duties and obligations of the Failed Bank with respect to such securities and items held in safekeeping. The Assuming Bank shall be entitled to all rights and benefits heretofore accrued or hereafter accruing with respect thereto; provided, that, fees related to the safe keeping business collected prior to Bank Closing shall be for the benefit of the Receiver and fees collected after Bank Closing shall be for the benefit of the Assuming Bank. The Assuming Bank shall provide to the Receiver written verification of all assets held by the Failed Bank for safekeeping within sixty (60) days after Bank Closing.

**4.5** **Agreement with Respect to Trust Business**.

(a)     The Assuming Bank shall, without further transfer, substitution, act or deed, to the full extent permitted by law, succeed to the rights, obligations, properties, assets, investments, deposits, agreements, and trusts of the Failed Bank under trusts, executorships, administrations, guardianships, and agencies, and other fiduciary or representative capacities, all to the same extent as though the Assuming Bank had assumed the same from the Failed Bank prior to Bank Closing; provided, that any liability based on the misfeasance, malfeasance or nonfeasance of the Failed Bank, its directors, officers, employees or agents with respect to the trust business is not assumed hereunder. Fees related to the trust business collected prior to Bank Closing shall be for the benefit of the Receiver and fees collected after Bank Closing shall be for the benefit of the Assuming Bank.

(b)     The Assuming Bank shall, to the full extent permitted by law, succeed to, and be entitled to take and execute, the appointment to all executorships, trusteeships, guardianships and other fiduciary or representative capacities to which the Failed Bank is or may be named in wills, whenever probated, or to which the Failed Bank is or may be named or appointed by any other instrument.

(c)     In the event additional proceedings of any kind are necessary to accomplish the transfer of such trust business, the Assuming Bank agrees that, at its own expense, it will take whatever action is necessary to accomplish such transfer. The Receiver agrees to use reasonable efforts to assist the Assuming Bank in accomplishing such transfer.

19

(d)      The Assuming Bank shall provide to the Receiver written verification of the assets held in connection with the Failed Bank's trust business within sixty (60) days after Bank Closing.

**4.6**      **Agreement with Respect to Leases**.

(a)      **Option to Assume.** The Receiver hereby grants to the Assuming Bank an exclusive option for the period of one hundred seventy (170) days commencing the day after Bank Closing to cause the Receiver to assign to the Assuming Bank any or all leases for leased Bank Premises, leased Furniture and Equipment and leased Fixtures, if any, which have been continuously occupied or utilized by the Assuming Bank from Bank Closing to the date it elects to accept an assignment of the leases with respect thereto, to the extent such leases can be assigned; provided, that the exercise of this option with respect to any lease must be as to all premises or other property subject to the lease. If an assignment cannot be made of any such leases, the Receiver may, in its discretion, enter into subleases with the Assuming Bank containing the same terms and conditions provided under such existing leases for such leased Bank Premises or other property. The Assuming Bank shall give notice to the Receiver within the option period of its election to accept or not to accept an assignment of any or all leases (or enter into subleases or new leases in lieu thereof). The Assuming Bank agrees to assume all leases assigned (or enter into subleases or new leases in lieu thereof) pursuant to this Section 4.6.

(c)      **Facilitation.** The Receiver agrees to facilitate the assumption, assignment or sublease of leases or the negotiation of new leases by the Assuming Bank; provided, that neither the Receiver nor the Corporation shall be obligated to engage in litigation, make payments to the Assuming Bank or to any third party in connection with facilitating any such assumption, assignment, sublease or negotiation or commit to any other obligations to third parties.

(d)      **Occupancy.** The Assuming Bank shall give the Receiver fifteen (15) days' prior written notice of its intention to vacate prior to vacating any leased Bank Premises with respect to which the Assuming Bank has not exercised the option provided in Section 4.6(b). Any such notice shall be deemed to terminate the Assuming Bank's option with respect to such leased Bank Premises.

(e)      **Occupancy Costs.**

(i) The Assuming Bank agrees to pay to the Receiver, or to appropriate third parties at the direction of the Receiver, during and for the period of any occupancy by it of (x) owned Bank Premises, the market rental value and all operating costs, and (y) leased Bank Premises, all operating costs with respect thereto and to comply with all relevant terms of applicable leases entered into by the Failed Bank, including without limitation the timely payment of all rent. Operating costs include, without limitation all taxes, fees, charges, utilities, insurance and assessments, to the extent not included in the rental value or rent.

(ii) The Assuming Bank agrees during the period of occupancy by it of owned or leased Bank Premises, to pay to the Receiver rent for the use of all leased Furniture and

Equipment and Fixtures located on such Bank Premises for the period of such occupancy. Rent for such property owned by the Failed Bank shall be the market rental value thereof, as determined by the Receiver within sixty (60) days after Bank Closing. Rent for such leased property shall be an amount equal to any and all rent and other amounts which the Receiver incurs or accrues as an obligation or is obligated to pay for such period of occupancy pursuant to all leases and contracts with respect to such property.

      **(f)**    **Certain Requirements as to Furniture, Equipment and Fixtures.** If the Assuming Bank accepts an assignment of the lease (or enters into a sublease or a new lease in lieu thereof) for leased Bank Premises as provided in Section 4.6(a) or 4.6(b), or if the Assuming Bank does not exercise such option but within twelve (12) months following Bank Closing obtains the right to occupy such premises (whether by assignment, lease, sublease, purchase or otherwise**)**, other than in accordance with Section 4.6(a) or (b), the Assuming Bank shall (i) accept an assignment or a sublease of the leases or negotiate new leases for all Furniture and Equipment and Fixtures leased by the Failed Bank and located thereon, and (ii) if applicable, accept an assignment or a sublease of any ground lease or negotiate a new ground lease with respect to any land on which such Bank Premises are located; <u>provided</u>, <u>that</u> the Receiver shall not have disposed of such Furniture and Equipment and Fixtures or repudiated the leases specified in clause (ii**)** or (iii).

      **(g)**    **Vacating Premises.**   If the Assuming Bank elects not to accept an assignment of the lease or sublease any leased Bank Premises, the notice of such election in accordance with Section 4.6**(**b) shall specify the date upon which the Assuming Bank's occupancy of such leased Bank Premises shall terminate, which date shall not be later than the date which is one hundred eighty (180) days after Bank Closing. Upon vacating such premises, the Assuming Bank shall relinquish and release to the Receiver such premises and the Fixtures and the Furniture and Equipment located thereon in the same condition as at Bank Closing, normal wear and tear excepted. By failing to provide notice of its intention to vacate such premises prior to the expiration of the option period specified in Section 4.6(b), or by occupying such premises after the one hundred eighty (180)-day period specified above in this paragraph (ii), the Assuming Bank shall, at the Receiver's option, (x) be deemed to have assumed all leases, obligations and liabilities with respect to such premises (including any ground lease with respect to the land on which premises are located), and leased Furniture and Equipment and leased Fixtures located thereon in accordance with this Section 4.6 (unless the Receiver previously repudiated any such lease), and (y) be required to purchase all Furniture and Equipment and Fixtures owned by the Failed Bank and located on such premises as of Bank Closing.

      **(h)**    **Furniture and Equipment and Certain Other Equipment.** The Receiver hereby grants to the Assuming Bank an option to purchase, effective as of the date of Bank Closing, <u>all</u> Furniture and Equipment, including any telecommunications, data processing equipment (including hardware and software) and check processing and similar operating equipment owned by the Failed Bank and located at any owned or leased Bank Premises that the Assuming Bank elects to vacate or which it could have, but did not occupy, pursuant to this Section 4.6; <u>provided</u>, <u>that</u>, the Assuming Bank shall give the Receiver notice of its election to purchase such property at the time it gives notice of its intention to vacate such Bank Premises or within ten (10) days after Bank Closing for Bank Premises it could have, but did not, occupy.

**4.7**     **Agreement with Respect to Leased Data Processing Equipment**.

(a)     The Receiver hereby grants to the Assuming Bank an exclusive option for the period of  one hundred seventy (170) days commencing the day after Bank Closing to accept an assignment from the Receiver of any or all Data Processing Leases to the extent that such Data Processing Leases can be assigned.

(b)     The Assuming Bank shall (i) give written notice to the Receiver within the option period specified in Section 4.7(a) of its intent to accept an assignment or sublease of any or all Data Processing Leases and promptly accept an assignment or sublease of such Data Processing Leases, and (ii) give written notice to the appropriate lessor(s) that it has accepted an assignment or sublease of any such Data Processing Leases.

(c)     The Receiver agrees to facilitate the assignment or sublease of Data Processing Leases or the negotiation of new leases or license agreements by the Assuming Bank; provided, that neither the Receiver nor the Corporation shall be obligated to engage in litigation or make payments to the Assuming Bank or to any third party in connection with facilitating any such assumption, assignment, sublease or negotiation.

(d)     The Assuming Bank agrees, during its period of use of any property subject to a Data Processing Lease, to pay to the Receiver or to appropriate third parties at the direction of the Receiver all operating costs with respect thereto and to comply with all relevant terms of the applicable Data Processing Leases entered into by the Failed Bank, including without limitation the timely payment of all rent, taxes, fees, charges, utilities, insurance and assessments.

(e)     The Assuming Bank shall, not later than fifty (50) days after giving the notice provided in Section 4.7(b), (i) relinquish and release to the Receiver all property subject to the relevant Data Processing Lease, in the same condition as at Bank Closing, normal wear and tear excepted, or (ii) accept an assignment or a sublease thereof or negotiate a new lease or license agreement under this Section 4.7.

**4.8**     **Agreement with Respect to Certain Existing Agreements**.

(a)     Subject to the provisions of Section 4.8(b), with respect to agreements existing as of Bank Closing which provide for the rendering of services by or to the Failed Bank, within one hundred seventy (170) days after Bank Closing, the Assuming Bank shall give the Receiver written notice specifying whether it elects to assume or not to assume each such agreement. Except as may be otherwise provided in this Article IV, the Assuming Bank agrees to comply with the terms of each such agreement for a period commencing on the day after Bank Closing and ending on: (i) in the case of an agreement that provides for the rendering of services by the Failed Bank, the date which is ninety (90) days after Bank Closing, and (ii) in the case of an agreement that provides for the rendering of services to the Failed Bank, the date which is sixty (60) days after the Assuming Bank has given notice to the Receiver of its election not to assume such agreement; provided, that the Receiver can reasonably make such service agreements available to the Assuming Bank. The Assuming Bank shall be deemed by the Receiver to have assumed agreements for which no notification is timely given. The Receiver agrees to assign, transfer, convey, and deliver to the Assuming Bank all right, title and interest of the Receiver, if

22

any, in and to agreements the Assuming Bank assumes hereunder. In the event the Assuming Bank elects not to accept an assignment of any lease (or sublease) or negotiate a new lease for leased Bank Premises under Section 4.6 and does not otherwise occupy such premises, the provisions of this Section 4.8(a) shall not apply to service agreements related to such premises. The Assuming Bank agrees, during the period it has the use or benefit of any such agreement, promptly to pay to the Receiver or to appropriate third parties at the direction of the Receiver all operating costs with respect thereto and to comply with all relevant terms of such agreement.

      (b)      The provisions of Section 4.8(a) shall not apply to (i) agreements pursuant to which the Failed Bank provides mortgage servicing for others or mortgage servicing is provided to the Failed Bank by others, (ii) agreements that are subject to Sections 4.1 through 4.7 and any insurance policy or bond referred to in Section 3.5(a) or other agreement specified in Section 3.5, and (iii) consulting, management or employment agreements, if any, between the Failed Bank and its employees or other Persons. Except as otherwise expressly set forth elsewhere in this Agreement, the Assuming Bank does not assume any liabilities or acquire any rights under any of the  agreements described in this Section 4.8(b).

      **4.9**      <u>**Informational Tax Reporting**</u>. The Assuming Bank agrees to perform all obligations of the Failed Bank with respect to Federal and State income tax informational reporting related to (i) the Assets and the Liabilities Assumed, (ii) deposit accounts that were closed and loans that were paid off or collateral obtained with respect thereto prior to Bank Closing, (iii) miscellaneous payments made to vendors of the Failed Bank, and (iv) any other asset or liability of the Failed Bank, including, without limitation, loans not purchased and Deposits not assumed by the Assuming Bank, as may be required by the Receiver.

      **4.10**      <u>**Insurance**</u>. The Assuming Bank agrees to obtain insurance coverage effective from and after Bank Closing, including public liability, fire and extended coverage insurance acceptable to the Receiver with respect to owned or leased Bank Premises that it occupies, and all owned or leased Furniture and Equipment and Fixtures and leased data processing equipment (including hardware and software) located thereon, in the event such insurance coverage is not already in force and effect with respect to the Assuming Bank as the insured as of Bank Closing. All such insurance shall, where appropriate (as determined by the Receiver), name the Receiver as an additional insured.

      **4.11**      <u>**Office Space for Receiver and Corporation**</u>.  The Assuming Bank agrees to provide to the Receiver and the Corporation, without charge, adequate and suitable office space (including parking facilities and vault space), furniture, equipment (including photocopying and telecopying machines) and utilities (including local telephone service) at the Bank Premises occupied by the Assuming Bank for their use in the discharge of their respective functions with respect to the Failed Bank. In the event the Receiver and the Corporation determine that the space provided is inadequate or unsuitable, the Receiver and the Corporation may relocate to other quarters having adequate and suitable space and the costs of relocation and any rental and utility costs for the balance of the period of occupancy by the Receiver and the Corporation shall be borne by the Assuming Bank.

      **4.12** <u>**Reserved**</u>

**4.13** **Agreement with Respect to Interim Asset Servicing and Interim Management.** At any time after Bank Closing, the Receiver may establish on its books an asset pool(s) and may transfer to such asset pool(s) (by means of accounting entries on the books of the Receiver) all or any assets and liabilities of the Failed Bank which are not acquired by the Assuming Bank, including, without limitation, wholly unfunded Commitments and assets and liabilities which may be acquired, funded or originated by the Receiver subsequent to Bank Closing. The Receiver may remove assets (and liabilities) from or add assets (and liabilities) to such pool(s) at any time in its discretion. At the option of the Receiver, the Assuming Bank agrees to service, administer, and collect such pool assets in accordance with and for the term set forth in Exhibit 4.13 "Interim Asset Servicing Arrangement" and to manage, administer, collect and liquidate such pool assets in accordance with and for the term set forth in Exhibit 4.13A "Interim Management Arrangement", as such pool assets may be assigned.

**4.14** **Agreement With Respect to Certain Back Room Functions and Certain Data Processing Services.**

(a)  Back room or back office functions provided by the Failed Bank prior to Bank Closing to any Affiliate financial institution or Subsidiary financial institution of the Failed Bank or any holding company of the Failed Bank shall be provided by the Assuming Bank to such institutions for no less than nine (9) months after Bank Closing, whether or not any such financial institution becomes in "default" as defined in 12 U.S.C. Section 1813(x)(1) during such period, subject to payment of fair and reasonable compensation to the Assuming Bank for such service.  For purposes of this Section 4.8(a), the term "back room" or "back office" functions (as this term is understood in the banking industry) includes but is not limited to bookkeeping operations, data processing provided pursuant to agreements, practices, customs or arrangements, item and/or deposit processing, and credit or loan processing.

(b)  The Assuming Bank agrees to continue to provide, in accordance with data processing agreements pursuant to which the Failed Bank provided data processing services to financial institutions or to Subsidiaries of the Failed Bank or any holding company of the Failed Bank as of Bank Closing, such services to such entities for a period of one hundred seventy (170) days after Bank Closing.  The Assuming Bank shall give the Receiver written notice specifying whether it elects to assume or not assume each such agreement prior to the end of such period.

(c)  The Receiver or the Corporation, in its discretion, may release the Assuming Bank from any obligation to provide services in accordance with paragraph (a) or (b) of this Section 4.8.

# ARTICLE V
# DUTIES WITH RESPECT TO DEPOSITORS OF THE FAILED BANK

**5.1** **Payment of Checks, Drafts and Orders.** Subject to Section 9.5, the Assuming Bank agrees to pay all properly drawn checks, drafts and withdrawal orders of depositors of the Failed Bank presented for payment, whether drawn on the check or draft forms provided by the

Failed Bank or by the Assuming Bank, to the extent that the Deposit balances to the credit of the respective makers or drawers assumed by the Assuming Bank under this Agreement are sufficient to permit the payment thereof, and in all other respects to discharge, in the usual course of conducting a banking business, the duties and obligations of the Failed Bank with respect to the Deposit balances due and owing to the depositors of the Failed Bank assumed by the Assuming Bank under this Agreement.

     **5.2**    **Certain Agreements Related to Deposits**. Subject to Section 2.2, the Assuming Bank agrees to honor the terms and conditions of any written escrow or mortgage servicing agreement or other similar agreement relating to a Deposit liability assumed by the Assuming Bank pursuant to this Agreement.

     **5.3**    **Notice to Depositors.**

     (a)    Within seven (7) days after Bank Closing, the Assuming Bank shall give (i) notice to depositors of the Failed Bank of its assumption of the Deposit liabilities of the Failed Bank, and (ii) any notice required under Section 2.2, by mailing to each such depositor a notice with respect to such assumption and by advertising in a newspaper of general circulation in the county or counties in which the Failed Bank was located. The Assuming Bank agrees that it will obtain prior approval of all such notices and advertisements from counsel for the Receiver and that such notices and advertisements shall not be mailed or published until such approval is received.

     (b)    The Assuming Bank shall give notice by mail to depositors of the Failed Bank concerning the procedures to claim their deposits, which notice shall be provided to the Assuming Bank by the Receiver or the Corporation. Such notice shall be included with the notice to depositors to be mailed by the Assuming Bank pursuant to Section 5.3(a).

     (c)    If the Assuming Bank proposes to charge fees different from those charged by the Failed Bank before it establishes new deposit account relationships with the depositors of the Failed Bank, the Assuming Bank shall give notice by mail of such changed fees to such depositors.

<div align="center">

**ARTICLE VI**
**RECORDS**

</div>

     **6.1**    **Transfer of Records**.

     (a)    In accordance with Section 3.1, the Receiver assigns, transfers, conveys and delivers to the Assuming Bank the following Records pertaining to the Deposit liabilities of the Failed Bank assumed by the Assuming Bank under this Agreement, except as provided in Section 6.4:

          (i) signature cards, orders, contracts between the Failed Bank and its depositors and Records of similar character;

<div align="center">25</div>

(ii) passbooks of depositors held by the Failed Bank, deposit slips, cancelled checks and withdrawal orders representing charges to accounts of depositors;

and the following Records pertaining to the Assets:

(iii) records of deposit balances carried with other banks, bankers or trust companies;

(iv) Loan and collateral records and Credit Files and other documents;

(v) deeds, mortgages, abstracts, surveys, and other instruments or records of title pertaining to real estate or real estate mortgages;

(vi) signature cards, agreements and records pertaining to Safe Deposit Boxes, if any; and

(vii) records pertaining to the credit card business, trust business or safekeeping business of the Failed Bank, if any.

(b)     The Receiver, at its option, may assign and transfer to the Assuming Bank by a single blanket assignment or otherwise, as soon as practicable after Bank Closing, any other Records not assigned and transferred to the Assuming Bank as provided in this Agreement, including but not limited to loan disbursement checks, general ledger tickets, official bank checks, proof transactions (including proof tapes) and paid out loan files.

**6.2     Delivery of Assigned Records**. The Receiver shall deliver to the Assuming Bank all Records described in (i) Section 6.1(a) as soon as practicable on or after the date of this Agreement, and (ii) Section 6.1(b) as soon as practicable after making any assignment described therein.

**6.3     Preservation of Records**. The Assuming Bank agrees that it will preserve and maintain for the joint benefit of the Receiver, the Corporation and the Assuming Bank, all Records of which it has custody for such period as either the Receiver or the Corporation in its discretion may require, until directed otherwise, in writing, by the Receiver or Corporation. The Assuming Bank shall have the primary responsibility to respond to subpoenas, discovery requests, and other similar official inquiries with respect to the Records of which it has custody.

**6.4     Access to Records; Copies**. The Assuming Bank agrees to permit the Receiver and the Corporation access to all Records of which the Assuming Bank has custody, and to use, inspect, make extracts from or request copies of any such Records in the manner and to the extent requested, and to duplicate and provide to Receiver, in the discretion of the Receiver or the Corporation, any Record electronic records pertaining to Deposit account relationships. The party requesting a copy of any Record shall bear the cost (based on standard accepted industry charges to the extent applicable, as determined by the Receiver) for providing such duplicate Records. A copy of each Record requested shall be provided as soon as practicable by the party having custody thereof.

## ARTICLE VII
## INITIAL PAYMENT; FINAL DISTRIBUTION

**7.1.** **Initial Payment**.  On the Payment Date, the Corporation will pay to the Assuming Bank, the Initial Payment, together with interest on such amount (if the Payment Date is not the day following the day of Bank Closing) from and including the day following Bank Closing to and including the day preceding the Payment Date at the Settlement Interest Rate.

**7.2** **Final Distribution.**.

Upon the realization on the Resolution Date of the value of substantially all of the Assets of the Assuming Bank, the Corporation (i) will pay to the Receiver on behalf of the Assuming Bank, or cause to be paid to the Receiver by the Assuming Bank, the amount, if any, realized in excess of the amount necessary to pay in full all of the obligations of the Assuming Bank (including the amount necessary to fully reimburse the Corporation for any funds it provides to the Assuming Bank unrelated to the Corporation's insurance obligation with respect to Insured Deposits), and (ii) convey on behalf of the Assuming Bank or cause the Assuming Bank to convey, to the Receiver, without recourse, free and clear of any Lien of the Corporation or the Assuming Bank, all of the Assuming Bank's right, title and interest in and to any such remaining Assets.

## ARTICLE VIII
## ADJUSTMENTS

**8.1** **Pro Forma Statement**. It is understood that the determination of the Initial Payment is based on the Receiver's best estimate of the Liabilities Assumed and the Assets at Bank Closing. The Receiver, as soon as practicable after Bank Closing, in accordance with the best information then available, shall provide to the Assuming Bank a pro forma statement reflecting any adjustments of such liabilities and assets as may be necessary. Such pro forma statement shall take into account, to the extent possible, (i) liabilities and assets of a nature similar to those contemplated by Section 2.1 or Section 3.1, respectively, which at Bank Closing were carried in the Failed Bank's suspense accounts, (ii) accruals as of Bank Closing for all income related to the assets and business of the Failed Bank acquired by the Assuming Bank hereunder, whether or not such accruals were reflected on the Accounting Records of the Failed Bank in the normal course of its operations, and (iii) adjustments to determine the Book Value of any investment in an Acquired Subsidiary and related accounts on the "bank only" (unconsolidated) balance sheet of the Failed Bank based on the equity method of accounting, whether or not the Failed Bank used the equity method of accounting for investments in subsidiaries, except that the resulting amount cannot be less than the Acquired Subsidiary's recorded equity as of Bank Closing as reflected on the Accounting Records of the Acquired Subsidiary. Any Loan purchased by the Assuming Bank pursuant to Section 3.1 which the Failed Bank charged off during the period following the date of the Information Package to Bank Closing shall be deemed not to be charged off for the

27

purposes of the pro forma statement, and the purchase price shall be determined pursuant to Section 3.2.

**8.2     Correction of Errors and Omissions; Other Liabilities**.

(a)      In the event any bookkeeping omissions or errors are discovered in preparing any pro forma statement or in completing the transfers and assumptions contemplated hereby, the parties hereto agree to correct such errors and omissions, it being understood that, as far as practicable, all adjustments will be made consistent with the judgments, methods, policies or accounting principles utilized by the Failed Bank in preparing and maintaining Accounting Records, except that adjustments made pursuant to this Section 8.2(a) are not intended to bring the Accounting Records of the Failed Bank into accordance with generally accepted accounting principles.

(b)      If the Receiver discovers at any time subsequent to the date of this Agreement that any claim exists against the Failed Bank which is of such a nature that it would have been included in the liabilities assumed under Article II had the existence of such claim or the facts giving rise thereto been known as of Bank Closing, the Receiver may, in its discretion, at any time, require that such claim be assumed by the Assuming Bank in a manner consistent with the intent of this Agreement. The Receiver will make appropriate adjustments to the pro forma statement provided by the Receiver to the Assuming Bank pursuant to Section 8.1 as may be necessary.

**8.3     Payments**. The Receiver agrees to cause to be paid to the Assuming Bank, or the Assuming Bank agrees to pay to the Receiver, as the case may be, on the Settlement Date, a payment in an amount which reflects net adjustments (including any costs, expenses and fees associated with determinations of value as provided in this Agreement) made pursuant to Section 8.1 or Section 8.2, plus interest as provided in Section 8.4. The Receiver and the Assuming Bank agree to effect on the Settlement Date any further transfer of assets to or assumption of liabilities or claims by the Assuming Bank as may be necessary in accordance with Section 8.1 or Section 8.2.

**8.4     Interest**. Any amounts paid under Section 8.3 or Section 8.5, shall bear interest for the period from and including the day following Bank Closing to and including the day preceding the payment at the Settlement Interest Rate.

**8.5     Subsequent Adjustments.** In the event that the Assuming Bank or the Receiver discovers any errors or omissions as contemplated by Section 8.2 or any error with respect to the payment made under Section 8.3 after the Settlement Date, the Assuming Bank and the Receiver agree to promptly correct any such errors or omissions, make any payments and effect any transfers or assumptions as may be necessary to reflect any such correction plus interest as provided in Section 8.4.

# ARTICLE IX
# CONTINUING COOPERATION

**9.1    General Matters**. The parties hereto agree that they will, in good faith and with their best efforts, cooperate with each other to carry out the transactions contemplated by this Agreement and to effect the purposes hereof.

**9.2    Additional Title Documents**. The Receiver, the Corporation and the Assuming Bank each agree, at any time, and from time to time, upon the request of any party hereto, to execute and deliver such additional instruments and documents of conveyance as shall be reasonably necessary to vest in the appropriate party its full legal or equitable title in and to the property transferred pursuant to this Agreement or to be transferred in accordance herewith. The Assuming Bank shall prepare such instruments and documents of conveyance (in form and substance satisfactory to the Receiver) as shall be necessary to vest title to the Assets in the Assuming Bank. The Assuming Bank shall be responsible for recording such instruments and documents of conveyance at its own expense.

**9.3    Claims and Suits**.

(a)    The Receiver shall have the right, in its discretion, to (i) defend or settle any claim or suit against the Assuming Bank with respect to which the Receiver has indemnified the Assuming Bank in the same manner and to the same extent as provided in Article XII, and (ii) defend or settle any claim or suit against the Assuming Bank with respect to any Liability Assumed, which claim or suit may result in a loss to the Receiver arising out of or related to this Agreement, or which existed against the Failed Bank on or before Bank Closing. The exercise by the Receiver of any rights under this Section 9.3(a) shall not release the Assuming Bank with respect to any of its obligations under this Agreement.

(b)    In the event any action at law or in equity shall be instituted by any Person against the Receiver and the Corporation as codefendants with respect to any asset of the Failed Bank retained or acquired pursuant to this Agreement by the Receiver, the Receiver agrees, at the request of the Corporation, to join with the Corporation in a petition to remove the action to the United States District Court for the proper district. The Receiver agrees to institute, with or without joinder of the Corporation as coplaintiff, any action with respect to any such retained or acquired asset or any matter connected therewith whenever notice requiring such action shall be given by the Corporation to the Receiver.

**9.4    Payment of Deposits**. In the event any depositor does not accept the obligation of the Assuming Bank to pay any Deposit liability of the Failed Bank assumed by the Assuming Bank pursuant to this Agreement and asserts a claim against the Receiver for all or any portion of any such Deposit liability, the Assuming Bank agrees on demand to provide to the Receiver funds sufficient to pay such claim in an amount not in excess of the Deposit liability reflected on the books of the Assuming Bank at the time such claim is made. Upon payment by the Assuming Bank to the Receiver of such amount, the Assuming Bank shall be discharged from any further obligation under this Agreement to pay to any such depositor the amount of such Deposit liability paid to the Receiver.

**9.5**     **Withheld Payments**. At any time, the Receiver or the Corporation may, in its discretion, determine that all or any portion of any deposit balance assumed by the Assuming Bank pursuant to this Agreement does not constitute a "Deposit" (or otherwise, in its discretion, determine that it is the best interest of the Receiver or Corporation to withhold all or any portion of any deposit), and may direct the Assuming Bank to withhold payment of all or any portion of any such deposit balance. Upon such direction, the Assuming Bank agrees to hold such deposit and not to make any payment of such deposit balance to or on behalf of the depositor, or to itself, whether by way of transfer, set-off, or otherwise. The Assuming Bank agrees to maintain the "withheld payment" status of any such deposit balance until directed in writing by the Receiver or the Corporation as to its disposition. At the direction of the Receiver or the Corporation, the Assuming Bank shall return all or any portion of such deposit balance to the Receiver or the Corporation, as appropriate, and thereupon the Assuming Bank shall be discharged from any further liability to such depositor with respect to such returned deposit balance. If such deposit balance has been paid to the depositor prior to a demand for return by the Corporation or the Receiver, and payment of such deposit balance had not been previously withheld pursuant to this Section, the Assuming Bank shall not be obligated to return such deposit balance to the Receiver or the Corporation. The Assuming Bank shall be obligated to reimburse the Corporation or the Receiver, as the case may be, for the amount of any deposit balance or portion thereof paid by the Assuming Bank in contravention of any previous direction to withhold payment of such deposit balance or return such deposit balance the payment of which was withheld pursuant to this Section.

**9.6**     **Proceedings with Respect to Certain Assets and Liabilities**.

(a)     In connection with any investigation, proceeding or other matter with respect to any asset or liability of the Failed Bank retained by the Receiver, or any asset of the Failed Bank acquired by the Receiver pursuant to this Agreement, the Assuming Bank shall cooperate to the extent reasonably required by the Receiver.

(b)     In addition to its obligations under Section 6.4, the Assuming Bank shall provide representatives of the Receiver access at reasonable times and locations without other limitation or qualification to (i) its directors, officers, employees and agents and those of the Acquired Subsidiaries, and (ii) its books and records, the books and records of the Acquired Subsidiaries and all Credit Files, and copies thereof. Copies of books, records and Credit Files shall be provided by the Assuming Bank as requested by the Receiver and the costs of duplication thereof shall be borne by the Receiver.

(c)     Not later than ten (10) days after the Put Notice pursuant to Section 3.4 or the date of the notice of transfer of any Loan by the Assuming Bank to the Receiver pursuant to Section 3.6, the Assuming Bank shall deliver to the Receiver such documents with respect to such Loan as the Receiver may request, including without limitation the following: (i) all related Credit Documents (other than certificates, notices and other ancillary documents), (ii) a certificate setting forth the principal amount on the date of the transfer and the amount of interest, fees and other charges then accrued and unpaid thereon, and any restrictions on transfer to which any such Loan is subject, and (iii) all Credit Files, and all documents, microfiche, microfilm and computer records (including but not limited to magnetic tape, disc storage, card forms and printed copy)

maintained by, owned by, or in the possession of the Assuming Bank or any Affiliate of the Assuming Bank relating to the transferred Loan.

**9.7** **Information**. The Assuming Bank promptly shall provide to the Corporation such other information, including financial statements and computations, relating to the performance of the provisions of this Agreement as the Corporation or the Receiver may request from time to time, and, at the request of the Receiver, make available employees of the Failed Bank employed or retained by the Assuming Bank to assist in preparation of the pro forma statement pursuant to Section 8.1.

## ARTICLE X
## CONDITION PRECEDENT

The obligations of the parties to this Agreement are subject to the Receiver and the Corporation having received at or before Bank Closing evidence reasonably satisfactory to each of any necessary approval, waiver, or other action by any governmental authority, the board of directors of the Assuming Bank, or other third party, with respect to this Agreement and the transactions contemplated hereby, the closing of the Failed Bank and the appointment of the Receiver, the chartering of the Assuming Bank, and any agreements, documents, matters or proceedings contemplated hereby or thereby.

**[Remainder of Page Blank]**

31

**ARTICLE XI**
**REPRESENTATIONS AND WARRANTIES OF THE ASSUMING BANK**

The Assuming Bank represents and warrants to the Corporation and the Receiver as follows:

**11.1** <u>**Corporate Existence and Authority**</u>. The Assuming Bank (i) is duly organized, validly existing and in good standing under the laws of its Chartering Authority and has full power and authority to own and operate its properties and to conduct its business as now conducted by it, and (ii) has full power and authority to execute and deliver this Agreement and to perform its obligations hereunder. The Assuming Bank has taken all necessary corporate action to authorize the execution, delivery and performance of this Agreement and the performance of the transactions contemplated hereby.

**11.2** <u>**Third Party Consents**</u>. No governmental authority or other third party consents (including but not limited to approvals, licenses, registrations or declarations) are required in connection with the execution, delivery or performance by the Assuming Bank of this Agreement, other than such consents as have been duly obtained and are in full force and effect.

**11.3** <u>**Execution and Enforceability**</u>. This Agreement has been duly executed and delivered by the Assuming Bank and when this Agreement has been duly authorized, executed and delivered by the Corporation and the Receiver, this Agreement will constitute the legal, valid and binding obligation of the Assuming Bank, enforceable in accordance with its terms.

**11.4** <u>**Compliance with Law**</u>.

(i) Neither the Assuming Bank nor any of its Subsidiaries is in violation of any statute, regulation, order, decision, judgment or decree of, or any restriction imposed by, the United States of America, any State, municipality or other political subdivision or any agency of any of the foregoing, or any court or other tribunal having jurisdiction over the Assuming Bank or any of its Subsidiaries or any assets of any such Person, or any foreign government or agency thereof having such jurisdiction, with respect to the conduct of the business of the Assuming Bank or of any of its Subsidiaries, or the ownership of the properties of the Assuming Bank or any of its Subsidiaries, which, either individually or in the aggregate with all other such violations, would materially and adversely affect the business, operations or condition (financial or otherwise) of the Assuming Bank or the ability of the Assuming Bank to perform, satisfy or observe any obligation or condition under this Agreement.

(ii) Neither the execution and delivery nor the performance by the Assuming Bank of this Agreement will result in any violation by the Assuming Bank of, or be in conflict with, any provision of any applicable law or regulation, or any order, writ or decree of any court or governmental authority.

**11.5** <u>**Representations Remain True**</u>. The Assuming Bank represents and warrants that all information provided and representations made by or on behalf of the Assuming Bank in connection with this Agreement and the transactions contemplated hereby, are true and correct in

32

all material respects and do not fail to state any fact required to make the information contained therein not misleading.

# ARTICLE XII
## INDEMNIFICATION

**12.1** <u>**Indemnification of Indemnitees**</u>. From and after Bank Closing and subject to the limitations set forth in this Section and Section 12.6 and compliance by the Indemnitees with Section 12.2, the Receiver agrees to indemnify and hold harmless the Indemnitees against any and all costs, losses, liabilities, expenses (including attorneys' fees) incurred prior to the assumption of defense by the Receiver pursuant to paragraph (d) of Section 12.2, judgments, fines and amounts paid in settlement actually and reasonably incurred in connection with claims against any Indemnitee based on liabilities of the Failed Bank that are not assumed by the Assuming Bank pursuant to this Agreement or subsequent to the execution hereof by the Assuming Bank or any Subsidiary or Affiliate of the Assuming Bank for which indemnification is provided hereunder in (a) of this Section 12.1, subject to certain exclusions as provided in (b) of this Section 12.1:

(a)

(1) claims based on the rights of any shareholder or former shareholder as such of (x) the Failed Bank, or (y) any Subsidiary or Affiliate of the Failed Bank;

(2) claims based on the rights of any creditor as such of the Failed Bank, or any creditor as such of any director, officer, employee or agent of the Failed Bank, with respect to any indebtedness or other obligation of the Failed Bank arising prior to Bank Closing;

(3) claims based on the rights of any present or former director, officer, employee or agent as such of the Failed Bank or of any Subsidiary or Affiliate of the Failed Bank;

(4) claims based on any action or inaction prior to Bank Closing of the Failed Bank, its directors, officers, employees or agents as such, or any Subsidiary or Affiliate of the Failed Bank, or the directors, officers, employees or agents as such of such Subsidiary or Affiliate;

(5) claims based on any malfeasance, misfeasance or nonfeasance of the Failed Bank, its directors, officers, employees or agents with respect to the trust business of the Failed Bank, if any;

(6) claims based on any failure or alleged failure (not in violation of law) by the Assuming Bank to continue to perform any service or activity previously performed by the Failed Bank which the Assuming Bank is not required to perform pursuant to this Agreement or which arise under any contract to which the Failed Bank was a party which the Assuming Bank elected not to assume in accordance with this Agreement and which neither the Assuming Bank nor any Subsidiary or Affiliate of the Assuming Bank has assumed subsequent to the execution hereof;

33

(7) claims arising from any action or inaction of any Indemnitee, including for purposes of this Section 12.1(a)(7) the former officers or employees of the Failed Bank or of any Subsidiary or Affiliate of the Failed Bank that is taken upon the specific written direction of the Corporation or the Receiver, other than any action or inaction taken in a manner constituting bad faith, gross negligence or willful misconduct; and

(8) claims based on the rights of any depositor of the Failed Bank whose deposit has been accorded "withheld payment" status and/or returned to the Receiver or Corporation in accordance with Section 9.5 and/or has become an "unclaimed deposit" or has been returned to the Corporation or the Receiver in accordance with Section 2.3;

(9) claims arising from any action or inaction in connection with the administration of an Asset following a transfer to the Receiver of responsibility for such administration under any provision of the Interim Servicing Arrangement, or similar agreement or arrangement pertaining to the management of the Asset;

(10) claims arising in connection with a refusal of the Assuming Bank, acting pursuant to instructions given in writing by the Receiver pursuant to any provision of the Interim Servicing Arrangement, or any similar agreement or arrangement pertaining to the management of an Asset, to advance funds under a Commitment to an Obligor on any Loan managed pursuant to the Interim Servicing Arrangement;

(b)     provided, that, with respect to this Agreement, except for paragraphs (7) and (8) of Section 12.1(a), no indemnification will be provided under this Agreement for any:

(1) judgment or fine against, or any amount paid in settlement (without the written approval of the Receiver) by, any Indemnitee in connection with any action that seeks damages against any Indemnitee (a "counterclaim") arising with respect to any Asset and based on any action or inaction of either the Failed Bank, its directors, officers, employees or agents as such prior to Bank Closing, unless any such judgment, fine or amount paid in settlement exceeds the greater of (i) the Repurchase Price of such Asset, or (ii) the monetary recovery sought on such Asset by the Assuming Bank in the cause of action from which the counterclaim arises; and in such event the Receiver will provide indemnification only in the amount of such excess; and no indemnification will be provided for any costs or expenses other than any costs or expenses (including attorneys' fees) which, in the determination of the Receiver, have been actually and reasonably incurred by such Indemnitee in connection with the defense of any such counterclaim; and it is expressly agreed that the Receiver reserves the right to intervene, in its discretion, on its behalf and/or on behalf of the Receiver, in the defense of any such counterclaim;

(2) claims with respect to any liability or obligation of the Failed Bank that is expressly assumed by the Assuming Bank pursuant to this Agreement or subsequent to the execution hereof by the Assuming Bank or any Subsidiary or Affiliate of the Assuming Bank;

(3) claims with respect to any liability of the Failed Bank to any present or former employee as such of the Failed Bank or of any Subsidiary or Affiliate of the Failed Bank, which

34

liability is expressly assumed by the Assuming Bank pursuant to this Agreement or subsequent to the execution hereof by the Assuming Bank or any Subsidiary or Affiliate of the Assuming Bank;

(4) claims based on the failure of any Indemnitee to seek recovery of damages from the Receiver for any claims based upon any action or inaction of the Failed Bank, its directors, officers, employees or agents as fiduciary, agent or custodian prior to Bank Closing;

(5) claims based on any violation or alleged violation by any Indemnitee of the antitrust, branching, banking or bank holding company or securities laws of the United States of America or any State thereof;

(6) claims based on the rights of any present or former creditor, customer, or supplier as such of the Assuming Bank or any Subsidiary or Affiliate of the Assuming Bank;

(7) claims based on the rights of any present or former shareholder as such of the Assuming Bank or any Subsidiary or Affiliate of the Assuming Bank regardless of whether any such present or former shareholder is also a present or former shareholder of the Failed Bank;

(8) claims, if the Receiver determines that the effect of providing such indemnification would be to (i) expand or alter the provisions of any warranty or disclaimer thereof provided in Section 3.3 or any other provision of this Agreement, or (ii) create any warranty not expressly provided under this Agreement;

(9) claims which could have been enforced against any Indemnitee had the Assuming Bank not entered into this Agreement;

(10) claims based on any liability for taxes or fees assessed with respect to the consummation of the transactions contemplated by this Agreement, including without limitation any subsequent transfer of any Assets or Liabilities Assumed to any Subsidiary or Affiliate of the Assuming Bank;

(11) except as expressly provided in this Article XII, claims based on any action or inaction of any Indemnitee, and nothing in this Agreement shall be construed to provide indemnification for (i) the Failed Bank, (ii) any Subsidiary or Affiliate of the Failed Bank, or (iii) any present or former director, officer, employee or agent of the Failed Bank or its Subsidiaries or Affiliates; provided, that the Receiver, in its discretion, may provide indemnification hereunder for any present or former director, officer, employee or agent of the Failed Bank or its Subsidiaries or Affiliates who is also or becomes a director, officer, employee or agent of the Assuming Bank or its Subsidiaries or Affiliates;

(12) claims or actions which constitute a breach by the Assuming Bank of the representations and warranties contained in Article XI;

(13) claims arising out of or relating to the condition of or generated by an Asset arising from or relating to the presence, storage or release of any hazardous or toxic substance, or

35

any pollutant or contaminant, or condition of such Asset which violate any applicable Federal, State or local law or regulation concerning environmental protection; and

(14) claims based on, related to or arising from any asset, including a loan, acquired or liability assumed by the Assuming Bank, other than pursuant to this Agreement.

**12.2    Conditions Precedent to Indemnification**. It shall be a condition precedent to the obligation of the Receiver to indemnify any Person pursuant to this Article XII that such Person shall, with respect to any claim made or threatened against such Person for which such Person is or may be entitled to indemnification hereunder:

(a)    give written notice to the Regional Counsel (Litigation Branch) of the Corporation in the manner and at the address provided in Section 13.7 of such claim as soon as practicable after such claim is made or threatened; provided, that notice must be given on or before the date which is six (6) years from the date of this Agreement;

(b)    provide to the Receiver such information and cooperation with respect to such claim as the Receiver may reasonably require;

(c)    cooperate and take all steps, as the Receiver may reasonably require, to preserve and protect any defense to such claim;

(d)    in the event suit is brought with respect to such claim, upon reasonable prior notice, afford to the Receiver the right, which the Receiver may exercise in its sole discretion, to conduct the investigation, control the defense and effect settlement of such claim, including without limitation the right to designate counsel and to control all negotiations, litigation, arbitration, settlements, compromises and appeals of any such claim, all of which shall be at the expense of the Receiver; provided, that the Receiver shall have notified the Person claiming indemnification in writing that such claim is a claim with respect to which the Person claiming indemnification is entitled to indemnification under this Article XII;

(e)    not incur any costs or expenses in connection with any response or suit with respect to such claim, unless such costs or expenses were incurred upon the written direction of the Receiver; provided, that the Receiver shall not be obligated to reimburse the amount of any such costs or expenses unless such costs or expenses were incurred upon the written direction of the Receiver;

(f)    not release or settle such claim or make any payment or admission with respect thereto, unless the Receiver consents in writing thereto, which consent shall not be unreasonably withheld; provided, that the Receiver shall not be obligated to reimburse the amount of any such settlement or payment unless such settlement or payment was effected upon the written direction of the Receiver; and

(g)    take reasonable action as the Receiver may request in writing as necessary to preserve, protect or enforce the rights of the indemnified Person against any Primary Indemnitor.

36

**12.3     No Additional Warranty**. Nothing in this Article XII shall be construed or deemed to (i) expand or otherwise alter any warranty or disclaimer thereof provided under Section 3.3 or any other provision of this Agreement with respect to, among other matters, the title, value, collectibility, genuineness, enforceability or condition of any (x) Asset, or (y) asset of the Failed Bank purchased by the Assuming Bank subsequent to the execution of this Agreement by the Assuming Bank or any Subsidiary or Affiliate of the Assuming Bank, or (ii) create any warranty not expressly provided under this Agreement with respect thereto.

**12.4     Indemnification of Receiver and Corporation**. From and after Bank Closing, the Assuming Bank agrees to indemnify and hold harmless the Corporation and the Receiver and their respective directors, officers, employees and agents from and against any and all costs, losses, liabilities, expenses (including attorneys' fees), judgments, fines and amounts paid in settlement actually and reasonably incurred in connection with any of the following:

(a)     claims based on any and all liabilities or obligations of the Failed Bank assumed by the Assuming Bank pursuant to this Agreement or subsequent to the execution hereof by the Assuming Bank or any Subsidiary or Affiliate of the Assuming Bank, whether or not any such liabilities subsequently are sold and/or transferred, other than any claim based upon any action or inaction of any Indemnitee as provided in paragraph (7) or (8) of Section 12.1(a); and

(b)     claims based on any act or omission of any Indemnitee (including but not limited to claims of any Person claiming any right or title by or through the Assuming Bank with respect to Assets transferred to the Receiver pursuant to Section 3.4 or 3.6), other than any action or inaction of any Indemnitee as provided in paragraph (7) or (8) of Section 12.1(a).

**12.5     Obligations Supplemental**. The obligations of the Receiver, and the Corporation as guarantor in accordance with Section 12.7, to provide indemnification under this Article XII are to supplement any amount payable by any Primary Indemnitor to the Person indemnified under this Article XII. Consistent with that intent, the Receiver agrees only to make payments pursuant to such indemnification to the extent not payable by a Primary Indemnitor. If the aggregate amount of payments by the Receiver, or the Corporation as guarantor in accordance with Section 12.7, and all Primary Indemnitors with respect to any item of indemnification under this Article XII exceeds the amount payable with respect to such item, such Person being indemnified shall notify the Receiver thereof and, upon the request of the Receiver, shall promptly pay to the Receiver, or the Corporation as appropriate, the amount of the Receiver's (or Corporation's) payments to the extent of such excess.

**12.6     Criminal Claims**. Notwithstanding any provision of this Article XII to the contrary, in the event that any Person being indemnified under this Article XII shall become involved in any criminal action, suit or proceeding, whether judicial, administrative or investigative, the Receiver shall have no obligation hereunder to indemnify such Person for liability with respect to any criminal act or to the extent any costs or expenses are attributable to the defense against the allegation of any criminal act, unless (i) the Person is successful on the merits or otherwise in the defense against any such action, suit or proceeding, or (ii) such action, suit or proceeding is terminated without the imposition of liability on such Person.

**12.7    Limited Guaranty of the Corporation.**  The Corporation hereby guarantees performance of the Receiver's obligation to indemnify the Assuming Bank as set forth in this Article XII. It is a condition to the Corporation's obligation hereunder that the Assuming Bank shall comply in all respects with the applicable provisions of this Article XII. The Corporation shall be liable hereunder only for such amounts, if any, as the Receiver is obligated to pay under the terms of this Article XII but shall fail to pay. Except as otherwise provided above in this Section 12.7, nothing in this Article XII is intended or shall be construed to create any liability or obligation on the part of the Corporation, the United States of America or any department or agency thereof under or with respect to this Article XII, or any provision hereof, it being the intention of the parties hereto that the obligations undertaken by the Receiver under this Article XII are the sole and exclusive responsibility of the Receiver and no other Person or entity.

**12.8    Subrogation.** Upon payment by the Receiver, or the Corporation as guarantor in accordance with Section 12.7, to any Indemnitee for any claims indemnified by the Receiver under this Article XII, the Receiver, or the Corporation as appropriate, shall become subrogated to all rights of the Indemnitee against any other Person to the extent of such payment.

### ARTICLE XIII
### MISCELLANEOUS

**13.1    Entire Agreement**. This Agreement embodies the entire agreement of the parties hereto in relation to the subject matter herein and supersedes all prior understandings or agreements, oral or written, between the parties.

**13.2    Headings**. The headings and subheadings of the Table of Contents, Articles and Sections contained in this Agreement, except the terms identified for definition in Article I and elsewhere in this Agreement, are inserted for convenience only and shall not affect the meaning or interpretation of this Agreement or any provision hereof.

**13.3    Counterparts**. This Agreement may be executed in any number of counterparts and by the duly authorized representative of a different party hereto on separate counterparts, each of which when so executed shall be deemed to be an original and all of which when taken together shall constitute one and the same Agreement.

**13.4    Governing Law**. THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS HEREUNDER SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE FEDERAL LAW OF THE UNITED STATES OF AMERICA, AND IN THE ABSENCE OF CONTROLLING FEDERAL LAW, IN ACCORDANCE WITH THE LAWS OF THE STATE IN WHICH THE MAIN OFFICE OF THE FAILED BANK IS LOCATED.

**[Remainder of Page Blank]**

**13.5** **Successors**. All terms and conditions of this Agreement shall be binding on the successors and assigns of the Receiver, the Corporation and the Assuming Bank. Except as otherwise specifically provided in this Agreement, nothing expressed or referred to in this Agreement is intended or shall be construed to give any Person other than the Receiver, the Corporation and the Assuming Bank any legal or equitable right, remedy or claim under or with respect to this Agreement or any provisions contained herein, it being the intention of the parties hereto that this Agreement, the obligations and statements of responsibilities hereunder, and all other conditions and provisions hereof are for the sole and exclusive benefit of the Receiver, the Corporation and the Assuming Bank and for the benefit of no other Person.

**13.6** **Modification; Assignment**. No amendment or other modification, rescission, release, or assignment of any part of this Agreement shall be effective except pursuant to a written agreement subscribed by the duly authorized representatives of the parties hereto.

**13.7** **Notice**. Any notice, request, demand, consent, approval or other communication to any party hereto shall be effective when received and shall be given in writing, and delivered in person against receipt therefor, or sent by certified mail, postage prepaid, courier service, telex or facsimile transmission to such party (with copies as indicated below) at its address set forth below or at such other address as it shall hereafter furnish in writing to the other parties. All such notices and other communications shall be deemed given on the date received by the addressee.

**Assuming Bank**

Federal Deposit Insurance Corporation as
Conservator for IndyMac Federal Bank, FSB
IndyMac Federal Bank, FSB
888 East Walnut Street
Pasadena, California 91101

Attention: President

with a copy to: General Counsel

**Receiver and Corporation**

Federal Deposit Insurance Corporation,
Receiver of IndyMac Bank, FSB
1601 Bryan St.
Dallas, Texas 75201-4586

Attention: Associate Director, Receivership Operations

with copy to: Regional Counsel (Litigation)

**and with respect to notices under Article XII:**

Federal Deposit Insurance Corporation,
Receiver of IndyMac Ban k, FSB
1601 Bryan St.
Dallas, Texas 75201-4586

Attention: Regional Counsel (Litigation)

      13.8   **Manner of Payment**. All payments due under this Agreement shall be in lawful money of the United States of America in immediately available funds as each party hereto may specify to the other parties; provided, that in the event the Receiver or the Corporation is obligated to make any payment hereunder in the amount of $25,000.00 or less, such payment may be made by check.

      13.9   **Costs, Fees and Expenses**. Except as otherwise specifically provided herein, each party hereto agrees to pay all costs, fees and expenses which it has incurred in connection with or incidental to the matters contained in this Agreement, including without limitation any fees and disbursements to its accountants and counsel; provided, that the Assuming Bank shall pay all fees, costs and expenses (other than attorneys' fees incurred by the Receiver) incurred in connection with the transfer to it of any Assets or Liabilities Assumed hereunder or in accordance herewith.

      13.10   **Waiver**. Each of the Receiver, the Corporation and the Assuming Bank may waive its respective rights, powers or privileges under this Agreement; provided, that such waiver shall be in writing; and further provided, that no failure or delay on the part of the Receiver, the Corporation or the Assuming Bank to exercise any right, power or privilege under this Agreement shall operate as a waiver thereof, nor will any single or partial exercise of any right, power or privilege under this Agreement preclude any other or further exercise thereof or the exercise of any other right, power or privilege by the Receiver, the Corporation, or the Assuming Bank under this Agreement, nor will any such waiver operate or be construed as a future waiver of such right, power or privilege under this Agreement.

      13.11   **Severability**. If any provision of this Agreement is declared invalid or unenforceable, then, to the extent possible, all of the remaining provisions of this Agreement shall remain in full force and effect and shall be binding upon the parties hereto.

      13.12   **Term of Agreement**. This Agreement shall continue in full force and effect until the sixth (6th) anniversary of Bank Closing; provided, that the provisions of Section 6.3 and 6.4 shall survive the expiration of the term of this Agreement. Provided, however, the receivership of the Failed Bank may be terminated prior to the expiration of the term of this Agreement; in such event, the guaranty of the Corporation, as provided in and in accordance with the provisions of Section 12.7 shall be in effect for the remainder of the term. Expiration of the term of this Agreement shall not affect any claim or liability of any party with respect to any (i) amount which is owing at the time of such expiration, regardless of when such amount becomes payable, and (ii) breach of this Agreement occurring prior to such expiration, regardless of when such breach is discovered.

**13.13**   **Survival of Covenants, Etc.** The covenants, representations, and warranties in this Agreement shall survive the execution of this Agreement and the consummation of the transactions contemplated hereunder.

**[Signature Page Follows]**

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed by their duly authorized representatives as of the date first above written.

**FEDERAL DEPOSIT INSURANCE CORPORATION,
RECEIVER OF INDYMAC BANK, FSB
PASADENA, CALIFORNIA, USA**

BY:

Mitchell Glassman

TITLE:  Director, Division of Resolutions and Receiverships

**FEDERAL DEPOSIT INSURANCE CORPORATION**

BY:

Mitchell Glassman

TITLE:  Director, Division of Resolutions and Receiverships

**FEDERAL DEPOSIT INSURANCE CORPORATION
AS CONSERVATOR FOR INDYMAC FEDERAL BANK,
FSB**

BY:

Mitchell Glassman

TITLE:  Director, Division of Resolutions and Receiverships

42

**SCHEDULE 2.1 - Certain Liabilities Assumed**

**SCHEDULE 3.1 – Certain Assets Purchased**

**SCHEDULE 3.1(e) - Loans Fully Secured by Assumed Deposits**

**SEE ATTACHED LIST**

**THE LIST(S) ATTACHED TO THIS SCHEDULE (OR SUBSCHEDULE(S)) AND THE INFORMATION THEREIN, IS AS OF THE INFORMATION PACKAGE DATE. IT WILL BE ADJUSTED TO REFLECT THE COMPOSITION AND BOOK VALUE OF THE LOANS AS OF THE DATE OF BANK CLOSING. THE LIST(S) MAY BE REPLACED WITH A MORE ACCURATE LIST POST CLOSING.**

**SCHEDULE 3.1(v) - Other Real Estate Purchased**

**SEE ATTACHED LIST**

**THE LIST(S) ATTACHED TO THIS SCHEDULE (OR SUBSCHEDULE(S)) AND THE INFORMATION THEREIN, IS AS OF THE INFORMATION PACKAGE DATE. IT WILL BE ADJUSTED TO REFLECT THE COMPOSITION AND BOOK VALUE OF THE ASSETS AS OF THE DATE OF BANK CLOSING. THE LIST(S) MAY BE REPLACED WITH A MORE ACCURATE LIST POST CLOSING.**

**SCHEDULE 3.1(h) - Acquired Subsidiaries**

**All Subsidiaries, including IndyMac Resources, Inc; IndyMac Financial Services; IndyMac Agency, Inc.;  IndyMac ABS, Inc.; IndyMac MBS, Inc.; IndyMac Retained Assets, Inc.; IndyMac Securities Corporation; Loan Associates, LLC;AMC1 LLC; IndyMac Commercial Lending Corporation; and Financial Freedom Senior Funding Corporation.**

**SCHEDULE 3.2 – Purchase Price of Assets or assets**

**SCHEDULE 3.5(k) - Securities Not Purchased**

**AS SPECIFIED IN SECTION 3.5**

## EXHIBIT 3.1(U) -- VALUATION OF CERTAIN
## QUALIFIED FINANCIAL CONTRACTS

A.     **Scope**

Interest Rate Contracts - All interest rate swaps, forward rate agreements, interest rate futures, caps, collars and floors, whether purchased or written.

Option Contracts - All put and call option contracts, whether purchased or written, on marketable securities, financial futures, foreign currencies, foreign exchange or foreign exchange futures contracts.

Foreign Exchange Contracts - All contracts for future purchase or sale of foreign currencies, foreign currency or cross currency swap contracts, or foreign exchange futures contracts.

B.     **Exclusions**

All financial contracts used to hedge assets and liabilities that are acquired by the Assuming Bank but are not subject to adjustment from Book Value.

C.     **Adjustment**

The difference between the Book Value and market value as of Bank Closing.

D.     **Methodology**

1.     The price at which the Assuming Bank sells or disposes of Qualified Financial Contracts will be deemed to be the fair market value of such contracts, if such sale or disposition occurs at prevailing market rates within a predefined timetable as agreed upon by the Assuming Bank and the Receiver.

2.     In valuing all other Qualified Financial Contracts, the following principles will apply:

      (i)     All known cash flows under swaps or forward exchange contracts shall be present valued to the swap zero coupon interest rate curve.

      (ii)     All valuations shall employ prices and interest rates based on the actual frequency of rate reset or payment.

      (iii)     Each tranche of amortizing contracts shall be separately valued. The total value of such amortizing contract shall be the sum of the values of its component tranches.

(iv)     For regularly traded contracts, valuations shall be at the midpoint of the bid and ask prices quoted by customary sources (e.g., <u>The Wall Street Journal</u>, Telerate, Reuters or other similar source) or regularly traded exchanges.


(v)     For all other Qualified Financial Contracts where published market quotes are unavailable, the adjusted price shall be the average of the bid and ask price quotes from three (3) securities dealers acceptable to the Receiver and Assuming Bank as of Bank Closing. If quotes from securities dealers cannot be obtained, an appraiser acceptable to the Receiver and the Assuming Bank will perform a valuation based on modeling, correlation analysis, interpolation or other techniques, as appropriate.

**EXHIBIT 4.13**
**INTERIM ASSET SERVICING ARRANGEMENT**

(a)     With respect to each asset (or liability) designated from time to time by the Receiver to be serviced by the Assuming Bank pursuant to this Arrangement (such being designated as "Pool Assets"), during the term of this Arrangement, the Assuming Bank shall:

(i) Promptly apply payments received with respect to any Pool Assets;

(ii) Reverse and return insufficient funds checks;

(iii) Pay (A) participation payments to participants in Loans, as and when received; and (B) tax and insurance bills on Pool Assets as they come due, out of escrow funds maintained for purposes;

(iv) Maintain accurate records reflecting (A) the payment history of Pool Assets, with updated information received concerning changes in the address or identity of the obligors and (B) usage of data processing equipment and employee services with respect to servicing duties;

(v) Send billing statements to obligors on Pool Assets to the extent that such statements were sent by the Failed Bank;

(vi) Send notices to obligors who are in default on Loans (in the same manner as the Failed Bank);

(vii) Send to the Receiver, Attn: Managing Liquidator, at the address provided in Section 13.7 of the Agreement, via overnight delivery: (A) on a weekly basis, weekly reports for the Pool Assets, including, without limitation, reports reflecting collections and the trial balances, transaction journals and loan histories for Pool Assets having activity, together with copies of (1) checks received, (2) insufficient funds checks returned, (3) checks for payment to participants or for taxes and insurance, (4) pay-off requests, (5) notices to defaulted obligors, and (6) data processing and employee logs and (B) any other reports, copies or information as may be periodically or from time to time requested;

(viii) Remit on a weekly basis to the Receiver, Attn: Division of Finance, Cashier Unit, Operations, at the address in (vii), via wire transfer to the account designated by the Receiver, all payments received on Pool Assets managed by the Assuming Bank or at such time and place and in such manner as may be directed by the Receiver;

(ix) prepare and timely file all information reports with appropriate tax authorities, and, if required by the Receiver, prepare and file tax returns and pay taxes due on or before the due date, relating to the Pool Assets; and

(x)  provide and furnish such other services, operations or functions as may be required with regard to Pool Assets, including, without limitation, as may be required with

regard to any business, enterprise or agreement which is a Pool Asset, all as may be required by the Receiver.

Notwithstanding anything to the contrary in this Section, the Assuming Bank shall not be required to initiate litigation or other collection proceedings against any obligor or any collateral with respect to any defaulted Loan. The Assuming Bank shall promptly notify the Receiver, at the address provided above in subparagraph (a)(vii), of any claims or legal actions regarding any Pool Asset.

(b)      The Receiver agrees to reimburse the Assuming Bank for actual, reasonable and necessary expenses incurred in connection with the performance of duties pursuant to this Arrangement, including expenses of photocopying, postage and express mail, and data processing and employee services (based upon the number of hours spent performing servicing duties).

(c)      The Assuming Bank shall provide the services described herein for an initial period of ninety (90) days after Bank Closing. At the option of the Receiver, exercisable by notice given not later than ten (10) days prior to the end of such initial period or a renewal period, the Assuming Bank shall continue to provide such services for such renewal period(s) as designated by the Receiver, up to the Settlement Date.

(d)      At any time during the term of this Arrangement, the Receiver may, upon written notice to the Assuming Bank, remove one or more Pool Assets from the Pool, at which time the Assuming Bank's responsibility with respect thereto shall terminate.

(e)      At the expiration of this Agreement or upon the termination of the Assuming Bank's responsibility with respect to any Pool Asset pursuant to paragraph (d) hereof, the Assuming Bank shall:

(i) deliver to the Receiver (or its designee) all of the Credit Documents and Pool Records relating to the Pool Assets; and

(ii) cooperate with the Receiver to facilitate the orderly transition of managing the Pool Assets to the Receiver (or its designee).

(f)      At the request of the Receiver, the Assuming Bank shall perform such transitional services with regard to the Pool Assets as the Receiver may request. Transitional services may include, without limitation, assisting in any due diligence process deemed necessary by the Receiver and providing to the Receiver or its designee(s) (x) information and data regarding the Pool Assets, including, without limitation, system reports and data downloads sufficient to transfer the Pool Assets to another system or systems, and (y) access to employees of the Assuming Bank involved in the management of, or otherwise familiar with, the Pool Assets.

**EXHIBIT 4.13A**
**INTERIM MANAGEMENT ARRANGEMENT**

**ARTICLE I**
**DEFINITIONS**

Capitalized terms used in this Interim Management Arrangement (the "Arrangement") not otherwise defined in the Agreement or herein shall have the meanings set forth below. As used herein, words importing the singular include the plural and vice versa.

**"Adjusted Pool Value"** means:

(i) with respect to any of the Pool Assets, exclusive of any Pool Assets constituting trust business or credit card business, an amount (not less than zero) equal to the sum of:

(A) the Base Pool Value of such Pool Asset; plus

(B) the aggregate amount of any advances that are made with respect to such Pool Asset after its transfer to the Pool and that are made in accordance with this Arrangement; plus

(C) the aggregate amount of any Capitalized Expenditures relating to such Pool Asset made after its transfer to the Pool; minus

(D) the aggregate amount of all Collections which are not recognized as income or as offsets to expenses pursuant to the Receivership Accounting Requirements with respect to such Pool Asset after its transfer to the Pool; and

(ii) with respect to any Pool Related Liability, the dollar amount thereof stated on the Pool Records as maintained in accordance with the Receivership Accounting Requirements.

The Adjusted Pool Value of any Pool Asset shall be reduced to zero upon Final Disposition of such Pool Asset.

**"Average Pool Assets"** means for any period the sum of the aggregate Adjusted Pool Values of all Pool Assets for each day of such period divided by the number of days in such period.

**"Base Pool Value"** means, with respect to any Pool Asset or Pool Related Liability, the amount required to be reflected on the Pool Records pursuant to the Receivership Accounting Requirements as of the date such Pool Asset or Pool Related Liability is transferred to the Pool. However, such shall exclude any Pool Assets constituting trust business or credit card business for purposes of the definition of Adjusted Pool Value.

**"Capitalized Expenditure"** means an expense of $25,000 or more (or such other amount approved by the Receiver) which would be capitalized under generally accepted

54

accounting principles. Expenditures of less than $25,000 do not constitute Capitalized Expenditures.

**"Collections"** mean, subject to the limitations set forth below in this definition, all cash or monetary revenues such as payments of principal and interest, fees, net proceeds of sale, net proceeds of collateral liquidation, and net insurance proceeds received, including by offset or similar exchange, or derived from a Pool Asset or an asset that otherwise would constitute a Pool Asset except for the fact that Final Disposition of such asset has occurred. The following receipts, exchanges, or transactions do not constitute Collections:

(i) the receipt of any promissory note, guarantee, or other obligation;

(ii) the receipt by any Person managing the Pool on behalf of the Receiver of any payments, fees, or other amounts to which such Person is paid, or compensated, by the Corporation or the Receiver under the Agreement, this Arrangement or any other agreement or arrangement; and

(iii) the receipt of consideration from the Assuming Bank or any Affiliate of the Assuming Bank for the purchase of any Pool Asset.

Solely for purposes of Section 5.1 hereof, Collections shall be subject to the following limitations:

(x) cash or monetary revenues derived from a loan that consists of revolving advances, revolving credit facilities, or similar credit arrangements that are received prior to Final Disposition of such loan and that would otherwise constitute Collections shall not constitute Collections until the earlier of (A) Final Disposition of such loan, or (B) the date upon which the duties of the Assuming Bank under this Arrangement are terminated. The amount of such cash or monetary revenues that shall be deemed to constitute Collections for such purpose shall be limited to the excess of the highest Adjusted Pool Value of such loan after its transfer to the Pool over the Adjusted Pool Value of such loan immediately prior to Final Disposition thereof or at the date the Assuming Bank's duties are terminated with respect thereto, as the case may be;

(y) Collections shall be reduced by the amount of gross reductions in Pool Related Liabilities excluding reductions from non-monetary settlements of such Pool Related Liabilities; and

(z) Collections derived from Excluded Subsidiaries shall be limited to those amounts actually paid to the Receiver as dividends or repayment of advances. Collections based on repayment of advances shall be subject to the same limitations as those with respect to loans that consist of revolving advances, revolving credit facilities and other similar credit arrangements as discussed in clause (x) above. Collections derived from any trust business or credit card business shall be excluded.

"**Cost of Carry**" means, for any calendar month, the one year "constant maturity" U.S. Treasury Rate as reported in <u>The Wall Street Journal</u> for the last Business Day of the preceding calendar month.

"**Counsel**" has the meaning set forth in Section 2.2 hereof.

"**Current Settlement Account**" has the meaning set forth in Section 4.2 hereof.

"**Excluded Subsidiary**" means any subsidiary of the Failed Bank designated by the Receiver as a Pool Asset.

"**Final Disposition**" means any event evidencing a legal or economic inability to produce further Collections for a Pool Asset, including full payment of the Legal Balance due under a Credit Document or, to the extent the following are effected in accordance with the procedures in the operations manual provided by the Receiver, a complete performance of final settlement agreements with Obligors, the sale of loans to the Corporation or to any third party or, with the approval of any oversight committee or other body established to oversee the management of the Pool, the voluntary and knowing abandonment of efforts to obtain further Collections.

"**Pool**" means such assets and related liabilities as determined by the Receiver from time to time for purposes of Section 4.13 of the Agreement.

"**Pool Assets**" means the assets as determined by the Receiver from time to time for purposes of Section 4.13 of the Agreement, to the extent designated by the Receiver as part of the Pool, including, without limitation, in whole or in part, the capital stock of Excluded Subsidiaries, any credit card business, and any trust business, if so designated, and related liabilities.

"**Pool Records**" means the books and records of the Pool established and maintained as provided in Section 4.1 hereof.

"**Pool Related Liability**" means any liability that is transferred to the Pool because it is a Related Liability with respect to a Pool Asset.

"**Receivership Accounting Requirements**" mean the rules, regulations, policies, procedures and reporting requirements relating to accounting for the Pool as determined by the Receiver, in its sole discretion, and communicated to the Assuming Bank from time to time. Unless otherwise directed by the Receiver, such requirements shall reflect generally accepted accounting principles.

## ARTICLE II
## ASSET MANAGEMENT

**2.1     Agreement with Respect to Management**. The Assuming Bank shall serve as an independent contractor to manage, administer, collect and liquidate the Pool Assets during the term of this Arrangement. The Assuming Bank shall be responsible to the Receiver for the performance of its duties hereunder, shall provide to the Receiver such reports as the Receiver deems advisable, and shall permit the Receiver to oversee, monitor and audit at any time the Assuming Bank's performance of its duties hereunder.

**2.2     Assuming Bank's Duties.** (a) In performance of its duties under this Arrangement, the Assuming Bank shall:

(i) liquidate, collect and manage the Pool Assets solely in the best interest of the Receiver;

(ii) exercise its best business judgment in managing the Pool Assets;

(iii) use its best efforts to maximize the net present value of net Collections with respect to the Pool Assets;

(iv) promptly advise the Receiver and its legal counsel (the "Counsel") of any situation (including but not limited to the initiation of any legal action) that may adversely affect any Pool Asset as provided in Article III hereof;

(v) adopt and implement accounting, reporting, recordkeeping and similar systems with respect to the Pool Assets as provided in Article IV hereof;

(vi) maintain fidelity bond coverage with respect to defalcations by its employees in connection with the services provided hereunder;

(vii) within thirty (30) days after transfer of an asset to the Pool, provide by mail a written notification, in a format acceptable to the Receiver, advising all Obligors with respect to such asset that such asset is held by the Receiver and that checks submitted as payments should be made payable to the Federal Deposit Insurance Corporation as Receiver of the Failed Bank and directing such Obligors to continue making loan payments as instructed in such notification;

(viii) comply in all respects with the operations manual provided by the Receiver;

(ix) permit Persons designated by the Receiver to conduct due diligence review of the Credit Documents of Pool Assets;

(x) provide adequate safekeeping for all Credit Documents of Pool Assets;

(xi) retain sufficient staff to perform its duties hereunder;

(xii) provide to the Receiver clerical or similar support staff as may be reasonably requested by the Receiver for use during the term of this Arrangement; and

(xiii) prepare and timely file all tax returns and information reports with appropriate tax authorities and pay taxes due on or before the due date, relating to the Pool and Pool Assets.

(b)     The Assuming Bank shall manage the Excluded Subsidiaries by (i) designating appropriate employees of the Assuming Bank to serve as officers subject to the approval of the board of directors of the Excluded Subsidiary, (ii) if the Receiver chooses to elect such employees, causing such employees to serve as directors of such Excluded Subsidiaries, and (iii) making such employees available for such periods as may be necessary to fulfill the duties of such offices. The officers of the Excluded Subsidiaries shall, in accordance with the laws of the relevant jurisdictions, manage the Excluded Subsidiaries at the direction of the duly elected directors of such Subsidiaries. Neither the Receiver nor any Excluded Subsidiary shall have any obligation to pay any compensation to the Assuming Bank or any of its employees for services provided pursuant to this Section 2.3(b). The Assuming Bank shall not be obligated under this Section 2.3(b) to pay any expense or liability of any Excluded Subsidiary other than the compensation and employment benefits of any employee of the Assuming Bank who serves as an officer or director of such Excluded Subsidiary pursuant to this Section 2.3(b).

(c)     In connection with the services provided by the Assuming Bank hereunder, the following shall be subject to the prior approval of the Receiver (whether or not reimbursable under Section 5.2 hereof):

(i) all purchases by the Assuming Bank of any Pool Asset and any transaction involving the Pool or any Pool Asset with an Affiliate of the Assuming Bank;

(ii) all compromises or settlements of loans that are Pool Assets, unless ninety percent (90%) or more of the Legal Balance is collected as a result of such compromise or settlement;

(iii) all releases of collateral for a cash payment of less than ninety percent (90%) of the appraised value of the collateral based upon a current, independent appraisal;

(iv) disposition of a Pool Asset that would result in a loss where the Adjusted Pool Value of such Pool Asset exceeds $25,000, other than a disposition which does not require approval as provided in Section 2.2(c)(ii) and (iii) hereof;

(v) restructuring of any loan including but not limited to the waiver of payment defaults or other material defaults, and/or the release of guarantors;

(vi) bulk sales of Pool Assets;

(vii) any expenditure in excess of $100,000, any Capitalized Expenditure, any proposed data processing conversions or changes in any existing data processing capabilities (including computer hardware and software), or any payment of a Pool Related Liability;

(viii) all loan disbursements (whether or not pursuant to a Commitment) with respect to any Pool Asset;

(ix) any subcontracting of the Assuming Bank's duties hereunder;

(x) incurring any obligation on behalf of the Receiver; and

(xi) the use of any employee of the Assuming Bank to (A) manage any Pool Asset for which he or she was the originating loan officer or for which he or she had personal and substantial involvement or responsibility (other than as a loan workout officer) as an employee of the Failed Bank or the Assuming Bank or in any other capacity; or (B) exercise supervisory responsibility over any other employee with respect to a Pool Asset that he or she would be prohibited from managing under clause (A) unless he or she is prohibited from making or influencing decisions with respect to such Pool Asset.

**2.3**    **Term and Termination.**

(a)    The Assuming Bank shall provide the services described herein for an initial period of ninety (90) days after Bank Closing. At the option of the Receiver, exercisable by notice given not later than ten (10) days prior to the end of such initial period or a renewal period, the Assuming Bank shall continue to provide such services for such renewal period(s) as designated by the Receiver, up to the Settlement Date.

(b)    The Receiver may, upon written notice to the Assuming Bank, remove one or more Pool Assets from the Pool, at which time the Assuming Bank's responsibility with respect thereto shall terminate.

(c)    At the expiration of this Arrangement or upon the termination of the Assuming Bank's responsibility with respect to any Pool Asset pursuant to Section 2.4(b) hereof, the Assuming Bank shall:

(i) deliver to the Receiver (or its designee) all of the Credit Documents and Pool Records relating to the Pool Assets; and

(ii) cooperate with the Receiver to facilitate the orderly transition of managing the Pool Assets to the Receiver (or its designee).

(d)    At the request of the Receiver, the Assuming Bank shall perform such transitional services with regard to the Pool Assets as the Receiver may request. Transitional services may include, without limitation, assisting in any due diligence process deemed necessary by the Receiver in connection with the selection of a permanent servicer for the Pool and providing to the Receiver or its designee(s) (x) information and data regarding the Pool and Pool Assets, including, without limitation, system reports and data downloads sufficient to transfer the Pool and Pool Assets to another system or systems, (y) access to employees of the Assuming Bank involved in the management of, or otherwise familiar with, the Pool Assets, and (z) office space and facilities sufficient to facilitate the due diligence process.

**ARTICLE III**
**LEGAL SERVICES**

**3.1     Agreement with Respect to Legal Services.** The Assuming Bank shall perform the duties set forth in this Article III with respect to any dispute involving the Pool Assets and shall coordinate such matters with the Counsel.

**3.2     Assuming Bank's Duties.** (a) Unless otherwise directed by the Counsel or provided herein, the Assuming Bank shall:

(i) not commence any legal proceeding, or refer any dispute involving the Pool Assets to outside counsel without the prior approval of the Counsel;

(ii) supervise all existing litigation or other legal proceedings with respect to the Pool Assets and, continue to use outside counsel retained prior to Bank Closing by the Failed Bank with respect to such matters; provided that, the Counsel may at any time direct the Assuming Bank to use only such outside counsel which are on the Corporation's List of Counsel Available;

(iii) coordinate and oversee all disputes and related matters involving the Pool Assets;

(iv) whenever the Assuming Bank selects outside counsel under this Arrangement, attempt to refer at least ten percent (10%) of the matters described in clause (i) to minority and women-owned law firms approved by the Corporation or identified in the List of Counsel Available;

(v) monitor the performance of outside counsel;

(vi) provide to the Counsel any information that the Counsel may request regarding pleadings, case strategies, the performance of outside counsel and any other information relating to any dispute involving the Pool Assets;

(vii) immediately notify and forward to the Counsel any summons, complaint or any other legal document or service of process received by the Assuming Bank with respect to any Pool Asset or claim against the Corporation or the Receiver; provided that, the Assuming Bank is not an authorized agent of the Corporation or the Receiver upon which service of process may be made;

(viii) immediately notify the Counsel of any adverse order or judgment with respect to any Pool Asset and obtain the written approval of the Counsel prior to appealing or taking any other action with respect to such order or judgment;

60

(ix) as directed by the Counsel, submit any dispute involving a Pool Asset to binding arbitration or other alternative dispute resolution procedure and immediately thereafter move to dismiss any pending litigation or other legal proceeding relating to such dispute;

(x) to the extent not inconsistent with the terms of this Arrangement, comply with the requirements set forth in the Corporation's <u>Guide For Outside Counsel</u>, and assure that all outside counsel retained by the Assuming Bank pursuant to this Arrangement also comply with such requirements;

(xi) take all necessary action to protect the privileges applicable to the Corporation and the Receiver, including but not limited to attorney-client and work product privileges; and

(xii) preserve and protect the confidentiality of all information and documentation communicated to and received from the Corporation and the Receiver and Counsel and outside counsel.

(b)    The Assuming Bank shall submit to the Counsel on or before the fifteenth (15th) day of the next following calendar month a monthly legal services report which shall describe (i) each new matter referred by the Assuming Bank to outside counsel, including the identity of such outside counsel, the nature of the legal services to be provided and a description of the Pool Asset involved, and (ii) each matter concluded, terminated or otherwise withdrawn.

(c)    Upon written notice from the Counsel, allow the Receiver to audit compliance by the Assuming Bank with this Article III.

**3.3    <u>Receiver's Rights.</u>** The Counsel may (a) consult directly with outside counsel regarding any litigation or dispute involving the Pool Assets and/or (b) direct or control, at the Receiver's sole cost and expense and upon written notice to the Assuming Bank, any legal action or services with respect to such litigation or dispute

## ARTICLE IV
## POOL ACCOUNTING AND REPORTING

**4.1    <u>Pool Records.</u>** The Assuming Bank shall immediately establish and maintain the Pool Records on a separate general ledger and on subsidiary ledgers as appropriate to account for Pool Assets and Pool Related Liabilities with such income and expense classifications as the Receiver may require. As of the end of each calendar month, the Assuming Bank shall deliver to the Receiver a report of the financial condition and operations of the Pool. Such report shall be prepared in accordance with the Receivership Accounting Requirements and include a balance sheet, income statement and cash flow statement, report of Collections, postings to the Current Settlement Account and such additional information as shall be required by the Receiver. The report shall include an invoice in a format acceptable to the Receiver for the amount due from the Receiver as reflected in the Current Settlement Account. The Assuming Bank shall deliver the report to the Receiver on or before the 15th day of the next following calendar month. Pool Assets shall be recorded on the Pool Records at their Base Pool Values, together with Pool Related Liabilities, as of the date of transfer to the Pool. Thereafter, Pool Assets and Pool

Related Liabilities shall be reflected at their Adjusted Pool Values. Subsidiary ledgers shall include and permit an accounting for (a) income and expense tracking for each loan with respect to each Obligor, and (b) legal fees paid with respect to each Pool Asset by law firm, attorney and each attorney's hourly rate. All accounting records of the Pool shall be maintained by the Assuming Bank on the cash basis of accounting.

      **4.2**    **Current Settlement Account.** The Assuming Bank shall establish and maintain an account (the "Current Settlement Account") to which the amount of payments due to or from the Receiver shall be posted on a calendar month basis.

      **4.3**    **Funding of Pool Asset Expenses.** The Assuming Bank shall establish a deposit account acceptable to the Receiver for the payment of (a) Pool Related Liabilities (except payments under participation agreements which are paid from Collections) and advances with respect to Pool Assets, in either case to the extent permitted by Section 2.3 hereof, (b) Capitalized Expenditures and (c) other expenses reimbursable under Section 5.2 hereof. Such account shall be maintained in accordance with the operations manual provided by the Receiver. As of the end of each calendar month, the Assuming Bank shall post to the Current Settlement Account the amount funded in accordance with this Section 4.3, together with interest for such period on the average daily balance of the amount of such fundings outstanding at a rate per annum equal to the Cost of Carry plus fifty (50) basis points (0.50%).

      **4.4**    **Payments.** Payment of the invoice accompanying the monthly report provided for in Section 4.1 hereof shall be made no later than fifteen (15) Business Days after the date of receipt of such report by the Receiver. Payment made to the Assuming Bank shall be applied to reduce the amount due to the Assuming Bank pursuant to Section 4.3 hereof on the date of receipt of such payment. The Receiver may withhold payment if, in its judgment, a basis exists for denying eligibility for payment of any amount included in the invoice until the Assuming Bank, after notice by the Receiver, demonstrates that such amount is eligible for payment. Any amount withheld shall be paid by the Receiver no later than fifteen (15) Business Days after the Receiver has approved such payment.

      **4.5**    **Collections.** The Assuming Bank shall establish and maintain in trust for the Receiver a deposit account acceptable to the Receiver to which all Collections shall be immediately deposited upon receipt thereof by the Assuming Bank. All collected funds in such account shall be wire transferred on a daily basis by the Assuming Bank to the bank account designated by the Receiver. Any amounts not promptly remitted to the Receiver pursuant to this Section 4.5 shall bear interest at a rate per annum equal to the Cost of Carry plus fifty (50) basis points (0.50%).

<div align="center">

**ARTICLE V**
**FEES AND EXPENSES**

</div>

      **5.1**    **Payment for Services.**

      (a)    The Receiver agrees to pay the following monthly fees to the Assuming Bank:

(i) a fee equal to the product of (A) one percent (1%) of the Average Pool Assets during the month and (B) the number of days this Arrangement is in effect during such month divided by three hundred sixty-five (365); and

(ii) a fee equal to six percent (6%) of the amount of Collections during the month;

(iii) with regard to any Pool Asset constituting a trust business, the amount of fees the Failed Bank would have collected attributable to the services rendered by the Assuming Bank, to the extent actually collected;

(iv) with regard to any Pool Asset constituting a credit card business, the actual, reasonable and necessary expenses incurred in connection with the performance of duties pursuant to this Arrangement, including expenses of photocopying, postage and express mail, and data processing and employee services (based upon the number of hours spent performing servicing duties).

(b)      At the end of each calendar month, the Assuming Bank shall post to the Current Settlement Account the amount, if any, of fees due for such month.

**5.2      Reimbursable Expenses.**

(a)      The Receiver agrees to reimburse the Assuming Bank for its actual direct asset expenses (i) incurred to secure, maintain or sell any Pool Asset (including legal expenses therefor), or (ii) incurred to enforce any rights under the Credit Documents.

(b)      Any expense otherwise reimbursable under this Section 5.2 shall not be reimbursed if the Receiver determines:

(i) such expense was not incurred (A) in good faith, (B) with the same degree of care that the Assuming Bank would exercise in the collection of troubled assets in its own portfolio, and (C) in accordance herewith;

(ii) such expense was incurred for a product, service, or activity that is of an extravagant nature or design; or

(iii) the approval of the Receiver for the payment of such expense (or for the contract or other arrangement under which it was incurred) was required under this Arrangement but was not obtained.

(c)      The following categories of expenses shall not be reimbursable under this Section 5.2:

(i) Federal, State, or local income taxes and expenses related thereto;

(ii) salaries and related benefits of the Assuming Bank's employees, including any bonus or severance arrangements, training, payroll taxes, dues, or travel- or relocation-related expenses;

(iii) the cost of space occupied by the Assuming Bank and its staff, the rental and maintenance of furniture and equipment, and expenses for data processing (including data processing conversions);

(iv) except as otherwise provided herein, fees for accounting, legal and other independent professional consultants (including employees of the Assuming Bank);

(v) out-of-pocket miscellaneous operating expenses incurred by the Assuming Bank or any Affiliate in the management of the Pool Assets;

(vi) expenses related to any trust business except to the extent such are reimbursed by such trusts or third parties;

(vii) expenses related to any credit card business (except as such may be paid under Section 5.1); and

(vi) any other expenses that are not reimbursable under this Section 5.2.

## ARTICLE VI
## ADDITIONAL INDEMNITY

**6.1** **Additional Indemnity.** The following additional indemnities are provided with regard to Pool Assets under this Arrangement in the same manner as if such appeared under Section 12.1(a) of the Agreement:

(9) claims arising from any action or inaction in connection with the administration of any asset of the Failed Bank that is not acquired under Section 3.1 of the Agreement following a transfer to the Receiver of responsibility for such administration under any provision of the Arrangement;

(10) claims arising in connection with any refusal of the Assuming Bank, acting pursuant to instructions given in writing by the Receiver pursuant to any provision of the Arrangement, or any similar arrangement pertaining to the management of any asset of the Failed Bank that is not acquired under Section 3.1 of the Agreement or any similar arrangement pertaining to the management of such assets, to advance funds under a commitment to an obligor on any loan included among such assets;

(11) any action or inaction taken or omitted to be taken pursuant to this Arrangement in connection with the administration of any asset or the management of any Subsidiary of the Failed Bank that is not acquired under Section 3.1 of the Agreement (the "Management Services"), if such action or inaction is taken or omitted to be taken in good faith

64

and in a manner reasonably believed to be in the best interests of the Receiver or such Subsidiary; and

(12) any action or inaction in connection with the Management Services which is taken or omitted to be taken upon the specific written direction of the Corporation or the Receiver.

**6.2     Additional Exclusions From Indemnity.** The following additional exclusions from indemnities are provided with regard to Pool Assets under this Arrangement in the same manner as if such appeared under Section 12.1(b) of the Agreement:

(15) claims arising from any action or inaction by the Person claiming indemnification which constitutes bad faith, gross negligence or willful misconduct;

(16) claims that could have been enforced against the Person claiming indemnification if the Assuming Bank had not agreed to perform the Management Services;

(17) claims arising from any violation, as a result of action or inaction by the Assuming Bank, or any Subsidiary or Affiliate of the Assuming Bank of (x) any agreement or instrument to which it is a party or by which it or its assets are bound, or (y) its charter or by-laws.

**6.3     Additional Indemnity For Receiver and Corporation.** The following additional indemnity is provided with regard to Pool Assets under this Arrangement in the same manner as if such appeared under Section 12.4 of the Agreement:

(3) claims arising from any action or inaction of any Indemnitee in connection with the Arrangement, if such action or inaction was taken or omitted in a manner constituting bad faith, gross negligence or willful misconduct.

Execution Copy

MASTER PURCHASE AGREEMENT

BY AND AMONG

THE FEDERAL DEPOSIT INSURANCE CORPORATION
AS CONSERVATOR FOR INDYMAC FEDERAL BANK, FSB,

IMB HOLDCO LLC, and

ONEWEST BANK GROUP LLC

Dated as of March 18, 2009

10070175 v63

## TABLE OF CONTENTS

ARTICLE I DEFINITIONS ............................................................................................. 2

    Section 1.01   Definitions.......................................................................... 2
    Section 1.02   Construction..................................................................... 16

ARTICLE II DESCRIPTION OF TRANSACTION............................................. 17

    Section 2.01   Formation of Purchaser................................................ 17
    Section 2.02   Capitalization................................................................. 17
    Section 2.03   Transactions Prior to Closing...................................... 17
    Section 2.04   Closing Date Transactions............................................ 17
    Section 2.05   The Closing..................................................................... 18

ARTICLE III PURCHASE PRICE FOR THE PURCHASE AND ASSUMPTION
       TRANSACTIONS ......................................................................... 18

    Section 3.01   Final Purchase Price...................................................... 18
    Section 3.02   Aggregate Closing Payment ........................................ 18
    Section 3.03   Post-Closing Settlement................................................ 19

ARTICLE IV ASSUMPTION OF GROUP 1 LIABILITIES ................................. 21

    Section 4.01   Group 1 Liabilities Assumed by the Purchaser......... 21
    Section 4.02   Liabilities Not Assumed by the Purchaser.................. 22
    Section 4.03   Interest on Thrift Deposit Liabilities.......................... 23
    Section 4.04   Unclaimed Deposits...................................................... 23
    Section 4.05   Employee Benefit Plans................................................ 23

ARTICLE V PURCHASE OF GROUP 1 ASSETS .............................................. 24

    Section 5.01   Group 1 Assets Purchased by the Purchaser............. 24
    Section 5.02   Assets Not Purchased by the Purchaser ..................... 25
    Section 5.03   Purchase Price; Closing Payment. .............................. 25
    Section 5.04   Prorations....................................................................... 26
    Section 5.05   Closing Procedure.......................................................... 26
    Section 5.06   Closing Adjustment Documents .................................. 27
    Section 5.07   Calculation of Adjustments.......................................... 27
    Section 5.08   Final Settlement ............................................................. 27
    Section 5.09   FHLB Advances Make Whole Payment...................... 27
    Section 5.10   Disclaimer....................................................................... 28

ARTICLE VI ASSUMPTION OF CERTAIN GROUP 1 DUTIES AND OBLIGATIONS ....... 28

    Section 6.01   Continuation of Banking Business................................ 28
    Section 6.02   Agreement with Respect to Debit Card Business ....... 28
    Section 6.03   Agreement with Respect to Safe Deposit Business ..... 29

Section 6.04   Agreement with Respect to Safekeeping Business ..................... 29
Section 6.05   Agreement with Respect to Custody Business .......................... 29
Section 6.06   Agreement with Respect to Assumed Contracts ........................ 30
Section 6.07   Informational Tax Reporting ....................................... 30
Section 6.08   Insurance ......................................................... 30
Section 6.09   Flow Subservicing ................................................. 30
Section 6.10   Transitional Services Agreement ................................... 30
Section 6.11   Agreement with Respect to Leased Bank Premises ..................... 31

ARTICLE VII DUTIES WITH RESPECT TO DEPOSITORS OF INDYMAC FEDERAL ...... 32

Section 7.01   Payment of Checks, Drafts and Orders .............................. 32
Section 7.02   Notice to Depositors .............................................. 33

ARTICLE VIII RECORDS ................................................................ 33

Section 8.01   Transfer of Records ............................................... 33
Section 8.02   Delivery of Records ............................................... 34
Section 8.03   Unassigned Records ................................................ 34
Section 8.04   Confidentiality ................................................... 36
Section 8.05   No Waiver of Privilege ............................................ 38
Section 8.06   System Security ................................................... 38
Section 8.07   Privacy And Data Protection ....................................... 38

ARTICLE IX GROUP 1 TRANSACTION COVENANTS ........................................ 39

Section 9.01   Additional Title Documents ........................................ 39
Section 9.02   Thrift Deposits ................................................... 39
Section 9.03   Payment of Thrift Deposits ........................................ 39
Section 9.04   Withheld Payments ................................................. 40

ARTICLE X TRANSACTION COVENANTS ................................................. 40

Section 10.01   Pre-Closing Covenants ............................................ 40
Section 10.02   Post-Closing Covenants Relating to Records and Accounting Records .... 42
Section 10.03   FHLB Excess Stock ................................................ 43
Section 10.04   Reformation and Amendment of Definitive Agreements in Certain
                Circumstances .................................................... 44

ARTICLE XI EMPLOYMENT MATTERS .................................................... 45

Section 11.01   Employees ........................................................ 45
Section 11.02   Welfare and Retirement Benefits for Transferred Employees ........ 45
Section 11.03   WARN Act ......................................................... 47
Section 11.04   Transition Employees ............................................. 47

ARTICLE XII TAX MATTERS ......................................................................... 48

    Section 12.01  Tax Characterization and Net Operating Losses ........................48

ARTICLE XIII CLOSING DELIVERIES FOR GROUP 1 TRANSACTION .......................... 49

    Section 13.01  Seller's Deliverables ....................................................49
    Section 13.02  Purchaser's Deliverables..................................................49

ARTICLE XIV CONDITIONS PRECEDENT TO TRANSACTION ................................... 50

    Section 14.01  Conditions to Each of HoldCo's, Intermediate HoldCo's and the
                  Purchaser's Obligation......................................................50
    Section 14.02  Conditions to the Seller's Obligation....................................52

ARTICLE XV REPRESENTATIONS AND WARRANTIES........................................... 54

    Section 15.01  Seller's Representations and Warranties .................................54
    Section 15.02  Representations and Warranties Regarding the Purchaser ....................55
    Section 15.03  HoldCo and Intermediate HoldCo's Representations and Warranties ......56

ARTICLE XVI TERMINATION ......................................................................... 60

    Section 16.01  Termination of Agreement.................................................60
    Section 16.02  Effect of Termination......................................................61
    Section 16.03  Survival..................................................................61
    Section 16.04  Deposit Refund ...........................................................61
    Section 16.05  Backstop Purchase .......................................................62
    Section 16.06  Failure to Close ..........................................................62
    Section 16.07  Investor Liability..........................................................63

ARTICLE XVII REIMBURSEMENT FOR LOSSES................................................. 63

    Section 17.01  Reimbursement Related to the Seller's Assets, Acts or Omissions..........63
    Section 17.02  Tax Reimbursement ......................................................65
    Section 17.03  Failure to Obtain Third-Party Consents Reimbursement; GSE
                  Reimbursement ............................................................66
    Section 17.04  Conditions Precedent to Reimbursement.................................67
    Section 17.05  No Additional Warranty ..................................................68
    Section 17.06  Indemnification of the Seller .............................................68
    Section 17.07  Obligations Supplemental.................................................70
    Section 17.08  Criminal Claims............................................................70
    Section 17.09  Subrogation................................................................71
    Section 17.10  Further Cooperation .......................................................71

ARTICLE XVIII NOTICES .................................................................................. 71

ARTICLE XIX MISCELLANEOUS PROVISIONS ..................................................... 72

    Section 19.01  Severability .............................................................................. 72
    Section 19.02  Governing Law ....................................................................... 73
    Section 19.03  Cost, Fees and Expenses ......................................................... 73
    Section 19.04  Waivers; Amendment and Assignment ................................... 73
    Section 19.05  No Presumption ...................................................................... 73
    Section 19.06  Entire Agreement .................................................................... 74
    Section 19.07  Jurisdiction; Venue and Service .............................................. 74
    Section 19.08  Waiver of Jury Trial ................................................................ 74
    Section 19.09  Counterparts; Facsimile Signatures .......................................... 75
    Section 19.10  Headings ................................................................................. 75
    Section 19.11  Compliance with Law .............................................................. 75
    Section 19.12  Use of the FDIC's Name and Reservation of Statutory Powers ... 75
    Section 19.13  Right to Specific Performance .................................................. 75
    Section 19.14  No Third Party Beneficiaries .................................................... 76
    Section 19.15  Confidentiality; Disclosures ..................................................... 76
    Section 19.16  Manner of Payment ................................................................. 76
    Section 19.17  Survival of Covenants, Etc ...................................................... 77

Schedules:

| Schedule | Description |
|---|---|
| Schedule 1.01 | List of Investors |
| Schedule 3.02(a) | Aggregate Closing Payment Calculation |
| Schedule 3.02(b) | Wire Transfer Instructions (Seller and Purchaser) |
| Schedule 4.01(a) | Thrift Deposits |
| Schedule 4.01(c)(i) | FHLB Advances |
| Schedule 4.01(c)(ii) | FHLB Contracts |
| Schedule 4.01(f) | Assumed Contracts |
| Schedule 4.01(g) | Assumed Real Property Leases |
| Schedule 4.01(h) | Other Liabilities |
| Schedule 4.02(a) | Excluded Contracts |
| Schedule 5.01(a) | Cash on Hand |
| Schedule 5.01(b)(i) | Owned Bank Premises |
| Schedule 5.01(b)(ii) | Servicing Business Premises |
| Schedule 5.01(c)(i) | Fixtures and Owned Furniture and Equipment |
| Schedule 5.01(c)(ii) | Additional Furniture and Equipment |
| Schedule 5.01(d) | Overdraft Loans |
| Schedule 5.01(e) | Seller's Intellectual Property |
| Schedule 5.01(f) | Accounts and Accounts Receivable |
| Schedule 5.01(j) | Artwork |
| Schedule 5.01(k) | Pre-Paid Expenses |
| Schedule 5.01(l) | Other Assets |
| Schedule 5.02 | Excluded Assets |
| Schedule 6.11(a) | Real Property Leases with Option to Assign |

Schedule 10.01(e)      Contracts Subject to Put
Schedule 13.01(i)       Additional Seller's Deliverables
Schedule 14.01(g)      Required Approvals
Schedule 15.01(c)       Litigation Pending (Seller)
Schedule 15.03(d)      Litigation Pending (HoldCo and Intermediate HoldCo)
Schedule 16.05           Backstop Purchasers

Exhibits:

Exhibit A-1          Assignment and Assumption Agreement
Exhibit A-2          Assignment and Assumption of Leases
Exhibit B             Bill of Sale
Exhibit C-1          Closing Escrow Agreement
Exhibit C-2          Consent and Collateral Assignment
Exhibit D             Term Sheet for Flow Subservicing Agreement
Exhibit E-1          Form of Trademark Assignment
Exhibit E-2          Form of Patent Assignment
Exhibit E-3          Form of Domain Name Assignment
Exhibit E-4          Form of Copyright Assignment
Exhibit F             Loan Sale Agreement
Exhibit G             Participation and Servicing Agreement
Exhibit H             Asset Contribution and Assignment Agreement
Exhibit I               LLC Operating Agreement
Exhibit J              LLC Interest Sale and Assignment Agreement
Exhibit K             Reverse Mortgage Business Asset Purchase Agreement
Exhibit L              Securities Sale Agreement
Exhibit M            Mortgage Loan Master Repurchase Agreement
Exhibit N             Securities Master Repurchase Agreement
Exhibit O-1          Collection Account Control Agreement (Securities)
Exhibit O-2          Collection Account Control Agreement (Mortgage Loans)
Exhibit P             Master Netting Agreement
Exhibit Q            Financing Electronic Tracking Agreement
Exhibit R-1          Collateral Account Control Agreement (Securities)
Exhibit R-2          Limited Guaranty Agreement (Securities)
Exhibit S             Financing Custodial Agreement
Exhibit T              Indenture
Exhibit U            Pricing Side Letter
Exhibit V             Receivables Purchase Agreement
Exhibit W           Note Purchase Agreement
Exhibit X             Financing Guaranty
Exhibit Y             Trust Agreement
Exhibit Z             Administration Agreement
Exhibit AA          Financing Note
Exhibit BB           Trust Certificate
Exhibit CC          Servicing Business Asset Purchase Agreement
Exhibit DD          [RESERVED]

Exhibit EE        Intellectual Property, Data and Information Technology Assets
                  License Agreement
Exhibit FF        Seller Closing Certifications and Other Documents to be Delivered to
                  HoldCo
Exhibit GG        Purchaser Closing Certifications, Opinions and Other Documents to be
                  Delivered to the Seller
Exhibit HH        HoldCo Closing Certifications, Opinions and Other Documents to be
                  Delivered to Seller
Exhibit II        Intermediate HoldCo Closing Certifications, Opinions and Other
                  Documents to be Delivered to Seller
Exhibit JJ        Legal Opinions of Cleary Gottlieb Steen & Hamilton LLP

## MASTER PURCHASE AGREEMENT

THIS MASTER PURCHASE AGREEMENT (as the same shall be amended or supplemented, this "**Agreement**") is made and entered into as of the 18th day of March, 2009 (the "**Effective Date**") by and among THE FEDERAL DEPOSIT INSURANCE CORPORATION AS CONSERVATOR FOR INDYMAC FEDERAL BANK, FSB (including its successors and assigns, the "**Seller**"), IMB HOLDCO LLC ("**HoldCo**") and ONEWEST BANK GROUP LLC ("**Intermediate HoldCo**").

## RECITALS

WHEREAS, on July 11, 2008, the FDIC (as defined below) was appointed receiver for IndyMac Bank, FSB (the "**Failed Thrift**") and certain assets and obligations of the Failed Thrift were transferred to a newly-formed thrift, IndyMac Federal Bank, FSB ("**IndyMac Federal**"), for which the FDIC was appointed conservator;

WHEREAS, under the Federal Deposit Insurance Act, as amended, the FDIC is authorized to sell or otherwise dispose of the assets of thrift institutions for which it serves as conservator or receiver;

WHEREAS, HoldCo desires to purchase certain specified assets and assume certain specified liabilities of IndyMac Federal on the terms and subject to the conditions set forth herein and in the other Definitive Agreements (as defined below);

WHEREAS, in order to facilitate the purchase of the assets and assumption of the liabilities by HoldCo, Intermediate HoldCo, a newly formed direct wholly owned subsidiary of HoldCo, will form a new federally chartered, FDIC insured, stock form savings association or savings bank to be known as OneWest Bank, FSB (the "**Purchaser**");

WHEREAS, in order to facilitate the transactions provided for herein and in the other Definitive Agreements, on the Closing Date (as defined below), the FDIC shall be appointed receiver of IndyMac Federal;

WHEREAS, on the Closing Date, each of the Purchaser and the FDIC, as receiver for IndyMac Federal, shall become a party to this Agreement by executing a joinder hereto, and shall thereafter be subject to and bound by all of the terms and conditions applicable to it hereunder, respectively, and each of the Purchaser (or a subsidiary of the Purchaser) and the FDIC, as receiver for IndyMac Federal, shall also enter into the other Definitive Agreements to which it is named as a party;

WHEREAS, pursuant to this Agreement and the other Definitive Agreements, the Seller shall sell, assign, convey and transfer to the Purchaser or a subsidiary of the Purchaser and, in connection with Group 3 and Group 4, as defined below, cause certain subsidiaries of IndyMac Federal to sell, assign, convey and transfer to the Purchaser or a subsidiary of the Purchaser, the following:

- certain assets and liabilities of IndyMac Federal's retail bank business (referred to herein as "**Group 1**");

- IndyMac Federal's servicing advances and servicing rights with respect to certain mortgage loans and the related platform (referred to herein as "**Group 2**");

- certain assets and liabilities of IndyMac Federal's reverse mortgage business (referred to herein as "**Group 3**");

- substantially all of IndyMac Federal's securities portfolio (referred to herein as "**Group 4**");

- substantially all of IndyMac Federal's residential mortgage loan portfolio (referred to herein as "**Group 5**"); and

- substantially all of IndyMac Federal's consumer construction loan portfolio, homebuilder loan portfolio and lot loan portfolio (referred to herein as "**Groups 6-8**");

WHEREAS, concurrently with the execution and delivery of this Agreement, as an inducement to HoldCo to enter into this Agreement and incur the obligations set forth herein, the FDIC is executing and delivering to HoldCo the FDIC Guaranty (as defined below); and

WHEREAS, the parties desire to memorialize their agreements relating to the transactions described above and certain other matters as set forth in this Agreement and the other Definitive Agreements.

NOW, THEREFORE, in consideration of the foregoing and the mutual promises and agreements hereinafter contained, and for other good and valuable consideration the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows.

## ARTICLE I

## DEFINITIONS

Section 1.01   Definitions.   For purposes of this Agreement, the following terms shall have the meanings and definitions hereinafter respectively set forth:

"**Accounting Records**" means the general ledger and subsidiary ledgers and supporting schedules which support the general ledger balances.

"**Accrual Period**" means the period beginning on the day immediately following a Measurement Date and ending on the immediately succeeding Measurement Date, except the first Accrual Period shall begin on the day immediately following the Closing Date and end on the second Measurement Date following the Closing Date and the last Accrual Period shall end on the Termination Date.

"**Acquired Subsidiary**" means IndyMac Financial Services, a California corporation and a wholly owned subsidiary of IndyMac Federal.

"**Adjusted FHLB Advances**" means the FHLB Advances identified on Schedule 4.01(c)(i), adjusted down for any maturities, payments or prepayments and shall exclude any FHLB Advances that have been extended, renewed or rolled over.

"**Affiliate**" means, with respect to any specified Person, any other Person that directly or indirectly, through one or more intermediaries, controls, is controlled by or is under common control with such specified Person. For purposes of this definition, the term "**control**" (including the phrases "**controlled by**" and "**under common control with**") when used with respect to any specified Person means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities or interests, by contract or otherwise.

"**Aggregate Closing Payment**" means an amount equal to the sum of (i) the Group 1 Closing Payment, *plus* (ii) the Group 2 Closing Payment, *plus* (iii) the Group 3 Closing Payment, *plus* (iv) the Group 4 Closing Payment, *plus* (v) the Group 5 Closing Payment, *plus* (vi) the Groups 6-8 Closing Payment.

"**Aggregate Final Payment**" means an amount equal to the sum of (i) the Group 1 Final Payment, *plus* (ii) the Group 2 Final Payment, *plus* (iii) the Group 3 Final Payment, *plus* (iv) the Group 4 Final Payment, *plus* (v) the Group 5 Final Payment, *plus* (vi) the Groups 6-8 Final Payment.

"**Aggregate Final Purchase Price**" has the meaning given in Section 3.01.

"**Agreement**" has the meaning given in the preamble, and shall include all exhibits, schedules and attachments hereto.

"**Amortizing Prepayment Penalty Schedule Amount**" means, for any Accrual Period, the differential between (a) the Initial Maximum Prepayment Penalty and (b) the sum of (i) all previous Differential Payment Calculations and (ii) the Differential Payment Calculation during such Accrual Period.

"**Assets**" means the aggregate of all of the Group 1 Assets and the assets included in Group 2, Group 3, Group 4, Group 5 and Groups 6-8, as more specifically identified in the applicable Definitive Agreement.

"**Assignment and Assumption Agreement**" means the Assignment and Assumption Agreement in the form attached hereto as Exhibit A-1.

"**Assignment and Assumption of Leases**" means the Assignment and Assumption of Leases in the form attached hereto as Exhibit A-2.

"**Assumed Contracts**" has the meaning given in Section 4.01(f).

"**Assumed Group 1 Liabilities**" has the meaning given in Section 4.01.

"**Assumed Real Property Leases**" has the meaning given in Section 4.01(g).

- 3-

"**Backstop Purchase**" has the meaning given in <u>Section 16.05</u>.

"**Backstop Purchasers**" has the meaning given in <u>Section 16.05</u>.

"**Bank Premises**" means the banking branch offices, drive-in banking facilities and teller facilities (staffed or automated), together with appurtenant parking, storage and service facilities and structures connecting remote facilities to banking branches, and land on which the foregoing are located, that are owned or leased by the Seller and that are occupied by IndyMac Federal (and, with respect to <u>Section 6.11</u>, real property leased by Financial Freedom) as of the Closing Date.

"**Bill of Sale**" means a Bill of Sale in the form attached hereto as <u>Exhibit B</u>.

"**Book Value**" means, with respect to any asset purchased or liability assumed by the Purchaser pursuant to this Agreement or the other Definitive Agreements, the Dollar amount thereof stated on the Accounting Records of IndyMac Federal, as of the applicable date, determined after adjustments made by the Seller for differences in accounts, suspense items, unposted debits and credits, and other similar adjustments or corrections and for setoffs, whether voluntary or involuntary. Without limiting the generality of the foregoing, the Book Value of an assumed liability shall include all accrued and unpaid interest thereon. The Book Value of an Asset shall not include any adjustment for loan premiums, discounts or any related deferred income or fees, or general or specific reserves on the Accounting Records of IndyMac Federal.

"**Business Day**" means any day except a Saturday, Sunday or other day on which federal savings banks in California, New York or Washington, D.C. or United States federal government offices are required or authorized by Law to close.

"**Capital Contribution**" means the capital contribution in the amount of ONE BILLION FIVE HUNDRED FIFTY MILLION Dollars ($1,550,000,000), inclusive of the Deposit, to be contributed by HoldCo to Intermediate HoldCo and thereafter by Intermediate HoldCo to the Purchaser.

"**Cash on Hand**" means any and all cash maintained at the Bank Premises in connection with the operation of the retail banking business and any cash maintained in the Seller's operating accounts (other than custodial accounts) as reflected on the Accounting Records.

"**Closing**" has the meaning given in <u>Section 2.05</u>.

"**Closing Adjustment Documents**" has the meaning given in <u>Section 3.03(a)</u>.

"**Closing Date**" has the meaning given in <u>Section 2.05</u>.

"**Closing Escrow Account**" means the escrow account for the Closing Escrow Funds pursuant to the Closing Escrow Agreement.

"**Closing Escrow Agreement**" means the Closing Escrow Agreement in the form attached hereto as <u>Exhibit C-1</u> to be entered into prior to the Closing Date by and among the escrow agent named therein, HoldCo and the FDIC as conservator for IndyMac Federal.

"**Closing Escrow Funds**" has the meaning given in <u>Section 2.03</u>.

"**Confidential Information**" has the meaning given in <u>Section 8.04(e)</u>.

"**Confidentiality Agreement**" means the Confidentiality Agreement executed by HoldCo on December 31, 2008.

"**Consent and Collateral Assignment**" means the Consent and Collateral Assignment in the form attached hereto as <u>Exhibit C-2</u> to be entered into as of the Closing Date by and among the Purchaser, the Seller and the FHLB.

"**Contract**" means any written agreement, lease (other than for real property), license or sublicense, evidence of indebtedness, or other written contract, commitment, arrangement or obligation.

"**Current Period Prepayment Penalty Amount**" means, for any Accrual Period, the sum of all prepayment penalties paid to the FHLB by the Purchaser or any of its Affiliates on the Adjusted FHLB Advances during such Accrual Period. For the avoidance of doubt, the prepayment penalties will not include any accrued interest calculable from the previous interest payment date on the Adjusted FHLB Advances. All prepayment penalties associated with the prepayment of an Adjusted FHLB Advance with a new FHLB advance will be excluded from any Prepayment Penalty Reimbursement Amount.

"**Data Processing Equipment**" means data processing equipment and related hardware and software, and shall include all equipment related thereto, including remote terminals, networked personal computers, cabling, writing and related installation equipment and materials.

"**Data Protection Laws**" has the meaning given in <u>Section 8.07(a)</u>.

"**Day Count**" means 30/360 for each Accrual Period, except for: (x) the first Accrual Period which will equal the fraction of (a) the actual number of days between the Closing Date and the second Measurement Date following the Closing Date and (b) 360; and (y) the last Accrual Period, if the Termination Date is the three (3) year anniversary of the Closing Date, which will equal the fraction of (i) the actual number of days between the previous Measurement Date and the Termination Date and (ii) 360.

"**Definitive Agreements**" means this Agreement, the Servicing Business Asset Purchase Agreement, the Reverse Mortgage Business Asset Purchase Agreement, the Securities Sale Agreement, the Loan Sale Agreement, the Shared-Loss Agreement, the Reverse Mortgage Shared-Loss Agreement, the Intellectual Property Assignments, the Intellectual Property, Data and Information Technology Assets License, the Participation Structure Documents, the Transitional Services Agreement, the Seller Financing Agreements, the FDIC Guaranty, and, upon execution of each such agreement, the Unfunded Commitment Definitive Agreements and the Flow Subservicing Definitive Agreement.

"**Deposit**" means the ONE HUNDRED THIRTY NINE MILLION Dollars ($139,000,000) being held in escrow pursuant to the Initial Escrow Agreement and released to the Seller on the date hereof in accordance with the terms of the Initial Escrow Agreement.

"**Differential Payment Calculation**" means, for any Accrual Period, the product of (a) the product of (i) the Differential Rate and (ii) the Day Count and (b) the average outstanding principal balance of the Adjusted FHLB Advances for such Accrual Period.

"**Differential Rate**" equals 1.25%.

"**Disagreement**" has the meaning given in Section 3.03(b).

"**Dollar**" or "**$**" means the lawful currency of the United States of America.

"**Effective Date**" has the meaning given in the preamble.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended.

"**ERISA Affiliate**" means any entity that, together with the Seller, the Failed Thrift or IndyMac Federal, would be treated as a single employer under Section 414 of the Internal Revenue Code of 1986, as amended.

"**Excess Stock**" has the meaning set forth in the Capital Plan of the FHLB.

"**Excess Stock Payment**" has the meaning given in Section 10.03(a).

"**Excluded Assets**" has the meaning given in Section 5.02.

"**Excluded Contracts**" has the meaning given in Section 4.02(a).

"**Excluded Liabilities**" has the meaning given in Section 4.02(b).

"**Excluded Losses**" means any consequential, special or indirect damages, lost profits, lost investment or business opportunity, interest, damages to reputation, punitive damages, exemplary damages, treble damages, nominal damages and operating losses.

"**Failed Thrift**" has the meaning given in the recitals.

"**Fair Market Value**" means the fair market value of an asset or a group of assets as set forth in an appraisal prepared prior to the Closing Date by Industrial Appraisal Company.

"**Fannie Mae**" means the Federal National Mortgage Association, or any successor thereto.

"**FDIA**" means the Federal Deposit Insurance Act, as amended.

"**FDIC**" means the Federal Deposit Insurance Corporation in any capacity.

"**FDIC Guaranty**" means the Guaranty Agreement dated as of the date hereof, by and among the FDIC, in its corporate capacity, HoldCo and each other Beneficiary (as defined therein) that executes a joinder thereto.

"**FHLB**" has the meaning given in Section 4.01(c).

"**FHLB Advance Make Whole Payment**" has the meaning given in Section 5.09(a).

"**FHLB Advances**" has the meaning given in Section 4.01(c).

"**FHLB Interest Rates**" means the interest rates so identified on Schedule 5.09(a).

"**FHLB Stock**" means the capital stock of the Federal Home Loan Bank of San Francisco owned by IndyMac Federal.

"**Financed Security**" has the meaning given in the Securities Sale Agreement.

"**Financed Group 4 Closing Payment**" has the meaning given in the Securities Sale Agreement.

"**Financed Group 4 Purchase Price**" has the meaning given in the Securities Sale Agreement.

"**Financial Freedom**" means Financial Freedom Senior Funding Corporation, a Delaware corporation and wholly owned subsidiary of IndyMac Federal.

"**Fixtures**" means those leasehold improvements, additions, alterations and installations constituting all or a part of the leased or owned Bank Premises and which were acquired, added, built, installed or purchased at the expense of the Failed Thrift, IndyMac Federal or the Seller.

"**Flow Subservicing Definitive Agreement**" means the definitive agreement executed pursuant to the terms set forth in the Term Sheet for Flow Subservicing Agreement attached hereto as Exhibit D.

"**Freddie Mac**" means the Federal Home Loan Mortgage Corporation, or any successor thereto.

"**Furniture and Equipment**" means the furniture, equipment and software owned by or licensed or leased to the Seller, IndyMac Federal or any Subsidiary thereof, and reflected on the Accounting Records of IndyMac Federal as of the Closing Date, or located on (or, for software, including accessed from) the leased or owned Bank Premises, including Safe Deposit Boxes, Data Processing Equipment, carpeting, furniture, artwork, office machinery, shelving, office supplies, information technology systems and equipment, telecommunications systems and equipment and surveillance and security systems.

"**GAAP**" means United States generally accepted accounting principles as in effect from time to time.

"**Ginnie Mae**" means the Government National Mortgage Association, or any successor thereto.

"**Governmental Authority**" means any United States or non-United States national, federal, state, local, municipal or provincial or international government or any political

subdivision of any governmental, regulatory or administrative authority, agency or commission, or judicial or arbitral body.

"**Group 1**" has the meaning given in the recitals.

"**Group 1 Assets**" has the meaning given in <u>Section 5.01</u>.

"**Group 1 Closing Adjustment Documents**" has the meaning given in <u>Section 5.06</u>.

"**Group 1 Closing Payment**" has the meaning given in <u>Section 5.03(b)</u>.

"**Group 1 Final Payment**" has the meaning given in <u>Section 5.07</u>.

"**Group 1 Final Purchase Price**" has the meaning given in <u>Section 5.03(a)</u>.

"**Group 2**" has the meaning given in the recitals.

"**Group 2 Closing Payment**" has the meaning given in the Servicing Business Asset Purchase Agreement.

"**Group 2 Final Payment**" has the meaning given in the Servicing Business Asset Purchase Agreement.

"**Group 2 Final Purchase Price**" has the meaning given in the Servicing Business Asset Purchase Agreement.

"**Group 3**" has the meaning given in the recitals.

"**Group 3 Closing Payment**" has the meaning given in the Reverse Mortgage Business Asset Purchase Agreement.

"**Group 3 Final Payment**" has the meaning given in the Reverse Mortgage Business Asset Purchase Agreement.

"**Group 3 Final Purchase Price**" has the meaning given in the Reverse Mortgage Business Asset Purchase Agreement.

"**Group 4**" has the meaning given in the recitals.

"**Group 4 Closing Payment**" has the meaning given in the Securities Sale Agreement.

"**Group 4 Final Payment**" has the meaning given in the Securities Sale Agreement.

"**Group 4 Final Purchase Price**" has the meaning given in the Securities Sale Agreement.

"**Group 5**" has the meaning given in the recitals.

"**Group 5 Closing Payment**" has the meaning given in the Loan Sale Agreement.

"**Group 5 Final Payment**" has the meaning given in the Loan Sale Agreement.

"**Group 5 Final Purchase Price**" has the meaning given in the Loan Sale Agreement.

"**Groups 6-8**" has the meaning given in the recitals.

"**Groups 6-8 Closing Payment**" has the meaning given in the LLC Interest Sale and Assignment Agreement.

"**Groups 6-8 Final Payment**" has the meaning given in the LLC Interest Sale and Assignment Agreement.

"**Groups 6-8 Final Purchase Price**" has the meaning given in the LLC Interest Sale and Assignment Agreement.

"**GSE Loans**" has the meaning given in Section 17.10.

"**HoldCo**" has the meaning given in the preamble.

"**Holdings**" has the meaning given in Section 15.03(n).

"**Independent Accounting Firm**" means a nationally recognized certified public accounting firm selected by the Purchaser and approved by the Seller (including approval by the Seller of the engagement terms of such firm), which approval shall not be unreasonably withheld.

"**IndyMac Federal**" has the meaning given in the recitals.

"**Initial Calculation Date**" means the close of business on January 31, 2009.

"**Initial Escrow Agreement**" means the Escrow Agreement, dated January 2, 2009, by and among the Seller, HoldCo and the escrow agent named therein.

"**Initial Maximum Prepayment Penalty**" means $288,236,052.71; however, if the Closing Date is after March 17, 2009, the Initial Maximum Prepayment Penalty will be reduced by $397,000 per day.

"**Intellectual Property Assignment**" means an Assignment in the forms attached hereto as Exhibit E-1, Exhibit E-2, Exhibit E-3 and Exhibit E-4.

"**Intellectual Property, Data and Information Technology Assets License**" means the Intellectual Property, Data and Information Technology Assets License Agreement in the form attached hereto as Exhibit EE.

"**Intermediate HoldCo**" has the meaning given in the preamble.

"**Investors**" means the Persons identified on Schedule 1.01.

- 9-

"**Law**" means any applicable statute, law, ordinance, regulation, rule, code, injunction, judgment, decree or order (including any executive order) of any Governmental Authority.

"**Lien**" means any mortgage, pledge, security interest, equity interest, participation interest, lien or other charge or encumbrance, including the lien or retained security title of a conditional vendor, upon or with respect to any property or assets.

"**LLC Interest Sale and Assignment Agreement**" means the LLC Interest Sale and Assignment Agreement in the form attached hereto as Exhibit J to be entered into as of the Closing Date by and among OneWest Ventures Holdings LLC, the Seller and IndyMac Venture, LLC, in connection with the sale of the Groups 6-8 assets.

"**Loan Sale Agreement**" means the Loan Sale Agreement in the form attached hereto as Exhibit F to be entered into as of the Closing Date by and between the Seller and the Purchaser in connection with the sale of the Group 5 assets.

"**Losses**" means actual losses, damages, liabilities, costs and expenses (including reasonable attorneys' fees and litigation and similar costs, and other out-of-pocket expenses incurred in investigating, defending, asserting or preparing the defense or assertion of any of the foregoing), deficiencies, claims, interest, awards, judgments, penalties and fines.

"**Measurement Date**" means the 15th calendar day of each month.

"**Minimum Equity Capital**" means equity capital paid by the Investors to HoldCo prior to the execution of this Agreement in the amount of ONE BILLION FIVE HUNDRED FIFTY MILLION Dollars ($1,550,000,000).

"**Monthly Prepayment Penalty Cap**" means, for any Accrual Period, the greater of (a) 0 and (b) the differential between (i) the Amortizing Prepayment Penalty Schedule Amount for such Accrual Period and (ii) the sum of (x) all previous FHLB Advance Make Whole Payments and (y) the current Rate Differential Payment for such Accrual Period.

"**MSR Mortgage Loan**" means a reverse mortgage loan with respect to which the Seller owns only the related servicing rights and not the reverse mortgage loan itself as provided for in the Reverse Mortgage Business Asset Purchase Agreement.

"**Non-Financed Group 4 Closing Payment**" has the meaning given in the Securities Sale Agreement.

"**Non-Financed Group 4 Purchase Price**" has the meaning given in the Securities Sale Agreement.

"**Non-Transferred Employee**" means any current or former employee or contractor of the Seller or its respective Affiliates who is not and does not become a Transferred Employee pursuant to the terms of Section 11.01.

"**Notice of Disagreement**" has the meaning given in Section 3.03(b).

"**Offeree Employee**" has the meaning given in Section 11.01(a).

"**OTS**" means the Office of Thrift Supervision.

"**Overdraft Loans**" means all overdraft balances on Thrift Deposits made pursuant to a written credit agreement between the Seller and the account party.

"**Participation Structure Documents**" means the Participation and Servicing Agreement (including the Servicing Agreement, the Electronic Tracking Agreement, the Account Control Agreement and the Custodial Agreement attached as exhibits thereto), the Asset Contribution and Assignment Agreement, the LLC Operating Agreement and the LLC Interest Sale and Assignment Agreement (and the guaranty required to be delivered thereby), all of which documents are to be entered into as of the Closing Date in connection with the sale of the Groups 6-8 assets in the form attached hereto as Exhibit G, Exhibit H, Exhibit I and Exhibit J.

"**Person**" means any individual, corporation, partnership (general or limited), limited liability company, limited liability partnership, firm, joint venture, association, joint-stock company, trust, estate, unincorporated organization, governmental or regulatory body or other entity.

"**Personally Identifiable Information**" means any information that, alone or in combination with other information, can serve to identify or trace a specific, identifiable individual person. Personally Identifiable Information includes individual names, social security numbers or other national identity numbers, passport or visa numbers, telephone numbers, home addresses, driver's license numbers, account numbers, credit card numbers, personal profiles, personnel records or files, email addresses, and vehicle registration numbers.

"**Prepayment Penalty Reimbursement Amount**" means, for any Accrual Period, the greater of (a) 0 and (b) the lesser of (x) the product of (i) 75% and (ii) the Current Period Prepayment Penalty Amount for such Accrual Period and (y) the Monthly Prepayment Penalty Cap for such Accrual Period.

"**Primary Indemnitor**" means any Person (other than the Purchaser or any of its Affiliates) who is obligated to indemnify or insure, or otherwise make payments (including payments on account of claims made against) to or on behalf of any Person in connection with the claims covered under Article XVII, including any insurer issuing any directors and officers liability policy or any Person issuing a financial institution bond or banker's blanket bond.

"**Privacy Laws**" has the meaning given in Section 8.07(a).

"**Privileged Information**" has the meaning given in Section 8.03(b)(ii).

"**Purchase and Assumption Transactions**" means the sale, transfer, conveyance and assignment of the assets and liabilities included in Group 1, Group 2, Group 3, Group 4, Group 5, and Groups 6-8.

"**Purchaser**" has the meaning given in the recitals.

"**Purchaser Employee Plans**" has the meaning given in Section 11.02(a).

"**Purchaser Indemnitor**" has the meaning given in Section 17.06(a).

"**Purchaser Notice**" has the meaning given in Section 3.03(c).

"**Rate Differential Payment**" means, for any Accrual Period, the product of (a) the product of (i) the differential between (x) the Weighted Average FHLB Interest Rate for such Accrual Period and (y) the Synthetic Rate and (ii) the Day Count and (b) the average daily outstanding principal balance of the Adjusted FHLB Advances for such Accrual Period.

"**Reassigned Contracts**" means the Contracts assigned back to the Seller pursuant to Section 10.01(e).

"**Records**" means copies and originals of all records and documents, whether in hard copy, microfiche, microfilm or electronic format (including but not limited to magnetic tape, disc storage, card forms, printed copy, and electronic stored information (as defined in Rule 34(a) of the Federal Rules of Civil Procedure) which (i) pertain to, and are utilized to administer, reflect, monitor, evidence or record information respecting the assets purchased and the liabilities assumed by the Purchaser or any of its Subsidiaries pursuant to this Agreement or the other Definitive Agreements and (ii) are owned by the Seller or any Subsidiary of IndyMac Federal and in the possession of the Seller or any such Subsidiary as of the Closing Date. For the avoidance of doubt, the definition of "**Records**" does not include "**Unassigned Records**".

"**Reimbursed Parties**" means HoldCo, Intermediate HoldCo, the Purchaser and their Affiliates.

"**Reformed Agreements**" has the meaning given in Section 10.04.

"**Reverse Mortgage Business Asset Purchase Agreement**" means the Reverse Mortgage Business Asset Purchase Agreement in the form attached hereto as Exhibit K to be entered into as of the Closing Date by and among the Seller, Financial Freedom, the Purchaser and a subsidiary of the Purchaser in connection with the sale of the Group 3 assets.

"**Reverse Mortgage Shared-Loss Agreement**" means the Reverse Mortgage Shared-Loss Agreement to be entered into as of the Closing Date by and among the Seller, Financial Freedom Acquisition LLC and the Purchaser.

"**Safe Deposit Boxes**" means the safe deposit boxes of the Seller, if any, including the removable safe deposit boxes and safe deposit stacks in the Seller's vault(s), all rights and benefits (other than fees collected prior to the Closing Date) under rental agreements with respect to such safe deposit boxes, and all keys and combinations thereto.

"**Securities Sale Agreement**" means the Sale Agreement in the form attached hereto as Exhibit L to be entered into as of the Closing Date by and between the Seller, the Purchaser and a subsidiary of the Purchaser in connection with the sale of the Group 4 assets.

"**Seller**" has the meaning given in the preamble.

- 12-

"**Seller Employees**" has the meaning given in Section 11.01.

"**Seller Employee Plan**" means any employee benefit plan within the meaning of Section 3(3) of ERISA, including multiemployer plans within the meaning of Section 3(37) of ERISA, and each other employment, severance, consulting, deferred compensation, incentive compensation, fringe benefit, change in control, retention, employee loan, stock option or other equity or equity-based or other compensatory or benefit plan, policy, agreement or arrangement (including any collective bargaining agreement, multiemployer, multiple employer or post retirement benefit plan), in all cases whether or not subject to ERISA, whether formal or informal, oral or written, legally binding or not, that is or was (i) maintained, sponsored, administered, contributed to or required to be contributed to by the Seller, the Failed Thrift, IndyMac Federal or any of their respective ERISA Affiliates, or to which the Seller, the Failed Thrift, IndyMac Federal or any of their respective ERISA Affiliates is or was a party or had or has any present or future liability thereunder (except as custodian, trustee, fiduciary or service provider to a customer plan), and (ii) is or was for the benefit of current or former employees, directors or consultants who have a present or future right to benefits in respect of services performed for the Seller, the Failed Thrift, IndyMac Federal or any of their respective Affiliates.

"**Seller Financing**" means the portion of the Aggregate Final Purchase Price that the Seller has agreed to finance on the Purchaser's behalf in accordance with the Seller Financing Agreements.

"**Seller Financing Agreements**" means the Mortgage Loan Master Repurchase Agreement, the Securities Master Repurchase Agreement, the Collection Account Control Agreement (Securities), the Collection Account Control Agreement (Mortgage Loan), the Master Netting Agreement, the Electronic Tracking Agreement (Mortgage Loan), Collateral Account Control Agreement (Securities), the Limited Guaranty Agreement (Securities), the Custodial Agreement (Mortgage Loan), the Indenture, the Pricing Side Letter, the Receivables Purchase Agreement, the Note Purchase Agreement, the Financing Guaranty, the Trust Agreement, the Administration Agreement, the Financing Note and the Trust Certificate, to be entered into on the Closing Date, in the form attached hereto as Exhibit M, Exhibit N, Exhibit O-1, Exhibit O-2, Exhibit P, Exhibit Q, Exhibit R-1, Exhibit R-2, Exhibit S, Exhibit T, Exhibit U, Exhibit V, Exhibit W, Exhibit X, Exhibit Y, Exhibit Z, Exhibit AA, and Exhibit BB, respectively, with such changes thereto as may be agreed upon by all parties thereto.

"**Seller Indemnitees**" means the Seller, the Failed Thrift and its predecessors-in-interest, and their respective officers, directors, employees, partners, principals, agents and contractors (other than the Transferred Employees).

"**Seller's Intellectual Property**" means all worldwide trade secrets and confidential information, excluding Unassigned Records; patents, inventions, know-how, tools, indices, analytics, designs, models; copyrights and copyrightable works; trademarks, trade names, corporate names, brand names, trade dress, slogans, logos and service marks, together with the goodwill of the business connected with the use of, or symbolized by, the foregoing; and Internet domain names and rights to use the IP addresses associated with such domain names (to the extent such IP addresses are static and within the contract rights of the Seller); in each case of the foregoing, whether registered or unregistered (and including any registrations or applications for

- 13-

registration of any of the foregoing, including those patent rights, trademarks, domain names and copyrights set forth in Schedule 5.01(e)), owned by the Seller and related to or used in the business of IndyMac Federal or the Assets, to the extent such business or Assets are being acquired by the Purchaser pursuant to this Agreement.  The foregoing does not include any intellectual property used exclusively in connection with the Excluded Assets, Excluded Contracts or Excluded Liabilities.

"**Servicing Business Asset Purchase Agreement**" means the Servicing Business Asset Purchase Agreement in the form attached hereto as Exhibit CC to be entered into as of the Closing Date by and between the Seller and the Purchaser in connection with the sale of the Group 2 assets.

"**Servicing Business Premises**" means the real property owned by the Seller set forth on Schedule 5.01(b)(ii).

"**Settlement Date**" has the meaning given in Section 3.03(d).

"**Settlement Interest Rate**" means, for the first calendar quarter or portion thereof during which interest accrues, the rate determined by the Seller to be equal to the equivalent coupon issue yield on twenty-six (26) week United States Treasury Bills in effect as of the Closing Date as published in The Wall Street Journal; provided that if no such equivalent coupon issue yield is available as of the Closing Date, the equivalent coupon issue yield for such Treasury Bills most recently published in The Wall Street Journal prior to the Closing Date shall be used.  Thereafter, the rate shall be adjusted to the rate determined by the Seller to be equal to the equivalent coupon issue yield on such Treasury Bills in effect as of the first day of each succeeding calendar quarter during which interest accrues as published in The Wall Street Journal.

"**Settlement Payment**" has the meaning given in Section 3.03(d).

"**Shared-Loss Agreement**" means the Shared-Loss Agreement in the form attached as Attachment G to the Loan Sale Agreement, to be entered into as of the Closing Date by and between the Seller and the Purchaser.

"**Swapped Fixed Rate**" means 1.628%.

"**Synthetic Rate**"  means the Swapped Fixed Rate plus 1.25%.

"**Subsidiary**" has the meaning set forth in Section 3(w)(4) of the FDIA (12 U.S.C. Section 1813(w)(4)).

"**Tax**" or "**Taxes**" means all income, excise, gross receipts, ad valorem, sales, use, employment, franchise, profits, gains, property, transfer, payroll, withholding, severance, occupation, social security, unemployment compensation, alternative minimum, value added, intangibles or other taxes, fees, stamp taxes, duties, charges, levies or assessments of any kind whatsoever (whether payable directly or by withholding), together with any interest and any penalties, fines, additions to tax or additional amounts imposed by any Governmental Authority with respect thereto.

"**Tax Authority**" means any branch, office, department, agency, instrumentality, court, tribunal, officer, employee, designee, representative, or other Person that is acting for, on behalf of, or as a part of any foreign or domestic government (or any state, local or other political subdivision thereof) that is engaged in or has any power, duty, responsibility or obligation relating to the legislation, promulgation, interpretation, enforcement, regulation, monitoring, supervision or collection of or any other activity relating to any Tax or Tax Return.

"**Tax Return**" means any return, election, declaration, report, schedule, information return, document, information, opinion, statement, or any amendment to any of the foregoing (including any consolidated, combined or unitary return) submitted or required to be submitted to any Tax Authority.

"**Termination Date**" has the meaning given in Section 5.09(a).

"**Third Party Claim**" means, with respect to any Reimbursed Party, a claim, counterclaim or demand made by any Person (other than the Purchaser or any of its directors, officers, partners, employees, agents, creditors, stockholders or other equityholders, whether beneficial or of record) against such Reimbursed Party; and, with respect to any Seller Indemnitee, a claim, counterclaim or demand made by any Person (other than the Seller or any of its Affiliates) against such Seller Indemnitee.

"**Thrift Deposit**" means a deposit as defined in 12 U.S.C. Section 1813(l), including outstanding cashier's checks and other official checks and all uncollected items included in the depositors' balances (including the balance in custodial accounts) and credited on the books and records of the Seller, including accrued interest thereon; provided that the term "Thrift Deposit" shall not include all or any portion of those deposit balances which, in the discretion of the Seller, (i) may be required to satisfy the Seller for any liquidated or contingent liability of any depositor arising from an unauthorized or unlawful transaction, or (ii) may be needed to provide payment of any liability of any depositor to the Seller, including the liability of any depositor as a director or officer of IndyMac Federal or the Seller, whether or not the amount of the liability is or can be determined as of the Closing Date.

"**Transaction**" means the aggregate of all of the transactions contemplated in this Agreement and the other Definitive Agreements.

"**Transferred Employee**" has the meaning given in Section 11.01.

"**Transferred Employees/Contractors**" has the meaning given in Section 8.03(b)(i).

"**Transferred Employee Data**" has the meaning given in Section 8.03(b)(i).

"**Transition Employees**" has the meaning given in Section 11.04.

"**Transition Employee Costs**" has the meaning given in Section 11.04.

"**Transition Period**" has the meaning given in Section 11.04.

"**Transitional Services Agreement**" means the Transitional Services Agreement to be entered into as of the Closing Date by and between the Seller and the Purchaser.

"**Unassigned Records**" has the meaning given in Section 8.03(b).

"**Unfunded Commitment Definitive Agreements**" means the definitive agreements executed after the Closing Date pursuant to the terms set forth in (i) the Term Sheet for Assignment of Funding Obligations to Servicer in HELOC Securitizations and Reimbursement for Draws attached to the Servicing Business Asset Purchase Agreement as Exhibit C, (ii) the Term Sheet for Shared-Loss and Participation Interest in Unfunded Commitments of Reverse Mortgage Loans attached to the Reverse Mortgage Business Asset Purchase Agreement as Exhibit F, and (iii) the Term Sheet for Participation Interests in Unfunded HELOC Commitments attached to the Loan Sale Agreement as Attachment H.

"**WARN Act**" has the meaning given in Section 11.03.

"**Weighted Average FHLB Interest Rate**" means, for any Accrual Period, the face weighted average FHLB advance rate as of the given period for all then outstanding FHLB Advances.

Section 1.02   Construction.   This Agreement shall be construed and interpreted in accordance with the following:

(a)   References to "Affiliates" include only other Persons which from time to time constitute "Affiliates" of such specified Person, and do not include, at any particular time, other Persons that may have been, but at such time have ceased to be, "Affiliates" of such specified Person, except to the extent that any such reference specifically provides otherwise.

(b)   The term "or" is not exclusive.

(c)   A reference to a law includes any amendment, modification or replacement to such law.

(d)   Accounting terms shall have the meanings assigned to them by GAAP applied on a consistent basis by the accounting entity to which they refer.

(e)   References to any document, instrument or agreement (i) shall be deemed to include all appendices, exhibits, schedules and other attachments thereto and all documents, instruments or agreements issued or executed in replacement thereof, and (ii) shall mean such document, instrument or agreement, or replacement thereto, as amended, modified and supplemented from time to time in accordance with its terms and as the same is in effect at any given time.

(f)   Unless otherwise specified, the words "hereof," "herein" and "hereunder" and words of similar import shall refer to this Agreement as a whole and not to any particular provision of this Agreement.

(g)     The words "include" and "including" and words of similar import are not limiting, and shall be construed to be followed by the words "without limitation," whether or not they are in fact followed by such words.

(h)     The word "during" when used with respect to a period of time shall be construed to mean commencing at the beginning of such period and continuing until the end of such period.

(i)     Unless the context otherwise requires, singular nouns and pronouns when used herein shall be deemed to include the plural and vice versa and impersonal pronouns shall be deemed to include the personal pronoun of the appropriate gender.

## ARTICLE II

## DESCRIPTION OF TRANSACTION

Section 2.01   Formation of Purchaser.  On or prior to the Closing Date, HoldCo shall cause Intermediate HoldCo to, and Intermediate HoldCo shall, organize the Purchaser as a federally chartered, FDIC insured, stock form savings association or savings bank and direct wholly owned subsidiary of Intermediate HoldCo.

Section 2.02   Capitalization.  On or prior to the Closing Date, HoldCo and Intermediate HoldCo shall make the Capital Contribution, which shall be deemed to have been made upon the occurrence of both of the following:

(a)     the application of the Deposit by the Seller on the Closing Date to the Aggregate Closing Payment, and

(b)     the release of the Closing Escrow Funds (as defined below) on the Closing Date from the Closing Escrow Account by the Seller and HoldCo in accordance with terms of the Closing Escrow Agreement and the application thereof to the Aggregate Closing Payment in accordance with Section 3.02 hereof.

Section 2.03   Transactions Prior to Closing.   On the Business Day immediately preceding the Closing Date, HoldCo shall pay by wire transfer of immediately available funds an amount equal to ONE BILLION FOUR HUNDRED ELEVEN MILLION Dollars ($1,411,000,000) to the Closing Escrow Account (the "**Closing Escrow Funds**").

Section 2.04   Closing Date Transactions.   The following transactions shall occur substantially simultaneously on the Closing Date but shall be deemed to occur in the following order:

(a)     the FDIC shall be appointed receiver for IndyMac Federal;

(b)     the Purchaser shall be formed as a federally chartered, stock form savings association or savings bank and direct wholly owned subsidiary of Intermediate HoldCo, subject to the supervision of the OTS;

(c)     the Purchaser shall be approved as an FDIC insured depository institution; and

(d)     the Purchase and Assumption Transactions shall occur in accordance with the terms hereof and the other applicable Definitive Agreements.

Section 2.05   The Closing.  The closing for the Transaction (the "**Closing**") shall take place at the offices of Sonnenschein Nath & Rosenthal LLP, Two World Financial Center, New York, New York, on March 19, 2009, or such other date as HoldCo and the Seller may mutually determine upon satisfaction or waiver of all conditions set forth in this Agreement and the other Definitive Agreements to the obligations of the parties to consummate the Transaction (other than conditions with respect to actions the respective parties will take at the Closing itself) (the "**Closing Date**").  Except as otherwise expressly provided with respect to Group 3 in the Reverse Mortgage Business Asset Purchase Agreement and in Article XIV below, the parties hereto acknowledge that if any Definitive Agreement is not performed, then none of the Definitive Agreements shall be deemed performed.

## ARTICLE III

## PURCHASE PRICE FOR THE PURCHASE AND ASSUMPTION TRANSACTIONS

Section 3.01   Final Purchase Price.  The aggregate purchase price for the Purchase and Assumption Transactions shall be determined as of the Closing Date pursuant to Section 3.03 below and shall be equal to the sum of (i) the Group 1 Final Purchase Price *plus* (ii) the Group 2 Final Purchase Price, *plus* (iii) to the extent the acquisition of Group 3 is completed, the Group 3 Final Purchase Price, *plus* (iv) the Group 4 Final Purchase Price, *plus* (v) the Group 5 Final Purchase Price, *plus* (vi) the Groups 6-8 Final Purchase Price (the "**Aggregate Final Purchase Price**").

Section 3.02   Aggregate Closing Payment.

(a)     Calculation.  The Aggregate Closing Payment shall be calculated by the Seller in accordance with Schedule 3.02(a), and such calculation shall be provided to the Purchaser at least two (2) Business Days prior to the Closing Date along with reasonable supporting information and documentation that was relied upon by the Seller in connection with such calculation.  Notwithstanding the prior sentence or the closing payment calculation provisions in Section 5.03(b) of this Agreement and in the other Definitive Agreements, for purposes of calculating the Aggregate Closing Payment only, if the appraisals necessary to determine Fair Market Value are not received by the Seller at least two (2) Business Days prior to the Closing Date, then any portion of the Aggregate Closing Payment that is to be calculated using Fair Market Value under the Definitive Agreements shall be calculated using the Book Value of the relevant Assets as of the Initial Calculation Date.

(b)     Payment.  At the Closing, assuming the Deposit has been released to the Seller in accordance with the Initial Escrow Agreement, the Aggregate Closing Payment shall be paid by HoldCo or one or more of its Subsidiaries as follows:

(i)    the Closing Escrow Funds shall be released from the Closing Escrow Account to the Seller in accordance with the terms of the Closing Escrow Agreement;

(ii)    subject to the provisions of paragraph (iii) below, the Purchaser shall pay to the Seller, by wire transfer of immediately available funds, in accordance with the wire transfer instructions set forth in Schedule 3.02(b), an amount equal to the positive difference, if any, obtained by subtracting (x) the sum of (1) the Deposit, (2) the Closing Escrow Funds and (3) the Seller Financing from (y) the Aggregate Closing Payment; and

(iii)    if the amount obtained by subtracting the amount in clause (x) from the amount in clause (y) in paragraph (ii) above results in a negative amount, then the release to the Seller of the Closing Escrow Funds pursuant to Section 3.02(b)(i) shall be reduced by such amount with the remainder of the Closing Escrow Funds released to the Purchaser in accordance with the terms of the Closing Escrow Agreement.

Section 3.03    Post-Closing Settlement.

(a)    Closing Adjustment Documents.  Within forty-five (45) calendar days following the Closing Date, the Purchaser shall prepare and deliver to the Seller the Group 1 Closing Adjustment Documents (as defined below) and the closing adjustment documents required under the other Definitive Agreements, along with the Purchaser's calculation of the Aggregate Final Purchase Price, the Aggregate Final Payment and the Settlement Payment (as defined below) (collectively, the "**Closing Adjustment Documents**"), all of which such documents shall be delivered on the same day.

(b)    Disagreements.  Within thirty (30) calendar days after delivery of the Closing Adjustment Documents, the Seller may dispute all or any portion of such Closing Adjustment Documents by giving written notice (a "**Notice of Disagreement**") to the Purchaser setting forth in reasonable detail the basis for any such dispute and the Seller's calculation of any amounts set forth in the Closing Adjustment Documents that are the subject of such dispute (any such dispute being hereinafter called a "**Disagreement**").  Promptly following the delivery of a Notice of Disagreement, the parties shall commence good faith negotiations with a view to resolving all such Disagreements.  If the Seller does not give a Notice of a Disagreement within thirty (30) calendar days after delivery of the Closing Adjustment Documents, the Seller will be deemed to have irrevocably accepted all of the Closing Adjustment Documents in the form delivered to the Seller by the Purchaser and to have agreed to all amounts set forth therein.  If the Seller gives a Notice of Disagreement with respect to one or more but not all of the Closing Adjustment Documents, the Seller will be deemed to have irrevocably accepted all of the Closing Adjustment Documents with respect to which no Notice of Disagreement was provided, in the form delivered to the Seller by the Purchaser and to have agreed to all amounts set forth therein.

(c)    Resolution of Disagreement.  If the Seller delivers a Notice of Disagreement and the Purchaser does not dispute all or any portion of such Notice of Disagreement by giving written notice (a "**Purchaser Notice**") to the Seller setting forth in

- 19-

reasonable detail the basis for such dispute within ten (10) calendar days following the receipt of such Notice of Disagreement, the Purchaser will be deemed to have irrevocably accepted the Closing Adjustment Documents as modified in the manner described in the Notice of Disagreement. If the Purchaser gives a Purchaser Notice within the ten (10)-day period described in the previous sentence, and the Purchaser and the Seller do not resolve the Disagreement within ten (10) calendar days after the delivery of the Purchaser Notice to the Seller (with such resolution evidenced by a written agreement signed by the Purchaser and the Seller), such Disagreement or portion thereof that is not resolved by an agreement signed by the Purchaser and the Seller shall be referred by the Purchaser to the Independent Accounting Firm for resolution. The Purchaser shall provide the Independent Accounting Firm with a copy of this Agreement and the other Definitive Agreements, copies of all schedules and other documents delivered at the Closing, the Closing Adjustment Documents and any supporting documentation that has been exchanged by the parties, the Notice of Disagreement, and any partial settlements agreed to by the Purchaser and the Seller in connection with the Closing Adjustment Documents that relate to the Notice of Disagreement (any such matters that have been agreed to by the parties are not considered part of the Disagreement and are not subject to a determination by the Independent Accounting Firm). The Independent Accounting Firm shall resolve the Disagreement as follows (and only as follows): it is to determine, solely based on the terms of this Agreement and the other documents made available to it in accordance with this Section 3.03(c), whether the amount due to or from the Purchaser pursuant to the Closing Adjustment Documents is (i) the amount the Seller claims to be due to or from the Purchaser, (ii) the amount the Purchaser claims to be due to or from the Purchaser or (iii) an amount in between the amount claimed by the Seller in clause (i) and the amount claimed by the Purchaser in clause (ii). For the avoidance of any doubt and in furtherance of the previous sentence, even if the Independent Accounting Firm determines that the correct amount due to or from the Purchaser is an amount greater than the higher of or less than the lower of the amounts set forth in clauses (i) and (ii) of the previous sentence, the Independent Accounting Firm nevertheless must resolve the Disagreement in accordance with the parameters set forth in the previous sentence. The Independent Accounting Firm shall issue a written decision setting forth the resolution of the Disagreement and provide the same to each party. Such resolution by the Independent Accounting Firm shall be final and binding upon the parties and the parties expressly acknowledge the foregoing. The Purchaser and the Seller shall use their best efforts to cause the Independent Accounting Firm to render its determination as soon as practicable after the referral to it of the Disagreement but in any event shall direct the Independent Accounting Firm to render its decision no later than thirty (30) calendar days after the date on which the Independent Accounting Firm receives all of the information to be provided to it in accordance with this Section 3.03(c). The Purchaser and the Seller each shall cooperate with the Independent Accounting Firm and provide such firm with reasonable access to such Accounting Records and personnel as the Independent Accounting Firm reasonably requests in order to render its determination. Either the Purchaser or the Seller may enforce the decision of the Independent Accounting Firm in a court of competent jurisdiction, but neither the Purchaser nor the Seller shall challenge or seek to appeal the decision of the Independent Accounting Firm, and each expressly waives any right it may otherwise have to so challenge such decision. The allocation of the fees and expenses of the Independent Accounting Firm shall be made in accordance with Section 19.03.

(d)     Settlement Payment.  On the fifth (5th) Business Day following the acceptance or deemed acceptance of the Closing Adjustment Documents or, if later, the fifth (5th) Business Day following the final resolution of any Disagreements relating to such Closing Adjustment Documents (the "**Settlement Date**"), there shall be a post-closing settlement payment for the Purchase and Assumption Transactions (the "**Settlement Payment**") as follows: (i) with respect to Group 4, (A) the Seller Financing with respect to the Financed Securities in Group 4 shall be adjusted in accordance with the Securities Master Repurchase Agreement, to wit, the Outstanding Purchase Price shall be increased or decreased to equal the Recalculated Purchase Price (as such terms are defined in the Securities Master Repurchase Agreement) and (B) an amount equal to (x) the Financed Group 4 Purchase Price minus the Financed Group 4 Closing Payment multiplied by (y) 0.25 shall be paid to the Seller (if positive) or the Purchaser (if negative); and (ii) with respect to all other Groups, an amount equal to (A) the sum of the Group 1 Final Payment, the Group 2 Final Payment, the Group 3 Final Payment, the Non-Financed Group 4 Purchase Price, the Group 5 Final Payment and the Groups 6-8 Final Payment, minus (B) the sum of the Group 1 Closing Payment, the Group 2 Closing Payment, the Group 3 Closing Payment, the Non-Financed Group 4 Closing Payment, the Group 5 Closing Payment and the Groups 6-8 Closing Payment shall be paid to the Seller (if positive) or the Purchaser (if negative).  The payments due under clause (i)(B) and clause (ii) shall be netted and the resulting payment due under this section shall be paid to the party entitled to receive such payment by wire transfer of immediately available funds in accordance with the wire transfer instructions set forth in Schedule 3.02(b), which instructions may be updated on or prior to the Settlement Date.

(e)     Interest.  Any amounts paid under Section 3.03(d) shall bear interest for the period from and including the day following the Closing Date to and including the day preceding the payment at the Settlement Interest Rate, and such interest shall be paid by the Purchaser or the Seller, as applicable, in connection with the Settlement Payment.

(f)     Adjustment to Purchase Price.  The Purchaser and the Seller agree to treat all payments and adjustments provided in this Agreement (including any interest described in Section 3.03(e)), other than any payments pursuant to Section 5.09, as adjustments to the Aggregate Final Purchase Price, and as having been made prior to the Closing Date, for all Tax purposes.

## ARTICLE IV

## ASSUMPTION OF GROUP 1 LIABILITIES

Section 4.01   Group 1 Liabilities Assumed by the Purchaser.  Subject to the terms and provisions of this Agreement (including the retention of all rights and remedies under Article XVII), and effective as of the Closing Date, the Purchaser shall assume and agree to pay, perform, and discharge all of the following liabilities and obligations of IndyMac Federal (such liabilities referred to as the "**Assumed Group 1 Liabilities**"):

(a)     subject to the provisions of Section 4.03, liabilities related to the Thrift Deposits as of the Closing Date, including the obligations under the deposit agreements with respect to Thrift Deposits opened after July 11, 2008 (the Thrift Deposits as of the Initial Calculation Date are set forth on Schedule 4.01(a));

(b)      all liabilities for indebtedness secured by mortgages, deeds of trust, chattel mortgages, security interests or other Liens on or affecting any Group 1 Assets (as defined below);

(c)      all liabilities for borrowings from the Federal Home Loan Bank of San Francisco (the "**FHLB**") listed on Schedule 4.01(c)(i) (the "**FHLB Advances**") and all liabilities under the related FHLB contracts listed on Schedule 4.01(c)(ii);

(d)      all liabilities for federal funds purchased, repurchase agreements and overdrafts in accounts maintained with other depository institutions (including any accrued and unpaid interest thereon computed to and including the Closing Date);

(e)      all liabilities related to United States Treasury tax and loan note option accounts, if any;

(f)      subject to Section 10.01(e), all duties, obligations and liabilities relating to the Contracts listed on Schedule 4.01(f) (the "**Assumed Contracts**") and the Contracts with IndyMac Federal customers governing Seller's debit card business (including any extensions of credit with respect thereto), overdraft protection plans, safe deposit business, safekeeping business and custody business, in each case from and after the Closing Date;

(g)      all duties, obligations and liabilities as a tenant under the leases for real property listed on Schedule 4.01(g) (the "**Assumed Real Property Leases**") from and after the Closing Date; and

(h)      all obligations of the Seller with respect to the other liabilities listed on Schedule 4.01(h).

Section 4.02    Liabilities Not Assumed by the Purchaser.

(a)      Except for the Assumed Group 1 Liabilities and the liabilities expressly assumed by the Purchaser pursuant to the other Definitive Agreements, the Seller shall not assign and the Purchaser shall not assume any claims, debts, obligations or liabilities (whether known or unknown, contingent or unasserted, matured or unmatured), however they may be characterized, that the Failed Thrift, IndyMac Federal or the Seller has or may have now or in the future, including, (i) the claims, debts, obligations or liabilities of the Seller relating to the Contracts listed on Schedule 4.02(a) (the "**Excluded Contracts**"); and (ii) any direct or indirect Tax liabilities or obligations of the Failed Thrift, IndyMac Federal or the Seller that are attributable to any taxable period (or portion thereof) ending on or before the Closing Date;

(b)      Notwithstanding anything to the contrary set forth herein, the Seller shall not assign and the Purchaser shall not assume: (i) any claim against or liability of the FDIC in its capacity as receiver for the Failed Thrift or the FDIC as receiver for IndyMac Federal that, under and in accordance with applicable Law, was, is or will be subject to the receivership administrative claims processes administered by the FDIC in its capacity as receiver for the Failed Thrift or the FDIC as receiver for IndyMac Federal pursuant to 12 U.S.C. §1821(d)(3) through (13), including claims and liabilities that are affirmative or defensive, now existing or arising in the future, contingent or fixed, monetary or non-monetary, equitable or legal, or

declarative or injunctive; or (ii) any claim against or liability based on any alleged act or omission of the Failed Thrift or IndyMac Federal which is not provable or allowable, or is otherwise barred against the FDIC as receiver for the Failed Thrift or the FDIC as receiver for IndyMac Federal under applicable Law, including claims and liabilities that are barred under 12 U.S.C. §§1821(c), (d), (e) (including §1821(e)(3)), (i), or (j); 12 U.S.C. §1822; 12 U.S.C. §1823; or 12 U.S.C. §1825. The claims, debts, obligations and liabilities referred to in Sections 4.02(a) and 4.02(b) are collectively referred to as the "**Excluded Liabilities**".

Section 4.03   Interest on Thrift Deposit Liabilities.  With respect to the Thrift Deposits opened after July 11, 2008, from and after the Closing Date the Purchaser shall accrue and pay interest on such Thrift Deposits under the deposit agreements assumed with respect to such Thrift Deposits in accordance with such assumed agreements.  With respect to the Thrift Deposits opened on or prior to July 11, 2008, from and after the Closing Date the Purchaser shall (i) accrue and pay interest on such Thrift Deposits at such rates as it shall determine and (ii) permit each depositor, to withdraw, without penalty for early withdrawal, all or any portion of such depositor's Thrift Deposit, whether or not the Purchaser elects to pay interest in accordance with any deposit agreement formerly existing between the Failed Thrift, IndyMac Federal or the Seller, on the one hand, and such depositor, on the other hand; provided that if such Thrift Deposit has been pledged to secure an obligation of the depositor or other party, any withdrawal thereof shall be subject to the terms of the agreement governing such pledge.

Section 4.04   Unclaimed Deposits.  If, within eighteen (18) months after the Closing Date, any depositor of the Seller does not claim or arrange to continue such depositor's Thrift Deposit assumed by the Purchaser pursuant to Section 4.01, the Purchaser shall, within fifteen (15) Business Days after the end of such eighteen (18)-month period, (i) refund to the Seller the full amount of each such Thrift Deposit (without reduction for service charges), (ii) provide to the Seller a schedule of all such refunded Thrift Deposits in such form as may be prescribed by the Seller, and (iii) assign, transfer, convey and deliver to the Seller all right, title and interest of the Purchaser in and to Records previously transferred to the Purchaser and other records generated or maintained by the Purchaser pertaining to such Thrift Deposits and the Seller shall assume all liabilities with respect to such refunded Thrift Deposits.  During such eighteen (18)-month period, at the request of the Seller, the Purchaser promptly shall provide to the Seller schedules of unclaimed deposits in such form as may be reasonably prescribed by the Seller.

Section 4.05   Employee Benefit Plans.  None of HoldCo, Intermediate HoldCo, the Purchaser or any of their Affiliates shall have any liabilities, obligations or responsibilities under any Seller Employee Plan or with respect to any Seller Employee who is not a Transferred Employee, unless HoldCo, Intermediate HoldCo, the Purchaser or any of their Affiliates, as applicable, and the Seller agree otherwise in writing subsequent to the Effective Date of this Agreement.

## ARTICLE V

## PURCHASE OF GROUP 1 ASSETS

Section 5.01   Group 1 Assets Purchased by the Purchaser.   On the Closing Date, the Purchaser shall purchase from the Seller, and the Seller shall sell, assign, transfer, convey, and deliver to the Purchaser, all right, title, and interest of the Seller in and to the following assets (whether personal or mixed, wherever located and however acquired) (collectively, the "**Group 1 Assets**") (it being understood that, as set forth below, the Schedules described in this Section 5.01 shall be updated as of the Closing Date and assets included in such updated Schedules shall constitute Group 1 Assets):

(a)      the Cash on Hand listed on Schedule 5.01(a);

(b)      the owned Bank Premises listed on Schedule 5.01(b)(i) and the owned Servicing Business Premises listed on Schedule 5.01(b)(ii);

(c)      the Fixtures and owned Furniture and Equipment listed on Schedule 5.01(c)(i), and the additional Furniture and Equipment listed on Schedule 5.01(c)(ii);

(d)      the Overdraft Loans listed on Schedule 5.01(d);

(e)      all rights in and to the Seller's Intellectual Property, including the Seller's Intellectual Property listed on Schedule 5.01(e);

(f)      the accounts and accounts receivable (other than any intercompany accounts receivable) listed on Schedule 5.01(f);

(g)      all rights of and benefits accruing to the Seller under the Assumed Contracts listed on Schedule 4.01(f) and the Contracts governing the Seller's debit card business, overdraft protection plans, safe deposit business, safekeeping business and custody business, and the Assumed Real Property Leases listed on Schedule 4.01(g), including rights to assert claims and take other rightful actions in respect of breaches, defaults and other violations of such Contracts or leases;

(h)      the FHLB Stock having an aggregate par value of $317,833,700;

(i)      all permits relating to the retail banking business of IndyMac Federal, to the extent transferable;

(j)      the artwork listed on Schedule 5.01(j);

(k)      pre-paid expenses listed on Schedule 5.01(k); and

(l)      the other assets listed on Schedule 5.01(l).

Each Schedule referenced above shall be updated as of the Closing Date and delivered to the Purchaser in accordance with Section 5.06.

To the extent that any party discovers within 180 days following the Closing that there were assets of the Seller used primarily in IndyMac Federal's retail banking business or of the type listed in this Section 5.01, which assets all parties hereto intended to have transferred in connection with the transactions contemplated in this Agreement but were omitted from the Schedules to this Agreement, such party shall promptly provide written notice of such discovery to the other parties.  Promptly following its discovery of such asset or its receipt of such written notice, as applicable, the Seller shall or shall cause its Affiliates to assign and transfer to the Purchaser all right, title and interest in such asset.

Section 5.02    Assets Not Purchased by the Purchaser.  The Assets shall not include, and the Purchaser shall not purchase or otherwise acquire, any assets not specifically being acquired pursuant to the Definitive Agreements (collectively, the "**Excluded Assets**"), including the excluded assets listed on Schedule 5.02.

Section 5.03    Purchase Price; Closing Payment.

(a)    Purchase Price.  Subject to the terms and conditions of this Agreement, the Purchaser shall pay to the Seller an aggregate purchase price for the Group 1 Assets in an amount equal to the sum of (such sum, the "**Group 1 Final Purchase Price**"):

(i)    with respect to the Cash on Hand, an amount equal to the aggregate Book Value thereof as of the Closing Date; *plus*

(ii)    with respect to the owned Bank Premises, an amount equal to the aggregate Book Value thereof as of the Closing Date; *plus*

(iii)    with respect to the Servicing Business Premises, an amount equal to the Fair Market Value thereof; *plus*

(iv)    with respect to the Fixtures and the owned Furniture and Equipment listed on Schedule 5.01(c)(i), an amount equal to the Fair Market Value thereof; *plus*

(v)    with respect to the additional Furniture and Equipment listed on Schedule 5.01(c)(ii), an aggregate amount equal to ONE HUNDRED TWENTY-TWO THOUSAND THREE HUNDRED SIXTY-FIVE Dollars ($122,365); *plus*

(vi)    with respect to the Overdraft Loans, an amount equal to the aggregate Book Value thereof less the amount of any reserves related thereto as of the Closing Date, plus accrued interest from the paid-to date to but not including the Closing Date; *plus*

(vii)    with respect to the accounts and accounts receivable listed on Schedule 5.01(f) (other than any intercompany accounts receivable), an amount equal to the aggregate Book Value thereof less the amount of any reserves related thereto as of the Closing Date; *plus*

(viii)    with respect to the FHLB Stock, an amount equal to the par value thereof; *plus*

(ix)    with respect to the artwork listed on Schedule 5.01(j), an aggregate amount equal to FIFTY-SIX THOUSAND Dollars ($56,000); *plus*

(x)    with respect to the prepaid expenses listed on Schedule 5.01(k), an amount equal to the aggregate Book Value thereof as of the Closing Date, prorated in accordance with Section 5.04; *plus*

(xi)    with respect to the other assets listed on Schedule 5.01(l), an amount equal to the aggregate Book Value of such other assets as of the Closing Date; *less*

(xii)    an amount equal to the aggregate Book Value of the Thrift Deposits as of the Closing Date; *less*

(xiii)    an amount equal to the aggregate Book Value of the liabilities for borrowings from the FHLB as of the Closing Date; *less*

(xiv)    an amount equal to the aggregate Book Value of the other liabilities listed on Schedule 4.01(h) as of the Closing Date.

(b)    Closing Payment.  On the Closing Date, the Purchaser shall pay to the Seller, in accordance with Article III, an amount equal to the balance of (i) the Group 1 Final Purchase Price, calculated using balances, as applicable, as of the Initial Calculation Date rather than the Closing Date, *less* (ii) prorated amounts owed by the Seller through and including the Closing Date which are calculable as of the Closing Date, as determined pursuant to Section 5.04 (collectively, the "**Group 1 Closing Payment**").

Section 5.04    Prorations.    Except to the extent otherwise specifically provided for herein, all payments under or pursuant to any Contract (including document custodial arrangements and applicable insurance policies) or any Assumed Real Property Lease assigned to the Purchaser under this Agreement, and real and personal property taxes related to the Group 1 Assets, whether or not payable after the Closing Date, shall be prorated between the Purchaser and the Seller, as the case may be, on the basis of a 365 day year and the number of days elapsed and days remaining in the applicable period through the end of the Closing Date.  With respect to any products sold (or services rendered) pursuant to any Contracts assigned to the Purchaser under this Agreement, the Seller and the Purchaser shall use commercially reasonable efforts to arrange for vendors to bill the Seller directly, through and including the Closing Date, and the Purchaser directly after the Closing Date.  All amounts prorated pursuant to this Section 5.04 will be taken into account in connection with the adjustments provided in Section 5.07.

Section 5.05    Closing Procedure.    At the Closing, subject to and upon the terms and conditions of this Agreement:

(a)    the Seller shall deliver to the Purchaser the certificates, instruments and documents referred to in Section 13.01;

- 26-

(b)     the Purchaser shall deliver to the Seller the certificates, instruments and documents referred to in Section 13.02;

(c)     the Seller shall, as herein provided, sell, assign, transfer, convey, and deliver to the Purchaser all right, title and interest in and to the Group 1 Assets, and the Group 1 Assets shall be transferred from the Seller to the Purchaser;

(d)     the Purchaser shall deliver the Group 1 Closing Payment in accordance with the provisions of Article III; and

(e)     the Seller shall, as herein provided, assign, transfer, convey, and deliver to the Purchaser the Assumed Group 1 Liabilities, and the Purchaser shall assume and agree to pay, perform and discharge in accordance with their terms all of the Assumed Group 1 Liabilities.

Section 5.06   <u>Closing Adjustment Documents</u>.   Within sixty (60) calendar days following the Closing Date, the Purchaser shall prepare and deliver to the Seller (i) a schedule of the Group 1 Assets as of the Closing Date, (ii) a schedule of the Assumed Group 1 Liabilities, including the Thrift Deposits, as of the Closing Date, (iii) Schedule 4.01(a), Schedule 4.01(c)(i), Schedule 4.01(h), Schedule 5.01(a), Schedule 5.01(b)(i), Schedule 5.01(d), Schedule 5.01(f), Schedule 5.01(k) and Schedule 5.01(l), each updated as of the Closing Date and prepared in accordance with the Accounting Records of IndyMac Federal and consistent with past practice (including the preparation of the Schedules attached hereto) and (iv) a schedule setting forth in reasonable detail the calculations contemplated by Section 5.07 below (collectively, the "**Group 1 Closing Adjustment Documents**").  The parties shall cooperate in the preparation of the Group 1 Closing Adjustment Documents and such additional documents as may be necessary to calculate the Group 1 Final Purchase Price.  Without limiting the generality of the foregoing, to the extent necessary, the Purchaser shall provide the Seller and its designees with reasonable access to the books, Records, work papers, personnel and representatives which relate to the Group 1 Assets and the Assumed Group 1 Liabilities.

Section 5.07   <u>Calculation of Adjustments</u>.  The Group 1 Closing Adjustment Documents shall set forth the Purchaser's calculation of (i) the Group 1 Final Purchase Price in accordance with Section 5.03(a) and (ii) a payment amount (such amount, the "**Group 1 Final Payment**") which shall be the sum of the following:  (i) the Group 1 Final Purchase Price, *less* (ii) prorated amounts, as determined pursuant to Section 5.04, owed by the Seller through and including the Closing Date.  The Group 1 Closing Adjustment Documents shall be reviewed, and any Disagreements related thereto resolved, in accordance with Article III.

Section 5.08   <u>Final Settlement</u>.  Upon the earlier of (x) the acceptance of the Closing Adjustment Documents by the Seller and (y) the final and binding resolution of any Disagreements, in each case in accordance with Article III, any amounts shall be paid in accordance with Section 3.03(d).

Section 5.09   <u>FHLB Advances Make Whole Payment</u>.

(a)     In respect of the Purchaser's assumption of the FHLB Advances, the Seller agrees to pay to the Purchaser on a monthly basis during the period beginning on the

date immediately following the Closing Date and ending on the earlier of the date that is the three (3) year anniversary of the Closing Date and the first Measurement Date as of which there are no longer any Adjusted FHLB Advances outstanding (in each case, the "**Termination Date**"), in accordance with Section 5.09(b), the sum of (a) the Rate Differential Payment and (b) the Prepayment Penalty Reimbursement Amount for the Accrual Period (such sum referred to herein as the "**FHLB Advance Make Whole Payment**").

       (b)     Within five (5) Business Days after the end of each Accrual Period, the Purchaser shall provide to the Seller the calculation of the FHLB Advance Make Whole Payment, together with all reasonable supporting documentation therefor. On or prior to the day that is five (5) Business Days following the receipt of the calculation and supporting documentation referenced in the preceding sentence the Seller shall pay to the Purchaser by wire transfer in immediately available funds in accordance with the wire transfer instructions provided by the Purchaser the FHLB Advance Make Whole Payment.

     Section 5.10   <u>Disclaimer</u>. EACH OF HOLDCO, INTERMEDIATE HOLDCO AND THE PURCHASER ACKNOWLEDGE THAT THE GROUP 1 ASSETS WILL BE CONVEYED "AS IS" AND "WITH ALL FAULTS," WITHOUT ANY REPRESENTATION, WARRANTY OR GUARANTY WHATSOEVER WITH RESPECT TO THE GROUP 1 ASSETS, INCLUDING AS TO THE COLLECTABILITY, ENFORCEABILITY, VALUE OF COLLATERAL, ABILITY OF ANY OBLIGOR TO REPAY, CONDITION, FITNESS FOR ANY PARTICULAR PURPOSE, MERCHANTABILITY OR ANY OTHER WARRANTY, WHETHER EXPRESS OR IMPLIED OR BY OPERATION OF LAW, BY ANY PERSON, INCLUDING THE SELLER, THE FAILED THRIFT OR THE FDIC, OR ANY PREDECESSOR OR AFFILIATE OF THE SELLER, THE FAILED THRIFT OR THE FDIC, OR ANY OF THEIR RESPECTIVE OFFICERS, DIRECTORS, EMPLOYEES, AGENTS OR CONTRACTORS.

## ARTICLE VI

## <u>ASSUMPTION OF CERTAIN GROUP 1 DUTIES AND OBLIGATIONS</u>

     Section 6.01   <u>Continuation of Banking Business</u>. The Purchaser shall provide full service retail banking in the retail branches of IndyMac Federal commencing on the first banking business day (including a Saturday) after the Closing Date. For the avoidance of any doubt, the foregoing shall not restrict or otherwise affect the ability of the Purchaser to make changes to the retail banking business that it conducts at any time from and after the Closing, including opening or closing retail branches.

     Section 6.02   <u>Agreement with Respect to Debit Card Business</u>. The Purchaser shall honor and perform, from and after the Closing Date, all duties and obligations with respect to IndyMac Federal's debit card business, and processing related to debit cards, if any. Fees related to the debit card business, if any, collected prior to the Closing Date shall be for the benefit of the Seller and fees collected after the Closing Date, if any, shall be for the benefit of the Purchaser.

Section 6.03   <u>Agreement with Respect to Safe Deposit Business</u>.  The Purchaser shall perform and discharge, from and after the Closing Date, in the usual course of conducting a retail banking business, the duties and obligations of IndyMac Federal with respect to all Safe Deposit Boxes, if any, of IndyMac Federal and maintain all of the necessary facilities for the use of such Safe Deposit Boxes by the renters thereof during the period for which such Safe Deposit Boxes have been rented and the rent therefor paid to IndyMac Federal, subject to the provisions of the rental agreements between IndyMac Federal and the respective renters of such Safe Deposit Boxes.  Fees related to the safe deposit business collected prior to the Closing Date shall be for the benefit of the Seller and fees collected after the Closing Date shall be for the benefit of the Purchaser.

Section 6.04   <u>Agreement with Respect to Safekeeping Business</u>.  The Seller hereby transfers, conveys and delivers to the Purchaser and the Purchaser accepts all securities and other items, if any, held by IndyMac Federal in safekeeping for the customers of IndyMac Federal as of the Closing Date.  The Purchaser shall perform and discharge, from and after the Closing Date, the duties and obligations of IndyMac Federal with respect to such securities and items held in safekeeping.  The Purchaser shall be entitled to all rights and benefits heretofore accrued or hereafter accruing with respect thereto; <u>provided</u> <u>that</u> fees related to the safe keeping business collected prior to the Closing Date shall be for the benefit of the Seller and fees collected after the Closing Date shall be for the benefit of the Purchaser.  Within sixty (60) days after the Closing Date, the Purchaser shall provide to the Seller written verification of all assets held for safekeeping as of the Closing Date by IndyMac Federal.

Section 6.05   <u>Agreement with Respect to Custody Business</u>.

(a)      From and after the Closing Date, the Purchaser shall, without further transfer, substitution, act or deed, to the fullest extent permitted by Law, succeed to the rights, obligations, properties, assets, investments, deposits, agreements and custodies under custodianships and other fiduciary or representative capacities of IndyMac Federal, all to the same extent as though the Purchaser had assumed the same from IndyMac Federal prior to the Closing Date; <u>provided</u> <u>that</u> any liability based on the misfeasance, malfeasance or nonfeasance of the Failed Thrift, IndyMac Federal or the Seller or their respective directors, officers, employees or agents with respect to the custody business is not assumed hereunder.  Fees related to the custody business collected prior to the Closing Date shall be for the benefit of the Seller and fees collected after the Closing Date shall be for the benefit of the Purchaser.

(b)      The Purchaser shall, to the fullest extent permitted by Law, succeed to, and be entitled to take and execute, the appointment to all custodianships and other fiduciary or representative capacities to which IndyMac Federal is or may be named or appointed by any instrument.

(c)      In the event additional proceedings of any kind are necessary to accomplish the transfer of such custody business, the Purchaser shall take whatever action is necessary to accomplish such transfer.  The Seller shall use reasonable efforts to assist the Purchaser in accomplishing such transfer.  The allocation of the costs and expenses incurred in connection with such transfer shall be made in accordance with <u>Section 19.03</u>.

- 29-

(d)    Within sixty (60) days after the Closing Date, the Purchaser shall provide to the Seller written verification of all assets held as of the Closing Date by IndyMac Federal in connection with IndyMac Federal's custody business.

Section 6.06    Agreement with Respect to Assumed Contracts.  Subject to Section 4.01 and Section 10.01(e), the Purchaser shall assume, perform and discharge IndyMac Federal's obligations under each Assumed Contract listed on Schedule 4.01(f), and each Assumed Real Property Lease listed on Schedule 4.01(g) and each other Contract assumed pursuant to Section 4.01, and shall comply with the terms and conditions of each such Contract or lease, in each case from and after the Closing Date.

Section 6.07    Informational Tax Reporting.  The Purchaser shall perform all obligations of IndyMac Federal with respect to federal and state income tax informational reporting related to (i) the Group 1 Assets and the Assumed Group 1 Liabilities, (ii) deposit accounts that were closed and loans that were paid off or collateral obtained with respect thereto prior to the Closing Date, (iii) miscellaneous payments made to vendors of IndyMac Federal, and (iv) any other asset or liability of IndyMac Federal, including loans not purchased and Thrift Deposits not assumed by the Purchaser, as may reasonably be required by the Seller.  The Seller shall provide the Purchaser with any information that is required to comply with any of the Purchaser's Tax reporting responsibilities, including the responsibilities described herein; provided that, such information is in the possession of the Seller, IndyMac Federal or the Failed Thrift and not in the possession of the Purchaser, Intermediate HoldCo or HoldCo.

Section 6.08    Insurance.  The Purchaser shall obtain insurance coverage effective from and after the Closing Date, including public liability, fire and extended coverage insurance reasonably acceptable to the Seller with respect to the owned or leased Bank Premises that the Purchaser occupies, and all owned or leased Furniture and Equipment and Fixtures (including leased Data Processing Equipment) located thereon, in the event such insurance coverage is not already in force and effect with respect to the Purchaser as the insured as of the Closing Date. All such insurance shall, where appropriate (as reasonably determined by the Seller), name the Seller as an additional insured.

Section 6.09    Flow Subservicing.  The Seller and the Purchaser hereby acknowledge and agree that the Seller is retaining certain assets of IndyMac Federal and the Purchaser will service such assets after the Closing on the terms set forth in the term sheet attached hereto as Exhibit D. The Seller and the Purchaser shall negotiate in good faith and use their best efforts, and the Purchaser shall cause Financial Freedom Acquisition LLC to negotiate in good faith and use its best efforts, to finalize the Flow Subservicing Definitive Agreement in accordance with such term sheet no later than thirty (30) calendar days after the Closing Date.

Section 6.10    Transitional Services Agreement.  The Seller and the Purchaser hereby acknowledge and agree that the Purchaser is to provide certain transitional services after the Closing pursuant to, and subject to the terms of, the Transitional Services Agreement.

Section 6.11    <u>Agreement with Respect to Leased Bank Premises</u>.

(a)    <u>Option to Lease</u>.  The Seller hereby grants to the Purchaser an exclusive option for the period of ninety (90) days commencing the day after the Closing to cause the Seller to assign, or to cause the Seller's Subsidiaries to assign (as applicable), to the Purchaser any or all leases for leased Bank Premises set forth on <u>Schedule 6.11(a)</u> which have been continuously occupied by the Purchaser from the Closing Date to the date it elects to accept an assignment of the leases with respect thereto to the extent such leases can be assigned; <u>provided that</u>, the exercise of this option with respect to any lease must be as to all premises or other property subject to the lease.  If an assignment cannot be made of any such lease, the Seller may, in its discretion, enter into subleases, or cause its Subsidiaries to enter into subleases (as applicable), with the Purchaser containing the same terms and conditions provided under such existing leases for such leased Bank Premises or other property.  The Purchaser shall give notice to the Seller within the option period of its election to accept or not to accept an assignment of any or all such leases (or enter into subleases or new leases in lieu thereof).  The Purchaser agrees to assume all leases assigned (or enter into subleases or new leases in lieu thereof) pursuant to this <u>Section 6.11</u>.

(c)    <u>Facilitation</u>.  The Seller agrees to facilitate, or to cause its Subsidiaries to facilitate (as applicable), the assumption, assignment or sublease of leases or the negotiation of new leases by the Purchaser with respect to the leased Bank Premises set forth on <u>Schedule 6.11(a)</u>; <u>provided that</u>, none of the FDIC, the Seller nor any of the Seller's Subsidiaries shall be obligated to engage in litigation, make payments to the Purchaser or to any third party in connection with facilitating any such assumption, assignment, sublease or negotiation or commit to any other obligations to third parties.

(d)    <u>Occupancy</u>.  The Purchaser shall give the Seller thirty (30) days' prior written notice of its intention to vacate prior to vacating any leased Bank Premises set forth on <u>Schedule 6.11(a)</u> with respect to which the Purchaser has not exercised the option provided in <u>Section 6.11(a)</u>.  Any such notice shall be deemed to terminate the Purchaser's option with respect to such leased Bank Premises.

(e)    <u>Occupancy Costs</u>.

(i)    The Purchaser agrees to pay to the Seller, or to appropriate third parties including Subsidiaries of the Seller at the direction of the Seller, during and for the period of any occupancy by it of any of the leased Bank Premises set forth on <u>Schedule 6.11(a)</u>, all operating costs with respect thereto and to comply with all relevant terms of applicable leases entered into by the Failed Thrift, the Seller or any Subsidiary of the Seller, including without limitation the timely payment of all rent.  Operating costs include, without limitation all taxes, fees, charges, utilities, insurance and assessments, to the extent not included in the rental value or rent.

(ii)    The Purchaser agrees during the period of occupancy by it of any of the leased Bank Premises set forth on <u>Schedule 6.11(a)</u>, to pay to the Seller or to the appropriate Subsidiary of the Seller rent for the use of all owned or leased Furniture and Equipment and all owned or leased Fixtures located on such Bank Premises for the period

- 31-

of such occupancy (provided that the Purchaser shall not be required to pay rent for any Furniture and Equipment or Fixtures that the Purchaser has purchased, or that is the subject of an Assumed Contract assumed by the Purchaser, pursuant to this Agreement or the other Definitive Agreements).  Rent for such leased property shall be an amount equal to any and all rent and other amounts which the Seller or any Subsidiary of the Seller incurs or accrues as an obligation or is obligated to pay for such period of occupancy pursuant to all leases and contracts with respect to such property. If the Purchaser purchases any owned Furniture and Equipment or owned Fixtures in accordance with Section 5.01(c), the amount of any rents paid by the Purchaser with respect thereto shall be applied as an offset against the purchase price thereof.

(f)     Vacating Premises.  If the Purchaser elects not to exercise the option provided in Section 6.11(a), the notice of such election in accordance with Section 6.11(a) shall specify the date upon which the Purchaser's occupancy of such leased Bank Premises shall terminate, which date shall not be later than the date which is one hundred seventy (170) calendar days after the Closing Date. Upon vacating such premises, the Purchaser shall relinquish and release to the Seller, or to the Seller's Subsidiaries (as applicable), such premises and the Fixtures and the Furniture and Equipment located thereon (other than any Furniture and Equipment purchased, or that is the subject of an Assumed Contract assumed by the Purchaser, pursuant to this Agreement or the other Definitive Agreements) in the same condition as at Closing, normal wear and tear excepted.  By failing to provide notice of its intention to vacate such premises prior to the expiration of the option period specified in Section 6.11(a), or by occupying such premises after the one hundred seventy (170)-day period specified above in this paragraph, the Purchaser shall, at the Seller's option, (x) be deemed to have assumed all leases, obligations and liabilities with respect to such premises (including any ground lease with respect to the land on which premises are located), and leased Furniture and Equipment and leased Fixtures located thereon in accordance with this Section 6.11 (unless the Seller or any Subsidiary of the Seller previously repudiated any such lease), and (y) be required to purchase all Furniture and Equipment and Fixtures owned by the Seller or any of the Seller's Subsidiaries and located on such premises as of the Closing Date.

## ARTICLE VII

## DUTIES WITH RESPECT TO DEPOSITORS OF INDYMAC FEDERAL

Section 7.01   Payment of Checks, Drafts and Orders.   Subject to Section 9.04, the Purchaser shall pay all properly drawn checks, drafts and withdrawal orders of depositors of IndyMac Federal presented for payment, whether drawn on the check or draft forms provided by the Failed Thrift or IndyMac Federal or by the Purchaser, to the extent that the Thrift Deposit balances to the credit of the respective makers or drawers assumed by the Purchaser under this Agreement are sufficient to permit the payment thereof, and in all other respects to discharge, in the usual course of conducting a retail banking business, the duties and obligations of IndyMac Federal with respect to the Thrift Deposit balances due and owing to depositors and assumed by the Purchaser under this Agreement.

Section 7.02    Notice to Depositors.

(a)    Within seven (7) calendar days after the Closing Date, the Purchaser shall give notice to depositors of IndyMac Federal of its assumption of the Thrift Deposit liabilities of IndyMac Federal, by mailing to each such depositor a notice with respect to such assumption and by advertising in a newspaper of general circulation in the county or counties in which the retail branches of IndyMac Federal are located as of the Closing.  The Purchaser agrees that such notice shall be in the form provided by the Seller to the Purchaser prior to the date hereof, with such additional changes as may be agreed to by the Seller.

(b)    The Purchaser shall give notice by mail to depositors of IndyMac Federal concerning the procedures to claim their deposits, which notice shall be in the form provided by the Seller to the Purchaser prior to the date hereof, with such additional changes as may be agreed to by the Seller.  Such notice shall be included with the notice to depositors to be mailed by the Purchaser pursuant to Section 7.02(a).

(c)    If the Purchaser proposes to charge fees different from those charged by IndyMac Federal immediately prior to the Closing before the Purchaser establishes new deposit account relationships with the existing depositors of IndyMac Federal as of the Closing Date, the Purchaser shall give notice by mail of such changed fees to such depositors.

## ARTICLE VIII

## RECORDS

Section 8.01    Transfer of Records.

(a)    The Seller, for itself and on behalf of IndyMac Federal and any Subsidiary thereof, assigns, transfers, conveys and delivers to the Purchaser the following Records pertaining to the Group 1 Assets and the Assumed Group 1 Liabilities, except as provided in Section 10.02(a):

(i)    signature cards, orders, contracts between IndyMac Federal and its depositors (to the extent the same are being assumed by the Purchaser) and Records of similar character;

(ii)    passbooks of deposits held by IndyMac Federal, deposit slips, cancelled checks and withdrawal orders representing charges to accounts of depositors;

(iii)    records of deposit balances carried with other banks, bankers or trust companies;

(iv)    deeds, mortgages, abstracts, surveys, and other instruments or records of title pertaining to the owned Bank Premises;

(v)    signature cards, agreements and records pertaining to Safe Deposit Boxes, if any; and

(vi)    records pertaining to the debit card business, overdraft protection plans, custody business or safekeeping business of IndyMac Federal, if any.

(b)    Subject to Section 8.03, the Seller shall assign and transfer to the Purchaser by a single blanket assignment or otherwise, as soon as practicable after the Closing Date, any other Records not assigned and transferred to the Purchaser as provided in this Agreement, including loan disbursement checks, general ledger tickets, official bank checks, proof transactions (including proof tapes) and paid out loan files.

Section 8.02    Delivery of Records.  The Seller shall deliver to the Purchaser all Records described above on the Closing Date by delivery of possession of the Bank Premises.

Section 8.03    Unassigned Records.

(a)    The Seller, IndyMac Federal or any of their respective Subsidiaries will deliver and make accessible the Transferred Employee Data (as defined in Section 8.03(b)(i)) to the Purchaser by delivery of possession of the Bank Premises on the Closing Date and may further disclose Transferred Employee Data through the period during which such Transferred Employee/Contractor (as defined below) remains an employee or contractor (as applicable) of the Seller, Indy Mac Federal or any of their Subsidiaries.

(b)    "**Unassigned Records**" means any of the following that the Seller, IndyMac Federal or any of their Subsidiaries, delivers, discloses or provides access to the Purchaser or its Subsidiaries (but, in any event, will not assign any rights, title or interest in or to):

(i)    any data, documents, records and information (including without limitation Personally Identifiable Information) relating to or in connection with (A) the Non-Transferred Employees, provided at any time, and (B) the Transferred Employees and individuals classified as contractors of Seller, IndyMac Federal or its Subsidiaries that are engaged to perform services as independent contractors of Purchaser or its Affiliates (collectively, the "**Transferred Employees/Contractors**"), in the Seller's, Indy Mac Federal's or any of their Subsidiary's possession or delivered to the Purchaser as of the Closing Date or through the period during which such Transferred Employee/Contractor remains an employee or contractor (as applicable) of the Seller, Indy Mac Federal or any of their Subsidiaries (the aforesaid data is referred to herein as "**Transferred Employee Data**");

(ii)    any data, documents, records and information (including without limitation Personally Identifiable Information) subject to a claim of protection from discovery or disclosure by the attorney client privilege, the attorney work product doctrine, or any other applicable privilege or doctrine held or asserted by the Seller, IndyMac Federal or any of their Subsidiaries or their respective counsel related to or in connection with (A) the Transferred Employees/Contractors, in the Seller's, IndyMac Federal's or any of their Subsidiary's possession or delivered to the Purchaser as of the Closing Date or through the period during which such Transferred Employee/Contractor remains an employee or contractor of the Seller, IndyMac Federal or any of their

- 34-

Subsidiaries, (B) Non-Transferred Employees, provided at any time, and (C) the Excluded Assets, Excluded Liabilities (or any facts related thereto or asserted therein) and Excluded Contracts (collectively, the "**Privileged Information**"); or

> (iii)   any data, documents, records and information (including without limitation Personally Identifiable Information) to the extent relating to or connected with the Excluded Assets, Excluded Liabilities and Excluded Contracts.

(c)   For purposes of clarification, Unassigned Records do not include any data, documents, records and information (including without limitation Personally Identifiable Information) relating to or in connection with a Transferred Employee/Contractor created from and after the date on which such Transferred Employee/Contractor becomes an employee or contractor of the Purchaser or any of its Affiliates (except with respect to Transferred Employee Data).  The data, documents, records and information (including without limitation Personally Identifiable Information) identified in the preceding sentence (except with respect to Transferred Employee Data) shall be owned by the Purchaser and its Affiliates.

(d)   The Seller, IndyMac Federal and any Subsidiary thereof, and their respective representatives, will have the same right and the Purchaser and its Affiliates will have the same obligations with respect to the Unassigned Records as to the Records in Section 10.02 of this Agreement.  Unassigned Records are, or shall be, and shall remain the property of, the Seller, IndyMac Federal or any Subsidiary thereof, with the Purchaser and its Affiliates holding such Unassigned Records for the benefit of the Seller, IndyMac Federal and any Subsidiary thereof.   The Seller for itself and on behalf IndyMac Federal and any Subsidiary thereof shall have and retain all right, title and interest, including without limitation worldwide ownership of trade secret and confidentiality rights and copyright, in and to the Unassigned Records and all copies made from it.  The Purchaser, its Affiliates, licensees, vendors or contractors shall not have, nor in any circumstances gain, any ownership interest in the Unassigned Records.

(e)   Without the Seller's prior written approval (in its sole discretion) or except as set forth in Section 8.03(f), the Unassigned Records shall not be (i) used by the Purchaser, its Affiliates, licensees, vendors or contractors in any manner other than in connection with providing the services to the Seller, IndyMac Federal or any Subsidiary thereof under the Transitional Services Agreement, (ii) disclosed, sold, assigned, leased, published, disseminated or otherwise provided to third parties by the Purchaser, its Affiliates, licensees, vendors or contractors, including without limitation in any anonymized or aggregated formats, (iii) commercially exploited by or on behalf of the Purchaser, its Affiliates, licensees, vendors or contractors, including without limitation in any anonymized or aggregated formats or (iv) used by the Purchaser, its Affiliates, licensees, vendors or contractors against the Seller, IndyMac Federal and its Subsidiaries.  The Purchaser on behalf of itself and its Affiliates hereby irrevocably assigns, transfers and conveys to the Seller for itself or on behalf of IndyMac Federal or any Subsidiary thereof without further consideration, any right, title or interest in and to the Unassigned Records or any proprietary rights therein worldwide in perpetuity that it may acquire notwithstanding the foregoing.  Upon request by the Seller, the Purchaser shall or shall cause its Affiliates to execute and deliver any financing statements or other documents that may be reasonably necessary or desirable under any laws,

- 35-

rule or regulation to preserve or protect, or enable the Seller, IndyMac Federal or any Subsidiary thereof to enforce, its rights hereunder with respect to the Unassigned Records, in each case at the Seller's cost and expense.

(f)    Subject to Sections 8.05 and 8.06, the Purchaser and its Subsidiaries shall have, and the Seller (for itself and on behalf of IndyMac Federal and any Subsidiary thereof (as applicable)) hereby grants, a royalty-free, worldwide, non-exclusive, non-transferable (other than a transfer by operation of law including a merger of the Purchaser or its Subsidiaries, as applicable), perpetual and non-sublicensable right and license to use the Transferred Employee Data for any reasonable purpose to the extent relating to or in connection with (i) the Transferred Employee/Contractor, or (ii) any employee of Purchaser or its Affiliates in connection or relating to such Transferred Employee/Contractor; provided, however, the foregoing right and license are limited to those uses for which the Seller (for itself and on behalf of IndyMac Federal and any Subsidiary thereof (as applicable)) may grant a license and right without violating any applicable Law or legal duty to a Transferred Employee/Contractor. The Purchaser and its Affiliates covenant for each of themselves and on behalf of each of their employees, personnel, contractors, agents and representatives that the Transferred Employee Data will not be used in contravention of the provisions set forth in this Agreement.

(g)    Contractors of the Purchaser and its Subsidiaries may, during their provision of contracted services, use the Transferred Employee Data solely for the purpose stated in Section 8.03(f) in the performance of such services and exclusively for the benefit of the Purchaser and its Subsidiaries, provided that such contractors are bound by confidentiality and data protection and security obligations no less stringent than those set forth in this Agreement.

Section 8.04    Confidentiality.

(a)    On and from the Effective Date, and during the term of this Agreement and each of the other Definitive Agreements and at all times thereafter, the Purchaser and its Affiliates each covenant they will hold, and their agents, representatives, licensees and contractors will hold, in confidence, all Confidential Information disclosed or made available to the Purchaser and its Affiliates by the Seller, IndyMac Federal or any Subsidiary thereof, except pursuant to subpoena, discovery request in pending litigation, other court process, or as otherwise required by Law; provided, however, that in the event the Purchaser receives such a demand, the Purchaser shall, unless expressly prohibited by a court order, promptly notify the Seller in writing of such required disclosure and cooperate with the Seller, at the Seller's cost and expense, in the Seller's efforts to contest or limit the scope of or impose conditions upon such required disclosure including seeking a protective order, or filing motions or otherwise making appearances before a court.

(b)    Except for Privileged Information, the Purchaser and its Subsidiaries may disclose Confidential Information (i) to their personnel, contractors and representatives in exercising their rights under Section 8.03(f) or in connection with the Transaction provided that (x) such disclosure is necessary for the exercise of such rights or the performance of the Purchaser's obligations under this Agreement, (y) such personnel, contractors and

representatives are informed by the Purchaser of the confidential nature of such information, and (z) such personnel, contractors and representatives are bound by confidentiality terms no less stringent than to those contained under this Agreement; and (ii) to any third parties directly in connection with pending litigation relating to a Transferred Employee/Contractor; provided, that prior to any such disclosure pursuant to this clause (ii), the Purchaser shall notify the Seller in writing and shall comply with the Seller's requirements to limit the scope of or impose conditions upon such disclosure including by entry, prior to disclosure, into a protective order governing protection of the Confidential Information.

(c)    With respect to Privileged Information, except with the prior written consent of the Seller, the Purchaser and its Affiliates may only disclose Privileged Information to (i) current employees who have a need to know the contents of the record, and (ii) third parties who are agents retained for the purpose of assisting the Purchaser's in-house or outside counsel in the provision of legal advice to the Purchaser, provided that such current employees or third parties are informed by the Purchaser of the confidential and privileged nature of such information and are bound by confidentiality terms no less stringent than to those contained under this Agreement or as set forth in Section 8.04(a).

(d)    The Purchaser shall be responsible for any failure by its or its Affiliates' personnel, contractors and representatives to comply with the Confidential Information, data protection and security provisions of this Agreement as if the Purchaser or its Affiliates have committed the breach themselves.  The Purchaser and its Affiliates shall take all reasonable measures to ensure that the Confidential Information is not disclosed or used in contravention of this Agreement.  The Purchaser shall use at least the same degree of care to safeguard and to prevent disclosing to third parties the Confidential Information to avoid unauthorized disclosure, publication, dissemination, destruction, loss or alteration of its own information (or information of its customers) of a similar nature, but not less than reasonable care.  If this Agreement or another Definitive Agreement is terminated or expires, the Purchaser and its Affiliates will deliver to the Seller, upon request, all Confidential Information and all copies thereof or destroy such Confidential Information and certify in writing such destruction, except with respect to the Transferred Employee Data, which the Purchaser and its Affiliates may retain in their possession subject to Section 8.03(f) and the confidentiality and data protection and security requirements set forth under this Agreement.

(e)    "**Confidential Information**" means (i) all information marked confidential, restricted or proprietary by the Seller, IndyMac Federal or any Subsidiary thereof, but excluding any information to the extent it is owned by Purchaser pursuant to Section 8.03(c) or is otherwise related to or part of the Assets or the Seller's Intellectual Property (except any information to the extent it is related to or part of Unassigned Records), (ii) any other information that is treated as confidential by the Seller, IndyMac Federal or any Subsidiary thereof and would reasonably be understood to be confidential, whether or not so marked, but excluding any information to the extent it is owned by Purchaser pursuant to Section 8.03(c) or is otherwise related to or part of the Assets or the Seller's Intellectual Property (except any information to the extent it is related to or part of the Unassigned Records), (iii) the Unassigned Records, (iv) data, documents, records and information (including without limitation Personally Identifiable Information) that is identified or designated by any party to be subject to attorney client privilege or work product obligations

- 37-

between the Seller, IndyMac Federal or any Subsidiary thereof and their respective counsel, including Privileged Information. Confidential Information will not include information to the extent it can be shown to have been (i) previously known on a non-confidential basis by the Purchaser or its Affiliates, (ii) in the public domain through no fault of the Purchaser or its Affiliates, (iii) later lawfully acquired by the Purchaser or its Affiliates from sources other than the Seller, IndyMac Federal or any Subsidiary thereof, or (iv) independently developed by the Purchaser or its Affiliates, provided the Purchaser or its Affiliates have not come to know of, obtained or accessed such information in breach of its confidentiality obligations under this Agreement.

Section 8.05   No Waiver of Privilege.  The parties acknowledge that the Records and Unassigned Records are found on servers and in other data stores that are being transferred from the Seller to the Purchaser, and that it is impractical and inefficient to separate the Records and Unassigned Records.  Both the Seller, IndyMac Federal, and their respective Subsidiaries and the Purchaser have a common interest in defending existing and possible future litigation relating to the Seller, IndyMac Federal and their respective Subsidiaries and acknowledge that the Records and Unassigned Records may contain data, documents, records, and information which Seller, IndyMac Federal, and their respective Subsidiaries or Purchaser and its Affiliates claim are protected from disclosure by the attorney client privilege, the attorney work product doctrine or other applicable privilege or doctrine.  Neither party waives any privilege or work product doctrine protection by the delivery or access described in this Article VIII or in Section 10.02. Each party may claim privilege or work product protection in such Records, and Seller, IndyMac Federal, and their respective Subsidiaries may claim privilege or work product protection in such Unassigned Records, and all data, documents, records, and information contained therein, and neither party shall claim that the other party waived privilege or work product protection based on such delivery or access.

Section 8.06   System Security.  The Purchaser and its Affiliates and subcontractors to whom Confidential Information and Unassigned Records are provided shall maintain a comprehensive data security program, which shall include reasonable and appropriate technical, organizational and security measures against the destruction, loss, unavailability, unauthorized access or alteration of Confidential Information and Unassigned Records in the possession or under the control of the Purchaser or such Affiliates, and be no less rigorous than industry accepted security standards for similar types of information.  The Purchaser shall promptly notify the Seller in writing of any actual or potential data breach or compromise that may affect any of the Unassigned Records.

Section 8.07   Privacy And Data Protection.

(a)      The Purchaser acknowledges that the Seller, IndyMac Federal and any Subsidiary thereof are and/or will be subject to United States Laws and other Laws throughout the world relating to the collection and   privacy of personally identifiable information including without limitation the Gramm-Leach-Bliley Act, Title V, and applicable regulations thereto (collectively, the "**Privacy Laws**") governing privacy and confidentiality of personal information as defined in the Privacy Laws, and relating to the collection, use, processing, protection, record retention, security or disclosure of data relating to individuals or corporations, including personal data (which may include European Directive 95/46/EC on the

protection of individuals with regard to the processing of personal data and on the free movement of such data, and any legislation implementing such article, and any legislation implementing the same in the relevant state; and may include state breach notification laws) (collectively, the "**Data Protection Laws**"). Each of the Purchaser and its Affiliates covenant that they shall at all times comply with all applicable Privacy Laws and Data Protection Laws in the collection, use, retention and disclosure of the Seller's, IndyMac Federal's and any Subsidiary thereof's customers', employees and other individuals' Personally Identifiable Information provided to or accessible by the Purchaser or its Affiliates pursuant to this Agreement or any other Definitive Agreement; provided, however, that the Purchaser and its Affiliates will not be liable to the Seller, IndyMac Federal or any Subsidiary thereof for any breach of Privacy Laws or Data Protection Laws regarding Personally Identifiable Information to the extent such information is owned by the Purchaser pursuant to Section 8.03(c) or is otherwise related to or part of the Assets or the Seller's Intellectual Property (except any such information to the extent it is related to or part of Unassigned Records and Confidential Information for which this Section will apply).

      (b)     The Purchaser shall perform the Services (as defined under the Transitional Services Agreement) and the Purchaser's other obligations pursuant to this Agreement in a manner that complies with all applicable Privacy Laws and Data Protection Laws. Nothing in this Agreement will be deemed to prevent the Seller, IndyMac Federal or any Subsidiary thereof from taking the steps it reasonably deems necessary or appropriate to comply with the Privacy Laws or Data Protection Laws.

<div align="center">

**ARTICLE IX**

**GROUP 1 TRANSACTION COVENANTS**

</div>

      Section 9.01   Additional Title Documents. The Seller and the Purchaser each agree, at any time, and from time to time, upon the request of any party hereto, to execute and deliver such additional instruments and documents of conveyance as shall be reasonably necessary to vest in the Purchaser its full legal or equitable title in and to the Group 1 Assets. The Purchaser shall prepare such instruments and documents of conveyance (in form and substance reasonably satisfactory to the Seller) as shall be necessary to vest title to the Group 1 Assets in the Purchaser. The Purchaser shall be responsible for recording such instruments and documents of conveyance at its own expense.

      Section 9.02   Thrift Deposits. From the Effective Date through the Closing Date, the Seller shall use commercially reasonable efforts to maintain customer Thrift Deposits (other than custodial accounts) within an aggregate range of 15% of the aggregate Thrift Deposit balance as of September 30, 2008 (excluding custodial accounts) and shall provide the Purchaser a consultation right with respect to the Seller's efforts to maintain such Thrift Deposits, including a consultation right with respect to the establishment of interest rates for all such Thrift Deposit products.

      Section 9.03   Payment of Thrift Deposits. In the event any depositor does not accept the obligation of the Purchaser to pay any Thrift Deposit liability of IndyMac Federal assumed by the Purchaser pursuant to this Agreement and asserts a claim against the Seller for all or any

<div align="center">- 39-</div>

portion of any such Thrift Deposit liability, the Purchaser agrees on demand to provide to the Seller funds sufficient to pay such claim in an amount not in excess of the Thrift Deposit liability reflected on the books of the Purchaser at the time such claim is made. Upon payment by the Purchaser to the Seller of such amount, the Purchaser shall assign back to the Seller any deposit agreements assumed by the Purchaser with respect to such Thrift Deposit, and, thereafter, shall be discharged from any further obligation under this Agreement or otherwise to pay to any such depositor the amount of such Thrift Deposit liability paid to the Seller.

Section 9.04   Withheld Payments.   At any time, the Seller may, in its discretion, determine that all or any portion of any deposit balance assumed by the Purchaser pursuant to this Agreement does not constitute a "Thrift Deposit" (or otherwise, in its discretion, determine that it is in the best interest of the Seller to withhold all or any portion of any deposit), and may direct the Purchaser to withhold payment of all or any portion of any such deposit balance. Upon such direction, the Purchaser shall hold such deposit and shall not make any payment of such deposit balance to or on behalf of the depositor, or to itself, whether by way of transfer, set-off, or otherwise. The Purchaser shall maintain the "withheld payment" status of any such deposit balance until directed in writing by the Seller as to its disposition. At the direction of the Seller, the Purchaser shall return all or any portion of such deposit balance to the Seller, as appropriate, and thereupon the Purchaser shall be discharged from any further liability to such depositor with respect to such returned deposit balance. If such deposit balance has been paid to the depositor prior to a demand for return by the Seller, and payment of such deposit balance had not been previously withheld pursuant to this Section 9.04, the Purchaser shall not be obligated to return such deposit balance to the Seller. The Purchaser shall be obligated to reimburse the Seller for the amount of any deposit balance or portion thereof paid by the Purchaser in contravention of any previous direction to withhold payment of such deposit balance or return such deposit balance the payment of which was withheld pursuant to this Section 9.04.

## ARTICLE X

## TRANSACTION COVENANTS

Section 10.01   Pre-Closing Covenants.   Each of the Seller, HoldCo, Intermediate HoldCo and the Purchaser agree as follows with respect to the period between the Effective Date and the Closing or, if earlier, the termination of this Agreement in accordance with its terms:

(a)   Efforts and Actions to Cause Closing to Occur.   Each of the Seller, HoldCo, Intermediate HoldCo and the Purchaser shall use its commercially reasonable efforts to take, or cause to be taken, all actions, and to do, or cause to be done, all things necessary, proper or advisable (subject to compliance with all Laws) to consummate the Transaction as promptly as practicable, including the preparation and filing of all forms, registrations and notices required to be filed to consummate the Transaction.

(b)   Applications; Regulatory and Other Approvals.   Each of the Seller, HoldCo, Intermediate HoldCo and the Purchaser shall provide information reasonably requested by any other party and within the timeframes requested by such other party for the preparation of any applications necessary to consummate the Transaction. Each of the Seller, HoldCo, Intermediate HoldCo and the Purchaser shall take all commercially reasonable steps necessary or

- 40-

desirable, and proceed diligently and in good faith and use all commercially reasonable efforts, as promptly as practicable to: (i) obtain all consents and approvals of, make all filings with and give all notices to each Governmental Authority or any other Person that are required to be obtained, made or given by the Seller, HoldCo, Intermediate HoldCo or the Purchaser, as the case may be, including all of the consents and approvals listed on Schedule 14.01(g), in order to consummate the Transaction, including but not limited to compliance with all Laws and all contracts (subject, in each case, to any statutory rights of the Seller to assign or transfer any asset or liability without any consent or approval); and (ii) satisfy each other condition to the obligations of the Seller, HoldCo, Intermediate HoldCo or the Purchaser, as the case may be, contained in this Agreement. In furtherance, but not in limitation of the foregoing, HoldCo and Intermediate HoldCo jointly and severally shall use commercially reasonable efforts to (x) organize the Purchaser as a federally chartered, FDIC insured, stock form savings bank or savings association and (y) organize or cause to be organized the Subsidiaries of the Purchaser that are to be party to any of the other Definitive Agreements.

(c)    Access and Information.    The Seller shall afford HoldCo reasonable access to its personnel, properties, contracts, books and records to the extent that the Seller itself has the right to grant such access (provided that, under all circumstances, each party will coordinate all visits and communications with management of the other party upon reasonable notice); provided, however, that the foregoing shall not (1) require the Seller to permit any inspection, or to disclose any information, that in its reasonable judgment would violate any obligations of the Seller to any third party with respect to confidentiality or (2) require any disclosure by the Seller that could, as a result of such disclosure, have the effect of causing the waiver of any attorney-client privilege (it being understood that the Seller shall use commercially reasonable efforts to obtain a consent for such disclosure or otherwise to avoid the impediments described in the foregoing clauses (1) and (2)). In addition to the confidentiality arrangements contained herein, all information provided or obtained in connection with the Transaction shall be held by HoldCo in accordance with and subject to the terms of the Confidentiality Agreement, as modified or amended by this Agreement. In the event of a conflict or inconsistency between the terms of this Agreement and the Confidentiality Agreement, the terms of this Agreement shall govern.

(d)    Minimum Equity Capital; Dividends.    HoldCo will continuously maintain the Minimum Equity Capital and will not declare, set aside or pay any dividend or other distribution to its members which would cause HoldCo to fail to continuously maintain the Minimum Equity Capital.

(e)    Contracts.    Notwithstanding anything to the contrary contained in this Agreement or the other Definitive Agreements, the Seller will (i) give HoldCo the opportunity to review the Contracts listed on Schedule 10.01(e) and (ii) give HoldCo the option to assign back to the Seller any Contracts listed on Schedule 10.01(e) by providing written notice to the Seller, no later than thirty (30) calendar days after the Closing Date, of the Contracts it is so assigning. The Seller shall pay, perform and discharge all of the duties, obligations and liabilities relating to the Reassigned Contracts effective as of the close of business on the last Business Day of the month in which the Seller receives the notice referred to in the prior sentence.

(f)     FHLB Financing.  The Seller shall use commercially reasonable efforts to cooperate with HoldCo with respect to obtaining any financing for the benefit of the Purchaser requested from the FHLB.

(g)     Delivery of Fair Market Value Appraisals.  On the Closing Date, or as soon as reasonably practicable thereafter, HoldCo and Intermediate HoldCo shall deliver to the Seller the appraisal(s), prepared by Industrial Appraisal Company, of all of the assets being purchased at Fair Market Value by the Purchaser pursuant to this Agreement and the other Definitive Agreements.

Section 10.02  Post-Closing Covenants Relating to Records and Accounting Records.

(a)     Retention of Records; Access.  Each of HoldCo, Intermediate HoldCo and the Purchaser agrees that, after the Closing Date, HoldCo, Intermediate HoldCo and the Purchaser shall retain, and maintain for the joint benefit of the Seller and the Purchaser, all Records of which they have custody for at least ten (10) years from the Closing Date and comply with all Laws in connection with the retention, storage and maintenance of all Records, including the length of time such Records are to be retained.  In addition, each of HoldCo, Intermediate HoldCo and the Purchaser shall permit the Seller and its representatives access, upon reasonable notice, to all Records of which HoldCo, Intermediate HoldCo or the Purchaser has custody, and to use, inspect, make extracts from or request copies of any such Records in the manner and to the extent requested, and to duplicate, in the discretion of the Seller, any Record; provided that, in the event that the Seller maintained one or more duplicate copies of any Records, the Purchaser hereby assigns, transfers, and conveys to the Seller one such duplicate copy of each such Record without cost to the Seller, and shall deliver to the Seller all Records assigned and transferred to the Seller under this Article X as soon as reasonably practicable on or after the Closing Date.  Each of HoldCo, Intermediate HoldCo and the Purchaser shall give reasonable notice to the Seller of HoldCo's, Intermediate HoldCo's or the Purchaser's intention to (i) destroy or dispose of any Records, or (ii) disable, discontinue, cancel or permit the lapse of any licenses or permits with respect to any software application or other medium used to obtain access to any Records either directly, or if necessary, after translation into a reasonably usable form (including but not limited to the e-MITS application).  After receipt by Seller of such notice, each of HoldCo, Intermediate HoldCo and the Purchaser will allow the Seller, at its own expense, a reasonable amount of time to plan for the recovery and recover such Records from HoldCo, Intermediate HoldCo or the Purchaser, as the case may be.  The Purchaser shall have the responsibility to respond to subpoenas, discovery requests, and other similar official inquiries with respect to the Records of which it has custody; and shall provide written notice to the Seller of any such subpoenas, requests and inquiries within five (5) Business Days after its receipt of the same.

(b)     Proceedings with Respect to Certain Assets and Liabilities.  In connection with any investigation or proceeding with respect to any asset or liability retained by the Seller, or any Asset or liability acquired or assumed by the Purchaser or any of its Subsidiaries pursuant to this Agreement or any of the other Definitive Agreements (i) each of HoldCo, Intermediate HoldCo and the Purchaser shall cooperate to the extent reasonably required by the Seller and the Seller shall cooperate to the extent reasonably required by HoldCo, Intermediate HoldCo or the Purchaser (ii) each of HoldCo, Intermediate HoldCo and the

- 42-

Purchaser shall provide representatives of the Seller access at reasonable times and locations without other limitation or qualifications to (x) its directors, officers, employees and agents and those of the Subsidiaries acquired by the Purchaser pursuant to the Definitive Agreements and (y) its books and records, the books and records of such Subsidiaries, and copies thereof. Copies of any books and records shall be provided by HoldCo, Intermediate HoldCo and the Purchaser as reasonably requested by the Seller and the costs of duplication thereof shall be borne by the Seller.

(c)     Other Information.   Each of HoldCo, Intermediate HoldCo and the Purchaser promptly shall provide to the Seller such other information, including financial statements and computations, relating to the performance of the provisions of this Agreement as the Seller may reasonably request from time to time.

Section 10.03  FHLB Excess Stock.

(a)     Seller Payment.   To the extent that (i) within three (3) years following the Closing Date, the Purchaser repays all or a portion of the FHLB Advances assumed pursuant to Section 4.01 and delivers a written notice to the FHLB in accordance with 12 U.S.C. § 1421 et seq., the rules and regulations of the FHLB promulgated thereunder and the Capital Plan of the FHLB requesting the redemption or repurchase of Excess Stock and (ii) the FHLB does not, within ninety (90) calendar days of such written notice, redeem or repurchase such Excess Stock, then, subject to the provisions of this Section 10.03, the Seller shall pay to the Purchaser an amount equal to the aggregate par value of the Excess Stock, if any, measured on the first, second and third anniversaries of the Closing Date (the "**Excess Stock Payment**").

(b)     Procedures.   Within thirty (30) calendar days of the anniversary of the Closing Date immediately following the FHLB's failure or refusal to redeem or repurchase Excess Stock as provided in Section 10.03(a), the Purchaser shall deliver to the Seller written notice and supporting documentation (including documentation evidencing repayment of such FHLB Advances, written notice to the FHLB to redeem or repurchase such Excess Stock and documentation evidencing the failure or refusal by the FHLB to redeem or repurchase such Excess Stock) of the Purchaser's demand for payment for such Excess Stock by the Seller under this Section 10.03. The Seller shall make any Excess Stock Payment to the Purchaser within ten (10) Business Days of the receipt of such notice and supporting documentation.

(c)     Annual Reconciliation.   In the event the Seller makes an Excess Stock Payment to the Purchaser, in connection with the next annual measurement of Excess Stock the Purchaser or the Seller, as applicable, shall make the following payments:

(i)     If the Excess Stock at the time of the prior Excess Stock Payment exceeds the Excess Stock measured as of the subsequent annual measurement, the Purchaser shall pay to the Seller the difference in par value of the Excess Stock as of the two annual measurements.

(ii)     If the Excess Stock at the time of the prior Excess Stock Payment is less than the Excess Stock measurement of the subsequent annual measurement, the

Seller shall pay to the Purchaser the difference in par value of the Excess Stock as of the two annual measurements.

In any event, the last measurement of Excess Stock for purposes of any Excess Stock Payment or any annual reconciliation under this paragraph (c) shall be the third anniversary of the Closing Date.  For the avoidance of doubt, any Excess Stock existing on the third anniversary of the Closing Date (regardless of the events creating Excess Stock) shall be eligible for the Excess Stock Payment provisions of Section 10.03(a).

(d)     Reconciliation for Sales of Excess Stock.  With respect to any Excess Stock for which the Seller has made a payment to the Purchaser under this Section 10.03 and for which the Purchaser has not reimbursed the Seller pursuant to Section 10.03(c)(i), if at any time following such payment by the Seller (including after the third anniversary of the Closing Date) and preceding any reimbursement pursuant to Section 10.03(c)(i) with respect to such Excess Stock: (i) the Purchaser shall sell such Excess Stock to any third party; (ii) such Excess Stock is redeemed by the FHLB; or (iii) the Purchaser shall receive dividends from the FHLB with respect to such Excess Stock, then, in each such case, the Purchaser shall promptly pay to the Seller the full amount of the proceeds or income (including dividends) therefrom, as the case may be; provided that, in the case of a sale or redemption pursuant to clause (i) or clause (ii) above, the Purchaser shall have no further obligation to reimburse the Seller with respect to such Excess Stock pursuant to Section 10.03(c)(i).  For the avoidance of doubt, any Excess Stock sold or redeemed and for which the Seller has received payment pursuant to clause (i) or clause (ii) above shall be excluded from all calculations under Section 10.03(c) thereafter (including the calculation of Excess Stock outstanding at the time of a prior Excess Stock Payment).

(e)     Post-Closing Purchases of FHLB Stock.  If at anytime after the Closing Date the Purchaser is required by the FHLB to purchase additional shares of FHLB Stock, the Purchaser shall, to the extent permitted to do so by the FHLB, first offer to purchase such additional shares from the Seller, at par value, before the Purchaser shall otherwise purchase such additional shares of FHLB Stock from any other source.

Section 10.04 Reformation and Amendment of Definitive Agreements in Certain Circumstances.  Notwithstanding anything to the contrary in this Agreement, if the conditions set forth in Section 14.01(n) and Section 14.02(n) have not been satisfied, or have become incapable of satisfaction, or if the transactions contemplated by the Consent and Collateral Assignment shall not have been consummated, prior to the close of business on March 23, 2009, the parties shall use commercially reasonable efforts to amend this Agreement and the other Definitive Agreements, as applicable, to (i) eliminate the transfer and assignment by the Seller to the Purchaser of, and to incorporate into the definition of Excluded Liabilities, any liabilities to the FHLB, including the FHLB Advances and the liabilities under the related FHLB contracts listed on Schedule 4.01(c)(ii), and replace the assumption of such liabilities with Seller Financing under the Mortgage Loan Master Repurchase Agreement, (ii) eliminate the transfer of the FHLB Stock to the Purchaser, (iii) include additional financing in the Seller Financing sufficient to enable the Purchaser to complete the purchase of the Assets included in Group 3 and eliminate any condition from the Seller Financing, as so supplemented, that requires financing from the FHLB or evidence to the effect that the Purchaser and its Affiliates are unable to finance the

acquisitions contemplated by the Definitive Agreements with financing from the FHLB, and (iv) to otherwise amend this Agreement and the other Definitive Agreements as appropriate consistent with the foregoing, including, without limitation, to (A) delete Section 5.09 and Section 10.03 and (B) delete the conditions set forth in Section 14.01(n) and Section 14.02(n) (such agreements, as so amended, the "Reformed Agreements").

## ARTICLE XI

## EMPLOYMENT MATTERS

Section 11.01 Employees.  HoldCo has separately provided written notice to the Seller and the FDIC of its decision with respect to the employees of the Seller, the Failed Thrift, IndyMac Federal or their respective Affiliates that are performing services relating to the business of the Failed Thrift, IndyMac Federal or their respective Affiliates (in either case, the "Seller Employees") to whom HoldCo or an Affiliate of HoldCo will, subject to this Section 11.01, make offers of employment (such Seller Employees, the "Offeree Employees"). HoldCo, Intermediate HoldCo or an Affiliate of HoldCo or Intermediate HoldCo shall make offers of employment to such Offeree Employees, subject to the terms hereof.  Such offers shall in all cases be offers for at-will employment unless HoldCo, Intermediate HoldCo or an Affiliate of HoldCo or Intermediate HoldCo, in its sole discretion, elects to offer some other form of employment relationship.   The Seller acknowledges that the continued employment of any Transferred Employee (as such term is defined below) following the Closing Date is subject to the sole discretion of HoldCo, Intermediate HoldCo and their Affiliates.  Each Offeree Employee who accepts an offer of employment from HoldCo, Intermediate HoldCo or one of their Affiliates, whether such acceptance occurs in writing or by the Offeree Employee continuing to work from and after the Closing Date (provided that any offer of employment to such Offeree Employee has not been declined, withdrawn or otherwise cancelled in accordance with this Section 11.01) is a "Transferred Employee" for purposes of this Agreement.   The Offeree Employees shall consent to, and HoldCo or Intermediate HoldCo intends to perform, such background and credit checks as HoldCo or Intermediate HoldCo shall deem reasonable and appropriate.  In the event that, prior to the Closing, (i) any Offeree Employee does not consent to such background or credit check; (ii) HoldCo, Intermediate HoldCo or one of their Affiliates is permitted or required under applicable law to withdraw, and elects to withdraw, the offer of employment based upon the results of either or both of such background or credit checks; or (iii) cause exists to terminate the Offeree Employee, then, in the case of (i), (ii) or (iii), the Offeree Employee shall not become a Transferred Employee and none of HoldCo, Intermediate HoldCo, the Purchaser and their Affiliates shall have any liability or obligation with respect to such Offeree Employee. Transferred Employees shall, subject to the terms of this Article XI, become employees of HoldCo, Intermediate HoldCo or an Affiliate of HoldCo or Intermediate HoldCo effective as of 12:00 a.m. on the day following the last day of the Transition Period.

Section 11.02 Welfare and Retirement Benefits for Transferred Employees. With regard to the Transferred Employees, each of HoldCo, Intermediate HoldCo and the Purchaser agrees as follows:

(a)      HoldCo, Intermediate HoldCo or the Purchaser shall provide, or shall cause an Affiliate to provide, and until the first anniversary of the Closing Date, shall maintain,

or shall cause an Affiliate to maintain, health, retirement and other welfare benefits for the Transferred Employees that are, in the aggregate, substantially comparable to the health, retirement and other welfare benefits (excluding any equity or equity-based compensation or retention bonuses) provided by the Seller to such Transferred Employees immediately prior to Closing, considered in the aggregate (the "**Purchaser Employee Plans**"); provided, however, that nothing in this subsection (a) shall (i) prevent the amendment or termination of any Purchaser Employee Plan, (ii) interfere with the right or obligation of HoldCo, Intermediate HoldCo or the Purchaser to make such changes as are necessary to conform or comply with Law or (iii) limit the right of HoldCo, Intermediate HoldCo or the Purchaser to terminate the employment of any Transferred Employee at any time.

(b)     HoldCo, Intermediate HoldCo and the Purchaser shall recognize, and shall cause their respective Affiliates to recognize, for the purposes of determining eligibility for participation in the Purchaser Employee Plans and for any applicable vesting periods pursuant to such plans only (and not for benefit accrual purposes), the service of any Transferred Employee with the Seller, the Failed Thrift, IndyMac Federal, their Affiliates and their respective predecessors, to the extent such service was recognized for purposes of the Seller Employee Plans.

(c)     HoldCo, Intermediate HoldCo and the Purchaser shall cause, or shall cause an Affiliate to cause, (i) any Purchaser Employee Plan that is a self-insured plan and (ii) to the extent practicable without a material increase in premium cost, any other Purchaser Employee Plan, to waive any coverage limitation thereunder due to any pre-existing condition for purposes of the Purchaser Employee Plans to the extent that such condition was covered and would have been waived by the Seller Employee Plans, and such condition would otherwise be covered by the Purchaser Employee Plans in the absence of such pre-existing condition coverage limitation. All Transferred Employees who become participants in the Purchaser Employee Plans shall receive credit for any co-payment and deductibles paid (or accrued) under the Seller Employee Plans for purposes of satisfying any applicable deductible or out-of-pocket requirements under the Purchaser Employee Plans, upon substantiation, in a form satisfactory to HoldCo, the Purchaser or their respective Affiliates that such co-payment and/or deductible has been paid.

(d)     HoldCo, Intermediate HoldCo or the Purchaser shall, or shall cause an Affiliate to, cooperate with the Seller to arrange for a transfer of the Transferred Employees' flexible spending account balances, if any, and HoldCo, Intermediate HoldCo or the Purchaser shall, or shall cause an Affiliate to, take all commercially reasonable actions necessary to assist in facilitating a plan-to-plan transfer of account balances. For this purpose, "account balance" shall mean (a) the amount of each Transferred Employee's reimbursement entitlement for the coverage period that includes the Closing Date, to the extent not drawn as of the Closing Date; (b) the obligation, if any, of the Transferred Employee to pay all or part of the cost of such reimbursement right through salary reduction contributions after the Closing Date and (c) the terms, conditions and limitations applicable to the Transferred Employee's participation in such flexible spending account as in effect immediately prior to the Closing Date.

(e)     If HoldCo, Intermediate HoldCo or the Purchaser maintains, or causes an Affiliate to maintain, a defined contribution plan intended to be qualified under Section 401

- 46-

of the Internal Revenue Code of 1986, as amended, HoldCo, Intermediate HoldCo or the Purchaser (as applicable) will, or will cause an Affiliate to, upon mutually agreeable terms with the Seller, assist in facilitating a trustee-to-trustee transfer of the Transferred Employees' defined contribution plan account balances to HoldCo or the Purchaser's defined contribution plan.

(f)     The Seller shall assume and be responsible for satisfying all obligations under Part 6, Subtitle B, Title I of ERISA (COBRA), if any: (i) with respect to Seller Employees other than the Transferred Employees and their qualified beneficiaries with respect to any benefit plan coverage and (ii) with respect to Transferred Employees and their qualified beneficiaries, but only with respect to qualifying events that occur on or prior to the last day of the Transition Period for that Transferred Employee.

Section 11.03 <u>WARN Act</u>.  From and after the Closing Date, HoldCo, Intermediate HoldCo and the Purchaser shall indemnify and hold harmless the Seller against any liability arising under the Workers Adjustment and Retraining Notification Act and any state or local equivalent (collectively, the "**WARN Act**") in connection with (i) the termination of employment of any Transferred Employee by HoldCo, Intermediate HoldCo or the Purchaser at any time after the Closing Date, or (ii) the issuance of any notices required by the WARN Act with respect to the termination of any Transferred Employee at any time after the Closing Date, and HoldCo, Intermediate HoldCo, the Purchaser and their respective Affiliates shall have no liability or obligation arising under the WARN Act with respect to any Seller Employees other than the Transferred Employees.  On or before the Closing Date, the Seller shall provide HoldCo and the Purchaser with a schedule of all layoffs and any other "employment losses" (as such term is defined in the WARN Act) in the United States, by site of employment, implemented by the Seller, IndyMac Federal, the Failed Thrift or any of their respective Affiliates during the ninety (90)-day period preceding the Closing Date.

Section 11.04 <u>Transition Employees</u>.  In the case of each Transition Employee (as defined below), during the period beginning at the close of business on the Closing Date and ending at the close of business on the last day of the Transition Employee's employment with the Seller or its Affiliates (or, if earlier, midnight Pacific time on March 31, 2009) (for such Transition Employee, the "**Transition Period**"), the Seller shall make available, or cause IndyMac Resources, Inc. to make available, to the Purchaser the services of all the Seller Employees who are expected to become Transferred Employees as a result of satisfying the conditions in <u>Section 11.01</u> hereof (the "**Transition Employees**").  During the applicable Transition Period, the Transition Employees shall perform exclusively such services as the Purchaser may request.  All such services shall be performed for the benefit of the Purchaser and under the supervision, direction and control of the Purchaser or its designees.  During the applicable Transition Period, a Transition Employee shall, and shall have been informed by the Seller that the Transition Employee shall, be subject only to the supervision, direction, control and instructions of the Purchaser.  The Purchaser shall reimburse the Seller for each and every direct cost reasonably incurred by the Seller with respect to the Transition Employees and attributable to the applicable Transition Period, including but not limited to (in each case, to the extent applicable) salaries, wages, overtime pay, on-call pay, payroll taxes, employee benefits, other compensation, unemployment insurance costs and any other expense, in each case which the Seller would not have incurred but for the fact that the Transition Employees remain

- 47-

employed by the Seller after the close of business on the Closing Date, but not including fidelity bond costs or errors and omissions insurance premiums or other costs if such costs or premiums are incurred directly by the Purchaser, the identity and amount of which shall be determined by the Seller and promptly communicated to the Purchaser (all such costs, the "**Transition Employee Costs**"). The reimbursement provided for in the preceding sentence shall be included as part of the calculation of the Settlement Payment, notwithstanding any other provision of this Agreement or the other Definitive Agreements. The Purchaser shall defend and indemnify the Seller against, and hold the Seller harmless from, any Losses arising out of or resulting from the fact that any Transition Employee remains employed by the Seller after the close of business on the Closing Date, including without limitation from any acts or omissions of any Transition Employee during the Transition Period and any Losses incurred by the Seller as a result of any claim asserted by any Transition Employee with respect to any act or omission of the Purchaser or any officer, director, employee or agent of the Purchaser during the Transition Period, except to the extent any such Losses are proven by the Purchaser by clear and convincing evidence to have arisen from any written instructions to the Transition Employee by the Seller or any act or omission by the Seller. Any indemnification provided for the benefit of the Seller under this Section 11.04 shall be subject to the applicable terms, conditions and procedures set forth in Section 17.06. To the extent reasonably practicable, the Purchaser shall have in place errors and omission insurance and fidelity bond insurance for the Transition Employees for the Transition Period to the same extent that it expects to have such insurance in place for all employees including Transferred Employees immediately following the Transition Period. This provision is intended to place the Purchaser and the Seller in the same position in which they would have been if all Transition Employees had resigned their employment with Seller at the close of business on the Closing Date and become employees of the Purchaser immediately following the close of business on the Closing Date, and it shall be interpreted, administered and enforced to give effect to such intent. This Section 11.04 shall be binding on and shall inure to the benefit of IndyMac Resources, Inc., which shall, notwithstanding any other provision of this Agreement have the right to enforce this Section 11.04 either as a signatory hereto or a third-party beneficiary hereof.

## ARTICLE XII

## TAX MATTERS

Section 12.01 Tax Characterization and Net Operating Losses. The Seller and HoldCo hereby acknowledge and agree that for United States federal income tax purposes, the Transaction will be treated as a sale of assets by IndyMac Federal pursuant to Treasury Regulation Section 1.597-5. HoldCo hereby acknowledges and agrees that it will not be permitted to take advantage of any tax benefits relating to net operating losses of IndyMac Federal. To the extent that the Seller, IndyMac Federal or the Purchaser files or causes to be filed any Tax Returns, such Tax Returns shall be filed in accordance with the tax treatment described in this Article XII.

**ARTICLE XIII**

**CLOSING DELIVERIES FOR GROUP 1 TRANSACTION**

Section 13.01 <u>Seller's Deliverables</u>.  In addition to any other documents to be delivered under other provisions of this Agreement, the Seller shall deliver and release, subject to and in accordance with this <u>Section 13.01</u>, to the Purchaser the following on or prior to the Closing:

(a)     an original Bill of Sale executed by the Seller;

(b)     four originals of the Assignment and Assumption Agreement executed by the Seller;

(c)     four originals of the joinder to this Agreement executed by the FDIC as receiver for IndyMac Federal;

(d)     four originals of each Intellectual Property Assignment executed by the Seller;

(e)     four originals of the Intellectual Property, Data and Information Technology Assets License executed by the Seller and the FDIC in its corporate capacity;

(f)     four originals of the Consent and Collateral Assignment for the FHLB Advances executed by the Seller;

(g)     four originals of the Assignment and Assumption of Leases executed by the Seller;

(h)     with respect to each of the owned Bank Premises listed on Schedule 5.01(b)(i) and each of the owned Servicing Business Premises listed on Schedule 5.01(b)(ii), an original grant deed in recordable form in the relevant jurisdiction, executed by the Seller; and

(i)     such other deeds, bills of sale, certificates of title and other instruments of assignment, transfer and conveyance as are set forth on Schedule 13.01(i), in form and substance to be agreed upon by the Purchaser and the Seller prior to Closing.

Section 13.02 <u>Purchaser's Deliverables</u>.  In addition to any other documents to be delivered under other provisions of this Agreement, the Purchaser shall deliver and release, subject to and in accordance with this <u>Section 13.02</u>, to the Seller the following on or prior to the Closing:

(a)     the Group 1 Closing Payment in accordance with this Agreement;

(b)     four originals of the Assignment and Assumption Agreement executed by the Purchaser;

       (c)    four originals of the joinder to this Agreement executed by the Purchaser;

       (d)    four originals of each Intellectual Property Assignment executed by the Purchaser;

       (e)    four originals of the Intellectual Property, Data and Information Technology Assets License executed by the Purchaser;

       (f)    four originals of the Consent and Collateral Assignment for the FHLB Advances executed by the Purchaser; and

       (g)    four originals of the Assignment and Assumption of Leases executed by the Purchaser.

## ARTICLE XIV

## CONDITIONS PRECEDENT TO TRANSACTION

Notwithstanding anything to the contrary in this Article XIV, any failure of any of the conditions set forth in Article IX of the Reverse Mortgage Business Asset Purchase Agreement shall not affect the obligation of either party to consummate the Transaction; provided, however that in such case the Assets included in Group 3 shall not be acquired by the Purchaser and the Aggregate Closing Payment, the Aggregate Final Payment and the Aggregate Final Purchase Price shall be calculated excluding the Group 3 Closing Payment, the Group 3 Final Payment and the Group 3 Final Purchase Price, respectively.

Section 14.01 Conditions to Each of HoldCo's, Intermediate HoldCo's and the Purchaser's Obligation.  The obligation of each of HoldCo, Intermediate HoldCo and the Purchaser to effect the Closing hereunder is subject to the satisfaction (or waiver by HoldCo, Intermediate HoldCo and/or the Purchaser, as applicable) of all of the following conditions on or prior to the Closing:

       (a)    The representations and warranties of the Seller set forth in this Agreement shall be true and accurate in all material respects when made and at and as of the Closing Date;

       (b)    The Seller shall have delivered to HoldCo, Intermediate HoldCo and the Purchaser duly executed copies of (i) each of the Definitive Agreements and other agreements related to the Transaction to which it is named as a party and (ii) the instruments of assignment, transfer and conveyance specifically identified in Article XIII hereof and in each of the other Definitive Agreements;

       (c)    The Seller shall have delivered to HoldCo, Intermediate HoldCo and the Purchaser such certifications and other documents as are expressly set forth on Exhibit FF and all other deliverables (other than those listed in this Article XIV) required to be delivered by it on or prior to the Closing pursuant to this Agreement and the other Definitive Agreements;

(d)     All approvals of trustees, bond insurers or rating agencies that are necessary to permit the Seller to transfer any mortgage servicing assets shall have been obtained other than those the failure of which to obtain would not have a material adverse effect on the benefits of the Transaction to HoldCo, Intermediate HoldCo or the Purchaser;

(e)     Subject to Section 14.01(d) above, the Seller shall have requested the consent of all other third parties whose consents are required in order to consummate the Transaction other than those the failure of which to obtain would not have a material adverse effect on the benefits of the Transaction to HoldCo, Intermediate HoldCo or the Purchaser;

(f)     No temporary restraining order, preliminary injunction or other order issued by any court of competent jurisdiction or other legal restraint or prohibition preventing the consummation of the Transaction shall be in effect as of the Closing Date;

(g)     All approvals or licenses required by Law or any Governmental Authority that are necessary to permit the Seller, the Purchaser, Intermediate HoldCo or HoldCo to perform their respective obligations hereunder and to consummate the Transaction, all of which are listed on Schedule 14.01(g), shall have been obtained, and all applicable waiting periods (and any extensions thereof) imposed by Law shall have expired or otherwise been terminated, including the receipt by each of J.C. Flowers & Co. LLC and Paulson & Co. Inc. of (i) a determination from the OTS substantially to the effect that it and its Affiliates do not control the Purchaser and therefore it is not required to register as a savings and loan holding company and (ii) a determination from the FDIC substantially to the effect that it and its Affiliates will not be deemed to control the Purchaser within the meaning of Section 3(w)(5) of the FDIA and for purposes of cross-guarantee liability under the FDIA, and will not be deemed to be "controlling stockholders" of the Purchaser for purposes of Section 3(u)(1) of the FDIA;

(h)     The Seller shall have performed and complied in all material respects with all other covenants and agreements required by this Agreement to be performed or complied with by it on or prior to the Closing;

(i)     HoldCo (or the applicable Affiliate of HoldCo) shall have received the requested Seller Financing on the terms and conditions set forth in the Seller Financing Agreements;

(j)     The FDIC, as receiver for IndyMac Federal, shall have entered into this Agreement by executing and delivering the joinder to this Agreement that follows the signature pages hereto;

(k)     All conditions to the obligations of each of HoldCo, Intermediate HoldCo and the Purchaser to consummate the transactions set forth in each of the Servicing Business Asset Purchase Agreement, the Reverse Mortgage Business Asset Purchase Agreement (subject to the introductory paragraph of this Article XIV), the Securities Sale Agreement, the Loan Sale Agreement and the Participation Structure Documents, if any, which conditions and obligations are not otherwise set forth herein, shall have been satisfied (or waived by HoldCo, Intermediate HoldCo or the Purchaser, as applicable);

(l)     The Seller shall have entered into the Transitional Services Agreement containing such terms as mutually agreed by the Seller and the Purchaser;

(m)     The Seller shall have entered into the Reverse Mortgage Shared-Loss Agreement containing such terms as mutually agreed by the Seller and the Purchaser; and

(n)     Subject to the provisions of Section 10.04 of this Agreement, the FHLB and the Seller shall have entered into the Consent and Collateral Assignment attached hereto as Exhibit C-2.

In furtherance, but not in limitation, of the foregoing, and except as set forth in the introductory paragraph of this Article XIV and in Article IX of the Reverse Mortgage Business Asset Purchase Agreement, each of HoldCo, Intermediate HoldCo and the Purchaser further acknowledges and agrees that it shall not otherwise be a condition to its obligations to consummate the Transaction (or any part thereof) that there shall not have been any material adverse change in the Assets between the date of this Agreement and the Closing.

Section 14.02 Conditions to the Seller's Obligation.   The obligation of the Seller to effect the Closing hereunder is subject to the satisfaction (or waiver by the Seller) of all of the following conditions on or prior to the Closing:

(a)     The representations and warranties of each of the Purchaser, Intermediate HoldCo and HoldCo set forth in this Agreement shall be true and accurate in all material respects when made and at and as of the Closing Date;

(b)     Each of the Purchaser, Intermediate HoldCo and HoldCo shall have delivered, and/or shall have caused its Affiliate to deliver, as applicable, to the Seller (i) duly executed copies of each of the Definitive Agreements and other agreements related to the Transaction to which it is named as a party and (ii) the instruments of assignment, transfer and conveyance specifically identified in Article XIII hereof and in each of the other Definitive Agreements;

(c)     The Purchaser shall have delivered to the Seller such certifications, opinions and other documents expressly set forth in Exhibit GG and all other deliverables (other than those listed in this Article XIV) required to be delivered by it on or prior to the Closing pursuant to this Agreement and the other Definitive Agreements;

(d)     HoldCo and Intermediate HoldCo shall have delivered to the Seller such certifications, opinions and other documents expressly set forth in Exhibit HH and Exhibit II, respectively; and each of HoldCo and Intermediate HoldCo shall have delivered all other deliverables (other than those listed in this Article XIV) required to be delivered by it on or prior to Closing pursuant to this Agreement;

(e)     All approvals of trustees, bond insurers or rating agencies that are necessary to permit the Seller to transfer any mortgage servicing assets shall have been obtained other than those the failure of which to obtain would not have a material adverse effect on the benefits of the Transaction to the Seller;

- 52-

(f)     Subject to Section 14.02(e), each of the Purchaser, Intermediate HoldCo and HoldCo shall have requested the consent of all other third parties whose consents are required to consummate the Transaction other than those the failure of which to obtain would not have a material adverse effect on the benefits of the Transaction to the Seller;

(g)     No temporary restraining order, preliminary injunction or other order issued by any court of competent jurisdiction or other legal restraint or prohibition preventing the consummation of the Transaction shall be in effect as of the Closing Date;

(h)     All approvals or licenses required by Law or any Governmental Authority that are necessary to permit the Seller, the Purchaser, Intermediate HoldCo or HoldCo to perform their respective obligations hereunder and to consummate the Transaction, all of which are listed on Schedule 14.01(g), shall have been obtained, and all applicable waiting periods (and any extensions thereof) imposed by Law shall have expired or otherwise been terminated, including the receipt by each of J.C. Flowers & Co. LLC and Paulson & Co. Inc. of (i) a determination from the OTS substantially to the effect that it and its Affiliates do not control the Purchaser and therefore it is not required to register as a savings and loan holding company and (ii) a determination from the FDIC substantially to the effect that it and its Affiliates will not be deemed to control the Purchaser within the meaning of Section 3(w)(5) of the FDIA and for purposes of cross-guarantee liability under the FDIA, and will not be deemed to be "controlling stockholders" of the Purchaser for purposes of Section 3(u)(1) of the FDIA;

(i)     Each of the Purchaser, Intermediate HoldCo and HoldCo shall have performed and complied in all material respects with all other covenants and agreements required by this Agreement to be performed or complied with by it on or prior to the Closing;

(j)     The Purchaser shall have entered into this Agreement by executing and delivering the joinder to this Agreement that follows the signature page hereto;

(k)     All conditions to the obligations of the Seller to consummate the transactions set forth in each of the Servicing Business Asset Purchase Agreement, the Reverse Mortgage Business Asset Purchase Agreement, the Securities Sale Agreement, the Loan Sale Agreement and the Participation Structure Documents, which conditions and obligations are not otherwise set forth herein, shall have been satisfied (or waived by the Seller);

(l)     The Purchaser shall have entered into the Transitional Services Agreement containing such terms as mutually agreed by the Seller and the Purchaser;

(m)     The Purchaser and Financial Freedom Acquisition LLC shall have entered into the Reverse Mortgage Shared-Loss Agreement containing such terms as mutually agreed by the Seller and the Purchaser; and

(n)     Subject to the provisions of Section 10.04 of this Agreement, the FHLB and the Purchaser shall have entered into the Consent and Collateral Assignment attached hereto as Exhibit C-2.

**ARTICLE XV**

**REPRESENTATIONS AND WARRANTIES**

Section 15.01 <u>Seller's Representations and Warranties</u>.  The Seller hereby represents and warrants to HoldCo and Intermediate HoldCo, and, on the Closing Date, to the Purchaser that the statements contained in this <u>Section 15.01</u> are correct and complete as of the date of this Agreement and will be correct and complete as of the Closing Date (as though made then and as though the Closing Date were substituted for the date of this Agreement throughout this <u>Section 15.01</u>).

(a)    <u>Authority of the Seller</u>.  The Seller has all requisite corporate power and authority to execute and deliver this Agreement, the other Definitive Agreements and all other related agreements and to perform its obligations hereunder and thereunder.  The execution, delivery and performance of this Agreement and the other Definitive Agreements (including all instruments of transfer to be delivered pursuant to this Agreement, the other Definitive Agreements and all other related agreements) and the consummation of the transactions contemplated hereby and thereby by the Seller have been duly and validly authorized and, assuming the due authorization, execution and delivery by the other parties hereto and thereto (as applicable), this Agreement and the other Definitive Agreements evidence valid and binding obligations of the Seller, enforceable against the Seller in accordance with their respective terms, except as enforceability may be limited by (i) applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting or relating to the enforcement of creditors' rights generally and (ii) general principles of equity.

(b)    <u>No Conflicts</u>.  None of the execution and delivery of this Agreement or any of the other Definitive Agreements by the Seller, the consummation of the Transaction, or the fulfillment of or compliance with the terms and conditions of this Agreement or any of the other Definitive Agreements by the Seller, will conflict with or result in a breach of any of the terms, conditions or provisions of the Seller's charter or by-laws or other constituent documents.

(c)    <u>No Litigation Pending</u>.  Except as set forth on <u>Schedule 15.01(c)</u>, there is no action, suit, proceeding or investigation pending against the Seller which, either individually or in the aggregate, if adversely decided against the Seller would reasonably be expected to materially and adversely affect the Seller's ability to perform its obligations under this Agreement or any of the other Definitive Agreements.

(d)    <u>No Consent Required</u>.  No consent, approval, authorization or order of any court, governmental agency or body, or non-governmental entity is required for the execution, delivery and performance of this Agreement or any of the other Definitive Agreements, or the consummation of the Transaction by the Seller, except for those consents, approvals, authorizations and orders that (x) have been or will be obtained prior to the Closing Date, or (y) have not been and will not be obtained due to the Seller's exercise of its statutory authority to transfer assets without obtaining any approval, assignment or consent with respect to such transfer.

- 54-

(e)     No Broker's Fees.   Except for Barclays Capital Inc. (including any predecessor company or company acquired by Barclays Capital Inc.) and Deutsche Bank Securities, Inc., and the fees and expenses payable to each of them (which fees and expenses will not be the responsibility of HoldCo, Intermediate HoldCo or the Purchaser), the Seller has not employed any broker, investment banker or registered financial adviser in a manner that would reasonably be expected to result in any liability on the part of HoldCo, Intermediate HoldCo or the Purchaser for any broker's fees, commissions or similar fees in connection with the consummation of the Transaction.

Section 15.02 Representations and Warranties Regarding the Purchaser.   HoldCo, Intermediate HoldCo and the Purchaser jointly and severally represent and warrant to the Seller that the statements contained in this Section 15.02 are correct and complete as of the Closing Date.

(a)     Due Organization.   The Purchaser is a federally chartered, stock form savings bank or savings association, duly organized, validly existing and in good standing under the laws of the United States of America.

(b)     Authority and Capacity; Performance.   The Purchaser has the requisite power, authority and capacity to execute and deliver this Agreement and the other Definitive Agreements, and the other documents, instruments and agreements required to be executed by the Purchaser in connection with this Agreement and the other Definitive Agreements, to perform its obligations hereunder and thereunder and to consummate the Transaction.   The execution, delivery and performance of the Definitive Agreements by the Purchaser does not and the consummation of the Transaction will not (i) violate any material provision of law, rule or regulation or any judgment, order, writ, injunction or decree of any court or Governmental Authority applicable to the Purchaser, (ii) conflict with any of the terms of (x) the Purchaser's organizational documents or (y) any other governing instrument relating to the conduct of the Purchaser's business or the ownership of its properties, or (iii) result in or give rise to any right of termination, cancellation or acceleration under any other agreement to which the Purchaser is a party or by which it is bound.

(c)     Authorization and Binding Agreement.   The execution and delivery of this Agreement and the other Definitive Agreements, and all documents, instruments and other agreements required to be executed in connection with this Agreement and the other Definitive Agreements, and the consummation of the Transaction, each have been duly authorized by all necessary action on behalf of the Purchaser, and assuming the due authorization, execution and delivery by the other parties hereto and thereto (as applicable), this Agreement and the other Definitive Agreements are, and each document, instrument and other agreement contemplated by this Agreement and the other Definitive Agreements to be delivered by the Purchaser, when executed and delivered in accordance with the provisions hereof and thereof, will be, a legal, valid and binding obligation of the Purchaser, enforceable against the Purchaser in accordance with its terms, except as enforceability may be limited by (i) applicable bankruptcy, insolvency, reorganization, moratorium or similar Laws affecting or relating to the enforcement of creditors' rights generally and (ii) general principles of equity.

(d)   No Violation.   The Purchaser is not in violation of any statute, regulation, order, decision, judgment or decree of, or any restriction imposed by, the United States of America, any state, municipality or other political subdivision or agency of any of the foregoing, or any court or other tribunal having jurisdiction over the Purchaser or any assets of the Purchaser, or any foreign government or agency thereof having such jurisdiction, with respect to the conduct of the business of the Purchaser, or the ownership of the properties of the Purchaser, which, either individually or in the aggregate with all other such violations, would materially and adversely affect the business, operations or condition (financial or otherwise) of the Purchaser or the ability of the Purchaser to perform, satisfy or observe any obligation or condition under this Agreement or any of the other Definitive Agreements.

(e)   Consents and Approvals of Governmental Authorities.   Except for those consents, approvals, authorizations, orders, waivers, declarations, filings and registrations that have been or will be obtained or made prior to the Closing Date, no consent, approval, authorization, order or waiver of, or declaration, filing or registration with, any court, governmental agency or body, or non-governmental entity is required for the execution, delivery and performance of this Agreement or any of the other Definitive Agreements, or the consummation of the Transaction, by the Purchaser.

(f)   Ability to Pay.   At the Closing, the Purchaser will have sufficient funds available to enable it to pay the Aggregate Final Purchase Price (after deducting the Seller Financing).

(g)   Excluded Assets.   The Purchaser acknowledges that it is not purchasing and has no right to or interest in any of the Excluded Assets or any amounts recoverable or recovered therefrom.

(h)   Limitations on Liability.   The Purchaser acknowledges and agrees that this Agreement and the other Definitive Agreements, except for the FDIC Guaranty, are entered into by the Seller or the FDIC, as receiver for IndyMac Federal, and not by the FDIC in its corporate capacity.

Section 15.03 HoldCo and Intermediate HoldCo's Representations and Warranties. HoldCo and Intermediate HoldCo jointly and severally represent and warrant to the Seller that the statements contained in this Section 15.03 are correct and complete as of the date of this Agreement and will be correct and complete as of the Closing Date (as though made then and as though the Closing Date were substituted for the date of this Agreement throughout this Section 15.03).

(a)   Due Organization.   Each of HoldCo and Intermediate HoldCo is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Delaware.

(b)   Authority and Capacity; Performance.   Each of HoldCo and Intermediate HoldCo has the requisite power, authority and capacity to enter into this Agreement and the other documents, instruments and agreements required to be executed by it in connection herewith, to perform its obligations hereunder and thereunder and to consummate the

- 56-

Transaction.  Subject solely to the receipt of all prior approvals and consents (if any) that are required to be obtained by HoldCo or Intermediate HoldCo pursuant to Section 14.02 to effect the Transaction, the execution, delivery and performance of this Agreement by HoldCo and Intermediate HoldCo does not and the consummation of the Transaction will not (i) violate any material provision of law, rule or regulation or any judgment, order, writ, injunction or decree of any court or Governmental Authority applicable to HoldCo or Intermediate HoldCo, or (ii) conflict with any of the terms of (x) HoldCo or Intermediate HoldCo's organizational documents or (y) any other governing instrument relating to the conduct of HoldCo or Intermediate HoldCo's business or the ownership of its properties, or (iii) result in or give rise to any right of termination, cancellation or acceleration under any other agreement to which HoldCo or Intermediate HoldCo is a party or by which it is bound.

(c)     Authorization and Binding Agreement.  The execution and delivery of this Agreement and all documents, instruments and other agreements required to be executed in connection herewith, and the consummation of the Transaction, each have been duly authorized by all necessary action on behalf of HoldCo and Intermediate HoldCo, as applicable, and, assuming the due authorization, execution and delivery by the Seller (or any other counterparty), this Agreement is, and each document, instrument and other agreement contemplated by this Agreement to be delivered by HoldCo or Intermediate HoldCo, as applicable, when executed and delivered in accordance with the provisions hereof, will be, a legal, valid and binding obligation of HoldCo and/or Intermediate HoldCo, as applicable, enforceable against HoldCo and/or Intermediate HoldCo, as applicable, in accordance with its terms, except as enforceability may be limited by (i) applicable bankruptcy, insolvency, reorganization, moratorium or similar Laws affecting or relating to the enforcement of creditors' rights generally and (ii) general principles of equity.

(d)     No Litigation Pending.  Except as set forth on Schedule 15.03(d), there is no action, suit, proceeding or investigation pending against HoldCo or Intermediate HoldCo which, either individually or in the aggregate, if adversely decided against HoldCo or Intermediate HoldCo, as applicable, would reasonably be expected to materially and adversely affect HoldCo's or Intermediate HoldCo's ability to perform its obligations under this Agreement.

(e)     No Violation.  None of HoldCo, Intermediate HoldCo or any of their Subsidiaries is in violation of any statute, regulation, order, decision, judgment or decree of, or any restriction imposed by, the United States of America, any state, municipality or other political subdivision or agency of any of the foregoing, or any court or other tribunal having jurisdiction over it or its assets, or any foreign government or agency thereof having such jurisdiction, with respect to the conduct of its business, or the ownership of its properties, which, either individually or in the aggregate with all other such violations, would materially and adversely affect the business, operations or condition (financial or otherwise) of HoldCo or Intermediate HoldCo or the ability of HoldCo or Intermediate HoldCo to perform, satisfy or observe any obligation or condition under this Agreement.

(f)     Consents and Approvals of Governmental Authorities. Except for those consents, approvals, authorizations, orders, waivers, declarations, filings, determinations and registrations that have been or will be obtained or made prior to the Closing Date, no consent,

- 57-

approval, authorization, order or waiver of, or declaration, filing, determination or registration with, any court, governmental agency or body, or non-governmental entity is required for the execution, delivery and performance of this Agreement or any of the other Definitive Agreements, or the consummation of the Transaction, by HoldCo or Intermediate HoldCo, or the contribution of the Minimum Equity Capital to HoldCo and the related acquisition of interests in HoldCo by HoldCo's members.

        (g)     No Broker's Fees.  None of HoldCo, HoldCo's members or Intermediate HoldCo has employed any broker, investment banker or registered financial adviser in a manner that would reasonably be expected to result in any liability on the part of the Seller for any broker's fees, commissions or similar fees in connection with the consummation of the Transaction.

        (h)     HoldCo Qualifications.  Each of HoldCo, HoldCo's members and Intermediate HoldCo is (i) a sophisticated Person having knowledge and experience in business matters and, in particular, in such matters related to assets similar to the Assets, such that it is capable of evaluating independently the merits and risks of a purchase of the Assets and (ii) is able to bear the economic risks of such a purchase.

        (i)     Ability to Pay.  HoldCo has sufficient funds available to enable it to pay the Capital Contribution.

        (j)     Limitations on Liability.  Each of HoldCo, on behalf of itself and its members, and Intermediate HoldCo acknowledges and agrees that this Agreement and the other Definitive Agreements, except the FDIC Guaranty, are entered into by the Seller or the FDIC, as receiver for IndyMac Federal, and not by the FDIC in its corporate capacity.

        (k)     Government Inquiries.  During the past three (3) years, there have been no material inspection reports, questionnaires, inquiries, demands or requests for information received by HoldCo, Intermediate HoldCo or, to the best of HoldCo's knowledge, HoldCo's members, from, or any material statement, report or other document relating to such an inquiry filed by HoldCo, Intermediate HoldCo, or to the best of HoldCo's knowledge, HoldCo's members, with, the federal government or any federal administrative agency (including, but not limited to, HUD, the Securities and Exchange Commission, Justice Department, Internal Revenue Service, Department of Labor, Occupational Safety and Health Administration, Federal Trade Commission, National Labor Relations Board, and Interstate Commerce Commission), any state securities administrator or any other Governmental Authority, in each case regarding possible illegal conduct by HoldCo, Intermediate HoldCo or HoldCo's members.

        (l)     No Bankruptcies.  Other than as a creditor, none of HoldCo, HoldCo's members or Intermediate HoldCo has voluntarily sought, consented to or acquiesced in the protection of, or become party to or made the subject of the Bankruptcy Code of the United States of America or any other applicable liquidation, conservatorship, bankruptcy, moratorium, rearrangement, receivership, insolvency, reorganization or similar debtor relief laws from time to time in effect affecting the rights of creditors generally.

(m)     <u>Due Diligence</u>.

(i)     HoldCo and Intermediate HoldCo are solely responsible for conducting the due diligence investigation of the assets and liabilities to be acquired pursuant to the Definitive Agreements.  Each of HoldCo and Intermediate HoldCo has made detailed inquiries concerning such assets and liabilities and has received and had an opportunity to review all information necessary to make its own independent informed decisions concerning the same and its decision to enter into this Agreement and all other related agreements and to consummate the transactions contemplated hereby and thereby. HoldCo's members have received the information necessary to make their own independent decisions to invest in HoldCo (including the payment of the Minimum Equity Capital).  Each of HoldCo, HoldCo's members and Intermediate HoldCo has completed its due diligence investigation of such assets and liabilities to its full satisfaction.

(ii)     None of HoldCo, HoldCo's members or Intermediate HoldCo is relying on any forecasted operating results or budgets prepared by the Seller or any other federal government agency, or any of its respective directors, officers, partners, employees, contractors, attorneys, agents or representatives, but rather is relying upon its own analysis, plan of operation and financial forecasts or such other information as it deems appropriate.  Each of HoldCo, on its own behalf and on behalf of its members, and Intermediate HoldCo acknowledges that, independently and without reliance on the Seller (other than with respect to the Seller's representations and warranties set forth in this Agreement and the other Definitive Agreements) or any other government agency or any of its respective officers, directors, partners, employees, contractors, attorneys, agents or representatives, and based upon such information as it deems adequate, appropriate and necessary, (x) each of HoldCo and Intermediate HoldCo has made its own analysis and decision to enter into this Agreement, and all related agreements and to consummate the Transaction and (y) HoldCo's members have made their own analysis and decision to pay the Minimum Equity Capital.

(n)     <u>Representations Remain True</u>.

(i)     (x) Each of HoldCo and its members has executed and delivered to the Seller a Purchaser Eligibility Certification and a confidentiality agreement in connection with this Agreement and the Transaction and (y) each of Paulson & Co. Inc. and IMB Management Holdings LP ("**Holdings**") has executed and delivered to the Seller a Bid Certification and Qualification Request.

(ii)     All certifications, representations and warranties made by or on behalf of HoldCo, HoldCo's members or Intermediate HoldCo in the Qualification Requests, the Purchaser Eligibility Certifications, the confidentiality agreements, the Bid Certifications, the proposal of HoldCo dated December 15, 2008 to acquire the Assets, the business plan of HoldCo submitted with such proposal, the Purchaser's application to the FDIC for deposit insurance, the Purchaser's, HoldCo's and Intermediate HoldCo's application to the OTS for the organization of the Purchaser as a direct, wholly owned subsidiary, and the registration of HoldCo and Intermediate HoldCo as federal savings

and loan holding companies (which are affirmed and ratified hereby) are and remain true and correct in all material respects and, with respect to the foregoing applications and registrations filed with the OTS and FDIC, as amended and supplemented, do not fail to state any fact required to make the information contained therein not misleading.

(o)     Minimum Equity Capital. HoldCo has received, and since its receipt has continuously maintained, the Minimum Equity Capital; provided that the parties hereto agree that HoldCo is deemed to have received and to have continuously maintained the Deposit as part of the Minimum Equity Capital.

(p)     Written Commitment. HoldCo has obtained, and has provided to the Seller, a written commitment from each Investor to pay to the Seller any amount of the Minimum Equity Capital that has been paid out to such Investor in violation of this Agreement.

## ARTICLE XVI

## TERMINATION

Section 16.01 Termination of Agreement. This Agreement may be terminated and the Transaction may be abandoned at any time prior to Closing, except as otherwise provided in the last paragraph of this Section 16.01:

(a)     by the mutual written consent of HoldCo and the Seller;

(b)     by HoldCo upon written notice to the Seller:

(i)     if the Transaction is not consummated as a result of the failure of one of the conditions set forth in Section 14.01 to be satisfied prior to March 31, 2009, or if any of such conditions becomes incapable of satisfaction, unless such failure or incapability is a result of a breach by HoldCo, Intermediate HoldCo or their Affiliates of this Agreement or any of the other Definitive Agreements (including a failure to act by HoldCo, Intermediate HoldCo or their Affiliates);

(ii)     in the event of a material breach of this Agreement by the Seller, which breach was not or cannot be cured within ten (10) days of receipt by the Seller of written notice from HoldCo specifying the nature of such breach and requesting that it be cured; or

(iii)     if the Transaction is not consummated prior to March 31, 2009, provided that (x) such failure to close is not the result of a breach of a representation, warranty, covenant or other agreement contained in this Agreement or any of the other Definitive Agreements by HoldCo, Intermediate HoldCo or their Affiliates and (y) this Agreement has not otherwise been terminated pursuant to Section 16.01(b)(i) or Section 16.01(b)(ii).

(c)     by the Seller upon written notice to HoldCo:

(i)      if the Transaction is not consummated as a result of the failure of one of the conditions set forth in <u>Section 14.02</u> to be satisfied prior to March 31, 2009, or if any of such conditions becomes incapable of satisfaction, unless such failure or incapability is a result of a breach by the Seller or its Affiliates of this Agreement or the other Definitive Agreements (including a failure to act by the Seller or its Affiliates);

(ii)      in the event of a material breach of this Agreement by HoldCo, which breach was not or cannot be cured within ten (10) days of receipt by HoldCo of written notice from the Seller specifying the nature of such breach and requesting that it be cured; or

(iii)      if the Transaction is not consummated prior to March 31, 2009, <u>provided that</u> (x) such failure to close is not the result of a breach of a representation, warranty, covenant or other agreement contained in this Agreement or the other Definitive Agreements by the Seller and (y) this Agreement has not otherwise been terminated pursuant to <u>Section 16.01(c)(i)</u> or <u>Section 16.01(c)(ii)</u>.

Notwithstanding anything in this <u>Section 16.01</u> to the contrary, if the conditions set forth in <u>Section 14.01(n)</u> and <u>Section 14.02(n)</u> have not been satisfied or have become incapable of satisfaction, or if the transactions contemplated by the Consent and Collateral Assignment shall not have been consummated, prior to the close of business on March 23, 2009, neither party shall have the right to terminate this Agreement unless such party has complied with the obligation set forth in <u>Section 10.04</u> and, notwithstanding the good faith efforts of the parties, the Reformed Agreements shall not have been executed and delivered and the Transaction shall not have been consummated prior to March 31, 2009.

Section 16.02  <u>Effect of Termination</u>.  In the event of termination of this Agreement pursuant to <u>Section 16.01</u>, none of the parties hereto (nor any of their respective former, current or future general or limited partners, direct or indirect equity holders, managers, members, directors, officers, Affiliates, representatives or agents) will have any liability or further obligation to any other party, except for liabilities or obligations arising from or in connection with any breach under this Agreement or any of the other Definitive Agreements, or as otherwise provided in <u>Section 16.03</u>.

Section 16.03  <u>Survival</u>.  Notwithstanding anything to the contrary in <u>Section 16.02</u>, each of the following Sections of this Agreement shall survive termination of this Agreement: <u>Section 16.04</u> (Deposit Refund), <u>Section 16.05</u> (Backstop Purchase), <u>Section 16.06</u> (Failure to Close), <u>Section 16.07</u> (Investor Liability), <u>Section 19.02</u> (Governing Law), <u>Section 19.03</u> (Costs and Expenses), <u>Section 19.06</u> (Entire Agreement), <u>Section 19.07</u> (Jurisdiction and Venue), <u>Section 19.08</u> (Waiver of Jury Trial) and <u>Section 19.15</u> (Confidentiality; Disclosures).

Section 16.04  <u>Deposit Refund</u>.  The Seller shall refund the Deposit to HoldCo if this Agreement is terminated pursuant to any subsection of <u>Section 16.01</u> other than <u>Section 16.01(c)(ii)</u>; <u>provided</u>, <u>however</u>, that in the event of termination pursuant to <u>Section 16.01(c)(i)</u>, the Seller shall not refund the Deposit if, subject to the introductory paragraph of <u>Article XIV</u>, the failure of one of the conditions set forth in <u>Section 14.02</u> to be satisfied (or to be capable of satisfaction) is a result of a breach by HoldCo, Intermediate HoldCo

or their Affiliates of this Agreement or any of the other Definitive Agreements (including a failure to act by HoldCo, Intermediate HoldCo or their Affiliates).  Except as otherwise provided in Section 16.05, if HoldCo is not entitled to a refund of the Deposit under this Section 16.04, the Deposit shall be retained by the Seller, and none of the Purchaser, Intermediate HoldCo or HoldCo shall have any right of claim therefor.  The Seller's retention of the Deposit pursuant to this Section 16.04 shall in no way preclude, or constitute a waiver of, any other remedy the Seller may have against the Purchaser, Intermediate HoldCo or HoldCo at law or in equity for breach of this Agreement.

Section 16.05 <u>Backstop Purchase</u>.  If the Transaction is not completed on the terms set forth in this Agreement by March 31, 2009, or if this Agreement is terminated in accordance with Section 16.01, Holdings and Paulson & Co. Inc., on behalf of the Investors listed on Schedule 16.05 (collectively, the "**Backstop Purchasers**") shall acquire the assets and liabilities included in Group 4 and Group 5 on the terms, and at the final purchase price, as adjusted, specified in, the Securities Sale Agreement and the Loan Sale Agreement, respectively (the "**Backstop Purchase**"); provided, however, that the Seller shall have no obligation to enter into the Backstop Purchase; provided, further, that if the Seller does not provide written notice of its intent to enter into the Backstop Purchase within ten (10) Business Days of date of termination of this Agreement in accordance with Section 16.01, the obligation of the Backstop Purchasers under this Section 16.05 shall terminate and be of no further effect.  In the event the Seller agrees to the Backstop Purchase, (i) such acquisition shall be subject to the execution and delivery of definitive agreements containing terms and conditions that are, to the extent applicable, substantially the same as those set forth in this Agreement, the Securities Sale Agreement and the Loan Sale Agreement, including only those closing conditions specified in Article XIV hereof, to the extent relevant; provided, however, that such definitive agreements shall contain a structure for the Backstop Purchase that is mutually agreed upon by the Backstop Purchasers and the Seller and (ii) such definitive agreements will be executed within ten (10) Business Days of the Seller's notice to enter into the Backstop Purchase and such Backstop Purchase shall be consummated within fourteen (14) calendar days of the date of execution of such definitive agreements; provided, further, that under the Mortgage Loan Master Repurchase Agreement, a form of which is attached as Exhibit M hereto, REO Property shall be treated no differently with respect to Applicable Percentage and Asset Value Amount than Loans (as such terms are defined in the Mortgage Loan Master Repurchase Agreement).  The Backstop Purchase shall not affect any liability that HoldCo may have for any breach of this Agreement or otherwise entitle HoldCo to any refund of the Deposit, except that, if the Transaction is not consummated under circumstances that would permit the Seller to retain the Deposit under Section 16.04, the entire Deposit shall be applied to pay, in part, the amount due at the closing of the Backstop Purchase and, if such Backstop Purchase is completed, HoldCo shall have no further liability under this Agreement or any of the other Definitive Agreements.

Section 16.06 <u>Failure to Close</u>.  If this Agreement is terminated (a) because any condition set forth in Section 14.02(a) (only with respect to the failure of a representation and warranty to be true when made), Section 14.02(b), Section 14.02(d), Section 14.02(f), Section 14.02(i) hereof that is required to be satisfied by HoldCo or Intermediate HoldCo has not been satisfied (and HoldCo's or Intermediate HoldCo's inability to satisfy such condition is not due to a breach by the Seller of any of the Seller's delivery obligations under this Agreement), (b) because of HoldCo's or Intermediate HoldCo's failure to comply with any reasonable request

of either the Seller or any third party whose consent or approval is required to effect the transfer of the Assets, or (c) because of HoldCo's failure to pay, in a timely manner, amounts due from HoldCo pursuant to this Agreement, each of HoldCo and Intermediate HoldCo specifically acknowledges and agrees that the Seller shall be entitled to exercise any or all of the following remedies, separately or in combination: (i) retain the Deposit to the extent provided in Section 16.04; (ii) disqualify HoldCo, Intermediate HoldCo and the Investors from participating in any future sales of any kind by the Seller or the FDIC, including as receiver or conservator for any entity; and (iii) such other remedies as may be available to the Seller at law or in equity for a breach of this Agreement.

Section 16.07 <u>Investor Liability</u>. The Seller's sole recourse for breach of this Agreement shall be against HoldCo, except in the case of a breach of the obligation of HoldCo in respect of the Minimum Equity Capital described in Section 10.01(d) hereof in which case no provision of this Agreement shall be construed to preclude any remedy available to the Seller against the Investors; <u>provided</u>, <u>however</u>, that the Seller acknowledges and agrees that, if the Transaction is not consummated, in no event shall the Investors or any of their respective former, current or future general or limited partners, stockholders, managers, members, directors, officers, affiliates or agents have aggregate liability with respect to the Transaction in excess of the Minimum Equity Capital.

<div align="center">

**ARTICLE XVII**

**REIMBURSEMENT FOR LOSSES**

</div>

Section 17.01 <u>Reimbursement Related to the Seller's Assets, Acts or Omissions</u>. From and after the Closing Date and subject to the limitations set forth in this Section 17.01 and Section 17.08 and compliance by the Reimbursed Parties with Section 17.04, the Seller shall reimburse the Reimbursed Parties as follows:

(a)     The Seller will reimburse the Reimbursed Parties for Losses incurred as a result of any Third Party Claims relating to liabilities arising from assets of or the acts or omissions of the Failed Thrift, IndyMac Federal or the Seller prior to the Closing, including Losses resulting from any settlement of any such Third Party Claim to which the Seller has provided its prior written consent; <u>provided</u>, <u>however</u>, that any Third Party Claim with respect to which reimbursement is sought pursuant to this Section 17.01(a) must be commenced within two (2) years after the Closing Date (three (3) years after the Closing Date if the Third Party Claim is brought by the FHLB under any Contract entered into by the Seller or the Failed Thrift governing the assumed FHLB Advances and assumed by the Purchaser hereunder; <u>provided</u>, <u>however</u>, that the Seller shall have no obligation hereunder following the date that is two (2) years after the Closing Date to reimburse any Reimbursed Party for a Third Party Claim brought by the FHLB after the occurrence of an "Event of Default" by the Purchaser, as such term is used in the Consent and Collateral Assignment).

(b)     Notwithstanding anything to the contrary set forth in this Agreement or the other Definitive Agreements, the Seller will not reimburse the Reimbursed Parties for:

<div align="center">

- 63-

</div>

(i)     Excluded Losses, <u>unless</u> such Losses are incurred as a direct result of a final, nonappealable order of a court of competent jurisdiction awarding damages in connection with a Third Party Claim;

(ii)    Losses arising from or in connection with any Third Party Claim in which the claimant is a mortgagor <u>unless</u> (x) such Third Party Claim is asserted as a part of a class action lawsuit, (y) a court of competent jurisdiction has rendered a final, nonappealable order in favor of the mortgagor finding that the related mortgage loan or mortgage note is rescinded, void or unenforceable, or (z) a court of competent jurisdiction has, in a final, nonappealable order, awarded damages to the mortgagor that are in excess of the then unpaid principal balance of the related mortgage loan;

(iii)   Losses attributable to or arising from overhead allocations or general internal and administrative costs or the costs of administering or complying with the preapproval, submission or reporting requirements imposed by the Seller in connection with the asset sale (i.e., in-house counsel costs);

(iv)    Losses reimbursable or payable by any Person other than the Seller or the FDIC, including but not limited to recovery in the form of insurance proceeds;

(v)     Losses attributable solely to or arising solely from any violation or alleged violation by any Reimbursed Party (other than the Acquired Subsidiary prior to the Closing Date) of any Law, including the antitrust, branching, banking or bank holding company or securities laws of any Governmental Authority; <u>provided</u>, that reimbursement of Losses attributable solely to or arising solely from any such alleged violation will not be restricted by this clause if there is a final, nonappealable, affirmative finding of a court of competent jurisdiction that no violation of Law related to such allegation exists (other than as a result of any settlement or consent order or decree unless the Seller has consented to the same in writing);

(vi)    Losses arising from or in connection with a claim based on the rights of any present or former shareholder, member, partner or equityholder of the Purchaser or any Subsidiary or Affiliate of the Purchaser regardless of whether any such Person is also a former shareholder of the Failed Thrift;

(vii)   Losses arising from or in connection with any liability for Taxes or fees assessed with respect to the consummation of the Transaction, including any subsequent transfer of any assets or assumption of any liabilities to any Subsidiary or Affiliate of the Purchaser, except as expressly provided herein or in the other Definitive Agreements;

(viii)  except as expressly provided in this <u>Article XVII</u> or in the other Definitive Agreements, Losses attributable to or arising from any claim based on any action or inaction of any Reimbursed Party (other than the Acquired Subsidiary prior to the Closing Date), and nothing in this Agreement shall be construed to provide reimbursement for Losses incurred by (x) the Failed Thrift or the Seller, (y) any Subsidiary or Affiliate of the Failed Thrift or the Seller, or (z) any present or former

- 64-

director, officer, employee or agent of the Failed Thrift or the Seller or its Subsidiaries or Affiliates; provided that the Seller, in its discretion, may provide reimbursement hereunder for any Losses incurred by any present or former director, officer, employee or agent of the Failed Thrift or the Seller, or its Subsidiaries or Affiliates who is also or becomes a director, officer, employee or agent of the Purchaser or its Subsidiaries or Affiliates;

(ix)    Losses caused solely by any inaccuracy or breach by the Purchaser or any Subsidiary or Affiliate of the Purchaser of any of the representations and warranties contained in Section 15.02 or Section 15.03 of this Agreement or in the other Definitive Agreements; or

(x)    except as expressly provided in the other Definitive Agreements, Losses arising out of or relating to the condition of or generated by an Asset arising from or relating to the presence, storage or release of any hazardous or toxic substance, or any pollutant or contaminant, or condition of such Asset which violate any applicable Federal, State or local law or regulation concerning environmental protection;

(xi)    Losses based on, related to or arising from any asset, including a loan, acquired or liability assumed by the Purchaser or any Subsidiary or Affiliate of the Purchaser, other than pursuant to this Agreement or the other Definitive Agreements.

The Reimbursed Party's failure to settle or enter into a consent decree or order shall not constitute a failure to mitigate Losses with respect to any alleged violation of the type referred to in clause (v) of this Section 17.01(b) if the Reimbursed Party has provided the Seller with written notice of, and a request that the Seller consent to, such proposed settlement, order or consent decree and the Seller fails to provide such consent within ten (10) Business Days after having received such notice and request.

Section 17.02 Tax Reimbursement.    Notwithstanding Section 17.01, the Seller shall reimburse and hold harmless the Reimbursed Parties for any Taxes imposed with respect to the Failed Thrift, IndyMac Federal, the Acquired Subsidiary or the Seller for any taxable periods (or portions thereof) ending on or before the Closing Date, including as a result of the Failed Thrift, IndyMac Federal or the Acquired Subsidiary being treated at any time prior to the Closing as a member of a consolidated, combined, unitary or similar group of companies pursuant to Treasury Regulation Section 1.1502-6 or any similar provision of Law or as a result of any Tax allocation, indemnification or sharing agreement or arrangement in effect prior to the Closing. For purposes of the Definitive Agreements, any Taxes for a Tax period that includes but does not end on the Closing Date shall be allocated between (i) the portion thereof ending on the Closing Date and (ii) the portion thereof ending after the Closing Date on a closing of the books basis, except that in the case of Taxes, deductions or credits determined on a periodic basis, the amount of Tax, deduction or credit shall be allocated on a daily pro rata basis. Notwithstanding anything in this Agreement or any of the other Definitive Agreements to the contrary, the Seller's obligations under this Section 17.02 shall survive for the duration of the statute of limitations for such tax liabilities; provided, however, that the Reimbursed Parties may not take any action to toll the statute of limitations for such Taxes, unless (i) such Reimbursed Parties are requested in writing

to do so by the Internal Revenue Service or any relevant taxing authority, or (ii) the Seller provides its written consent, not to be unreasonably withheld or delayed.

Section 17.03 <u>Failure to Obtain Third-Party Consents Reimbursement; GSE Reimbursement</u>.

(a)     Notwithstanding <u>Section 17.01</u>, the Seller shall reimburse the Reimbursed Parties for any Losses (other than Excluded Losses) incurred as a result of the (i) Seller's failure to obtain the consent of all third parties (other than the consents referred to in <u>Section 14.01(d)</u> and <u>Section 14.02(e)</u>) whose consents are required in order to consummate the Transaction and (ii) any breach or alleged breach of a contract or agreement otherwise requiring such third party consent by the Purchaser solely as a result of such failure, regardless of whether the Seller requests a consent that is not received or the Seller does not request a consent consistent with its statutory authority, <u>provided</u>, <u>however</u>, that (i) there shall be no reimbursement to the extent that such Loss has resulted in a reimbursement of a pro-rata portion of the Group 3 Final Purchase Price pursuant to the Reverse Mortgage Business Asset Purchase Agreement or an adjustment to the Aggregate Final Purchase Price, including an adjustment to the Group 2 Final Purchase Price pursuant to the Servicing Business Asset Purchase Agreement, and (ii) such Losses shall have been incurred and a claim for the same made in accordance with the claims procedures specified in <u>Section 17.04</u> within two (2) years after the Closing Date.

(b)     Notwithstanding <u>Section 17.01</u>, the Seller shall reimburse the Reimbursed Parties for any Losses (other than Excluded Losses) incurred as a result of the following Third Party Claims:

(i)     Third Party Claims made by Fannie Mae or Freddie Mac relating to any liabilities or obligations imposed on the seller of Mortgage Loans under the applicable Servicing Agreements (as each such term is defined in the Servicing Business Asset Purchase Agreement), in any case only with respect to Mortgage Loans acquired by Fannie Mae or Freddie Mac from the Seller, IndyMac Federal or the Failed Thrift after July 11, 2008, which claims are commenced within five (5) years after the Closing Date;

(ii)     Third Party Claims made by Ginnie Mae relating to any liabilities or obligations imposed on the seller of Mortgage Loans under the applicable Servicing Agreements (as each such term is defined in the Servicing Business Asset Purchase Agreement), in any case only with respect to Mortgage Loans acquired by Ginnie Mae from the Seller, IndyMac Federal or the Failed Thrift at any time, which claims are commenced within five (5) years after the Closing Date; and

(iii)     Third Party Claims made by Fannie Mae, Freddie Mac or Ginnie Mae relating to any liabilities or obligations imposed on the seller of MSR Mortgage Loans under the applicable Servicing Agreements (as each such term is defined in the Reverse Mortgage Business Asset Purchase Agreement), in any case only with respect to MSR Mortgage Loans acquired by Fannie Mae, Freddie Mac or Ginnie Mae from Seller, Financial Freedom, IndyMac Federal or the Failed Thrift, which claim is commenced within ten (10) years after the Closing Date; <u>provided</u>, <u>however</u>, that the time period shall

be reduced to five (5) years after the Closing Date, with respect to MSR Mortgage Loans acquired by Fannie Mae from the Seller, IndyMac Federal or the Failed Thrift, at such time as the Seller provides to the Purchaser evidence of an agreement by Fannie Mae to release, or to agree not to make a claim against or otherwise pursue, the Purchaser with respect to any liabilities or obligations imposed on the seller of such MSR Mortgage Loans under the applicable Servicing Agreements.

Section 17.04  Conditions Precedent to Reimbursement.  It shall be a condition precedent to the obligation of the Seller to reimburse any Person pursuant to this Article XVII that such Person shall, with respect to any Third Party Claim against such Person for which such Person is or may be entitled to reimbursement hereunder:

(a)     give written notice to the Seller in the manner and at the address provided in Article XVIII of such Third Party Claim as soon as practicable, but in no event later than ten (10) Business Days, after such Person becomes aware of such Third Party Claim; provided that, such notice shall describe in reasonable detail the facts giving rise to any claim for reimbursement hereunder, the amount of such claim (if known) and such other information with respect thereto as is available to the Person being reimbursed and as the Seller may reasonably request; provided, further, that any failure to give such notice within the 10-Business Day time period will not affect the reimbursement provided hereunder except to the extent that (i) any defense or other rights available to the Seller have been materially prejudiced as a result of such failure or delay or (ii) the Loss to be reimbursed as a result of such Third Party Claim has increased as a result of such failure or delay (in which case the reimbursement to which any Person is entitled under this Article XVII shall be reduced by the amount of such increase);

(b)     provide to the Seller such information and cooperation with respect to such claim as the Seller may reasonably require;

(c)     cooperate and take all steps, as the Seller may reasonably require, to preserve and protect any defense to such Third Party Claim;

(d)     in the event suit or other proceeding is brought against such Person with respect to such Third Party Claim, upon reasonable prior notice, afford to the Seller the right, which the Seller may exercise in its sole discretion, to conduct the investigation, control the defense and effect settlement of any such Third Party Claim raised in such suit or proceeding, including the right to designate counsel and to control all negotiations, litigation, arbitration, settlements, compromises and appeals of any such claim with respect thereto, all of which shall be at the expense of the Seller; provided that (x) the Seller shall have notified the Person claiming reimbursement in writing that such suit or proceeding is a Third Party Claim with respect to which the Person claiming reimbursement is entitled to reimbursement under this Article XVII, (y) if the Person claiming reimbursement hereunder reasonably determines, based on an opinion of counsel, that representation by the Seller's counsel of both the Seller and such Person would present such counsel with a conflict of interest under applicable ethics rules, then such Person may employ separate counsel to represent or defend it in any suit or proceeding and the Seller shall pay the reasonable fees and disbursements of such separate counsel, and (z) the Seller shall obtain the prior written approval of the Reimbursed Party

- 67-

before entering into any settlement, adjustment or compromise of such Third Party Claim involving injunctive or similar equitable relief being imposed upon the Reimbursed Party or any of its Affiliates;

(e)     not incur any costs or expenses in connection with any response or suit with respect to such Third Party Claim, unless such costs or expenses were incurred upon the written direction of the Seller or the Seller does not elect to control the defense of such Third Party Claim or otherwise in accordance with Section 17.04(d); provided that the Seller shall not be obligated to reimburse the amount of any such costs or expenses unless such costs or expenses were incurred upon the written direction of the Seller or the Seller does not elect to control the defense of such Third Party Claim or otherwise in accordance with Section 17.04(d);

(f)     not release or settle such Third Party Claim or make any payment or admission with respect thereto, unless the Seller consents in writing thereto, which consent shall not be unreasonably withheld; provided that the Seller shall not be obligated to reimburse the amount of any such settlement or payment unless such settlement or payment was effected with the written consent of the Seller; and

(g)     take reasonable action as the Seller may request in writing as necessary to preserve, protect or enforce the rights of the reimbursed Person against any Primary Indemnitor.

Section 17.05  No Additional Warranty.  Nothing in this Article XVII shall be construed or deemed to (i) expand or otherwise alter any warranty or disclaimer thereof provided under Section 5.10 or any other provision of this Agreement with respect to, among other matters, the title, value, collectability, genuineness, enforceability or condition of any (x) Asset, or (y) asset of the Seller purchased by the Purchaser or any Subsidiary or Affiliate of the Purchaser pursuant to this Agreement or subsequent to the execution hereof, or (ii) create any warranty not expressly provided under this Agreement with respect thereto.

Section 17.06  Indemnification of the Seller.

(a)     From and after the Closing Date, each of HoldCo, Intermediate HoldCo, the Purchaser and its Affiliates (each, a "**Purchaser Indemnitor**") shall indemnify and hold harmless the Seller Indemnitees, from and against any Losses, arising out of or resulting from (x) any breach by any Purchaser Indemnitor or any of its officers, directors, employees, partners, principals, agents or contractors of any of the Purchaser Indemnitor's obligations under or covenants, representations or agreements contained in this Agreement or any other Definitive Agreement or such other related agreements to which such Purchaser Indemnitor is a party (including any claim asserted by the Seller against any Purchaser Indemnitor to enforce its rights hereunder or thereunder or by any third party), or (y) any third-party allegation or claim based upon facts alleged that, if true, would constitute such a breach, or any gross negligence, bad faith or willful misconduct (including any act or omission constituting theft, embezzlement, breach of trust or violation of any Law).  Such indemnity shall survive the termination of this Agreement.  In order for a Seller Indemnitee to be entitled to any indemnification provided for under this Agreement involving a Loss arising out of a Third

- 68-

Party Claim, such Seller Indemnitee shall deliver notice thereof to the Purchaser Indemnitor promptly after receipt by such Seller Indemnitee of written notice of the Third Party Claim, describing in reasonable detail the facts giving rise to any claim for indemnification hereunder, the amount of such claim (if known) and such other information with respect thereto as is available to the Seller Indemnitee and as the Purchaser Indemnitor may reasonably request. The failure or delay to provide such notice, however, shall not release the Purchaser Indemnitor from any of its obligations under this Section 17.06 except to the extent that (i) any defense or other rights available to the Purchaser Indemnitor have been materially prejudiced as a result of such failure or delay or (ii) the Loss to be reimbursed as a result of such Third Party Claim has increased as a result of such failure or delay (in which case the indemnification to which the Seller Indemnitee is entitled under this Article XVII shall be reduced by the amount of such increase).

(b)     If for any reason the indemnification provided for herein is unavailable or insufficient to hold harmless the Seller Indemnitees, the Purchaser Indemnitor shall contribute to the amount paid or payable by the Seller Indemnitees as a result of the Losses of the Seller Indemnitees in such proportion as is appropriate to reflect the relative fault of the Seller Indemnitees, on the one hand, and the Purchaser Indemnitor, on the other hand, in connection with a breach of the Purchaser Indemnitor's obligations under this Agreement.

(c)     If the Purchaser Indemnitor confirms in writing to the Seller Indemnitee within fifteen (15) Business Days after receipt of the notice described in Section 17.06(a) its responsibility to indemnify and hold harmless the Seller Indemnitee therefor, the Purchaser Indemnitor may elect to assume control over the compromise or defense of such Third Party Claim at the Purchaser Indemnitor's expense and by the Purchaser Indemnitor's counsel, which counsel must be reasonably satisfactory to the Seller Indemnitee, provided that (i) the Seller Indemnitee may, if such Seller Indemnitee so desires, employ counsel at such Seller Indemnitee's own expense to assist in the handling (but not control the defense) of any Third Party Claim; (ii) the Purchaser Indemnitor shall keep the Seller Indemnitee advised of all material events with respect to any Third Party Claim; (iii) the Purchaser Indemnitor shall obtain the prior written approval of the Seller Indemnitee before ceasing to defend against any Third Party Claim or entering into any settlement, adjustment or compromise of such Third Party Claim involving injunctive or similar equitable relief being imposed upon the Seller Indemnitee or any of its Affiliates; and (iv) the Purchaser Indemnitor will not, without the prior written consent of the Seller Indemnitee, settle or compromise or consent to the entry of any judgment in any pending or threatened action in respect of which indemnification may be sought hereunder (whether or not any such Seller Indemnitee is a party to such action), unless such settlement, compromise or consent by its terms obligates the Purchaser Indemnitor to satisfy the full amount of the liability in connection with such Third Party Claim and includes an unconditional release of such Seller Indemnitee from all liability arising out of such Third Party Claim.

(d)     Notwithstanding anything contained herein to the contrary, no Purchaser Indemnitor shall be entitled to control (and if the Seller Indemnitee so desires, it shall have sole control over) the defense, settlement, adjustment or compromise of (but the Purchaser Indemnitor shall nevertheless be required to pay all Losses incurred by the Seller Indemnitee in connection with such defense, settlement or compromise): (i) any Third Party Claim that seeks

an order, injunction or other equitable relief against the Seller Indemnitee or any of its Affiliates; (ii) any action in which the Purchaser Indemnitor (or any Affiliate) and the Seller Indemnitee are named as parties and either the Purchaser Indemnitor (or such Affiliate) or the Seller Indemnitee determines with advice of counsel that there may be one or more legal defenses available to it that are different from or additional to those available to the other party or that a conflict of interest between such parties may exist in respect of such action; and (iii) any matter that raises or implicates any issue relating to any power, right or obligation of the FDIC under any Law.  If the Purchaser Indemnitor elects not to assume the compromise or defense against the Third Party Claim, fails to timely and properly notify the Seller Indemnitee of its election as herein provided, or, at any time after assuming such defense, fails to diligently defend against such Third Party Claim in good faith, the Seller Indemnitee may pay, compromise or defend against such Third Party Claim (but the Purchaser Indemnitor shall nevertheless be required to pay all Losses incurred by the Seller Indemnitee in connection with such defense, settlement or compromise).  In connection with any defense of a Third Party Claim (whether the Purchaser Indemnitor or the Seller Indemnitee), all of the parties hereto shall, and shall cause their respective Affiliates to, cooperate in the defense or prosecution thereof and to in good faith retain and furnish such records, information and testimony, and attend such conferences, discovery proceedings, hearings, trials and appeals, as may be reasonably requested by a party hereto in connection therewith.

Section 17.07 <u>Obligations Supplemental</u>.  The obligations of the parties hereto, and the FDIC in its corporate capacity as guarantor under the FDIC Guaranty, to provide reimbursement or indemnification under this <u>Article XVII</u> are to supplement any amount payable by any Primary Indemnitor to the Person being reimbursed or indemnified under this <u>Article XVII</u>. Consistent with that intent, each party hereto agrees to make payments pursuant to such reimbursement only to the extent not payable by a Primary Indemnitor.  If the aggregate amount of payments by the Seller, or the FDIC as guarantor pursuant to the FDIC Guaranty, and all Primary Indemnitors with respect to any item of reimbursement under this <u>Article XVII</u>, or by the Purchaser Indemnitors and all Primary Indemnitors with respect to any item of indemnification under this <u>Article XVII</u>, exceeds the amount payable with respect to such item, such Person being reimbursed or indemnified shall notify the Person obligated to make the reimbursement or indemnification payment thereof and, upon request, shall promptly pay to the Seller, or the FDIC as appropriate, or the Purchaser Indemnitor the amount of the Seller's (or FDIC's) or the Purchaser Indemnitor's payments to the extent of such excess.

Section 17.08 <u>Criminal Claims</u>.  Notwithstanding any provision of this <u>Article XVII</u> to the contrary, in the event that any Person being reimbursed under this <u>Article XVII</u> shall become involved in any criminal action, suit or proceeding, whether judicial, administrative or investigative, the Seller shall have no obligation hereunder to reimburse such Person for liability with respect to any criminal act or to the extent any costs or expenses are attributable to the defense against the allegation of any criminal act, unless (i) the Person is successful on the merits or otherwise in the defense against any such action, suit or proceeding, or (ii) such action, suit or proceeding is terminated without the imposition of liability on such Person or (iii) such criminal act was solely the act of the Seller, IndyMac Federal, the Failed Thrift or their predecessors-in-interest.

Section 17.09 <u>Subrogation</u>.   Upon the making of any payment pursuant to the reimbursement and indemnification obligations under this <u>Article XVII</u>, the party making such payment shall become subrogated to all rights of party receiving such payment against any other Person to the extent of such payment.

Section 17.10 <u>Further Cooperation</u>.   For so long as the Seller has reimbursement obligations under <u>Sections 17.01, 17.02</u> and <u>17.03</u> of this Agreement or under any of the other Definitive Agreements, the Purchaser shall cooperate with the Seller and provide the Seller with a copy of the following reports in order to facilitate the Seller's monitoring and assessment of the Seller's potential liability for claims made or that may be made pursuant to <u>Sections 17.01, 17.02</u> and <u>17.03</u> of this Agreement or the reimbursement obligations of the Seller under any other Definitive Agreements: (i) with respect to any loans serviced for Ginnie Mae and with respect to any loans serviced for Fannie Mae or Freddie Mac that were sold to Fannie Mae or Freddie Mac on or after July 11, 2008 by the Seller (such loans, collectively, the "**GSE Loans**"), monthly servicing reports showing the performance of the GSE Loans, including unpaid principal balances, liquidations, payoffs, delinquencies, etc.; (ii) with respect to the GSE Loans, quarterly reports identifying repurchase and make whole requests and, with respect to each such request, whether the Purchaser has agreed to the repurchase or make whole request, as well as the results of appeals and rescission rates; and (iii) with respect to all loans serviced for Ginnie Mae, Fannie Mae or Freddie Mac, annual reports containing loan-level information of the type provided in the monthly and quarterly reports required by clauses (i) and (ii).

## ARTICLE XVIII

### NOTICES

All notices, requests, demands and other communications required or permitted to be given or delivered under or by reason of the provisions of this Agreement shall be in writing and shall be given by certified or registered mail, postage prepaid, or delivered by hand or by nationally recognized air courier service, in any case directed to the address of such Person as set forth below.

If to the Seller:      Manager, Structured Transactions
                       c/o Federal Deposit Insurance Corporation
                       550 17th Street, NW (Room F-7008)
                       Washington, D.C. 20429-0002
                       Attention:  George Alexander

with a copy to:        Senior Counsel
                       FDIC Legal Division
                       Litigation and Resolutions Branch, Receivership Section
                       Special Issues Unit
                       3501 Fairfax Drive (Room E-7056)
                       Arlington, Virginia 22226
                       Attention:  David Gearin

If to HoldCo,
Intermediate HoldCo
or the Purchaser:     IMB HoldCo LLC
                888 East Walnut Street
                Pasadena, California 91101-7211
                Attention:  Steven Mnuchin

with a copy to:     Cleary Gottlieb Steen & Hamilton LLP
                One Liberty Plaza
                New York, New York 10006
                Attention: Paul E. Glotzer

Any such notice shall become effective when received (or receipt is refused) by the addressee, provided that any notice or communication that is received (or refused) other than during regular business hours of the recipient shall be deemed to have been given at the opening of business on the next Business Day of the recipient.  From time to time, any Person may designate a new address for purposes of notice hereunder by notice to such effect to the other Persons identified in this Article XVIII.

<h3 style="text-align:center">ARTICLE XIX</h3>

<h3 style="text-align:center">MISCELLANEOUS PROVISIONS</h3>

Section 19.01 Severability.  Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction shall be ineffective, but such ineffectiveness shall be limited as follows:  (i) if such provision is prohibited or unenforceable in such jurisdiction only as to a particular Person or Persons and/or under any particular circumstance or circumstances, such provision shall be ineffective, but only in such jurisdiction and only with respect to such particular Person or Persons and/or under such particular circumstance or circumstances, as the case may be; (ii) without limitation of clause (i), such provision shall in any event be ineffective only as to such jurisdiction and only to the extent of such prohibition or unenforceability, and such prohibition or unenforceability in such jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction; and (iii) without limitation of clauses (i) or (ii), such ineffectiveness shall not invalidate any of the remaining provisions of this Agreement.  Without limitation of the preceding sentence, it is the intent of the parties to this Agreement that in the event that in any court proceeding, such court determines that any provision of this Agreement is prohibited or unenforceable in any jurisdiction (because of the duration or scope (geographic or otherwise) of such provision, or for any other reason) such court shall have the power to, and shall, (x) modify such provision (including, to the extent applicable, by limiting the duration or scope of such provision and/or the Persons against whom, and/or the circumstances under which, such provision shall be effective in such jurisdiction) for purposes of such proceeding to the minimum extent necessary so that such provision, as so modified, may then be enforced in such proceeding and (y) enforce such provision, as so modified pursuant to clause (x), in such proceeding.  Nothing in this Section 19.01 is intended to, or shall, limit (1) the ability of any party to this Agreement to appeal any court ruling or the effect of any favorable ruling on appeal or (2) the intended effect of Section 19.02.

Section 19.02 <u>Governing Law</u>.   THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH FEDERAL LAW, BUT IF FEDERAL LAW DOES NOT PROVIDE A RULE OF DECISION IT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAW OF THE STATE OF NEW YORK (EXCLUDING ANY CONFLICT OF LAWS RULE OR PRINCIPLE THAT MIGHT REFER THE GOVERNANCE OR THE CONSTRUCTION OF THIS AGREEMENT TO THE LAW OF ANOTHER JURISDICTION).   Nothing in this Agreement shall require any unlawful action or inaction by any party hereto.

Section 19.03 <u>Cost, Fees and Expenses</u>.   Each of HoldCo and the Seller will be responsible for and bear all of its own costs and expenses (including any broker's or finder's fees and the expenses of its representatives) incurred at any time in connection with pursuing or consummating the Transaction, except that HoldCo shall be responsible for and bear all of the documented reasonable out-of-pocket expenses (including reasonable fees, disbursements and other charges of counsel) incurred by the Seller in connection with (i) the preparation, execution, delivery and consummation of the Seller Financing Agreements and (ii) any appraisals conducted by a third party appraiser for the purpose of determining the Fair Market Value of any asset or liability to be acquired by the Purchaser pursuant to this Agreement or any other Definitive Agreement.   In addition, notwithstanding the foregoing, HoldCo and the Seller shall pay equally (x) all fees, costs and expenses of the Independent Accounting Firm under <u>Section 3.03(c)</u> and (y) the fees, costs and expenses referred to in <u>Section 3.04</u> and <u>Section 5.11</u> of the Servicing Business Asset Purchase Agreement, <u>Section 3.04</u> of the Reverse Mortgage Business Asset Purchase Agreement, <u>Section 8.05</u> of the Securities Sale Agreement, and <u>Section 3.02</u>, <u>Section 3.04</u>, <u>Section 3.05</u> and <u>Section 3.06</u> of the Loan Sale Agreement; <u>provided that</u> the Seller's obligation under clause (y) shall not exceed FOUR MILLION THREE HUNDRED FIFTY THOUSAND Dollars ($4,350,000).   In addition, and notwithstanding the foregoing, HoldCo and the Seller shall pay equally all fees, costs and expenses of any trustee in connection with the transfer of servicing rights under the Definitive Agreements and of any rating agency in connection with obtaining "no downgrade" letters.

Section 19.04 <u>Waivers; Amendment and Assignment</u>.   No provision of this Agreement may be amended or waived except in writing executed by all of the parties to this Agreement. This Agreement and the terms, covenants, conditions, provisions, obligations, undertakings, rights and benefits hereof shall be binding upon, and shall inure to the benefit, of the undersigned parties and their respective heirs, executors, administrators, representatives, successors and permitted assigns, and no other Person or Persons shall have any rights or remedies under or by reason of this Agreement.   Notwithstanding the foregoing, this Agreement may not be transferred or assigned without the express prior written consent of the Seller and any attempted assignment without such consent shall be void *ab initio*.

Section 19.05 <u>No Presumption</u>.   This Agreement shall be construed fairly as to each party hereto and if at any time any such term or condition is desired or required to be interpreted or construed, no consideration shall be given to the issue of who actually prepared, drafted or requested any term or condition of this Agreement or any agreement or instrument subject hereto.

Section 19.06 <u>Entire Agreement</u>.  This Agreement, the other Definitive Agreements and the Confidentiality Agreement contain the entire agreement between the parties hereto with respect to the subject matter hereof and supersede any and all other prior agreements, whether oral or written.  In the event of a conflict between the terms of this Agreement and the terms of any other Definitive Agreement or other document or instrument executed in connection herewith or in connection with the Transaction, including any translation into a foreign language of this Agreement for the purpose of any other Definitive Agreement or any other document or instrument executed in connection herewith which is prepared for notarization, filing or any other purpose, the terms of this Agreement shall control, and furthermore, the terms of this Agreement shall in no way be or be deemed to be amended, modified or otherwise affected in any manner by the terms of such other Definitive Agreement or other document or instrument.

Section 19.07 <u>Jurisdiction; Venue and Service</u>.  Each of HoldCo, Intermediate HoldCo and the Purchaser, for itself and its Affiliates, and the Seller hereby irrevocably and unconditionally:

(a)     (i) agrees that any suit, action or proceeding instituted against it by any other party with respect to this Agreement may be instituted, and that any suit, action or proceeding by it against any other party with respect to this Agreement shall be instituted, only in the United States District Court for the Southern District of New York or the United States District Court for the District of Columbia (and appellate courts from any of the foregoing), (ii) consents and submits, for itself and its property, to the jurisdiction of such courts for the purpose of any such suit, action or proceeding instituted against it by any other party and (iii) agrees that a final judgment in any such suit, action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Law;

(b)     agrees that service of all writs, process and summonses in any suit, action or proceeding pursuant to <u>Section 19.07(a)</u> may be effected by the mailing of copies thereof by registered or certified mail, postage prepaid, to its address for notices pursuant to <u>Article XVIII</u> (with copies to such other Persons as specified therein); <u>provided</u>, <u>however</u>, that nothing contained in this <u>Section 19.07</u> shall affect its ability to be served process in any other manner permitted by Law;

(c)     (i) waives any objection that it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement brought in any court specified in <u>Section 19.07(a)</u>, (ii) waives any claim that any such suit, action or proceeding brought in any such court has been brought in an inconvenient forum and (iii) agrees not to plead or claim either of the foregoing; and

(d)     agrees that nothing contained in this <u>Section 19.07</u> shall be construed as a limitation on any removal rights the FDIC may have.

Section 19.08 <u>Waiver of Jury Trial</u>.  EACH OF HOLDCO, INTERMEDIATE HOLDCO AND THE PURCHASER, FOR ITSELF AND ITS AFFILIATES, AND THE SELLER HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY OF ANY DISPUTE ARISING OUT OF OR RELATING TO

THIS AGREEMENT AND AGREES THAT ANY SUCH DISPUTE SHALL BE TRIED BEFORE A JUDGE SITTING WITHOUT A JURY.

Section 19.09 <u>Counterparts; Facsimile Signatures</u>. This Agreement may be executed in two (2) or more counterparts, each of which shall be deemed an original but all of which together shall constitute but one and the same agreement. This Agreement and any amendments hereto, to the extent signed and delivered by facsimile or other electronic means, shall be treated in all manner and respects as an original agreement and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person. No signatory to this Agreement shall raise the use of a facsimile machine or other electronic means to deliver a signature or the fact that any signature or agreement was transmitted or communicated through the use of a facsimile machine or other electronic means as a defense to the formation or enforceability of a contract and each such Person forever waives any such defense.

Section 19.10 <u>Headings</u>. Section titles or captions contained in this Agreement are inserted only as a matter of convenience and for reference and in no way define, limit, extend or describe the scope of this Agreement or the intent of any provisions hereof. All Section and paragraph references contained herein shall refer to Sections and paragraphs in this Agreement unless otherwise specified.

Section 19.11 <u>Compliance with Law</u>. Except as otherwise specifically provided herein, each party to this Agreement shall, at its own cost and expense, obey and comply with all Laws, as they may pertain to such party's performance of its obligations hereunder.

Section 19.12 <u>Use of the FDIC's Name and Reservation of Statutory Powers</u>. None of HoldCo, Intermediate HoldCo or the Purchaser shall use or permit the use by its agents, successors, assigns or Affiliates of any name or combination of letters that is similar to "FDIC" or "Federal Deposit Insurance Corporation." None of HoldCo, Intermediate HoldCo or the Purchaser will represent or imply that it is affiliated with, authorized by or in any way related to the FDIC. The Purchaser and its Subsidiaries that are party to any of the other Definitive Agreements shall be entitled to assert (and claim the benefit of) the statute of limitations established under 12 U.S.C. § 1821 (d)(14). However, each of HoldCo, Intermediate HoldCo and the Purchaser acknowledges and agrees that the assignment of any rights or other assets pursuant to the terms of this Agreement or the other Definitive Agreements shall not constitute the assignment of any other rights, powers or privileges granted to the Seller pursuant to the provisions the FDIA, including those granted pursuant to 12 U.S.C. § 1821(d), 12 U.S.C. § 1823(e) and 12 U.S.C. § 1825, all such rights and powers being expressly reserved by the Seller, nor shall HoldCo, Intermediate HoldCo or the Purchaser assert or attempt to assert any such right, power or privilege in any pending or future litigation involving any asset transferred hereunder or under the other Definitive Agreements.

Section 19.13 <u>Right to Specific Performance</u>. EACH OF HOLDCO, INTERMEDIATE HOLDCO AND THE PURCHASER, FOR ITSELF AND ITS AFFILIATES, HEREBY ACKNOWLEDGES AND AGREES THAT THE DAMAGES TO BE INCURRED BY THE SELLER AS A RESULT OF HOLDCO'S, INTERMEDIATE HOLDCO'S OR THE PURCHASER'S BREACH OF THIS AGREEMENT WILL BE DIFFICULT, IF NOT IMPOSSIBLE, TO ASCERTAIN, THAT DAMAGES WILL NOT BE AN ADEQUATE

REMEDY AND THAT ANY BREACH OR THREATENED BREACH OF ANY OF THE PROVISIONS OF THIS AGREEMENT BY HOLDCO, INTERMEDIATE HOLDCO OR THE PURCHASER MAY CAUSE IMMEDIATE IRREPARABLE HARM FOR WHICH THERE MAY BE NO ADEQUATE REMEDY AT LAW. ACCORDINGLY, THE PARTIES AGREE THAT, IN THE EVENT OF ANY SUCH BREACH OR THREATENED BREACH, THE SELLER SHALL BE ENTITLED TO (I) IMMEDIATE AND PERMANENT EQUITABLE RELIEF (INCLUDING INJUNCTIVE RELIEF AND SPECIFIC PERFORMANCE OF THE PROVISIONS OF THIS AGREEMENT) FROM A COURT OF COMPETENT JURISDICTION (IN ADDITION TO ANY OTHER REMEDY TO WHICH IT MAY BE ENTITLED AT LAW OR IN EQUITY), AND (II) SOLELY IN THE CASE OF A BREACH OF SECTION 19.12 HEREOF, LIQUIDATED DAMAGES IN THE AMOUNT OF $25,000 FOR EACH BREACH OF SUCH SECTION. THE PARTIES AGREE AND STIPULATE THAT THE SELLER SHALL BE ENTITLED TO EQUITABLE (INCLUDING INJUNCTIVE) RELIEF WITHOUT POSTING A BOND OR OTHER SECURITY AND HOLDCO, INTERMEDIATE HOLDCO AND THE PURCHASER EACH FURTHER WAIVES ANY DEFENSE IN ANY SUCH ACTION FOR SPECIFIC PERFORMANCE OR INJUNCTIVE RELIEF THAT A REMEDY AT LAW WOULD BE ADEQUATE AND ANY REQUIREMENT UNDER LAW TO POST SECURITY AS A PREREQUISITE TO OBTAINING EQUITABLE RELIEF. NOTHING CONTAINED IN THIS SECTION SHALL LIMIT ANY PARTY'S RIGHT TO ANY REMEDIES AT LAW, INCLUDING THE RECOVERY OF DAMAGES FOR BREACH OF THIS AGREEMENT.

Section 19.14   No Third Party Beneficiaries.   This Agreement is made for the sole benefit of the Seller, HoldCo, Intermediate HoldCo and the Purchaser and their respective successors and permitted assigns, and no other Person or Persons, including any Seller Employees or Transferred Employees shall have any rights or remedies under or by reason of this Agreement. Notwithstanding the foregoing, the FDIC shall be considered a third party beneficiary of this Agreement.

No provision of this Agreement shall modify or amend any Seller Employee Plan unless this Agreement explicitly states that the provision "amends" such Seller Employee Plan. This shall not prevent the parties entitled to enforce this Agreement from enforcing any provision in this Agreement, but no other party shall be entitled to enforce any provision in this Agreement on the grounds that it is an amendment to such Seller Employee Plan.

Section 19.15   Confidentiality; Disclosures.   No party to this Agreement shall disclose the existence or terms of this Agreement to any third party, other than its respective financial, legal and other professional advisors and its members, limited partners or other investors, without the prior written consent of the other parties except as may be required by Law, including the FDIC's obligations under the Freedom of Information Act. The Seller, HoldCo, Intermediate HoldCo and the Purchaser shall mutually agree to the timing and content of any announcements, press releases or public statements concerning the Transaction. Except as expressly modified hereby, the Confidentiality Agreement shall remain in full force and effect.

Section 19.16   Manner of Payment.   All payments due under this Agreement shall be in lawful money of the United States of America in immediately available funds as each party hereto may specify to the other parties; provided that, in the event the any party is obligated to

make any payment hereunder in the amount of $25,000.00 or less, such payment may be made by check.

Section 19.17  Survival of Covenants, Etc.  The covenants, representations and warranties in this Agreement shall survive the execution of this Agreement and the consummation of the Transaction, unless otherwise contemplated herein.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

**IN WITNESS WHEREOF,** the parties hereto have caused this Master Purchase Agreement to be executed by their duly authorized representatives as of the date first above written.

FEDERAL DEPOSIT INSURANCE
CORPORATION AS CONSERVATOR FOR
INDYMAC FEDERAL BANK, FSB

By: *Mitchell L. Glassman*
Name: Mitchell L. Glassman
Title: Director, DRR - FDIC

IMB HOLDCO LLC

By: _____
Steven T. Mnuchin
Chief Executive Officer

ONEWEST BANK GROUP LLC

By: _____
Steven T. Mnuchin
Chief Executive Officer

IN WITNESS WHEREOF, the parties hereto have caused this Master Purchase Agreement to be executed by their duly authorized representatives as of the date first above written.

FEDERAL DEPOSIT INSURANCE
CORPORATION AS CONSERVATOR FOR
INDYMAC FEDERAL BANK, FSB

By: _____
    Name:
    Title:

IMB HOLDCO LLC

By: _____
    Steven T. Mnuchin
    Chief Executive Officer

ONEWEST BANK GROUP LLC

By: _____
    Steven T. Mnuchin
    Chief Executive Officer

## JOINDER

By its execution and delivery of this signature page, the undersigned hereby joins in and agrees to be bound by the terms and conditions of the Master Purchase Agreement, dated as of March 18, 2009, by and among the Federal Deposit Insurance Corporation as conservator for IndyMac Federal Bank, FSB, IMB HoldCo LLC and OneWest Bank Group LLC as the "Purchaser" thereunder and authorizes this signature page to be attached to the Master Purchase Agreement or counterparts thereof.

ONEWEST BANK, FSB

By: _____

Name: Terrence P. Laughlin

Title:   Chief Executive Officer and President

**JOINDER**

By its execution and delivery of this signature page, the undersigned hereby joins in and agrees to be bound by the terms and conditions of the Master Purchase Agreement, dated as of March 18, 2009, by and among the Federal Deposit Insurance Corporation as conservator for IndyMac Federal Bank, FSB, IMB HoldCo LLC and OneWest Bank Group LLC as the "Seller" thereunder and authorizes this signature page to be attached to the Master Purchase Agreement or counterparts thereof.

FEDERAL DEPOSIT INSURANCE
CORPORATION, AS RECEIVER FOR
INDYMAC FEDERAL BANK, FSB

By: _Mitchell L. Glassman_

Name: Mitchell L. Glassman
Title: Director, DRR - FDIC

## JOINDER

By its execution and delivery of this signature page, the undersigned hereby joins in and agrees to be bound by the terms and conditions of the Master Purchase Agreement, dated as of March 18, 2009, by and among the Federal Deposit Insurance Corporation as conservator for IndyMac Federal Bank, FSB, IMB HoldCo LLC and OneWest Bank Group LLC, solely with respect to Section 11.04 thereunder and authorizes this signature page to be attached to the Master Purchase Agreement or counterparts thereof.

INDYMAC RESOURCES, INC.

By: _____
Name:  George Alexander
Title:    Attorney-in-Fact

# Exhibit 6

# ORANGE COUNTY CLERK'S OFFICE RECORDING PAGE
### THIS PAGE IS PART OF THE INSTRUMENT – DO NOT REMOVE

TYPE IN BLACK INK;
NAME(S) OF PARTY(S) TO DOCUMENT

SECTION 24  BLOCK 1  LOT 45.2

WILLIAM COVINO

TO

INDYMAC MORTGAGE SERVICES, A
DIVISION OF ONEWEST BANK, FSB

RECORD AND RETURN TO:
(name and address)

Indecomm Global Services
2925 Country Drive
St. Paul, MN 55117

7LC957385

THIS IS PAGE ONE OF THE RECORDING

ATTACH THIS SHEET TO THE FIRST PAGE OF EACH
RECORDED INSTRUMENT ONLY

## DO NOT WRITE BELOW THIS LINE

INSTRUMENT TYPE: DEED___MORTGAGE___SATISFACTION___ASSIGNMENT___ OTHER Taxable Mtg Cgmt

## PROPERTY LOCATION

| | | |
|---|---|---|
| 2089 BLOOMING GROVE (TN) | 4289 MONTGOMERY (TN) | NO PAGES 8 CROSS REF. |
| 2001 WASHINGTONVILLE (VLG) | 4201 MAYBROOK (VLG) | CERT.COPY ADD'L X-REF. |
| 2289 CHESTER (TN) | 4203 MONTGOMERY (VLG) | MAP# PGS. |
| 2201 CHESTER (VLG) | 4205 WALDEN (VLG) | |
| 2489 CORNWALL (TN) | 4489 MOUNT HOPE (TN) | PAYMENT TYPE: CHECK ✓ |
| 2401 CORNWALL (VLG) | 4401 OTISVILLE (VLG) | CASH |
| 2600 CRAWFORD (TN) | 4600 NEWBURGH (TN) | CHARGE |
| 2800 DEERPARK (TN) | 4800 NEW WINDSOR (TN) | NO FEE |
| 3089 GOSHEN (TN) | 5089 TUXEDO (TN) | Taxable |
| 3001 GOSHEN (VLG) | 5001 TUXEDO PARK (VLG) | CONSIDERATION $ |
| 3003 FLORIDA (VLG) | 5200 WALLKILL (TN) | TAX EXEMPT |
| 3005 CHESTER (VLG) | ✓5489 WARWICK (TN) | Taxable |
| 3200 GREENVILLE (TN) | 5401 FLORIDA (VLG) | MORTGAGE AMT.$ 159,898.70 |
| 3489 HAMPTONBURGH (TN) | 5403 GREENWOOD LAKE (VLG) | |
| 3401 MAYBROOK (VLG) | 5405 WARWICK (VLG) | |
| 3689 HIGHLANDS (TN) | 5600 WAWAYANDA (TN) | MORTGAGE TAX TYPE: |
| 3601 HIGHLAND FALLS (VLG) | 5889 WOODBURY (TN) | (A) COMMERCIAL/FULL 1% |
| 3889 MINISINK (TN) | 5801 HARRIMAN (VLG) | (B) 1 OR 2 FAMILY |
| 3801 UNIONVILLE (VLG) | | (C) UNDER $10,000 |
| 4089 MONROE (TN) | CITIES | (E) EXEMPT |
| 4001 MONROE (VLG) | 0900 MIDDLETOWN | ✓(F) 3 TO 6 UNITS |
| 4003 HARRIMAN (VLG) | 1100 NEWBURGH | (I) NAT.PERSON/CR. UNION |
| 4005 KIRYAS JOEL (VLG) | 1300 PORT JERVIS | (J) NAT.PER-CR.UN/1 OR 2 |
| | 9999 HOLD | (K) CONDO |

DONNA L. BENSON
ORANGE COUNTY CLERK

RECEIVED FROM: Indecomm

RECORDED/FILED
03/12/2012/  07:00:00
County Clerk
DONNA L. BENSON
ORANGE COUNTY, NY
FILE # 20120024937
M AG1/BK 13308 PG 0724
SER# DC008080 MTAX 1,678.95
BASIC 799.50
MTA 479.70
SPECIAL 0.00
SPECIAL ASST 399.75
RECORDING FEES 80.50
Receipt#1424185 joanned

When Recorded Return To:
Indecomm Global Services
2925 Country Drive
St. Paul, MN 55117
① ·7(c957385

Modification Agreement:
**Please sign and return**

November 1, 2010



# Sign & Return

William Covino
28 North Dr
Rochelle Park, NJ 07662-3602

January 26, 2011    2441    D010-153947
Product: IndyMac Mortgage Services Custom Modification
IndyMac Mortgage Services Loan Number: 1011305602
Investor Loan Number: 129510289
Property Address: 10 Eagle Wood Vista Ln, Warwick, NY 10990

This letter ("Agreement") will confirm your agreement to modify the Note, dated 5/16/2007, and the Security Instrument of the same date, recorded on 06/13/2007 in Book 12465, Page(s) 1751, or Instrument or Document No. CY005245 of the Official Records of Orange County, State of New York. The Security Instrument encumbers the real and personal property described in the Security Instrument and defined as the "Property," located in Orange County, New York, and which currently has the address referenced above. Capitalized terms not otherwise defined herein have the meaning given them in the Note or the Security Instrument.

1. This Agreement is not binding on Note Holder, unless and until Note Holder, or servicing agent, IndyMac Mortgage Services, a division of OneWest Bank, FSB ("IndyMac"), verifies that you qualify for this modification offer. You will promptly provide IndyMac acceptable information to permit verification of your income, and make the payments shown in the payment schedule in paragraph 5 of this Agreement, while IndyMac verifies your information. If you qualify, IndyMac, will sign and return this Agreement to you, and it will be effective on the date it is signed by IndyMac. If you do not make all payments when due while we verify that you qualify, or if you do not qualify, your Note will not be modified. IndyMac will apply any payments you made to the amounts you owe.

2. The unpaid principal balance of your Note as of the date of this Agreement, before modification, is $748,168.13.

Lenders address: 2900 Esperanza Crossing, Austin Tx 78758

MERS, Inc. 1901 E. Voorhees St. Suite C Denville, Il 61834

Unpaid Balance $748,168.13
New Balance $908,066.83
Taxable amount $159,898.70

S/B/L 24/1/45.2
Dwelling only: one family

10272010/64A/080408/HFI_6286/3/1011305602-68652-10282010

Page 1 of 4

3. The Note and the Security Instrument are modified to increase the principal balance of the Note by the amounts of your arrears on the Note of $159,898.70, including past due interest in the amount of $98,840.56, past due Escrow items totaling $56,985.14 and servicing costs totaling $4,073.00. The new principal amount of the Note is $908,066.83. All unpaid late charges have been waived. There are no fees or other charges assessed for the modification.

4. We agree that any portion of Escrow items that we add to the unpaid Principal Balance which creates a surplus in your escrow account will not be secured by the real property described in the Security Instrument, but is included in the Principal Balance that you must repay as provided in this Agreement.

5. The interest rate and monthly payment on your Note is modified as follows:

| Year | New Interest Rate | Interest Rate Change Date | New Monthly Principal & Interest Payment Amount | Estimated Monthly Escrow Payment Amount | New Monthly Payments Begin On | Number of Payments |
|------|------|------|------|------|------|------|
| 1-5 | 2.000% | 11/1/2010 | $1,311.72 | $1,525.40, May Adjust Periodically | 12/1/2010 | 60 |
| 6 | 3.000% | 11/1/2015 | $1,523.91 | May Adjust Periodically | 12/1/2015 | 12 |
| 7 | 4.000% | 11/1/2016 | $1,747.90 | May Adjust Periodically | 12/1/2016 | 12 |
| 8-40 | 4.250% | 11/1/2017 | $1,805.05 | May Adjust Periodically | 12/1/2017 | 396 |
| One additional payment of $474,906.68, your deferred principal balance, is due on 11/1/2050 for your loan to be paid in full. | | | | | Deferred Principal Balance | 1 |

6. Your monthly payment stated in your Note will change, effective with the payment due on 12/1/2010 (i.e., one month after the effective date of the reduction of your interest rate, as set forth in paragraph 5 above). This monthly payment will consist of principal and interest, and will continue until the next payment or interest rate change date. This monthly payment will change as shown in paragraph 5 above and will be sufficient to pay in full $433,160.15 of the principal amount of the Loan at your New Interest Rate.

7. The Note Holder will send you notice of these changes.

8. You will pay in full the remainder of the principal you owe on the date of this Agreement, $474,906.68 ("Deferred Principal Balance"), upon the earliest of (i) the date you sell the Property, (ii) the date you refinance the Property, or (iii) the Maturity Date. Until 11/1/2050, Note Holder will not charge you interest on this amount.

9. The Maturity Date stated in your Security Instrument and in your Note will change from 7/1/2038 to 11/1/2050.

10. ☐ If box is checked, a Post-Chapter 7 Rider to Modification Agreement ("Rider") is attached to this Agreement. The Rider is incorporated into this Agreement with the same effect as if the Rider had been included directly into the body of this Agreement.

11. The monthly payments for principal and interest, stated above, do not include required payments for taxes and insurance, which may be substantial. Your monthly requirements for taxes and insurance will change periodically during the term of your mortgage.

12. Your Security Instrument will continue to secure payment and performance of the Note as amended by this Agreement.

13. Except as modified by this Agreement, all terms and provisions of the Note, any Riders, and the Security Instrument remain in full force and effect.

14. The Note and Security Instrument are duly valid, binding agreements, enforceable in accordance with their terms, and are hereby reaffirmed.

15. I agree that I will execute such other documents as may be reasonably necessary to either (i) consummate the terms and conditions of this Agreement; or (ii) correct the terms and conditions of this Agreement if an error is detected after execution of this Agreement. I understand that a corrected Agreement will be provided to me and this Agreement will be void and of no legal effect upon notice of such error. If I elect not to sign any such corrected Agreement, the terms of the original Loan Documents shall continue in full force and effect, such terms will not be modified by this Agreement.

IndyMac Mortgage Services, a division of OneWest Bank, FSB

Lender: _____
        Wendy Traxler, First Vice President

By: _____
                          Date

I/We agree to the modification of my/our Loan as described above.

_____   11/10/10        Patricia Cerbo     11-11-10
William Covino            Date            WITNESS             Date

_____   11/12/10        G. Michael Cerbo   11-11-10
Witness                   Date            Witness             Date

**Notarize on Back**

10272010/64A/080408/HFL_6266/3/1011305602-68652-10282010

Page 3 of 4

Loan # 1011305602

## Notary Section

STATE OF NEW ~~YORK~~ Jersey        )
                                    ) ss.:
COUNTY OF ~~ORANGE~~ Bergen         )

On the _10_ day of _November_ _____ in the year _2010_ before me, the
undersigned, a Notary Public in and for said State, personally appeared _William Covino_
_____

personally known to me or proved to me on the basis of satisfactory evidence to be the
individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me
that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their
signature(s) on the instrument, the individual(s), or the person on behalf of which the individual(s)
acted, executed the instrument.

_____
Notary Signature
    GERUALDO A. ADAMO
    NOTARY PUBLIC OF NEW JERSEY
    COMMISSION EXPIRES 07-14-84
    Printed Name

Notary Public; State of _New Jersey_
Qualified in the County of _Bergen_
My commission expires: _7/14/14_
Official Seal:

Lender:
Indymac Mortgage Services, A division of One West Bank, F.S.B.

State of    *Texas*
County of    *Travis*

Today ___14ᵗʰ Dec___, 2010 before me    Abigail R. Harris,   Notary Public   personally
appeared          Wendy Traxler , First Vice President          of Indymac Mortgage Services, A division of
Onewest Bank personally known to me to be the person whose name is subscribed to the within instrument and
acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument,
the person, or entity upon behalf of which the person acted, executed this instrument.

**WITNESS** my hand and official seal



Signature of Notary Public, Abigail R. Harris
(Notary Seal)

ABIGAIL R. HARRIS
Notary Public, State of Texas
My Commission Expires
November 28, 2013

5

EXHIBIT A

ALL THAT CERTAIN PLOT, PIECE OR PARCEL OF LAND, SITUATE,
LYING AND BEING IN THE TOWN OF
WARWICK, COUNTY OF ORANGE, SLATE OF NEW YORK, BEING BOUNDED
AND DESCRIBED AS FOLLOWS:

BEING LOT NO. 2 ON A CERTAIN SUBDIVISION MAP ENTITLED
"FINAL SUBDIVISION PREPARED FOR EAGLE WOOD VISTAS, TOWN OF
WARWICK, ORANGE COUNTY, NEW YORK" AND FILED IN THE ORANGE
COUNTY CLERK'S OFFICE ON JUNE 1, 2005 AS MAP NO. 435/05.

TOGETHER WITH ALL RIGHTS, PRIVILEGES AND EASEMENTS AND
SUBJECT TO ALL COVENANTS, EASEMENTS, RESERVATIONS AND
RESTRICTIONS OF RECORD AFFECTING SAID PREMISES.

BEING A PORTION OF THE SAME PREMISES CONVEYED BY PATRICIA
MCCONNELL, DIANE FOTINO AND FRANCIS A. ROY REVOCABLE LIVING
TRUST TO EAGLE WOOD CUSTOM BUILDERS, INC. BY DEED DATED
JUNE 1, 2004 AND RECORDED SEPTEMBER 27, 2004 IN LIBER 11625
OF DEEDS, PAGE 1123, ORANGE COUNTY CLERK'S OFFICE.

SUBJECT TO THE DECLARATION OF COVENANTS, EASEMENTS AND
RESTRICTIONS DATED JUNE 14, 2005 AND RECORDED JUNE 20, 2005
IN LIBER 11876, PAGE 1530, ORANGE COUNTY CLERK.

SUBJECT TO THE DECLARATION OF PRIVATE ROAD, DRAINAGE AND
INFRASTRUCTURE MAINTENANCE, AGRICULTURAL AND RIDGELINE
PROTECTION DATED JANUARY 28, 2005 AND RECORDED MARCH 18,
2005 IN LIBER 11783, PAGE 754, ORANGE COUNTY CLERK.

TAX MAP NUMBER: 24-1-45.2  ADDRESS: 10  EAGLE WOOD VISTA
LN;  WARWICK, NY 10990

Tax id # 3354 890240000001045200 0000

·U01808514·
2441  2/1/2011  76957385/1

7 ₩

## AFFIDAVIT UNDER SECTION 255 OF THE NEW YORK STATE LAW
### (MODIFICATION AGREEMENT)

State of Texas }
}

County of Travis}

I, **R. Emmett Myatt**, Vice President, being duly sworn, deposes and says:

1. Grantors, EAGLE WOOD CUSTOM BUILDERS, INC conveyed property to Grantees, WILLIAM COVINO, by deed dated 9/13/2006, recorded on 10/10/2006 in volume 12276, page 341 in official records of ORANGE County, New York. Consideration of $10.00.
2. That he/she is the agent for the owner and holder of the hereinafter described mortgage, and is familiar with the facts set forth herein.
   a) A certain mortgage bearing the date of 5/16/2007, in the principal of SEVEN Hundred, FIFTY-TWO Thousand dollars and no cents ($752,000.00) was made by Mortgagee, Indymac Bank, FSB to Mortgagor, WILLIAM COVINO, recorded on 6/13/2007, in Liber 12465 at Page(s)1751, upon which mortgage a mortgage tax in the sum of $7866.00 was duly paid.
   ASSIGNED TO ONE WEST BANK FSB, RECORDED 11/2/2009, LIBER 12919, PAGE 1820.
3. The instrument offered for recording herewith is a Modification made by Mortgage Electronic Registration Systems, Inc. (MERS), as Nominee for Indymac Mortgage Services, A division of OneWest Bank, FSB to WILLIAM COVINO, effective 12/1/2010, and to be recorded in the ORANGE County Clerk's Office.
4. The instrument offered for recording modifies and does not create or secure any new or further lien, indebtedness or obligation other than the principal indebtedness or obligation secured by or which under any contingency may be secured by the recorded mortgage hereinabove first described with the exception of the following amount:
   a. Unpaid principal balance $748,168.13
   b. New unpaid principal balance $ 908,066.83
   c. b minus a equals $159,898.70
   d. Additional obligation secured by mortgage as modified

Additional mortgage recording tax of $~~1648.94~~ is therefore being paid on this Modification on the sum set forth in 4c. 1678.95
That Exemption from further tax is CLAIMED under Section 255 of the Tax Law.

R. Emmett Myatt, Vice President
Sworn before me to this 19th Day    of December 2011

Notary Public: Abigail R. Harris

ABIGAIL R. HARRIS
Notary Public, State of Texas
My Commission Expires
November 26, 2013

# Exhibit 7



Comptroller of the Currency

TREASURY DEPARTMENT

OF THE UNITED STATES

Washington, D. C.

*Whereas,* satisfactory evidence has been presented to the Comptroller of the Currency that OneWest Bank, FSB has complied with all provisions of the statutes of the United States required to be complied with before being authorized to commence the business of banking as a National Banking Association;

*Now, therefore,* I hereby certify that the above-named association is authorized to commence the business of banking as a National Banking Association under the title of

## OneWest Bank, National Association

located in *Pasadena,* State of *California,* effective *February 28, 2014.*

*In testimony whereof,* witness my signature and seal of office *February 28, 2014.*



Comptroller of the Currency

Charter No. 25079

# Exhibit 8

 Office of the Comptroller of the Currency

Western District
1225 17th St., Suite 300
Denver, CO 80202

August 3, 2015

Joseph M. Otting
President and CEO
CIT Bank, National Association
888 East Walnut Street
Pasadena, California 91101

Re:  Application to Merge CIT Bank, Salt Lake City, UT with and into OneWest Bank,
     National Association, Pasadena, CA.
     OCC Control Number: 2014-WE-Combination-139872

Dear Mr. Otting:

This letter is the official certification of the Comptroller of the Currency (OCC) of the merger
of CIT Bank, Salt Lake City, UT with and into OneWest Bank, National Association effective
as of August 3, 2015.  The resulting bank title is CIT Bank, National Association, charter
number 25079.

Sincerely,

David W. Finnegan
Senior Licensing Analyst
National Bank Examiner

# Exhibit 9

```
I6681-721          CIT BANK MORTGAGE SERVICING              LOAN HISTORY Y-T-D INV 001 CAT 100 INV# 0129510289 T13 12/30/17
                                                                                                          PAGE  41879

LN#    ███████    WILLIAM COVINO                                                                        EMP 0   P0F2
                                            28 NORTH DRIVE              ROCHELLE PARK        NJ 07662    0000

1ST MTGE PRIN 2ND MTGE PRIN  ESC BAL     REST ESC      SUSPENSE      ADV BAL    REPL RES  HUD BAL    LC BAL    INT DUE DUE DATE HUD PRT OF M
   386,647.91  474,906.68       .00          .00          .00 19,975.50        .00       .00       747.67        .00 11-01-16    .00 G5 F

  P & I 1ST  P&I 2ND   CO TAX CITY TAX  HAZ INS   M I P    LIEN  BSC  A & H      LIFE       MISC       REP RES   TOT PAYMT INT RATE DT BM
   1523.91      .00            437.43  367.83    .00 1126.67 .00    .00 0     .00 0      .00 0        .00      3780.12 .0300000  1 7
  OVER/SHORT AMT      324.28

    1ST ORIG MTG  2ND ORIG MTG     PRIN BAL BEG  INT IND  CAP FLAG  MTGR SSN      DEF INT BAL  PRIOR YR PPD INT  PPD INT IND  GPM ORG
       752,000     474,907          386,647.91                    136 70 2291         0.00            0           0           0

ASSUM-DT XFER-DEED FHA-SEC/NUM   LIP PAYOFF FC-TRK-SW YE-ACQ-RPT/DATE    SALE-ID EXEMPT PLGD-LN PMT-OPT CALC-METH ELOC BNKRPCY CH/DT
                                                      N/08-01-08

PMT PERIOD  1098-DET-HIST  POINTS-PAID/RPTG YR  SUPPR-MICR-STMT  DI-NOT-RPT-YR  REAS CAUS  RI-HDR-SW  1ST-DUE-DT     REO STAT/COMPL DT
   12                            .00                                             I                   08-08

IOE CREDIT YTD/W-H SW/W-H BALANCE   IORE CREDIT YTD/W-H SW/W-H BALANCE   CONSTR CD   NO PURGE FLAG/YR   BNKRPT STAT   LAST DEF DUE
   2.20              .00                         .00                                                                 11-50

REC CORP ADV BAL  3RD REC CORP ADV BAL   FORECL WKST CODE/REINSTATE DATE   INIT ESC STMT CODE / DATE   LOSS MIT STATUS/COMPL DATE
    5,174.70          3,420.43            A         02-10-15               9            05-16-07        R       11-13-14

   DUE  PROC  TP  SQ    AMOUNT    PRINCIPAL  PRINCIPAL  INTEREST    ESCROW    ESCROW   ADVANCE  STATUS    STATUS    UNEARNED    OTHER  CFD
   DATE DATE  TR NO    RECEIVED     PAID     BALANCE     PAID       PAID     BALANCE  BALANCE  AMOUNT    BALANCE   INT-BAL.    AMOUNTS DCT
BAL-FWD                                     861554.59                       4012.49    .00
01-17 01-10 3 13  1    CHECK #WIRE                                 5283.74- 1271.25-         PAYEE CD 310710021
                                                                                                                              2.20 P
11-16 01-10 1 61  2    1271.25        .00   861554.59      .00    1271.25      .00  1271.25    .00       .00        .00        .00 WB1

                                                                                                              386647.91 P1
                                                                                                              474906.68 P2
00-00 01-12 6 33  1       .00 PROCES NIV  REASON COIF INSPECTION FEE    CORP:SEQ     PAYEE 30T13   ORIG PAY PI3000    11.00 AT
                       CHECK #775502
11-16 01-17 1 52  1       .00        .00  861554.59      .00       .00      .00  1271.25    .00       .00        .00      34.96- 11
                                                                                                                              .00 WB
                                                                                                              386647.91 P1
                                                                                                              474906.68 P2
00-00 01-31 6 33  1       .00 PROCES NIV  REASON DAIF ACCES DENY INSPC  CORP:SEQ     PAYEE 50T13   ORIG PAY PI3000    11.00 AT
                       CHECK #776541
00-00 02-06 6 01  1       .00 PROCES PAS  REASON COIF INSPECTION FEE    CORP:SEQ 01 PAYEE 50R13   ORIG PAY           11.00 AR
                       CHECK #776787
00-00 02-06 7 66  2     11.00 PROCES PAS  REASON COIF INSPECTION FEE    CORP:SEQ     PAYEE 30T13   ORIG PAY          11.00 AT
11-16 02-16 1 52  1       .00        .00  861554.59      .00       .00      .00  1271.25    .00       .00        .00      34.96- 11
                                                                                                                              .00 WB
                                                                                                              386647.91 P1
                                                                                                              474906.68 P2
00-00 02-28 6 33  1       .00 PROCES NIV  REASON COIF INSPECTION FEE    CORP:SEQ     PAYEE 30T13   ORIG PAY PI3000    11.00 AT
                       CHECK #778124
03-17 02-28 3 51  2    CHECK #778072                              5090.00- 5090.00-         PAYEE CD 71324
11-16 02-28 1 61  3    5090.00       .00  861554.59      .00    5090.00      .00  6361.25    .00       .00        .00        .00 WB1

                                                                                                              386647.91 P1
                                                                                                              474906.68 P2
```

```
I6681-721              CIT BANK MORTGAGE SERVICING        LOAN HISTORY Y-T-D INV 001 CAT 100 INV# 0129510289 T13 12/30/17
LOAN-NO (CONT'D)                                                                                                PAGE 41880

LN#  _____       WILLIAM COVINO                                                                  EMP 0   P0F2

DUE   PROC  TP SQ   AMOUNT     PRINCIPAL  PRINCIPAL  INTEREST   ESCROW    ESCROW   ADVANCE  STATUS     STATUS   UNEARNED   OTHER   CFD
DATE  DATE  TR NO   RECEIVED   PAID       BALANCE    PAID       PAID      BALANCE  BALANCE  AMOUNT     BALANCE  INT-BAL.   AMOUNTS DCT
11-16 03-16 1 52 1     .00         .00    861554.59      .00       .00       .00   6361.25     .00        .00       .00    34.96- 11
                                                                                                                              .00 WB
                                                                                                                       386647.91 P1
                                                                                                                       474906.68 P2
00-00 03-21 6 33 1     .00 PROCES NIV   REASON EBPO EXTERIOR BPO      CORP:SEQ        PAYEE 30T13   ORIG PAY MS4855       95.00 AT
                    CHECK #779218
00-00 03-31 6 33 1     .00 PROCES NIV   REASON COIF INSPECTION FEE    CORP:SEQ        PAYEE 30T13   ORIG PAY PI3000       11.00 AT
                    CHECK #779895
11-16 03-31 1 60 2    2.20         .00    861554.59      .00      2.20      2.20   6361.25     .00        .00       .00        .00 WB1
                                                                                                                       386647.91 P1
                                                                                                                       474906.68 P2
11-16 04-03 1 68 1     .00         .00    861554.59      .00     2.20-       .00   6359.05     .00        .00       .00        .00 WB1
                                                                                                                             2.20 V
                                                                                                                       386647.91 P1
                                                                                                                       474906.68 P2
                                                                             BATCH CPI EDIT-SEQ 999999
00-00 04-04 6 01 1     .00 PROCES 5Z5   REASON EBPO EXTERIOR BPO   CORP:SEQ 01 PAYEE 50R13   ORIG PAY                   95.00 AR
                    CHECK #780013
00-00 04-04 7 66 1   95.00 PROCES 5Z5   REASON EBPO EXTERIOR BPO      CORP:SEQ        PAYEE 30T13   ORIG PAY            95.00 AT
00-00 04-12 6 32 1     .00 PROCES NIV   REASON FBTS TITLE SEARCH      CORP:SEQ        PAYEE 50R13   ORIG PAY MS5603    325.00 AR
                    CHECK #780478
11-16 04-17 1 52 1     .00         .00    861554.59      .00       .00       .00   6359.05     .00        .00       .00    34.96- 11
                                                                                                                              .00 WB
                                                                                                                       386647.91 P1
                                                                                                                       474906.68 P2
00-00 04-19 6 30 1     .00 PROCES NIV   REASON FBAA ADV ATTORNEY FEE  CORP:SEQ        PAYEE 50R13   ORIG PAY AT5577     78.00 AT
                    CHECK #780874
00-00 04-19 6 32 2     .00 PROCES NIV   REASON FBSC SVC COST/PUB      CORP:SEQ        PAYEE 50R13   ORIG PAY AT5577     55.00 AT
                    CHECK #780884
00-00 05-08 6 33 1     .00 PROCES NIV   REASON COIF INSPECTION FEE    CORP:SEQ        PAYEE 30T13   ORIG PAY PI3000     11.00 AT
                    CHECK #782247
11-16 05-16 1 52 1     .00         .00    861554.59      .00       .00       .00   6359.05     .00        .00       .00    34.96- 11
                                                                                                                              .00 WB
                                                                                                                       386647.91 P1
                                                                                                                       474906.68 P2
00-00 06-01 6 33 1     .00 PROCES NIV   REASON COIF INSPECTION FEE    CORP:SEQ        PAYEE 30T13   ORIG PAY PI3000     11.00 AT
                    CHECK #783638
00-00 06-02 6 01 1     .00 PROCES PAS   REASON COIF INSPECTION FEE    CORP:SEQ 01 PAYEE 50R13   ORIG PAY               11.00 AR
                    CHECK #783683
00-00 06-02 7 66 2   11.00 PROCES PAS   REASON COIF INSPECTION FEE    CORP:SEQ        PAYEE 30T13   ORIG PAY           11.00 AT
11-16 06-16 1 52 1     .00         .00    861554.59      .00       .00       .00   6359.05     .00        .00       .00    34.96- 11
                                                                                                                              .00 WB
                                                                                                                       386647.91 P1
                                                                                                                       474906.68 P2
00-00 06-21 6 31 1     .00 PROCES NIV   REASON TRIP TRIP CHARGES      CORP:SEQ        PAYEE 50R13   ORIG PAY PI3000     35.00 AR
                    CHECK #784654
00-00 06-21 6 31 2     .00 PROCES NIV   REASON RPOM OT MAINTAIN COST  CORP:SEQ        PAYEE 50R13   ORIG PAY PI3000      2.84 AR
                    CHECK #784654
00-00 06-30 6 33 1     .00 PROCES NIV   REASON COIF INSPECTION FEE    CORP:SEQ        PAYEE 30T13   ORIG PAY PI3000     11.00 AT
                    CHECK #785158
11-16 07-17 1 52 1     .00         .00    861554.59      .00       .00       .00   6359.05     .00        .00       .00    34.96- 11
                                                                                                                              .00 WB
```

```
I6681-721              CIT BANK MORTGAGE SERVICING        LOAN HISTORY Y-T-D INV 001 CAT 100 INV# 0129510289 T13 12/30/17
LOAN-NO (CONT'D)                                                                                        PAGE  41881

LN#          ▓▓▓▓▓   WILLIAM COVINO                                                              EMP 0  P0F2

  DUE   PROC  TP  SQ    AMOUNT    PRINCIPAL  PRINCIPAL  INTEREST   ESCROW    ESCROW    ADVANCE   STATUS    STATUS   UNEARNED    OTHER  CFD
  DATE  DATE  TR  NO   RECEIVED     PAID      BALANCE     PAID      PAID    BALANCE   BALANCE   AMOUNT    BALANCE   INT-BAL.   AMOUNTS DCT
                                                                                                                            386647.91 P1
                                                                                                                            474906.68 P2
00-00 08-01 6 33  1        .00 PROCES NIV  REASON COIF INSPECTION FEE      CORP:SEQ      PAYEE 30T13  ORIG PAY PI3000      11.00 AT
                        CHECK #786850
00-00 08-09 6 30  1        .00 PROCES NIV  REASON FBAA ADV ATTORNEY FEE    CORP:SEQ      PAYEE 50R13  ORIG PAY AT5577    1889.50 AR
                        CHECK #787290
11-16 08-16 1 52  1        .00         .00   861554.59        .00       .00        .00  6359.05      .00         .00      .00    34.96- 11
                                                                                                                               .00 WB
                                                                                                                            386647.91 P1
                                                                                                                            474906.68 P2
00-00 08-30 6 30  1        .00 PROCES NIV  REASON FBAA ADV ATTORNEY FEE    CORP:SEQ      PAYEE 50R13  ORIG PAY AT5577    1094.00 AR
                        CHECK #788371
00-00 08-31 6 33  1        .00 PROCES NIV  REASON COIF INSPECTION FEE      CORP:SEQ      PAYEE 30T13  ORIG PAY PI3000      11.00 AT
                        CHECK #788433
00-00 09-05 6 01  1        .00 PROCES PAS  REASON COIF INSPECTION FEE      CORP:SEQ 01 PAYEE 50R13   ORIG PAY             11.00 AT
                        CHECK #788546
00-00 09-05 7 66  2      11.00 PROCES PAS  REASON COIF INSPECTION FEE      CORP:SEQ      PAYEE 30T13  ORIG PAY             11.00 AT
09-17 09-14 3 15  1        CHECK #WIRE                        13616.45- 13616.45-                     PAYEE CD 310716055
11-16 09-14 1 61  2   13616.45         .00   861554.59        .00  13616.45       .00 19975.50      .00         .00      .00     .00 WB1

                                                                                                                            386647.91 P1
                                                                                                                            474906.68 P2
11-16 09-18 1 52  1        .00         .00   861554.59        .00       .00        .00 19975.50      .00         .00      .00    34.96- 11
                                                                                                                               .00 WB
                                                                                                                            386647.91 P1
                                                                                                                            474906.68 P2
00-00 10-03 6 33  1        .00 PROCES NIV  REASON COIF INSPECTION FEE      CORP:SEQ      PAYEE 30T13  ORIG PAY PI3000      11.00 AT
                        CHECK #789891
00-00 10-10 6 30  1        .00 PROCES NIV  REASON FBAA ADV ATTORNEY FEE    CORP:SEQ      PAYEE 50R13  ORIG PAY AT5577     766.50 AR
                        CHECK #790152
11-16 10-16 1 52  1        .00         .00   861554.59        .00       .00        .00 19975.50      .00         .00      .00    34.96- 11
                                                                                                                               .00 WB
                                                                                                                            386647.91 P1
                                                                                                                            474906.68 P2
00-00 10-31 6 33  1        .00 PROCES NIV  REASON COIF INSPECTION FEE      CORP:SEQ      PAYEE 30T13  ORIG PAY PI3000      11.00 AT
                        CHECK #791177
00-00 11-09 6 30  1        .00 PROCES NIV  REASON FBAA ADV ATTORNEY FEE    CORP:SEQ      PAYEE 50R13  ORIG PAY AT5577     761.50 AR
                        CHECK #791567
11-16 11-16 1 52  1        .00         .00   861554.59        .00       .00        .00 19975.50      .00         .00      .00    34.96- 11
                                                                                                                               .00 WB
                                                                                                                            386647.91 P1
                                                                                                                            474906.68 P2
00-00 12-05 6 33  1        .00 PROCES NIV  REASON COIF INSPECTION FEE      CORP:SEQ      PAYEE 30T13  ORIG PAY PI3000      11.00 AT
                        CHECK #792873
11-16 12-18 1 52  1        .00         .00   861554.59        .00       .00        .00 19975.50      .00         .00      .00    36.10- 11
                                                                                                                               .00 WB
                                                                                                                            386647.91 P1
                                                                                                                            474906.68 P2
00-00 12-27 6 33  1        .00 PROCES NIV  REASON COIF INSPECTION FEE      CORP:SEQ      PAYEE 30T13  ORIG PAY PI3000      11.00 AT
                        CHECK #794172
```

```
I6681-721           CIT BANK MORTGAGE SERVICING           LOAN HISTORY Y-T-D INV 001 CAT 100 INV# 0129510289 T13 12/30/17
LOAN-NO (CONT'D|    ▮▮▮▮▮▮▮                                                                                PAGE  41882

REQ-BY TOTALS    19,979.90                    .00                          .00                       5,085.08
     Y/E                         .00                  19,977.70

OTHER AMOUNT CODES:
A =FHA-PENALTY        B =                C =235-FEE           D =                E =CHG-OWNER-FEE-PD   F =MISC
G =SER-INT-PD TO POOL H =                I =A-H-PD            J =LIFE-PD          K =INT-DUE-PD         L =
M =ADVANCE-EFF-DATE   N =ADVANCE-MEMO-AMT O =                 P =ACCRUED-IOE/IORE  Q =SCHED-PMT-DUE-AMT  R =UE-INT-AMT
S =CR-LIFE-AMT        T =ORIG-FEE-AMT     U =REAPPLICATION-FEE V =ESCROW-ADVANCE   W =SUSPENSE           X =REPLACEMENT-RESERVE
Y =HUD-FUND           Z =RESTRICTED-ESCROW AA=SER-FEE-PD      AB=DEF/CAP-INT-PD   AC=LF-DEF/CAP-INT-PD  AD=CHECK-NO
AE=DEF/CAP-INT-LTD-PD AF=LF-DEF/CAP-INT-LTD AG=SUB-CODE       AH=                 AI=                   AJ=DEF-INT-ADJ-FLAG
AK=ADV-AMT-RECD       AL=TRAN-SOURCE      AM=IOC-SPEC-INT-PD  AN=NON-REC-CORP-ADV  AO=                   AP=DATE-STAMP
AQ=TIME-STAMP         AR=MTGR-REC-CORP-ADV AS=PREV-POSTED     AT=3RD-REC-CORP-ADV  AU=                   AV=
AW=                   AX=                 AY=ADJ YE 1098 IND  AZ=
P1=1ST PRIN BAL       P2=2ND PRIN BAL     WB=SUSP BAL
FEE CODES:            1=LATE-CHARGE        2=BAD-CK-FEE        3=CHG-OWNER          $=ELOC-FEE
```

```
I6681-721          ONEWEST BANK MORTGAGE SERVICING              LOAN HISTORY Y-T-D INV 001 CAT 100 INV# 0129510289 T13 12/31/16
                                                                                                      PAGE  63583

LN#      ███████      WILLIAM COVINO
                                         28 NORTH DRIVE              ROCHELLE PARK        NJ 07662       EMP 0  P0F0
                                                                                                        0000

1ST MTGE PRIN 2ND MTGE PRIN  ESC BAL    REST ESC     SUSPENSE      ADV BAL     REPL RES  HUD BAL    LC BAL   INT DUE DUE DATE HUD PRT OF M
 386,647.91   474,906.68    4012.49        .00          .00          .00         .00       .00     327.01      .00 11-01-16     .00 G5 3

 P & I 1ST  P&I 2ND   CO TAX CITY TAX  HAZ INS  M I P    LIEN   BSC A & H     LIFE       MISC     REP RES  TOT PAYMT INT RATE DT BM
 1523.91     .00        437.43 367.83    .00 1126.67  .00    .00 0    .00 0    .00 0      .00    3780.12 .0300000  1 9
 OVER/SHORT AMT    324.28

  1ST ORIG MTG  2ND ORIG MTG    PRIN BAL BEG  INT IND  CAP FLAG  MTGR SSN      DEF INT BAL  PRIOR YR PPD INT  PPD INT IND  GPM ORG
    752,000      474,907        392,687.13                       136 70 2291       0.00              0.00          0           0

ASSUM-DT XFER-DEED FHA-SEC/NUM    LIP PAYOFF FC-TRK-SW YE-ACQ-RPT/DATE    SALE-ID EXEMPT PLGD-LN PMT-OPT CALC-METH ELOC BNKRPCY CH/DT
                                                       N/08-01-08

PMT PERIOD  1098-DET-HIST  POINTS-PAID/RPTG YR  SUPPR-MICR-STMT  DI-NOT-RPT-YR  REAS CAUS  RI-HDR-SW  1ST-DUE-DT     REO STAT/COMPL DT
   12                            .00                                              I                   08-08

IOE CREDIT YTD/W-H SW/W-H BALANCE    IORE CREDIT YTD/W-H SW/W-H BALANCE    CONSTR CD   NO PURGE FLAG/YR    BNKRPT STAT    LAST DEF DUE
    48.55              .00               .00              .00                                                             11-50

REC CORP ADV BAL  3RD REC CORP ADV BAL    FORECL WKST  CODE/REINSTATE DATE   INIT ESC STMT CODE / DATE   LOSS MIT STATUS/COMPL DATE
    39.36              3,310.43               R          02-10-15            9          05-16-07          R          11-13-14

 DUE   PROC  TP  SQ   AMOUNT   PRINCIPAL  PRINCIPAL  INTEREST   ESCROW   ESCROW   ADVANCE  STATUS    STATUS   UNEARNED   OTHER   CFD
 DATE  DATE  TR  NO  RECEIVED    PAID      BALANCE     PAID      PAID   BALANCE  BALANCE  AMOUNT   BALANCE   INT-BAL.  AMOUNTS  DCT
BAL-FWD                                   867593.81                     4281.43     .00             .00        .00             .00 WB
00-00 01-11 6 01  1      .00 PROCES PAS  REASON COIF INSPECTION FEE     CORP:SEQ 01 PAYEE 50R13  ORIG PAY             11.00 AR
                  CHECK #753145
00-00 01-11 7 66  2    11.00 PROCES PAS  REASON COIF INSPECTION FEE     CORP:SEQ     PAYEE 30T13  ORIG PAY             11.00 AT
01-16 01-11 3 13  3   CHECK #WIRE                                  5249.13- 967.70-       PAYEE CD 310710021
                                                                                                                     2.58 P
12-15 01-11 1 61  4    967.70       .00  867593.81       .00   967.70      .00   967.70     .00             .00       .00 WB1

                                                                                                               392687.13 P1
                                                                                                               474906.68 P2
12-15 01-19 1 52  1      .00       .00  867593.81       .00      .00       .00   967.70     .00             .00     30.48- 11
                                                                                                                    .00 WB
                                                                                                               392687.13 P1
                                                                                                               474906.68 P2
12-15 02-04 1 72  1   3366.84    542.19  867051.62    981.72 1842.93  1842.93   967.70    .00             .00       .00 WB1
                                                                                 MPL-ID ESC1
                                                                                 PRV-PD FROM: 12-29-15   THRU: 02-04-16
                                                                                                               392144.94 P1
                                                                                                               474906.68 P2
12-15 02-04 1 68  2      .00       .00  867051.62       .00   967.70-  875.23     .00     .00             .00       .00 WB1
                                                                                 MPL-ID ESC1
                                                                                 BATCH 850 EDIT-SEQ 147735
                                                                                                                 967.70 V
                                                                                                               392144.94 P1
                                                                                                               474906.68 P2
12-15 02-04 1 72  3      .00       .00  867051.62       .00      .00    875.23     .00    .00             .00       .00 WB1
                                                                                 MPL-ID ESC1
                                                                                 BATCH 850 EDIT-SEQ 147735
                                                                                                               392144.94 P1
```

```
I6681-721          ONEWEST BANK MORTGAGE SERVICING          LOAN HISTORY Y-T-D INV 001 CAT 100 INV# 0129510289 T13 12/31/16
LOAN-NO (CONT'D)                                                                                               PAGE  63584

LN#        ████████    WILLIAM COVINO                                                                          EMP 0   P0F0

 DUE   PROC  TP  SQ    AMOUNT    PRINCIPAL    PRINCIPAL    INTEREST    ESCROW    ESCROW    ADVANCE   STATUS     STATUS    UNEARNED    OTHER  CFD
 DATE  DATE  TR  NO   RECEIVED     PAID        BALANCE       PAID       PAID    BALANCE   BALANCE   AMOUNT    BALANCE    INT-BAL.   AMOUNTS DCT
                                                                                                                                  474906.68 P2
                                                              HI 2                              BATCH 850 EDIT-SEQ 147735
00-00 02-05 6 33  1       .00 PROCES NIV  REASON DAIF ACCES DENY INSPC   CORP:SEQ      PAYEE 50T13   ORIG PAY PI3000     11.00 AT
                      CHECK #754786
01-16 02-16 1 52  1       .00         .00   867051.62       .00       .00    875.23      .00        .00        .00        .00     30.48- 11
                                                                                                                                    .00 WB
                                                                                                                                392144.94 P1
                                                                                                                                474906.68 P2
03-16 02-26 3 51  1   CHECK #756086                                  4414.00- 3538.77-           PAYEE CD 71324
                                                                                                                                   1.06 P
01-16 02-26 1 61  2   3538.77         .00   867051.62       .00   3538.77      .00    3538.77      .00        .00        .00        .00 WB1

                                                                                                                                392144.94 P1
                                                                                                                                474906.68 P2
00-00 02-29 6 33  1       .00 PROCES NIV  REASON DAIF ACCES DENY INSPC   CORP:SEQ      PAYEE 50T13   ORIG PAY PI3000     11.00 AT
                      CHECK #756188
01-16 03-14 1 72  1   3366.84      543.55   866508.07    980.36   1842.93   1842.93   3538.77      .00        .00        .00        .00 WB1
                                                                                    MPL-ID ESC1
                                                                                    PRV-PD FROM: 02-04-16  THRU: 03-14-16
                                                                                                                                391601.39 P1
                                                                                                                                474906.68 P2
                                                                                              BATCH 850 EDIT-SEQ 025680
01-16 03-14 1 68  2       .00         .00   866508.07       .00   1842.93-     .00    1695.84      .00        .00        .00        .00 WB1
                                                                                    MPL-ID ESC1

                                                                                                                                  1842.93 V
                                                                                                                                391601.39 P1
                                                                                                                                474906.68 P2
                                                                                              BATCH 850 EDIT-SEQ 025680
01-16 03-14 1 72  3       .00         .00   866508.07       .00       .00      .00    1695.84      .00        .00        .00        .00 WB1
                                                                                    MPL-ID ESC1

                                                                                                                                391601.39 P1
                                                                                                                                474906.68 P2
                                                              HI 2                              BATCH 850 EDIT-SEQ 025680
02-16 03-16 1 52  1       .00         .00   866508.07       .00       .00      .00    1695.84      .00        .00        .00     30.48- 11
                                                                                                                                    .00 WB
                                                                                                                                391601.39 P1
                                                                                                                                474906.68 P2
00-00 03-30 6 33  1       .00 PROCES NIV  REASON COIF INSPECTION FEE     CORP:SEQ      PAYEE 30T13   ORIG PAY PI3000     11.00 AT
                      CHECK #758175
02-16 03-31 1 60  1      3.64         .00   866508.07       .00      3.64     3.64    1695.84      .00        .00        .00        .00 WB1
                                                                                                                                391601.39 P1
                                                                                                                                474906.68 P2
02-16 04-01 1 68  1       .00         .00   866508.07       .00      3.64-     .00    1692.20      .00        .00        .00        .00 WB1
                                                                                                                                   3.64 V
                                                                                                                                391601.39 P1
                                                                                                                                474906.68 P2
                                                                                              BATCH CPI EDIT-SEQ 999999
00-00 04-06 6 01  1       .00 PROCES PAS  REASON COIF INSPECTION FEE     CORP:SEQ 01 PAYEE 50R13    ORIG PAY            11.00 AR
                      CHECK #758499
00-00 04-06 7 66  2     11.00 PROCES PAS  REASON COIF INSPECTION FEE     CORP:SEQ      PAYEE 30T13    ORIG PAY          11.00 AT
00-00 04-07 6 33  1       .00 PROCES NIV  REASON EBPO EXTERIOR BPO       CORP:SEQ      PAYEE 30T13    ORIG PAY MS4855   95.00 AT
                      CHECK #758579
```

```
I6681-721        ONEWEST BANK MORTGAGE SERVICING      LOAN HISTORY Y-T-D INV 001 CAT 100 INV# 0129510289 T13 12/31/16
LOAN-NO (CONT'D)                                                                                         PAGE  63585

LN#         ■■■■■■■      WILLIAM COVINO                                                             EMP 0   P0F0

 DUE  PROC  TP  SQ    AMOUNT   PRINCIPAL  PRINCIPAL  INTEREST  ESCROW    ESCROW   ADVANCE   STATUS     STATUS   UNEARNED    OTHER  CFD
 DATE DATE  TR  NO   RECEIVED    PAID      BALANCE     PAID     PAID    BALANCE   BALANCE   AMOUNT     BALANCE  INT-BAL.   AMOUNTS DCT
 02-16 04-15 1 73  1  4833.52      .00   866508.07     .00      .00       .00   1692.20      .00        .00       .00    4833.52 W 1
                                                                                                                        4833.52 WB
                                                                                              PRV-PD                    THRU: 04-15-16
                                                                                                                       391601.39 P1
                                                                                                                       474906.68 P2
                           SF:DR                                                                 BATCH 0KD EDIT-SEQ 999999 ACTION 1909
 02-16 04-15 1 73  2      .00    544.91   865963.16   979.00  1842.93   1842.93  1692.20      .00        .00       .00    3366.84-W 1
                                                                                                                        1466.68 WB
                                                                                              PRV-PD FROM: 03-14-16  THRU: 04-15-16
                                                                                                                       391056.48 P1
                                                                                                                       474906.68 P2
                                                                                                BATCH 929 EDIT-SEQ 999999 ACTION 0029
 02-16 04-15 1 68  3      .00      .00    865963.16     .00   1692.20-   150.73      .00      .00        .00       .00    1466.68 WB1
                                                                                                                        1692.20 V
                                                                                                                       391056.48 P1
                                                                                                                       474906.68 P2
                                                                                                BATCH 929 EDIT-SEQ 999999 ACTION 0029
 02-16 04-15 1 73  4      .00      .00    865963.16     .00      .00     150.73      .00      .00        .00       .00    1466.68 WB1
                                                                                                                       391056.48 P1
                                                                                                                       474906.68 P2
 00-00 05-09 6 01  1      .00 PROCES PAS  REASON EBPO EXTERIOR BPO     HI 2          CORP:SEQ 01 PAYEE 50R13  ORIG PAY       95.00 AR
                           CHECK #760889                                                         BATCH 929 EDIT-SEQ 999999 ACTION 0029
 00-00 05-09 7 66  2    95.00 PROCES PAS  REASON EBPO EXTERIOR BPO       CORP:SEQ       PAYEE 30T13  ORIG PAY      95.00 AT
 03-16 05-31 1 73  1  4833.52      .00    865963.16     .00      .00     150.73      .00      .00        .00       .00    4833.52 W 1
                                                                                                                        6300.20 WB
                                                                                              PRV-PD                    THRU: 05-31-16
                                                                                                                            .38 P
                                                                                                                       391056.48 P1
                                                                                                                       474906.68 P2
                           SF:DR                                                                 BATCH 0KF EDIT-SEQ 999999 ACTION 1909
 03-16 05-31 1 73  2      .00    546.27   865416.89   977.64  1842.93   1993.66      .00      .00        .00       .00    3366.84-W 1
                                                                                                                        2933.36 WB
                                                                                              PRV-PD FROM: 04-15-16  THRU: 05-31-16
                                                                                                                       390510.21 P1
                                                                                                                       474906.68 P2
                                                                                                BATCH 929 EDIT-SEQ 999999 ACTION 0029
 03-16 05-31 1 73  3      .00      .00    865416.89     .00      .00    1993.66      .00      .00        .00       .00    2933.36 WB1
                                                                                                                       390510.21 P1
                                                                                                                       474906.68 P2
                                                                                        HI 2            BATCH 929 EDIT-SEQ 999999 ACTION 0029
 04-16 06-30 1 73  1  4833.52      .00    865416.89     .00      .00    1993.66      .00      .00        .00       .00    4833.52 W 1
                                                                                                                        7766.88 WB
                                                                                              PRV-PD                    THRU: 06-30-16
                                                                                                                       390510.21 P1
                                                                                                                       474906.68 P2
                                                                                                BATCH 875 EDIT-SEQ 155140 ACTION 1029
 04-16 06-30 1 73  2      .00    547.63   864869.26   976.28  1842.93   3836.59      .00      .00        .00       .00    3366.84-W 1
                                                                                                                        4400.04 WB
                                                                                              PRV-PD FROM: 05-31-16  THRU: 06-30-16
                                                                                                                       389962.58 P1
                                                                                                                       474906.68 P2
```

```
I6681-721            ONEWEST BANK MORTGAGE SERVICING           LOAN HISTORY Y-T-D INV 001 CAT 100 INV# 0129510289 T13 12/31/16
LOAN-NO (CONT'D)                                                                                                PAGE  63586

LN#      ▉▉▉▉▉▉      WILLIAM COVINO                                                                    EMP 0   P0F0

 DUE   PROC   TP  SQ    AMOUNT    PRINCIPAL   PRINCIPAL   INTEREST    ESCROW      ESCROW   ADVANCE    STATUS      STATUS   UNEARNED       OTHER   CFD
 DATE  DATE   TR NO    RECEIVED     PAID       BALANCE      PAID       PAID      BALANCE   BALANCE    AMOUNT     BALANCE   INT-BAL.     AMOUNTS  DCT
                                                                                        BATCH 929 EDIT-SEQ 999999 ACTION 0029
04-16 06-30 1 73  3         .00        .00   864869.26        .00        .00    3836.59       .00       .00        .00        .00    4400.04 WB1
                                                                                                                                    389962.58 P1
                                                                                                                                    474906.68 P2
                                                                   HI 2                  BATCH 929 EDIT-SEQ 999999 ACTION 0029
05-16 06-30 1 73  4         .00     549.00   864320.26     974.91    2256.21    6092.80       .00       .00        .00        .00    3780.12-W 1
                                                                                                                                       619.92 WB
                                                                                        PRV-PD FROM: 06-30-16  THRU: 06-30-16
                                                                                                                                    389413.58 P1
                                                                                                                                    474906.68 P2
                                                                                        BATCH 929 EDIT-SEQ 999999 ACTION 0029
05-16 06-30 1 73  5         .00        .00   864320.26        .00        .00    6092.80       .00       .00        .00        .00     619.92 WB1
                                                                                                                                    389413.58 P1
                                                                   HI 2                  BATCH 929 EDIT-SEQ 999999 ACTION 0029      474906.68 P2
06-16 06-30 1 60  6        3.66        .00   864320.26        .00       3.66    6096.46       .00       .00        .00        .00     619.92 WB1
                                                                                                                                    389413.58 P1
                                                                                                                                    474906.68 P2
06-16 08-01 1 73  1     4833.52        .00   864320.26        .00        .00    6096.46       .00       .00        .00        .00    4833.52 W 1
                                                                                                                                    5453.44 WB
                                                                                        PRV-PD                   THRU: 08-01-16
                                                                                                                                      10.69 P
                                                                                                                                    389413.58 P1
                                                                                                                                    474906.68 P2
           SF:DR                                                                         BATCH V37 EDIT-SEQ 999999 ACTION 1909
06-16 08-01 1 73  2         .00     550.38   863769.88     973.53    2256.21    8352.67       .00       .00        .00        .00    3780.12-W 1
                                                                                                                                    1673.32 WB
                                                                                        PRV-PD FROM: 06-30-16  THRU: 08-01-16
                                                                                                                                    388863.20 P1
                                                                                                                                    474906.68 P2
                                                                                        BATCH 929 EDIT-SEQ 999999 ACTION 0029
06-16 08-01 1 73  3         .00        .00   863769.88        .00        .00    8352.67       .00       .00        .00        .00    1673.32 WB1
                                                                                                                                    388863.20 P1
                                                                   HI 2                                                              474906.68 P2
                                                                                        BATCH 929 EDIT-SEQ 999999 ACTION 0029
07-16 09-06 1 73  1     4833.52        .00   863769.88        .00        .00    8352.67       .00       .00        .00        .00    4833.52 W 1
                                                                                                                                    6506.84 WB
                                                                                        PRV-PD                   THRU: 09-06-16
                                                                                                                                      16.48 P
                                                                                                                                    388863.20 P1
                                                                                                                                    474906.68 P2
           SF:DR                                                                         BATCH 0KD EDIT-SEQ 999999 ACTION 1909
07-16 09-06 1 73  2         .00     551.75   863218.13     972.16    2256.21   10608.88       .00       .00        .00        .00    3780.12-W 1
                                                                                                                                    2726.72 WB
                                                                                        PRV-PD FROM: 08-01-16  THRU: 09-06-16
                                                                                                                                    388311.45 P1
                                                                                                                                    474906.68 P2
                                                                                        BATCH 929 EDIT-SEQ 999999 ACTION 0029
07-16 09-06 1 73  3         .00        .00   863218.13        .00        .00   10608.88       .00       .00        .00        .00    2726.72 WB1
                                                                                                                                    388311.45 P1
                                                                   HI 2                                                              474906.68 P2
                                                                                        BATCH 929 EDIT-SEQ 999999 ACTION 0029
```

```
I6681-721          ONEWEST BANK MORTGAGE SERVICING          LOAN HISTORY Y-T-D INV 001 CAT 100 INV# 0129510289 T13 12/31/16
LOAN-NO (CONT'D)                                                                                            PAGE  63587

LN#    ▉▉▉▉▉▉▉     WILLIAM COVINO                                                                        EMP 0    P0F0
```

| DUE DATE | PROC DATE | TP TR | SQ NO | AMOUNT RECEIVED | PRINCIPAL PAID | PRINCIPAL BALANCE | INTEREST PAID | ESCROW PAID | ESCROW BALANCE | ADVANCE BALANCE | STATUS AMOUNT | STATUS BALANCE | UNEARNED INT-BAL. | OTHER AMOUNTS | CFD DCT |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 09-16 | 09-14 | 3 15 | 1 | CHECK #WIRE | | | | 13406.27- | 2797.39- | | PAYEE CD | 310716055 | | 4.65 | P |
| 08-16 | 09-14 | 1 61 | 2 | 2797.39 | .00 | 863218.13 | .00 | 2797.39 | .00 | 2797.39 | .00 | .00 | .00 | 2726.72 | WB1 |
| 08-16 | 09-16 | 1 52 | 1 | .00 | .00 | 863218.13 | .00 | .00 | .00 | 2797.39 | .00 | .00 | .00 | 388311.45 / 474906.68 / 30.48- / 2726.72 / 388311.45 / 474906.68 | P1 / P2 / 11 / WB / P1 / P2 |
| 00-00 | 09-27 | 6 33 | 1 | .00 PROCES 75T | REASON STAX SALES TAX | | | | CORP:SEQ | | PAYEE 50R13 | ORIG PAY PS0684 | | 2.84 | AR |
| | | | | CHECK #769007 | | | | | | | | | | | |
| 00-00 | 09-27 | 6 33 | 2 | .00 PROCES 75T | REASON STAX SALES TAX | | | | CORP:SEQ | | PAYEE 50R13 | ORIG PAY PS0684 | | 2.84 | AR |
| | | | | CHECK #769007 | | | | | | | | | | | |
| 00-00 | 09-27 | 6 33 | 3 | .00 PROCES 75T | REASON STAX SALES TAX | | | | CORP:SEQ | | PAYEE 50R13 | ORIG PAY PS0684 | | 2.84 | AR |
| | | | | CHECK #769007 | | | | | | | | | | | |
| 00-00 | 09-27 | 6 33 | 4 | .00 PROCES 75T | REASON STAX SALES TAX | | | | CORP:SEQ | | PAYEE 50R13 | ORIG PAY PS0684 | | 2.84 | AR |
| | | | | CHECK #769007 | | | | | | | | | | | |
| 00-00 | 09-29 | 6 33 | 1 | .00 PROCES 75T | REASON STAX SALES TAX | | | | CORP:SEQ | | PAYEE 50R13 | ORIG PAY PI3000 | | 2.84 | AR |
| | | | | CHECK #769185 | | | | | | | | | | | |
| 00-00 | 09-29 | 6 33 | 2 | .00 PROCES 75T | REASON STAX SALES TAX | | | | CORP:SEQ | | PAYEE 50R13 | ORIG PAY PI3000 | | 2.84 | AR |
| | | | | CHECK #769185 | | | | | | | | | | | |
| 00-00 | 09-29 | 6 33 | 3 | .00 PROCES 75T | REASON STAX SALES TAX | | | | CORP:SEQ | | PAYEE 50R13 | ORIG PAY PI3000 | | 2.84 | AR |
| | | | | CHECK #769185 | | | | | | | | | | | |
| 00-00 | 09-29 | 6 33 | 4 | .00 PROCES 75T | REASON STAX SALES TAX | | | | CORP:SEQ | | PAYEE 50R13 | ORIG PAY PI3000 | | 2.84 | AR |
| | | | | CHECK #769185 | | | | | | | | | | | |
| 00-00 | 09-29 | 7 66 | 5 | 2.84 PROCES PAS | REASON STAX SALES TAX | | | | CORP:SEQ | | PAYEE 50R13 | ORIG PAY PS0684 | | 2.84 | AR |
| 00-00 | 09-29 | 7 66 | 6 | 2.84 PROCES PAS | REASON STAX SALES TAX | | | | CORP:SEQ | | PAYEE 50R13 | ORIG PAY PS0684 | | 2.84 | AR |
| 00-00 | 09-29 | 7 66 | 7 | 2.84 PROCES PAS | REASON STAX SALES TAX | | | | CORP:SEQ | | PAYEE 50R13 | ORIG PAY PS0684 | | 2.84 | AR |
| 00-00 | 09-29 | 7 66 | 8 | 2.84 PROCES PAS | REASON STAX SALES TAX | | | | CORP:SEQ | | PAYEE 50R13 | ORIG PAY PS0684 | | 2.84 | AR |
| 08-16 | 09-30 | 1 60 | 1 | 31.82 | .00 | 863218.13 | .00 | 31.82 | 31.82 | 2797.39 | .00 | .00 | .00 | 2726.72 / 388311.45 / 474906.68 | WB1 / P1 / P2 |
| 08-16 | 10-03 | 1 68 | 1 | .00 | .00 | 863218.13 | .00 | 31.82- | .00 | 2765.57 | .00 | .00 | .00 | 2726.72 / 31.82 / 388311.45 / 474906.68 | WB1 / V / P1 / P2 |
| 08-16 | 10-17 | 1 52 | 1 | .00 | .00 | 863218.13 | .00 | .00 | .00 | 2765.57 | .00 | .00 | .00 | BATCH CPI EDIT-SEQ 999999 / 30.48- / 2726.72 / 388311.45 / 474906.68 | 11 / WB / P1 / P2 |
| 00-00 | 10-31 | 6 33 | 1 | .00 PROCES NIV | REASON DAIF ACCES DENY INSPC | | | | CORP:SEQ | | PAYEE 50T13 | ORIG PAY PI3000 | | 11.00 | AT |
| | | | | CHECK #770955 | | | | | | | | | | | |
| 08-16 | 11-16 | 1 52 | 1 | .00 | .00 | 863218.13 | .00 | .00 | .00 | 2765.57 | .00 | .00 | .00 | 30.48- / 2726.72 / 388311.45 / 474906.68 | 11 / WB / P1 / P2 |
| 08-16 | 11-17 | 1 73 | 1 | 8613.64 | .00 | 863218.13 | .00 | .00 | .00 | 2765.57 | .00 | .00 | .00 | 8613.64 / 11340.36 | W 1 / WB |
| | | | | | | | | | | | PRV-PD | | THRU: 11-17-16 | 388311.45 | P1 |

```
I6681-721            ONEWEST BANK MORTGAGE SERVICING        LOAN HISTORY Y-T-D INV 001 CAT 100 INV# 0129510289 T13 12/31/16
LOAN-NO (CONT'D)                                                                                          PAGE  63588

LN#          ▮▮▮▮▮    WILLIAM COVINO                                                                       EMP 0  P0F0

 DUE  PROC  TP  SQ    AMOUNT    PRINCIPAL  PRINCIPAL  INTEREST  ESCROW    ESCROW   ADVANCE  STATUS    STATUS    UNEARNED    OTHER   CFD
 DATE DATE  TR NO    RECEIVED     PAID      BALANCE     PAID     PAID    BALANCE   BALANCE  AMOUNT   BALANCE   INT-BAL.    AMOUNTS  DCT
                                                                                                                        474906.68 P2
                                                                               BATCH 874 EDIT-SEQ 198772 ACTION 102T
08-16 11-18 1 73  1      .00     553.13   862665.00   970.78  2256.21   2256.21  2765.57     .00       .00        .00  11340.36-W 1
                                                                                                                            .00 WB
                                                                               PRV-PD FROM: 09-06-16  THRU: 11-17-16
                                                                                                                     387758.32 P1
                                                                                                                     474906.68 P2
                                                                               BATCH 4GY EDIT-SEQ 005428
08-16 11-18 1 68  2      .00        .00   862665.00      .00  2256.21-     .00    509.36     .00       .00        .00        .00 WB1
                                                                                                                        2256.21 V
                                                                                                                     387758.32 P1
                                                                                                                     474906.68 P2
                                                                               BATCH 4GY EDIT-SEQ 005428
08-16 11-18 1 73  3      .00        .00   862665.00      .00      .00      .00    509.36     .00       .00        .00        .00 WB1
                                                                                                                     387758.32 P1
                                                                                                                     474906.68 P2
                                                                    HI 2       BATCH 4GY EDIT-SEQ 005428
09-16 11-18 1 73  4      .00     554.51   862110.49   969.40  2256.21   2256.21  509.36      .00       .00        .00        .00 WB1
                                                                               PRV-PD FROM: 11-17-16  THRU: 11-17-16
                                                                                                                     387203.81 P1
                                                                                                                     474906.68 P2
                                                                               BATCH 4GY EDIT-SEQ 005428
09-16 11-18 1 68  5      .00        .00   862110.49      .00   509.36- 1746.85      .00      .00       .00        .00        .00 WB1
                                                                                                                         509.36 V
                                                                                                                     387203.81 P1
                                                                                                                     474906.68 P2
                                                                               BATCH 4GY EDIT-SEQ 005428
09-16 11-18 1 73  6      .00        .00   862110.49      .00      .00   1746.85      .00      .00      .00        .00        .00 WB1
                                                                                                                     387203.81 P1
                                                                                                                     474906.68 P2
                                                                    HI 2       BATCH 4GY EDIT-SEQ 005428
10-16 11-18 1 73  7      .00     555.90   861554.59   968.01  2256.21   4003.06      .00      .00      .00        .00        .00 WB1
                                                                               PRV-PD FROM: 11-17-16  THRU: 11-17-16
                                                                                                                     386647.91 P1
                                                                                                                     474906.68 P2
                                                                               BATCH 4GY EDIT-SEQ 005428
10-16 11-18 1 73  8      .00        .00   861554.59      .00      .00   4003.06      .00      .00      .00        .00        .00 WB1
                                                                                                                     386647.91 P1
                                                                                                                     474906.68 P2
                                                                    HI 2       BATCH 4GY EDIT-SEQ 005428
00-00 11-23 7 13  1   100.00 PROCES 042  REASON FBTS TITLE SEARCH      CORP:SEQ  PAYEE 50R13  ORIG PAY AT00244     100.00 AR
00-00 11-29 6 33  1      .00 PROCES NIV  REASON CAIF CANCL INSPCT FEE  CORP:SEQ  PAYEE 50T13  ORIG PAY PI3000        1.00 AT
                      CHECK #772560
11-16 12-16 1 52  1      .00        .00   861554.59      .00      .00   4003.06      .00      .00      .00        .00      34.96- 11
                                                                                                                            .00 WB
                                                                                                                     386647.91 P1
                                                                                                                     474906.68 P2
11-16 12-31 1 60  1     9.43        .00   861554.59      .00     9.43   4012.49      .00      .00      .00        .00        .00 WB1
                                                                                                                     386647.91 P1
                                                                                                                     474906.68 P2
```

```
I6681-721          ONEWEST BANK MORTGAGE SERVICING              LOAN HISTORY Y-T-D INV 001 CAT 100 INV# 0129510289 T13 12/31/16
LOAN-NO (CONT'D)  ███████████                                                                                  PAGE  63589

REQ-BY TOTALS     46,867.33              10,723.79                        .00                    7,629.94
    Y/E                    6,039.22                    22,800.46

OTHER AMOUNT CODES:
A =FHA-PENALTY        B =                 C =235-FEE           D =                  E =CHG-OWNER-FEE-PD   F =MISC
G =SER-INT-PD TO POOL H =                 I =A-H-PD            J =LIFE-PD           K =INT-DUE-PD         L =
M =ADVANCE-EFF-DATE   N =ADVANCE-MEMO-AMT O =                  P =ACCRUED-IOE/IORE  Q =SCHED-PMT-DUE-AMT  R =UE-INT-AMT
S =CR-LIFE-AMT        T =ORIG-FEE-AMT     U =REAPPLICATION-FEE V =ESCROW-ADVANCE    W =SUSPENSE           X =REPLACEMENT-RESERVE
Y =HUD-FUND           Z =RESTRICTED-ESCROW AA=SER-FEE-PD       AB=DEF/CAP-INT-PD    AC=LF-DEF/CAP-INT-PD  AD=CHECK-NO
AE=DEF/CAP-INT-LTD-PD AF=LF-DEF/CAP-INT-LTD AG=SUB-CODE        AH=                  AI=                   AJ=DEF-INT-ADJ-FLAG
AK=ADV-AMT-RECD       AL=TRAN-SOURCE      AM=IOC-SPEC-INT-PD   AN=NON-REC-CORP-ADV  AO=                   AP=DATE-STAMP
AQ=TIME-STAMP         AR=MTGR-REC-CORP-ADV AS=PREV-POSTED      AT=3RD-REC-CORP-ADV  AU=                   AV=
AW=                   AX=                 AY=ADJ YE 1098 IND   AZ=
P1=1ST PRIN BAL       P2=2ND PRIN BAL     WB=SUSP BAL
FEE CODES:            1=LATE-CHARGE       2=BAD-CK-FEE         3=CHG-OWNER          $=ELOC-FEE
```

| LoanNumber | FirstPrincipalBalance | NextPaymentDueDate | Zone | InvestorId | TransactionDate | DueDate | TotalAmount | TransactionCode |
|---|---|---|---|---|---|---|---|---|
| ■■■■ | 386,647.91 | 11/1/2016 | 5H | AB6 | 9/18/2018 | 11/1/2016 | 13862.75 | 161 |
| ■■■■ | 386,647.91 | 11/1/2016 | 5H | AB6 | 9/18/2018 | 9/1/2018 | -13862.75 | 315 |
| ■■■■ | 386,647.91 | 11/1/2016 | 5H | AB6 | 1/18/2019 | 11/1/2016 | 5548.14 | 161 |
| ■■■■ | 386,647.91 | 11/1/2016 | 5H | AB6 | 1/18/2019 | 1/1/2019 | -5548.14 | 313 |
| ■■■■ | 386,647.91 | 11/1/2016 | 5H | AB6 | 2/25/2019 | 11/1/2016 | 5515 | 161 |
| ■■■■ | 386,647.91 | 11/1/2016 | 5H | AB6 | 2/25/2019 | 3/1/2019 | -5515 | 351 |
| ■■■■ | 386,647.91 | 11/1/2016 | 5H | AB6 | 3/25/2019 | 11/1/2016 | -5515 | 168 |
| ■■■■ | 386,647.91 | 11/1/2016 | 5H | AB6 | 3/25/2019 | 11/1/2016 | 5515 | 161 |
| ■■■■ | 386,647.91 | 11/1/2016 | 5H | AB6 | 3/25/2019 | 11/1/2016 | 5515 | 163 |
| ■■■■ | 386,647.91 | 11/1/2016 | 5H | AB6 | 3/25/2019 | 3/1/2020 | -5515 | 351 |
| ■■■■ | 386,647.91 | 11/1/2016 | 5H | AB6 | 9/13/2019 | 11/1/2016 | 14168.87 | 161 |
| ■■■■ | 386,647.91 | 11/1/2016 | 5H | AB6 | 9/13/2019 | 9/1/2019 | -14168.87 | 315 |
| ■■■■ | 386,647.91 | 11/1/2016 | 5H | AB6 | 1/10/2020 | 11/1/2016 | 5633.84 | 161 |
| ■■■■ | 386,647.91 | 11/1/2016 | 5H | AB6 | 1/10/2020 | 1/1/2020 | -5633.84 | 313 |
| ■■■■ | 386,647.91 | 11/1/2016 | 5H | AB6 | 2/21/2020 | 11/1/2016 | 5182 | 161 |
| ■■■■ | 386,647.91 | 11/1/2016 | 5H | AB6 | 2/21/2020 | 3/1/2020 | -5182 | 351 |
| ■■■■ | 386,647.91 | 11/1/2016 | 5H | AB6 | 7/15/2020 | 11/1/2016 | 17258 | 169 |
| ■■■■ | 386,647.91 | 11/1/2016 | 5H | AB6 | 7/27/2020 | | -4314.5 | 304 |
| ■■■■ | 386,647.91 | 11/1/2016 | 5H | AB6 | 7/31/2020 | | -12943.5 | 304 |
| ■■■■ | 386,647.91 | 11/1/2016 | 5H | AB6 | 9/11/2020 | 11/1/2016 | 14425.19 | 161 |
| ■■■■ | 386,647.91 | 11/1/2016 | 5H | AB6 | 9/11/2020 | 9/1/2020 | -14425.19 | 315 |

| TransactionDescription | LN_ACQ_OR_S ALE_ID | LN_ACQ_DT | LN_SERV_SOLD_ID |
|---|---|---|---|
| ESCROW ADVANCE | CIT030118 | 3/1/2018 | |
| MISCELLANEOUS TAX BILLS | CIT030118 | 3/1/2018 | |
| ESCROW ADVANCE | CIT030118 | 3/1/2018 | |
| CITY TAX | CIT030118 | 3/1/2018 | |
| ESCROW ADVANCE | CIT030118 | 3/1/2018 | |
| HOMEOWNERS INSURANCE PREMIUM | CIT030118 | 3/1/2018 | |
| ESCROW ADVANCE REFUND | CIT030118 | 3/1/2018 | |
| ESCROW ADVANCE | CIT030118 | 3/1/2018 | |
| HAZARD INSURANCE REFUND | CIT030118 | 3/1/2018 | |
| HOMEOWNERS INSURANCE PREMIUM | CIT030118 | 3/1/2018 | |
| ESCROW ADVANCE | CIT030118 | 3/1/2018 | |
| MISCELLANEOUS TAX BILLS | CIT030118 | 3/1/2018 | |
| ESCROW ADVANCE | CIT030118 | 3/1/2018 | |
| CITY TAX | CIT030118 | 3/1/2018 | |
| ESCROW ADVANCE | CIT030118 | 3/1/2018 | |
| HOMEOWNERS INSURANCE PREMIUM | CIT030118 | 3/1/2018 | |
| | CIT030118 | 3/1/2018 | |
| Restricted Escrow Disbursement | CIT030118 | 3/1/2018 | |
| Restricted Escrow Disbursement | CIT030118 | 3/1/2018 | |
| ESCROW ADVANCE | CIT030118 | 3/1/2018 | |
| MISCELLANEOUS TAX BILLS | CIT030118 | 3/1/2018 | |

# Exhibit 10



**ORANGE COUNTY – STATE OF NEW YORK**
**ANN G. RABBITT, COUNTY CLERK**
**255 MAIN STREET**
**GOSHEN, NEW YORK 10924**

---

**COUNTY CLERK'S RECORDING PAGE**
**\*\*\*THIS PAGE IS PART OF THE DOCUMENT – DO NOT DETACH\*\*\***

---



```
                                 Recording:

                                 Recording Fee                30.00
                                 Cross References              0.50
                                 Cultural Ed                   14.25
                                 Records Management - Coun     1.00
                                 Records Management - Stat     4.75

BOOK/PAGE:  14994 / 1178                                    _____
INSTRUMENT #:  20210043465       Total:                       50.50
                                 **** NOTICE: THIS IS NOT A BILL ****
Receipt#: 2913647
Clerk:    PM
Rec Date: 07/01/2021 12:38:58 PM
Doc Grp:  RP
Descrip:  AST
Num Pgs:  2
Rec'd Frm: AMERICAN MORTGAGE INVESTMENT
PARTNERS MANAGEMENT, LLC

Party1:   CIT BANK
Party2:   WILMINGTON SAVINGS FUND SOCIETY
TR
Town:     MISCELLANEOUS
          24-1-45.2
```

Payment Type:       Check ___
            Cash ___
         Charge ___
         No Fee ___

Comment: _____

Ann G. Rabbitt
Orange County Clerk

```
                                 Record and Return To:


                                 ELECTRONICALLY RECORDED BY SIMPLIFILE
```

Recording Requested By/Return To:
AMIP Management
Attn: Dena Noble
3020 Old Ranch Pkwy #180
Seal Beach, CA 90740

Servicer ID: 63334

### ASSIGNMENT OF MORTGAGE

**Section 24  Lot 45.2  Block 1**

For Value Received, CIT BANK, N.A, FKA ONEWEST BANK, N.A., FKA ONEWEST BANK, FSB (herein "Assignor"), whose address is 75 NORTH FAIR OAKS AVENUE, PASADENA, CA 91103 does hereby grant, sell, assign, transfer and convey, unto WILMINGTON SAVINGS FUND SOCIETY, FSB, AS OWNER TRUSTEE OF THE RESIDENTIAL CREDIT OPPORTUNITIES TRUST VI-A, (herein "Assignee"), whose address is 3020 OLD RANCH PARKWAY, STE 180, SEAL BEACH, CA 90740, a certain described  MORTGAGE, together with the note(s) and obligations therein described and the money due and to become due thereon with interest, and all rights accrued or to accrue under such MORTGAGE.

Mortgage by William Covino, a single man to IndyMac Bank, F.S.B., its successors and assigns, in the amount of $752,000.00 dated 05/16/2007 and recorded 06/13/2007 in Book 12465, Page 1751 as Inst# 20070067112 in Orange County, NEW YORK

Assignment dated 08/21/2009 from IndyMac Bank, F.S.B. to OneWest Bank, FSB filed for record 11/02/2009 in Book 12919, Page 1820 as Inst# 20090107391 in Orange County, NY.

Property Address: **10 EAGLE WOOD VISTA LN, WARWICK, NY 10990**

*This assignment is not subject to the requirements of Section 275 of the Real Property Law because it is an assignment within the secondary mortgage market.*

IN WITNESS WHEREOF, the undersigned Assignor has executed this Assignment of MORTGAGE on 6 17 202 1 , 20__.

CIT BANK, N.A, FKA ONEWEST BANK, N.A., FKA ONEWEST BANK, FSB
By: American Mortgage Investment Partners Management, LLC, its Attorney-in-Fact

By: _____
Ron McMahan
CEO        **POA Submitted Herewith**

---

*A Notary Public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.*

---

State of California
County of Orange

On 6 17 2021 before me, Valya Fisher,  the undersigned Notary Public, personally appeared Ron McMahan who proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument the person or the entity upon behalf of which the person acted, executed the instrument.

I certify under penalty of perjury under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal

Signature_____
Valya Fisher, Notary Public

VALYA FISHER
Notary Public - California
Orange County
Commission # 2283516
My Comm. Expires Mar 29, 2023